1                         STATE OF MICHIGAN

2              IN THE 44TH CIRCUIT COURT (LIVINGSTON COUNTY)

3    PEOPLE OF THE STATE OF MICHIGAN,

4    v                                  Case Number: 18-25329-FH

5    GARY THOMAS FISCHER,

6            Defendant.
     _____/

7

8                      JURY TRIAL - VOLUME I

9         BEFORE THE HONORABLE SUZANNE GEDDIS, CIRCUIT JUDGE

10            Howell, Michigan - Monday, March 4, 2019

11
     APPEARANCES:
12
     For the People:              MR. MICHAEL TAYLOR (P49497)
13                                Assistant Prosecuting Attorney
                                  210 South Highlander Way
14                                Howell, Michigan 48843
                                  (517) 546-1850
15

16   For the Defendant:          MR. ROLLAND SIZEMORE (P52758)
                                  Attorney at Law
17                                207 N. Michigan Ave., #202
                                  Howell, Michigan 48843
18                                (517) 548-2411

19

20
     TRANSCRIBED BY:             Ms. Emily Whetsell, CER9160
21                                Certified Electric Recorder
                                  (941) 928-4627
22

23

24

25

1                          TABLE OF CONTENTS

2
                                                              PAGE
3    WITNESSES:      PEOPLE

4    HEATHER MINER

5        Direct Examination by Mr. Taylor             90
         Cross-Examination by Mr. Sizemore           165
6        Redirect Examination by Mr. Taylor          193

7    DAVID FOGO

8        Direct Examination by Mr. Taylor            199
         Cross-Examination by Mr. Sizemore           233
9        Redirect Examination by Mr. Taylor          246

10

11

12   WITNESSES:      DEFENDANT

13   NONE

14

15   Jury sworn                                       13

16   Jury Voir Dire                                   20

17   Jury Impaneled                                   60

18   People's Opening Statement                       78

19

20   EXHIBITS:                     IDENTIFIED        ADMITTED

21       PX#1-11, 13-22 - photos        3               5

22

23

24

25

1              Howell, Michigan

2              Monday, March 4, 2019 - 9:04 a.m.

3              THE COURT:  Okay, I'm going to call the case of

4       People versus Fischer.

5              MR. TAYLOR:  Michael Taylor for the People.

6              MR. SIZEMORE:  Good morning, Your Honor, Rolland

7       Sizemore appearing on behalf of and in the absence of Mr.

8       Fischer, who is in, back in the lockup; I've spoken to him

9       already this morning.

10             MR. TAYLOR:  Your Honor, we have reviewed potential

11      exhibits in this case.  The parties have stipulated to the

12      admissions of 21 of the 22 People's proposed exhibits.

13      That's one through 22, with the exception of number 12.  I

14      believe Mr. Sizemore wants to lodge an objection as that one,

15      I would ask the Court to make a pretrial ruling on it.

16             (At 9:04 a.m., PX#1 though PX#22 identified)

17             THE COURT:  Okay, what would be the purpose of

18      introducing this particular exhibit?

19             MR. TAYLOR:  Your Honor, as an offer of proof, the

20      defendant is charged with a count of resisting, obstructing a

21      police officer after they were dispatched to the scene.  They

22      gave him lawful commands and he decided to flee from them and

23      then become actively resistant and it wasn't until multiple

24      instances of indicating they were the police that the

25      defendant became passively resistant.  I think that photo is

1   indicative of his demeanor on the night in question and

2   informs the jury of his attitude towards the police and I

3   think that it's relevant.

4      THE COURT:  Mr. Sizemore?

5      MR. SIZEMORE:  On information, I believe the

6   resisting and obstruction count is based upon behavior that

7   happened outside of the house, outside of the scene of the

8   other alleged incidents.  I believe this picture was taken

9   sometime later and at a different location, most likely the

10   jail.  So I'm not sure that it's relevant to anything to do

11   with any charged offense that the prosecutor has brought.

12   Also, I would say on a straight MRE 403, uh, analysis, the

13   danger of unfair prejudice greatly outweighs any probative

14   value of that picture would have.  There are rules about when

15   you can and can't use a defendant's mug shot.  The most

16   common one that I see is when they change their appearance

17   before trial so you can show them legitimately what he looked

18   like on that date.  Mr. Fischer has not changed his

19   appearance dramatically at all and there is another picture

20   right behind the one with the fingers that would allow a jury

21   to pass, uh, on identity.  So I don't think there's any

22   relevance of it and I think a 403 analysis would keep that

23   picture out.

24      THE COURT:  Well, since I haven't seen all the

25   exhibits, and since I don't know all of the facts in this

1       case, I'm going to take this matter under advisement at this

2       time and, um, it is questionable whether or not this is

3       probative of anything.  I understand the argument that it

4       shows some, an attitude, if you will, um, towards the,

5       towards the police.  It does appear to have, um, been taken

6       at the police station.  It looks like they're cinderblock

7       walls, so it does look like it was at the police station.  So

8       I think I'm going to wait and hear the facts and then make my

9       determination.  So I'm going to take it under advisement.

10      And that's number 12 of the exhibits.

11                    MR. TAYLOR:  Thank you, Your Honor.

12                    THE COURT:  However, exhibits one though 21 have

13      been admitted, except for 12.  Is that correct?

14                    MR. TAYLOR:  Twenty-two.

15                    MR. SIZEMORE:  Twenty-two, Your Honor.

16                    THE COURT:  Twenty-two.

17                    MR. TAYLOR:  Yes, Your Honor.

18                    MR. SIZEMORE:  And yes, I would stipulate to the

19      admission of all but People's proposed 12.

20                    MR. TAYLOR:  Thank you.

21                    THE COURT:  Thank you.

22                    (At 9:08 a.m., PX#1 through PX#11 and PX#13 through

23                    PX#22 admitted by stipulation)

24                    THE COURT:  Are you all set, Mr. Sizemore?

25                    MR. SIZEMORE:  No, I still don't have my jury list.

1    I can try to go find it.

2                THE COURT:  Why doesn't he have a jury list?

3                COURT CLERK:  I don't know.  He said that she was

4    getting a copy.  It would have been easier if I just took his

5    and went in chambers and copied it.

6                MR. TAYLOR:  I, I really don't mind, if it would be

7    faster.

8                COURT CLERK:  Well, he just --

9                MR. TAYLOR:  I think he's just frustrated because -

10   -

11               COURT CLERK:  Do you want to catch him and I'll

12   just make the copy?

13               MR. TAYLOR:  Sure.

14               COURT CLERK:  Help expedite this.

15               THE COURT:  Are you just a spectator?

16               UNIDENTIFIED SPEAKER:  Yes.

17               THE COURT:  Okay.  When the jury comes in, make

18   sure that you move down all the way.

19               UNIDENTIFIED SPEAKER:  Okay.

20               THE COURT:  Okay?

21               UNIDENTIFIED SPEAKER:  Does it matter which side?

22               THE COURT:  That, either side; it doesn't matter.

23   It's just, we want you to move all the way down because the

24   jury will take up room.  As soon as we pick a jury, then

25   there will be plenty of room for you.

1            UNIDENTIFIED SPEAKER:  Okay.

2            THE COURT:  All right.

3            MR. TAYLOR:  Hi (indecipherable).

4            THE COURT:  She just went in to make a copy.  So

5     let's go.  You need to hurry.  Well, Mr. Sizemore needs a

6     copy of the --

7            THE COURT:  Yup.

8            MR. SIZEMORE:  Thank you so much.

9            THE COURT:  And do we have an envelope?

10            COURT CLERK:  If you could just return that to me,

11     okay?

12            MR. SIZEMORE:  Absolutely.

13            COURT CLERK:  Yes.

14            THE COURT:  Could I see it?

15            MR. TAYLOR:  Do you want me to put the exhibits

16     down --

17            THE COURT:  Just give it to me.

18            MR. TAYLOR:  -- (indecipherable) as like a common

19     area for you to retrieve them from so we're not, like,

20     searching for them?

21            MR. SIZEMORE:  Sure.

22            UNIDENTIFIED SPEAKER:  The names are

23     (indecipherable).

24            MR. TAYLOR:  So, Felicia, if you're ever looking

25     for the exhibits --

1     UNIDENTIFIED SPEAKER:  I'll take them --

2     MR. TAYLOR:  -- we're going to keep them right here

3 throughout the trial.

4     COURT CLERK:  Okay.

5     THE COURT:  What is it say?  Call after March 8th?

6     COURT CLERK:  March, call back this Friday, March

7 8th, after 5:30.  I'm going to give this to you

8 (indecipherable).

9     MR. SIZEMORE:  Wenzel, what?

10     THE COURT:  What's wrong?

11     MR. SIZEMORE:  I just see Bradley Wenzel and I'm

12 wondering if he's related to Kathy.

13     MR. TAYLOR:  No prosecutors or police officers I've

14 noticed this time, which will make it a little smoother.

15     MR. SIZEMORE:  That's good.

16     THE COURT:  There is a trooper in there.

17     MR. SIZEMORE:  There's a trooper in here?

18     THE COURT:  Yeah.

19     MR. TAYLOR:  Which one?

20     THE COURT:  Trooper Sivy.  O-

21     MR. TAYLOR:  Olivia Sivy.

22     THE COURT:  Olivia Sivy.

23     MR. TAYLOR:  Sivy is in there?

24     MR. SIZEMORE:  Oh.

25     THE COURT:  Yup.

1          MR. TAYLOR:  Ah, see, proved me wrong.

2          THE COURT:  I just looked really quickly through

3     the thing just to see if I knew anybody because I never know.

4          COURT CLERK:  Thank you.

5          MR. TAYLOR:  Thank you.

6          COURT CLERK:  Is this another set?

7          THE COURT:  No, let Rolland have a minute.  Are you

8     ready for your client or do you want a few minutes?

9          MR. SIZEMORE:  Um, no, I'm ready; that's fine.

10         THE COURT:  Okay.  You can bring him up.  Thank

11    you.

12         COURT CLERK:  You're welcome.

13         MR. TAYLOR:  Everybody things that --

14         THE COURT:  I just have to the duty of reminding

15    you, otherwise, I get in big trouble and I think, you know,

16    that's kind of hard for me to remember.  Why don't they sit

17    that on something, you know?  Like a piece of paper to hand

18    out or something, you know?

19         COURT CLERK:  Yeah.

20         THE COURT:  Because jurors have to remember that

21    too.

22         COURT CLERK:  Yeah, there should be something

23    that's handed out.

24         MR. SIZEMORE:  So this is a full copy of all the

25    reports.

1          THE COURT:  But she needs somebody, so --

2          (At 9:13 a.m., Court recessed)

3          (At 9:19 a.m., Court reconvened)

4          THE COURT:  -- Fischer, we should be on the record.

5          MR. TAYLOR:  Michael Taylor for the People.

6          MR. SIZEMORE:  Good morning, Your Honor.  Rolland

7     Sizemore appearing with and on behalf of Gary Fischer.

8          THE COURT:  Okay.  This matter is scheduled for

9     trial today.  This is file 18-25329-FH.  And are the People

10    ready for trial?

11         MR. TAYLOR:  We are, Your Honor.  We're ready for

12    the jury.

13         THE COURT:  Mr. Sizemore?

14         MR. SIZEMORE:  Yes, Your Honor.  Yes.

15         THE COURT:  No preliminary motions other than the

16    one we took out regarding the one exhibit?

17         MR. SIZEMORE:  Correct.  I move to sequester, but -

18    -

19         MR. TAYLOR:  Stipulate.

20         THE COURT:  All right, I will grant sequestration

21    and if we're ready for the jury to come down?

22         MR. SIZEMORE:  Yes, Your Honor.

23         THE COURT:  You can go get them.  I can't even see

24    half the jurors.

25         COURT CLERK:  Do you want that screen on the other

10

1        side, the monitor on the other side?

2                    THE COURT:  That might be better.  I don't know if

3        it goes that way.  Yeah, of course, if he left another court

4        --

5                    (At 9:23 a.m., jury brought in)

6                    THE COURT:  Bailiff, is that everyone?

7                    THE BAILIFF:  Yes, Judge.

8                    THE COURT:  Okay, very good.  Again, thank you for

9        being here.  We do appreciate your service.  This is an

10       important place in our society and we welcome you here.

11       Ladies and gentlemen, I am Judge Suzanne Geddis and it is my

12       pleasure and privilege to welcome you to the Livingston

13       County 44th Circuit Court.  I know that jury duty may be a

14       new experience for some of you.  Jury duty is one of the most

15       serious duties that members of a free society are asked to

16       perform.  Our system of self-government could not exist

17       without it.  The jury is an important part of this Court.

18       The right to a jury is an ancient tradition and part of our

19       heritage.  The law says that both a person who is accused of

20       a crime and the prosecution have the right to a trial, not by

21       one person, but a jury of 12 impartial persons.  Jurors must

22       be as free as humanly possible from bias, prejudice, or

23       sympathy for either side.  Each side in a trial is entitled

24       to jurors who keep open minds until the time comes to decide

25       the case.

1          A trial begins with jury selection.  The purpose of

2     this process is to obtain information about you that will

3     help us choose a fair and impartial jury to hear this case.

4     During jury selection, the lawyers and I will ask you some

5     questions.  This is called voir dire.  The questions are

6     meant to find out if you know anything about the case.  Also,

7     we need to find out if you have any opinions or personal

8     experiences that might influence you for or against the

9     prosecution, the defendant, or any witnesses.

10         One or more of these things could cause you to be

11    excused in this particular case, even though you may

12    otherwise be qualified to be a juror.  The questions may

13    probe deeply into your attitudes, beliefs, and experiences.

14    They are not meant to be an unreasonable prying into your

15    private life.  The law requires that we get this information

16    so that an impartial jury can be chosen.  If you do not hear

17    or understand a question, you should say so.  If you do

18    understand it, you should answer it truthfully and

19    completely.  Please do not hesitate to speak freely about

20    anything you believe we should know.

21         During jury selection, you may be excused from

22    serving on the jury in one of two ways.  First, I may excuse

23    you for cause.  That is, I may decide that there is a valid

24    reason why you cannot or should not serve in this case.  Or a

25    lawyer from one side or the other may excuse you without

1    giving any reason for doing so.  This is called a preemptory

2    challenge.  The law gives each party the right to excuse a

3    certain number of jurors in this way.  If you are excused,

4    you should not feel bad or take it personally.  As I

5    explained before, there simply may be something that causes

6    you to be excused from this particular case.

7              I will now ask you to stand and to swear to answer

8    truthfully, fully, and honestly all the questions that you

9    will be asked about your qualifications to serve as a juror

10   in this case.  If you have religious beliefs against taking

11   an oath, you may affirm that you will answer all the

12   questions truthfully, fully, and honestly.  If you'd all

13   stand and raise your right hands, here is your oath:  Do you

14   solemnly swear or affirm that you will truthfully and

15   completely answer all questions about your qualifications to

16   serve as jurors in this case?

17              JURY:  Yes.

18              (At 9:28 a.m., jury sworn in)

19              THE COURT:  Okay, thank you.

20              I'd like to introduce you to the members of my

21   staff.  This is Felicia Millhouse.  She is the court recorder

22   and keeps track of everything that is said in the courtroom.

23   This is Carla Billadew.  She is my judicial secretary.  She

24   ordinarily is not out here, but she is assisting Felicia in

25   picking this jury.  And then I have a research attorney named

1      Jacqueline Kominski.

2            This is a criminal case involving the charges of

3      home invasion first degree, interfering with a crime report,

4      committing a crime, threatening to kill or injury, assaulting

5      a police officer, re-, resisting, obstructing a police

6      officer, and aggravated assault, which I will explain more

7      fully later.  These charges have been made against the

8      defendant, who is Gary Thomas Fisher.  The defendant's lawyer

9      is Rolland Sizemore.  The lawyer for the State is assistant

10     prosecuting attorney, Michael Taylor.  Mr. Taylor, will you

11     please stand and introduce yourself, the members of your

12     office, your officer in charge, and the names of the

13     witnesses that you may call in this trial?

14            MR. TAYLOR:  Certainly, Your Honor.  Thank you.

15            So as the judge said, my name is Mike Taylor.  I'm

16     an assistant prosecutor here with Livingston County.  My boss

17     is Bill Vailliencourt, the elected prosecutor.  We have Pam

18     Maas, Bill Warden, Shawn Ryan, Angela DelVero, Scott

19     Ehlfledt, Kim Morrison, and Marilyn Bradford.  Anyone else

20     that you know that either works as a prosecutor or a support

21     staff for the Livingston County prosecutor's office, make

22     sure you let us know when you get up in the box.

23            Other witnesses you may hear from in this case is

24     our officer in charge, Sergeant Fogo, from Howell Police.

25     Officer Alisha Valance, also from Howell, Deputies McNamarra

14

```
 1        and Burke from the sheriff's department, Heather Miner of
 2        Howell, and potentially a representative of the 911 dispatch.
 3        If you know anyone who works at any of those agencies or any
 4        one of those you think you might know, when you get up to the
 5        box, just let us know.  Thank you.
 6             THE COURT:  Thank you.  Mr. Sizemore, would you
 7        please stand and introduce yourself, any associates you may
 8        have, your client, and the names of any witnesses that you
 9        may call during the trial.
10             MR. SIZEMORE:  Thank you, Your Honor.
11             Good morning, my name is Rolland Sizemore.  I work
12        as a sole practitioner here in Howell.  I am affiliated with
13        the Kaiser Law Firm.  The lawyers at that, at that law firm
14        are Tom Kaiser, Steve Lackamari, Bridge Brissari, Andrea
15        Bandfield.  If you know any of them, if you get into the box,
16        please let us know.  In addition to the prosecutor's
17        witnesses that he identified, Mr. Fischer may very well
18        testify.
19             MR. FISCHER:  Good morning.
20             MR. SIZEMORE:  That's it, thank you.
21             THE COURT:  Thank you.  We think this trial, as
22        I've told you, will last two to three days, but there's no
23        promises.  We believe that it will be two to three days.  If
24        you believe that the length of the trial will be a real
25        hardship for you, you'll let us know when you get into the
```

1       box.  Some of you may have health problems that would prevent

2       you from serving on a jury.  For example, if anyone has a

3       medical problem or makes you unable to sit for two or three

4       hours at a time, then we are going to want to know that when

5       you are in the box.  And if anyone has any problems with

6       sight or hearing problems, I will be asking you about that as

7       well.

8               This is a criminal case.  The paper used to charge

9       the defendant with a crime is called an information.  The

10      information in this case charges the defendant, Gary Thomas

11      Fischer, with home invasion first degree, interfering with a

12      crime report, committing a crime, threatening to kill or

13      injure, also resisting and obstructing a police officer, and

14      aggravated assault.  I will now read to you what the

15      information says.

16              The information is a piece of paper that gives the

17      defendant and the jurors notice as to what the charges are.

18      It reads as follows: that on or about September 18, 2018, in

19      Howell City, in Livingston County, the defendant did

20      allegedly break and enter or did enter without permission a

21      dwelling located at 1629 Weland Street and while present in

22      or exiting did commit an assault.  While entering, present

23      in, or exiting the dwelling, Heather Miner was lawfully

24      present there in contrary to state law.  Count two, that on

25      that date in that location that the defendant allegedly did,

16

1    through the unlawful use of physical force, prevent or

2    attempt to prevent another person from reporting a crime,

3    committed or attempted by another person.  And the violation

4    involved committing or attempting to commit home invasion

5    first degree against a person against state law.  Count

6    three, it's alleged on that date in that location that the

7    defendant did assault, batter, wound, resist, obstruct,

8    oppose, or endanger Sergeant Fogo, a police officer of Howell

9    Police Department and the defendant knew or had reason to

10   know was performing his duties as a police officer, contrary

11   to state law.  And that count four is aggravated assault,

12   that on that date, in that location, that the defendant did

13   make an assault without being armed with a weapon upon

14   Heather Miner and did inflict a serious or aggravated injury

15   upon said person, but without intending to commit the crime

16   of murder or to inflict great bodily harm, less than the

17   crime of murder, contrary to state law.

18        The defendant has pled not guilty to these charges.

19   You should clearly understand that the information I have

20   read is not evidence.  An information is read in every

21   criminal trial so that the defendant and the jury can hear

22   the charges.  You must not think it is evidence of his guilt

23   or that he must be guilty because he has been charged.

24        A person accused of a crime is presumed to be

25   innocent.  This means that you must start with the

17

1    presumption that the defendant is innocent.  This presumption

2    continues throughout the trial and enables the defendant to a

3    verdict of not guilty unless you are satisfied beyond a

4    reasonable doubt that he is guilty.

5         Every crime is made up of parts called elements.

6    The prosecutor must prove each element of the crime beyond a

7    reasonable doubt.  The defendant is not required to prove his

8    innocence or to do anything.  If you find that the prosecutor

9    has not proven every element beyond a reasonable doubt, then

10   you must find the defendant not guilty.  A reasonable doubt

11   is a fair, honest doubt growing out of the evidence or lack

12   of evidence.  It is not merely an imaginary or possible

13   doubt, but a doubt based on reason and common sense.  A

14   reasonable doubt is just that, a doubt that is reasonable

15   after a careful and considered examination of the facts and

16   circumstances of this case.

17        Okay, now we're going to call the people to the

18   jury box and number one is going to sit in the back, all the

19   way over to, to the end.  Okay?  And then as we get to juror

20   number eight, it will be all the way to the end in front of

21   number one, okay?  Okay, if we could call the jurors.

22        COURT CLERK:  Juror number one, I apologize if I

23   mispronounce your last name, the first person is Austin Krol,

24   K-r-o-l.

25        THE COURT:  What number?

18

1               COURT CLERK:  Number one.

2               THE COURT:  No, what number is he?

3               MR. TAYLOR:  No --

4               COURT CLERK:  Oh, I'm sorry, 57; I apologize.

5               THE COURT:  What --

6               COURT CLERK:  Juror --

7               THE COURT:  Just wait a second, Austin Krol.

8               COURT CLERK:  K-r-o-l.

9               THE COURT:  Thank you.

10              COURT CLERK:  Juror number two, number 49, that is

11      going to be Shannon Decker.  Juror number three, number 67,

12      that's going to be Douglas Schults.  Juror number four,

13      number 69, that's going to be Jeffrey Gilboe, G-i-l-b-o-e.

14      Juror number five, number 114, that's going to be Scott

15      Estes, E-s-t-e-s.  Juror number six, number 53 is going to be

16      Edward Frutig, F-r-u-t-i-g.  Juror number seven, number 193

17      is going to be Bradley Wenzel, W-e-n-z-e-l.  Juror number

18      eight is number 35, that's going to be Spence Werner, W-e-r-

19      n-e-r.

20              THE COURT:  Mr. Werner, you're going to sit way

21      over to the end in the front row.

22              THE COURT:  Juror number nine, that's number 7,

23      Karen Zoe, Z-o-e, or Zoe.  Juror number 10 is going to be

24      number 38, that will be Jason Johnson.  Juror number 11 is

25      number 2, Michael Marnon, M-a-r-n-o-n.  Juror number 12,

1       number 14 is going to be Patrick Goryl, G-o-r-y-l.  Juror

2       number 13 is number nine, Jennifer Maher, M-a-h-e-r.  Juror

3       number 14 is number 270, Jennifer Koski, or Koski, K-o-s-k-i.

4       Juror number --

5                   THE COURT:  Oh, wait 14.

6                   COURT CLERK:  That was 14.

7                   THE COURT:  Yeah, that's all we have.

8                   COURT CLERK:  Oh, I'm sorry, Judge.  I was just

9       going to keep on.  Sorry, everybody.

10                  THE COURT:  Everyone wants to be a juror.  Okay, to

11      go down the list, we want to make sure, juror in seat one is

12      number 57, juror in seat two is 49, juror in seat three is

13      67, juror in four, in seat four is 69, juror in seat five is

14      114, juror in seat six is 53, juror in seat seven is 193,

15      juror in seat eight is 35, juror in seat nine is seven, juror

16      in seat 10 is 38, juror in seat 11 is number two, juror in

17      seat 12 is 14, and juror in seat 13 is nine, and juror in 14

18      is 270.  Do I have it correctly, everyone?  Okay, very good.

19      Okay, you have some cards in front of you that tell us a

20      little bit about you, but I'm going to ask you some questions

21      first and then we'll ask you those questions, okay?  Does

22      anyone have a conflict with the jury dates that I've given

23      you?  Monday, Tuesday, at least Wednesday.  Okay, juror

24      number seven, what is your problem?

25                  JUROR 9:  I have a counseling appointment.

1     THE COURT:  I'm sorry?

2     JUROR 9:  Counseling appointment.

3     THE COURT:  I can't hear you.

4     JUROR 9:  Tomorrow I have a counseling appointment.

5     THE COURT:  You have a counseling appointment?

6     JUROR 9:  Yes.

7     THE COURT:  But you can remake that counseling

8 appointment, can't you?  Okay, then we'd ask you to do that.

9 We'll give your counselor a note if they need to have a note

10 as to the reason why you canceled and you need another date,

11 okay?  Does anyone else have a conflict?  And, again, I said

12 to Tahiti or surgery or something like that.  Juror in seat

13 three, number 67?

14     JUROR 67:  Just, I'm self-employed and I don't, I

15 own my own business and if I'm not there, the business is

16 shut down, so it'd have to be --

17     THE COURT:  And I understand that and a lot of

18 people are going to lose time from work and that's not a

19 valid reason.  It has to be a little bit better than that,

20 but I understand your dilemma.  Who knows, maybe you'll be

21 kicked off for peremptory challenge, so anybody else?  Do any

22 of you know any of the attorneys or witnesses that they've

23 stated?  Anybody?  Answer no to all.  Has anyone served on a

24 jury before?  Anyone?  Answer no to all.  That's amazing; I

25 usually get at least four hands up.  Does anyone have any

```
 1          health issues or problems with hearing or sight?  Anybody

 2          raise their hand?  Yes, sir?

 3                    UNIDENTIFIED SPEAKER:  My eyes.

 4                    THE COURT:  I'm sorry?

 5                    UNIDENTIFIED SPEAKER:  My eyes.

 6                    THE COURT:  Your eyes?

 7                    UNIDENTIFIED SPEAKER:  Yeah.

 8                    THE COURT:  Can you see me?

 9                    UNIDENTIFIED SPEAKER:  Yes.

10                    THE COURT:  Okay.  If you have a problem seeing

11          something, will you let us know by raising your hand?

12                    UNIDENTIFIED SPEAKER:  Sure.

13                    THE COURT:  Okay.  Do you have anything like

14          partial blindness in your eyes?

15                    UNIDENTIFIED SPEAKER:  No.

16                    THE COURT:  Okay.  Does anyone have any moral or

17          religious beliefs where you feel as though you cannot pass

18          judgment on someone else?  Anyone, raise your hand?  The

19          answer no to all.  Has anyone ever been involved as a party

20          or witness with a lawsuit similar to what the defendant is

21          charged with?  Anyone?  Answer no to all.  Anyone been

22          charged with this crime or have family members charged with

23          this crime?  Answer no to all.  Do any of you have any legal

24          or medical training?  Okay, and that's juror in seat 13,

25          number nine.  What, what med-, do you have medical or legal
```

```
 1          training?

 2                  JUROR 9:  Medical.

 3                  THE COURT:  Okay, are you an RN or --

 4                  JUROR 9:  No, no.

 5                  THE COURT:  What medical training do you have?

 6                  JUROR 9:  I'm a lab technician, phlebotomist.

 7                  THE COURT:  A phlebotomist?

 8                  JUROR 9:  Yes.

 9                  THE COURT:  Okay, thank you.  And do all of you

10          believe that you can be fair and impartial in this case based

11          upon what you know at this time?  Yes.  Okay, now I'm going

12          to have you read off the cards.  The cards that were given to

13          you, asked you what your occupation is and your, um,

14          community, meaning what area do you live in, do you live in

15          Hamburg or Pinckney or something like that; you don't have to

16          give an address or street name, just the area that you live

17          in, your marital status, occupation of your spouse, your

18          children's ages, if you have children, and your educational

19          background.  I'm going to start with number, in seat one,

20          sir, can you tell us that information?

21                  JUROR 57:  The juror number is 57, my name is

22          Austin Krol, and the community, I live in Pinckney, and

23          occupation, I'm a beer merchandiser, and I'm not married, and

24          educational background, I have two years at community,

25          Washtenaw Community College and a semester at Michigan State.
```

1               THE COURT:  Okay.  And no children?

2               JUROR 57:  No children.

3               THE COURT:  Okay.

4               JUROR 57:  I hope not.

5               THE COURT:  And in seat two.

6               JUROR 49:  I'm juror number 49.  My name is Shannon

7       Decker.  I live in Brighton.  I'm a stay-at-home mom.  I'm

8       divorced.  I have two children 24 and 14.  And I graduated

9       high school.

10              THE COURT:  Okay.  And in seat three, Mr. Schults.

11              JUROR 67:  Juror number 67, Douglas Schults.  I

12      live in Pinckney.  I'm a chiropractor.  I'm married.  My wife

13      is a homemaker and a editor for a nonprofit organization.  I

14      have five kids, 17, 15, 13, 12, and 6.  And bachelor of

15      science degree and a doctor of chiropractic degree.

16              THE COURT:  Okay.  So you've had some medical

17      training?

18              JUROR 67:  Oh --

19              THE COURT:  Yeah.  Okay, and in seat four.

20              JUROR 69:  Juror number 69.  My name is Jeffrey

21      Gilboe.  I'm from Howell.  I do building maintenance at the

22      hospital.  I am not married.  I have no children.  And I have

23      a two year associate's degree from Lima, Ohio, University of

24      Northwestern.

25              THE COURT:  Okay, thank you.  In seat five?

1          JUROR 114:  Judge, I don't know what number is.

2          THE COURT:  Your number is 114.

3          JUROR 114:  All right, my number is, juror number

4     is 114.  My name is Scott Estes.  I live in Hamburg.  I am a

5     finance director at a car dealership.  I am married.  My wife

6     is an RN.  I have a three-year-old son.  And I have two years

7     community college.

8          JUROR 53:  All right, my turn, I am --

9          THE COURT:  In seat six.

10         JUROR 53:  -- juror number --

11         THE COURT:  Go ahead.

12         JUROR 53:  I'm sorry, juror number 53, my name is

13    Ed Frutig.  I live in Brighton.  I work in sales for an

14    automotive supplier.  I am married.  My wife is a stay-at-

15    home mom.  I have a 1 1/2 year old and I got a bachelors in

16    business administration from Easter Michigan.

17         THE COURT:  Okay, thank you.  And in seat seven?

18         JUROR 193:  Is that me?

19         UNIDENTIFIED SPEAKER:  Yeah.

20         THE COURT:  You are juror number 193.

21         JUROR 193:  My name is Bradley Allen Wenzel.

22         THE COURT:  Okay.

23         JUROR 193:  I am from Livingston County.

24         THE COURT:  Where in Livingston County?

25         JUROR 193:  South Lyon, Michigan.

1          THE COURT:  Pardon me?

2          JUROR 193:  South Lyon.

3          THE COURT:  South Lyon?

4          JUROR 193:  Yes.

5          THE COURT:  Okay.  And are you married.

6          JUROR 193:  I am not married, Your Honor.

7          THE COURT:  Okay.

8          JUROR 193:  I am single.

9          THE COURT:  And you do not have any children?

10         JUROR 193:  Correct.

11         THE COURT:  How far did you go in school?

12         JUROR 193:  Some college.

13         THE COURT:  Okay.

14         JUROR 193:  I graduated from high school, but I did

15    not graduate from college yet.

16         THE COURT:  All right, thank you.  Seat eight.

17         JUROR 35:  My jury, or juror number is 35, my name

18    is Spence Werner.  I live in Fenton.  I'm a pipe fitter

19    welder.  I am married.  My wife is a therapist, no children,

20    and I have trade school background.

21         THE COURT:  Okay.  And seat nine.

22         JUROR 7:  Hi, my name is -- my number is seven, my

23    name is Karen Zoe, I'm from Pinckney.  I am an aide to my

24    daughter, she's got a traumatic brain injury.  I am married.

25    My husband is retired from Ford Motor.  I have, we have three

1       children, ages 32, 35, and 49.  I have two associate's

2       degrees, commerce and liberal arts.

3               THE COURT:  Okay, and juror number, in seat 10.

4               JUROR 38:  Juror number 38, Jason Johnson.  I live

5       in Hartland, engineering, mechanical engineer, automotive,

6       single, no children, bachelors and masters in engineering.

7               THE COURT:  Okay.  And seat 11.

8               JUROR 2:  Juror number two, my name is Michael

9       Marnon.  I live in Brighton.  I am a test and repair

10      technician team leader.  I'm divorced.  I have three

11      children, 15, 14, and 13.  I have some college.

12              THE COURT:  Okay.  And seat 12.

13              JUROR 14:  I'm juror number 14.  My name is Patrick

14      Goryl.  I live in Brighton.  My occupation is a cook at, is a

15      cook.  I'm not married, and no children, and my education, I

16      completed high school and currently attending my second year

17      in Washtenaw.

18              THE COURT:  Okay, thank you.  And in seat 13.

19              JUROR 9:  My number is juror number nine, my name

20      is Jennifer Maher.  I'm from Whitmore Lake, Livingston

21      County.  Occupation, I'm a phlebotomist.  I am married.  My,

22      my husband is retired.  I have no children and I have some

23      college and then medical training in phlebotomy.

24              THE COURT:  Okay.  And in seat 14.

25              JUROR 270:  Hi, I'm juror number 270.  My name is

1   Jennifer Koski.  I'm from South Lyon.  I'm a, an admin and
2   assistant.  I'm married.  My husband is a, an engineer.  My
3   children are aged two and eight, and I have a associates
4   degree and a bachelors degree.
5                THE COURT:  A Bachelor of Arts or Science?
6                JUROR 270:  Science.
7                THE COURT:  Okay.  All right, now I'm going to give
8   Mr. Taylor the opportunity to ask you some questions that we,
9   we may not have fully explored.  He may ask you about your
10  spouses or, you know, if they were retired, what they were
11  retired from, but he has some questions for you, okay?  Okay.
12               MR. TAYLOR:  Thank you, Your Honor.
13               THE COURT:  Go ahead.
14               MR. TAYLOR:  So I know we had some South Lyon
15  addresses and maybe a Whitmore Lake or two in there.  Is
16  everybody here from Livingston County?  Everyone's shaking
17  their head yes, okay.  So, first and foremost, I think that
18  we probably have all come to the courtroom here with some
19  experience, maybe through TV or through other mediums that we
20  learned a little bit about the court system.  Does everybody
21  understand that as the prosecutor, it's my job to prove the
22  defendant's guilty beyond a reasonable doubt in order for you
23  to return that verdict.  Everybody understand that?  All
24  right, and as the judge told you, the defendant doesn't have
25  to do anything; he could sit there with his attorney and do

1    crossword puzzles and if I failed to present enough evidence

2    to you to convince you beyond a reasonable doubt that he's

3    guilty, it's your job to find him not guilty.  Does everybody

4    agree with that?  Okay.  Does everybody agree that if I do

5    prove to you beyond a reasonable doubt that he has committed

6    the offenses he's charged that it's your job to find him

7    guilty?  Everybody is shaking his head yes.

8         So the judge asked some questions that, kind of,

9    had, sort of, a big picture question.  I'm going to ask a

10   little bit more narrow details.  Anyone ever been charged

11   with, arrested for, accused of, the victim of domestic

12   violence or an assault by a family member or a relative or

13   someone in a relationship?  Any of those things?  All right,

14   we have a few hands in the front row.  I'll start in

15   numerical order, I think it was Ms. Zoe.  What was the

16   circumstance in which you were in?

17        JUROR 7:  It was years ago, somebody drugged me and

18   sexually assaulted me.

19        MR. TAYLOR:  Okay, are, is that going to affect

20   your ability to sit and fairly judge the facts and

21   circumstances of this case?

22        JUROR 7:  I don't believe so.

23        MR. TAYLOR:  Okay.  I saw Mr. Goryl.

24        JUROR 14:  It was last year, my brother, it was a

25   bad fight.

1                    MR. TAYLOR:  Okay, a family gathering or something

2          like that?

3                    JUROR 14:  No, it was a, it was still in the

4          household kind of thing.

5                    MR. TAYLOR:  Okay.  Anything about that

6          circumstance going to affect your ability to sit fairly in

7          this case?

8                    JUROR 14:  No, not at all.

9                    MR. TAYLOR:  Okay.  And then was it Ms. Koski?

10                    JUROR 270:  Uh-huh.

11                    MR. TAYLOR:  What, what were the circumstances for

12          you?

13                    JUROR 270:  I was abused as a child.

14                    MR. TAYLOR:  Okay.  Again, anything about that

15          experience going to affect the way that you view the facts of

16          this case?

17                    JUROR 270:  Um, no.

18                    MR. TAYLOR:  Okay.  Um, does everybody understand

19          for the nature of all these questions is just to make sure

20          that you're not going to let some influence that you have

21          from your prior life experience decide how you behave when

22          you look at the evidence, right?  We want to, uh, 12 people

23          that are going to sit in the jury, listen to all the facts

24          and circumstances, and then come up with a decision about

25          what happened based just on what you heard in the courtroom.

1       Does everybody agree that you could do that?  All right,

2       anybody here ever been the victim or had someone enter your

3       house without your permission, trespass, home invasion,

4       breaking and entering, anything like that?  Okay, we got a

5       hand in the back row.  That's Ms. Decker?

6               JUROR 49:  Uh-huh.  I had somebody trespassed at my

7       house --

8               MR. TAYLOR:  Okay.

9               JUROR 49:  -- they didn't get charged, through

10      Livingston County.

11              MR. TAYLOR:  All right, and they came into your

12      house without your permission?

13              JUROR 49:  They were arrested for trespassing at my

14      home, yes.

15              MR. TAYLOR:  Okay.  And did you speak to the police

16      when that happened?

17              JUROR 49:  Uh-huh.

18              MR. TAYLOR:  Do you think that that, I'm sorry, you

19      said yes?

20              JUROR 49:  Yes.

21              MR. TAYLOR:  All right.

22              JUROR 49:  Yes, sorry.

23              MR. TAYLOR:  They record everything.  Um, did, did

24      you feel like the police handled your situation fairly?

25              JUROR 49:  Yes.

1              MR. TAYLOR:  Okay.  Anybody else have a similar

2      experience?  All right, I'm going to ask you a question and I

3      know it's loaded because rarely do we have good experience

4      with police officers, but anybody had an experience with law

5      enforcement or the courts that you felt you were treated

6      unfairly or that you would qualify as a bad experience?  No

7      hands are raised, okay.  Mr. Wenzel, I know that you told the

8      judge that you have a counseling appointment.  If you sit as

9      a juror here today and hear some evidence in this case, is

10     part of your mind going to be distracted on what's going on

11     with your counseling appointment or do you think you can give

12     your full attention to the case?

13             JUROR 193:  I can give my full attention.

14             THE COURT:  Okay.  And same question for Mr.

15     Schults, are you going to be worrying about your practice if

16     you're sitting here or are we going to get the, a full work

17     day out of you?

18             JUROR 67:  I have to be honest, it, I think it will

19     worry me a bit to be here for --

20             MR. TAYLOR:  Okay.

21             JUROR 67:  -- a couple of days.

22             MR. TAYLOR:  That's fair.  That's all we're here to

23     ask questions to try to get the answers for.  So anybody here

24     ever had -- oh, sorry, Ms. Zoe?

25             JUROR 7:  I was just thinking, I've had a couple,

1    like, negative experiences, but it's more with my adult son.

2         MR. TAYLOR:  Okay.

3         JUROR 7:  Where he, like, in one instance, where he

4    was threatened to be charged with something that we, it ended

5    up costing over a year, so he would go to prison instead of

6    jail if he didn't lie and t-, say he did something lesser.

7         MR. TAYLOR:  Okay.

8         JUROR 7:  So, in other words, the police had him be

9    honest or threatened to make sure that he went to prison.

10        MR. TAYLOR:  Do you feel like if you sit here today

11   and listen to the testimony of people who are police

12   officers, that that's your experience with your son's going

13   to make you question what they have to say?  Or are you going

14   to treat them just like you'd treat anybody else?

15        JUROR 7:  I think whether it's police or the

16   defendant or anybody, I'll take with a grain of salt.

17        MR. TAYLOR:  Okay.  So you're just going to listen

18   to what they have to say and then judge if it makes sense to

19   you?

20        JUROR 7:  Yeah.

21        MR. TAYLOR:  Okay.  The question I was going to ask

22   is anybody here ever had somebody try to stop you from making

23   a phone call, either like physically taking the phone from

24   you, pulling the cord out of the wall, covering the handset

25   up?  Anybody have anything like that happen to you?

1              UNIDENTIFIED SPEAKER:  Excuse me --

2              THE COURT:  And you mean in a violent way?

3              MR. TAYLOR:  Just, in any way?

4              THE COURT:  I mean, a lot of times, people might

5        say let me talk to grandma.  That --

6              MR. TAYLOR:  Okay.

7              THE COURT:  -- that's not what he means.

8              MR. TAYLOR:  Right.

9              THE COURT:  He's talking about --

10             MR. TAYLOR:  No, the judge is correct; I'm not

11       asking about fighting over the phone to talk to grandma.  I'm

12       obviously referring to when somebody, when you're trying to

13       make a phone call and somebody doesn't want you to make it so

14       they stop you.  Has anybody ever had that happen to you?

15             UNIDENTIFIED SPEAKER:  My son did that to my

16       husband and I.

17             MR. TAYLOR:  Okay.  Now, having had that experience

18       yourself, is that going to affect how you view the evidence

19       in this case or whether you come to the jury room to

20       deliberate with any preconceived notions about how things

21       happen?

22             UNIDENTIFIED SPEAKER:  No, because it would depend

23       on the surrounding circumstances too.

24             MR. TAYLOR:  Okay.  So, again, that all comes back

25       to are you going to wait until you hear all the evidence

1        before you decide what happened?

2                    UNIDENTIFIED SPEAKER:  Yeah.

3                    MR. TAYLOR:  Okay.  All right, I have no further

4        questions, thank you.

5                    THE COURT:  Thank you.  Mister -- what?  Mr.

6        Sizemore.

7                    MR. SIZEMORE:  Good morning.

8                    JURY:  Good morning.

9                    MR. SIZEMORE:  So Mr. Taylor has asked a lot of

10       questions that are designed, at least in part, I think, to

11       determine what else you've got on your mind.  The judge is

12       going to read you an instruction later that says you're not

13       allowed to bring into the jury room any specialized knowledge

14       or training that you have.  In other words, medical training,

15       for instance, or engineering, and we got at least one

16       engineer on here; anything like that.  If you hear something

17       in this courtroom that doesn't make any sense to you based on

18       any special knowledge that you have, you're not allowed to go

19       back in the jury room and be an educator, to teach the jury

20       what might have been misstated or, or might just be wrong in

21       your experience.  Can everyone follow that instruction?  Is

22       there anyone that had a hard time with that instruction?  If

23       so, raise your hand.  No hands are raised.

24                    Flipside of that is that you're allowed to bring in

25       your common sense; you're allowed to bring in your everyday

1    knowledge.  You're not supposed to check out and just to go

2    back there and have an absolutely clean slate.  So, for

3    instance, those of you that were saying I'm going to keep my

4    mind open and I'm going to wait to hear what all the evidence

5    is.  You got it right.  You can make, decide if that evidence

6    makes sense to you.  Does everyone understand that?  Okay,

7    everyone's shaking their head.

8         Along with that goes this, this idea that we have

9    in every court in this country and certainly every court in

10   this state and that's the presumption of innocence.  Mr.

11   Fischer is presumed innocent as he sits here right now.  The

12   judge has read you an information that contains four counts

13   that he's alleged to have committed, but it's clearly not

14   evidence that he committed anything, any offense.  Does

15   everyone understand that Mr. Fischer, as he sits in this

16   courtroom right now, is absolutely innocent of everything?

17   Okay, no hands are raised.  Does anybody have a problem with

18   that?  No hands are raised.

19        So when Mr. Taylor read off his list of witnesses,

20   you probably heard that he's got four police officers on his

21   witness list.  Is there anything about the fact that there

22   are going to be police officers testifying for the

23   prosecution that's going to make any one of you think, oh,

24   four police officers, he's probably going to win, they're

25   prob-, all those cops testifying, I'm going to have to vote

36

```
 1        for the prosecutor?  Any of that going on in anyone's head
 2        yet?  No, no hands are raised.  How about the flipside?  Does
 3        anybody here just doesn't trust police officers at all and if
 4        these police officers are going to testify, you are not going
 5        to believe what they have to say?  Any of that?  No hands are
 6        raised.
 7             In short, the judge will instruct you, we're going
 8        to ask you to follow the instruction that a police officer's
 9        testimony should be weighed exactly in the same fashion as
10        anybody else's; when you're trying to decide if this person
11        is telling the truth, you use whatever formula you have,
12        whether they're wearing a uniform or not.  Can everybody do
13        that?  Okay, I see a lot of nodding heads.
14             Can anyone, anyone think of -- oh, strike that.  Is
15        anyone in, in the box been falsely accused of anything
16        before?  Accused of doing something that you didn't do?  No
17        hands are raised.
18             THE COURT:  Sir.
19             MR. SIZEMORE:  I'm sorry, I didn't see you.  Okay.
20             JUROR 2:  I'm sorry, it was a little late.
21             MR. SIZEMORE:  You got to me a little bit late
22        there, all right.  I'll get my handy dandy cheat sheet.  And
23        you're juror number two?
24             JUROR 2:  Yes, sir.
25             MR. SIZEMORE:  Okay.  Don't need to know about
```

1      that, okay?  Anybody else been falsely accused of anything?

2      Were you an adult or were you, is this something in your

3      childhood?

4              JUROR 2:  I was 17.

5              MR. SIZEMORE:  Okay.

6              JUROR 2:  In another state.

7              MR. SIZEMORE:  In, okay, all right.  And I don't

8      just mean criminally.  Has anybody got brothers or sisters?

9      Okay, now I see some people that are waking up and shaking

10     their heads yes.  Has anybody been accused by your friend,

11     your brother, your parents of something that you didn't do?

12     Is there anybody that that hasn't happened to?  Okay, all

13     right.  Mr. Wenzel, did you raise your hand?  Or I just, I

14     couldn't tell if you were going up with it or not.

15             THE COURT:  He was just answering that he had a

16     brother or sister.

17             MR. SIZEMORE:  Oh, okay, all right, very good.  All

18     right, who has heard the phrase garbage in, garbage out?

19     Okay, I see a few hands.  To save you any individual

20     questioning, my understanding of garbage in, garbage out is

21     basically you learned in when I was learning how to use a

22     computer, but it goes to everything, math equations, trials

23     in criminal courts.  If you put bad information into an

24     equation, you're going to get bad information out of it.  Or

25     if you put bad information into a computer program, what

1    you're going to get at the end of it is unreliable.  Is

2    anybody here that doesn't understand or agree with that?  No

3    hands are raised.  Nothing further, thank you, Your Honor.

4            THE COURT:  Okay, thank you.  Challenges for cause?

5            MR. TAYLOR:  None for cause, Your Honor.

6            THE COURT:  Chal-, preemptory challenges?

7            MR. TAYLOR:  Well --

8            MR. SIZEMORE:  None for cause, Your Honor, from the

9    defense.

10            THE COURT:  Oh, okay, thank you.  Preemptory

11   challenges?

12            MR. TAYLOR:  Pass for peremptory challenges.

13            THE COURT:  Mr. Sizemore?

14            MR. SIZEMORE:  Your Honor, the, we would ask the

15   Court to take and excuse juror in seat number nine, juror

16   number seven.

17            (At 10:05 a.m., juror 7 excused)

18            UNIDENTIFIED SPEAKER:  Do I leave now?  Can I get

19   up and go?

20            THE COURT:  You may be excused.

21            UNIDENTIFIED SPEAKER:  What number did he say?

22            MR. SIZEMORE:  Ms. Zoe.

23            THE COURT:  In seat nine.

24            MR. SIZEMORE:  Seat nine, juror number 7.

25            JUROR 7:  Do I go home now or just sit out here?

1           THE COURT:  Have a seat for just one minute; I'm

2      going to tell everybody that you have to call back this

3      Friday, March 8th, after 5:30 for further instructions if

4      you're not picked as a juror.  So that would apply to you and

5      you can leave, okay?

6           COURT CLERK:  Going into seat number nine is juror

7      number 75, and that is going to be Trisha Follmer, F-o-l-l-m-

8      e-r.

9           THE COURT:  Hi.

10          JUROR 75:  Hi.

11          THE COURT:  Any problems with the date?

12          JUROR 75:  No.

13          THE COURT:  Okay.  Do you know any of the attorneys

14     or their associates or witnesses that they announced?

15          JUROR 75:  No.

16          THE COURT:  Okay.  Do you, have you ever served on

17     a jury before?

18          JUROR 75:  No.

19          THE COURT:  Do you have any health issues or

20     problems with hearing or sight?

21          JUROR 75:  No.

22          THE COURT:  Do you have any moral or religious

23     beliefs where you feel as though you can't pass judgment on

24     someone else?

25          JUROR 75:  No.

1          THE COURT:  Have you ever been charged as a party

2      or witness to a crime similar to what the defendant is

3      charged with?

4          JUROR 75:  No.

5          THE COURT:  Okay.  Have you had any legal or

6      medical training?

7          JUROR 75:  Yes.

8          THE COURT:  What, what is that?

9          JUROR 75:  I have medical training.

10         THE COURT:  Medical training?

11         JUROR 75:  Yes.

12         THE COURT:  Are you an RN?

13         JUROR 75:  No, I am a, I have medical record

14     training, medical assisting training, and I'm currently a

15     medical receptionist.

16         THE COURT:  A medical receptionist?

17         JUROR 75:  Yes.

18         THE COURT:  Okay.  What kind of doctor's office?

19         JUROR 75:  Allergy.

20         THE COURT:  I'm sorry?

21         JUROR 75:  Allergy.

22         THE COURT:  Allergy, okay.  Do you believe you can

23     be fair and impartial in this case?

24         JUROR 75:  Yes.

25         THE COURT:  You've heard the questions posed by Mr.

1       Taylor and Mr. Sizemore, and I ask all of you to pay

2       attention to what they ask because there might be something

3       that you want to tell them that you think is important, but

4       is there anything that comes to your mind right now that they

5       have asked the other jurors that you feel as though they

6       would want to know about you?

7               JUROR 75:  I was a victim of domestic violence.

8       That's really the only thing that I can remember at the

9       moment --

10              THE COURT:  Okay.

11              JUROR 75:  -- as far as questions that they've

12      asked.

13              THE COURT:  And when was that?

14              JUROR 75:  Twenty some years ago.

15              THE COURT:  Okay.  And I forgot, but can you read

16      off that little card what your --

17              JUROR 75:  Sure.

18              THE COURT:  -- you kind of told us your, your juror

19      number is 75 and your name and you live where?

20              JUROR 75:  So my juror number is 75, my name is

21      Trisha Follmer.  I live in Howell.  As I said, I'm a medical

22      receptionist.  I'm also a freelance graphic designer.  I'm

23      currently separated.  My husband is a real estate developer.

24      I have three children and their ages are 28, 22, and 17.  And

25      I have a bachelor's degree in graphic design.

1          THE COURT:  Okay.  The fact that you were a victim

2     of domestic violence, do you believe that that may affect you

3     in deciding this case?

4          JUROR 75:  No.

5          THE COURT:  Okay.  You believe that, you understand

6     that the defendant is not the person that hurt you --

7          JUROR 75:  Correct.

8          THE COURT:  -- and I want to make sure that the,

9     your emotions, I'm sure it was an emotional time for you, it

10    was 20 years ago, but still, it remains in your mind, that

11    that isn't going to affect you in deciding this case?

12         JUROR 75:  Correct.

13         THE COURT:  You believe you can be fair and

14    impartial with this defendant?

15         JUROR 75:  Yes.

16         THE COURT:  Okay.

17         JUROR 75:  The one other question that was asked

18    about the telephone --

19         THE COURT:  Yes.

20         JUROR 75:  -- that was part of the domestic.

21         THE COURT:  I'm sorry?

22         JUROR 75:  The not being able to make a phone call,

23    that was also part of that time period with the domestic

24    violence.

25         THE COURT:  The domestic violence?

1               JUROR 75:  Uh-huh.

2               THE COURT:  Okay.  All right, go ahead.

3               MR. TAYLOR:  Certainly.  So, and I think the

4      judge's questions were, sort of, designed to probe a little

5      bit further because I think in concept, whether you've been

6      the victim of domestic violence or not, that we all agree

7      that it's a bad things, right?  I don't think anybody's going

8      to be here saying oh, well, you know, it's not that big of a

9      deal.  But I think the judge's questions are designed to ask

10     you, essentially, will you wait to hear what each of the

11     witnesses has to say, what the exhibits look like, and then

12     come to a conclusion about whether the defendant even did

13     anything to warrant being accused of these crimes?  Or, as

14     you sit there and look at him, do you believe he must have

15     done something to get in that chair?

16               JUROR 75:  So your question is --

17               MR. TAYLOR:  Do you believe, which, I mean, will

18     you, will you wait and hear the evidence --

19               JUROR 75:  Oh, yes, I will.

20               MR. TAYLOR:  -- or do you, do you have a

21     presumption about him other than that he's innocent right

22     now?

23               JUROR 75:  No, I will wait to hear.

24               MR. TAYLOR:  Okay.  So, you know, and I think Mr.

25     Sizemore and I both hit on that, is you haven't heard

                                    44

1    anything about what he did or didn't do that get, that, that

2    got him charged with a crime.  So as he sits there with you

3    having heard no evidence whatsoever, you would find him not

4    guilty right now, right?

5              JUROR 75:  Correct.

6              MR. TAYLOR:  Okay.  If I prove to you through the

7    evidence and the exhibits and the witnesses that testify in

8    this case that he's guilty beyond a reasonable doubt, once

9    you've decided that, then the presumption is out the window.

10    You understand how that works?  You have to wait until you've

11    everything, make the decision about whether he did it, and

12    then have that feeling of whether you should be in judgment

13    of him or not.  Do you agree with that?

14              JUROR 75:  Correct, yeah.

15              MR. TAYLOR:  Um, anything about that process you

16    feel like you will have any struggle with?

17              JUROR 75:  No.

18              MR. TAYLOR:  For instance, if I put up witnesses

19    that say there was a loud noise, I don't know what happened,

20    that's all I know.  What would you do with that information?

21    Would you find them guilty or not guilty?

22              JUROR 75:  Well, he would be not guilty.

23              MR. TAYLOR:  Because you don't know what happened,

24    right?

25              JUROR 75:  Right.

45

1           MR. TAYLOR:  Okay.  So that's all the judge is

2      asking is to make sure that you're able to do that without

3      regard to what happened to yourself.  Is that fair?

4           JUROR 75:  Yes.

5           MR. TAYLOR:  Okay.  Outside of the incidences you

6      were talking about before, have you ever been in a physical

7      altercation or a fight yourself, like a fistfight in middle

8      school or --

9           JUROR 75:  No.

10          MR. TAYLOR:  -- high school, anything like that?

11     Okay.  All right, well thank you so much.

12          JUROR 75:  Thank you.

13          THE COURT:  Mr. Sizemore.

14          MR. SIZEMORE:  The state read off four or five

15     witnesses that they intend to produce and testify.  And I got

16     up and I said, well, we're going to use their witnesses and

17     potentially Mr. Fischer as well.  The judge will read an

18     instruction that says that it doesn't matter who presents

19     more witnesses; it's what the witnesses have to say.  Do you

20     think that you'll be able to disregard who has more witnesses

21     and just listen and evaluate what it said and presented in

22     court?

23          JUROR 75:  Yes.

24          MR. SIZEMORE:  Okay.  You understand that, like he

25     said, we don't have to do anything; we could sit and do

 1          crosswords all day and if he doesn't fulfill his burden,

 2          according to all the jurors, got to vote not guilty.  Are you

 3          all right with that?

 4                    JUROR 75:  Yes.

 5                    MR. SIZEMORE:  Do you think that's unfair?

 6                    JUROR 75:  No.

 7                    MR. SIZEMORE:  Okay, thank you.

 8                    THE COURT:  Challenges for cause, Mr. Sizemore?

 9                    MR. SIZEMORE:  None for cause, Your Honor.

10                    THE COURT:  Challenges for cause, Mr. Taylor?

11                    MR. TAYLOR:  None for cause, Your Honor.

12                    THE COURT:  Preemptory challenges, Mr. Sizemore?

13                    MR. SIZEMORE:  Your Honor, we'd ask the Court to

14          thank and excuse Mr. Estes in seat number five.

15                    (At 10:14 a.m., juror 114 excused)

16                    THE COURT:  Thank you, sir.  Call Friday after

17          5:30, okay?

18                    JUROR 114:  Yes, ma'am.  Thank you.

19                    THE COURT:  Thank you.

20                    COURT CLERK:  For seat number five, we have juror

21          number 64, and that is Jennifer Martz, M-a-r-t-z.

22                    THE COURT:  Hi.

23                    JUROR 64:  Hi.

24                    THE COURT:  Ms. Martz, do you have any conflict

25          with the jury trial dates?

```
1                    JUROR 64:  No.

2                    THE COURT:  Okay.  Do you know any of the

3          attorneys, their associates, or witnesses that they've

4          announced?

5                    JUROR 64:  No.

6                    THE COURT:  Okay.  Have you ever served on a jury

7          before?

8                    JUROR 64:  No.

9                    THE COURT:  Do you have any health issues or

10         problems with hearing or sight?

11                   JUROR 64:  No.

12                   THE COURT:  Do you have any moral or religious

13         beliefs where you feel as though you can't pass judgment on

14         someone else?

15                   JUROR 64:  No.

16                   THE COURT:  And have you ever been involved with a

17         crime similar to what the defendant is charged with?

18                   JUROR 64:  No.

19                   THE COURT:  Anybody in your family been charged

20         with a crime similar to what the defendant is charged with?

21                   JUROR 64:  No.

22                   THE COURT:  Have you had any legal or medical

23         training?

24                   JUROR 64:  Yes.

25                   THE COURT:  What?
```

1              JUROR 64:  Medical, I'm a surgical technologist, so

2        I work in surgery.

3              THE COURT:  I'm sorry?

4              JUROR 64:  I work in surgery, I'm a surgical

5        technologist.

6              THE COURT:  Surgical technologist.  Where do you do

7        that?

8              JUROR 64:  At U of M, at the cardiovascular center.

9              THE COURT:  Okay.  And do you believe you can be

10       fair and impartial in this particular trial?

11             JUROR 64:  Yes.

12             THE COURT:  Okay.  You've heard the questions posed

13       by Mr. Taylor and Mr. Sizemore, is there anything that you

14       think that they would want to know about you that they've

15       asked the other jurors?

16             JUROR 64:  No.

17             THE COURT:  No?  Okay.  Mr. Taylor.

18             MR. TAYLOR:  The judge asked earlier if you or any

19       of your family members had been charged with any of the

20       similar offenses.  Have you or any of your family members

21       been victims or on the receiving end of any of those

22       offenses?

23             JUROR 64:  No.

24             MR. TAYLOR:  Okay.  I have no further questions.

25             THE COURT:  Mr. Sizemore?

1             MR. SIZEMORE:  You heard the questions that I asked

2     about the police witnesses, a number of witnesses, and

3     proving a negative and all that.  Is there anything that you

4     felt like you needed to answer to any of those questions?

5             JUROR 64:  No.

6             MR. SIZEMORE:  Anything differently than they were

7     already answered by the other members of the jury?

8             JUROR 64:   I don't think so.

9             MR. SIZEMORE:  Same with his questions, anything

10    there that, kind of, struck a nerve and made you think, ooh -

11    -

12            JUROR 64:  No.

13            MR. SIZEMORE:  -- maybe I should answer that?  No,

14    okay, thank you.

15            THE COURT:  Okay.  Challenges for cause, Mr.

16    Taylor?

17            MR. TAYLOR:  None for cause, Your Honor.

18            THE COURT:  Challenges for cause, Mr. Sizemore?

19            MR. SIZEMORE:  None for cause, thank you.

20            THE COURT:  Preemptory challenges, Mr. Taylor?

21            MR. TAYLOR:  None, Your Honor.

22            THE COURT:  Mr. Sizemore?

23            MR. SIZEMORE:  May I have a second, please?

24            THE COURT:  Yes.

25            MR. SIZEMORE:  Your Honor, we would ask the Court

1          to thank and excuse Mr. Wenzel in seat number seven.

2                    (At 10:17 a.m., Juror 193 excused)

3                    THE COURT:  Thank you, Mr. Wenzel.  Be sure and

4          call Friday night, okay?  Thank you.

5                    COURT CLERK:  Going to seat number seven is juror

6          number 31, and that is going to be Frank Gandolfo, G-a-n-d-o-

7          l-f-o.  I apologize if I mispronounced your last name.

8                    THE COURT:  Okay, any problems with the dates?

9          Okay, do you know any of the attorneys or associates or

10         witnesses?

11                   JUROR 31:  No.

12                   THE COURT:  Have you ever served on a jury before?

13                   JUROR 31:  No.

14                   THE COURT:  Do you have any health issues or

15         problems with hearing or sight?

16                   JUROR 31:  I do wear hearing aids.

17                   THE COURT:  You do hear -- okay, can you hear me

18         now?

19                   JUROR 31:  I can.

20                   THE COURT:  Okay.  And you'll let us know if you

21         can't hear something?

22                   JUROR 31:  I will.

23                   THE COURT:  We do have these really good mics for

24         your ears if you can't hear something, we've learned that

25         they are very helpful to people, even if you do have hearing

1  aids, okay?  Do you have any moral or religious beliefs where

2  you feel as though you can't pass judgment on someone else?

3  　　　　　JUROR 31:  No.

4  　　　　　THE COURT:  Have you ever been a party or a witness

5  or a family member ever been a party or witness to a crime

6  similar to what the defendant is charged with?

7  　　　　　JUROR 31:  No.

8  　　　　　THE COURT:  Have you had any situations of domestic

9  violence in your family?

10  　　　　　JUROR 31:  No.

11  　　　　　THE COURT:  Okay.  Do you have any legal or medical

12  training?

13  　　　　　JUROR 31:  No.

14  　　　　　THE COURT:  And do you believe you can be fair and

15  impartial in this case?

16  　　　　　JUROR 31:  Yes.

17  　　　　　THE COURT:  Okay, can you take that card and tell

18  me a little bit about yourself?

19  　　　　　JUROR 31:  I'm juror number 31.  My name is Frank

20  Gandolfo.  I live in Brighton Township.  I do IT work.  I'm

21  married.  My wife is a student nutrition coordinator.  I have

22  three children, 32, 30, 28.  And I have electronics

23  background.

24  　　　　　THE COURT:  Okay, thank you.  Mr. Taylor, any

25  questions?

1                    MR. TAYLOR:  Sir, you said you have three kids?

2                    JUROR 31:  Yes.

3                    MR. TAYLOR:  Are they boys or girls?

4                    JUROR 31:  All boys.

5                    MR. TAYLOR:  You ever have any fights in your house

6        when they were growing up?

7                    JUROR 31:  Such as?

8                    MR. TAYLOR:  Physical altercations inside your

9        house?

10                   JUROR 31:  (indecipherable)

11                   MR. TAYLOR:  Okay, they took it outside?

12                   JUROR 31:  No, we just, verbal.

13                   MR. TAYLOR:  Oh, okay, okay.  You can tell I grew

14       up in a little bit of a different house.  So, so we asked

15       some questions before to the other jurors and, kind of, I

16       know it's hard to keep track of all of them, but you yourself

17       have never been either accused of or the victim of a crime

18       involving violence from a domestic partner or a family

19       member?

20                   JUROR 31:  No.

21                   MR. TAYLOR:  Okay.  And any ill will towards law

22       enforcement?

23                   JUROR 31:  No.

24                   MR. TAYLOR:  Okay.  And Mr. Sizemore had asked some

25       questions about the number of witnesses.  You don't care how

1        many witnesses or who puts them on there as long as you get

2        to understand the evidence, right?

3                    JUROR 31:  Correct.

4                    MR. TAYLOR:  Okay.  I have no further questions,

5        Your Honor.

6                    THE COURT:  Mr. Sizemore?

7                    MR. SIZEMORE:  No questions, Your Honor.  Thank

8        you.

9                    THE COURT:  Okay.  Challenges for cause?

10                   MR. TAYLOR:  None for cause, Your Honor.

11                   THE COURT:  Challenges for cause, Mr. Sizemore?

12                   MR. SIZEMORE:  None for cause, Your Honor.

13                   THE COURT:  Preemptory challenges, Mr. Taylor?

14                   MR. TAYLOR:  None, Your Honor.

15                   THE COURT:  Preemptory challenges, Mr. Sizemore?

16                   MR. SIZEMORE:  Your Honor, we'd ask the Court to

17       thank and excuse Mr. Schults in seat number three.

18                   (At 10:21 a.m., Juror 67 excused)

19                   THE COURT:  Okay.  It works out for you, doesn't

20       it?

21                   JUROR 67:  Yes.

22                   COURT CLERK:  Moving into juror seat number three

23       is number 61 and that is going to be Kelly Latham, L-a-t-h-a-

24       m.

25                   THE COURT:  Hi.

```
1                    JUROR 61:  Hi.

2                    THE COURT:  Ms. Latham, any problems with the date?

3                    JUROR 61:  No.

4                    THE COURT:  Okay, do you know any of the attorneys,

5        their associates, or witnesses?

6                    JUROR 61:  No.

7                    THE COURT:  Do you -- have you ever served on a

8        jury before?

9                    JUROR 61:  No.

10                   THE COURT:  Do you have any health issues such as

11       problems with hearing or sight?

12                   JUROR 61:  No.

13                   THE COURT:  Do you have any moral or religious

14       beliefs where you feel as though you can't pass judgment on

15       someone else?

16                   JUROR 61:  No.

17                   THE COURT:  Have you ever been involved as a party

18       or witness or victim to a crime that the defendant is charged

19       with?

20                   JUROR 61:  No.

21                   THE COURT:  Anybody in your family?

22                   JUROR 61:  My aunt spent the night in jail for

23       threatening her husband.

24                   THE COURT:  I'm sorry, I can't hear.

25                   JUROR 61:  My aunt spent the night in jail for
```

1          threatening her husband.

2                    THE COURT:  Your aunt did?

3                    JUROR 61:  Yes.

4                    THE COURT:  Now you said she spent the night in

5          jail, was she charged with a crime?

6                    JUROR 61:  She was released the next morning.

7                    THE COURT:  Okay.  And do you know if she was

8          convicted of anything?

9                    JUROR 61:  No, he dropped the charges.

10                    THE COURT:  Okay.  The fact that your aunt was

11          charged with this or had an experience with this, is this

12          going to affect you in deciding this case against the

13          defendant?

14                    JUROR 61:  No.

15                    THE COURT:  Do you have any legal or medical

16          training?

17                    JUROR 61:  No.

18                    THE COURT:  Okay.  Do you believe you can be fair

19          and impartial in this case?

20                    JUROR 61:  Yes.

21                    THE COURT:  Okay.  Could you please read what's on

22          the card?

23                    JUROR 61:  Juror number 61, Kelly Latham.  I live

24          in Cahocta Township.  I'm a finance manager for an automotive

25          supplier.  I am single.  I have no children.  And I have a

56

1        bachelor's and master's degree in finance.

2                THE COURT:  A bachelor's and master's degree?

3                JUROR 61:  Yes.

4                THE COURT:  Okay.  And what's your master's in?

5                JUROR 61:  Business administration.

6                THE COURT:  Quite an accomplishment.  You've heard

7        the questions asked by Mr. Taylor and Mr. Sizemore, would you

8        ask, answer any of the questions differently or is there

9        something that you think that they would want to know about

10       you?

11               JUROR 61:  No.

12               THE COURT:  Mr. Taylor?

13               MR. TAYLOR:  Again, just to be more specific, ever

14       witnessed any domestic violence, been a victim of domestic

15       violence, anything like that?

16               JUROR 61:  No.

17               MR. TAYLOR:  Okay.  When your aunt was arrested,

18       how'd you find out about that?

19               JUROR 61:  My mom told me.

20               MR. TAYLOR:  Okay.  When your mom told you, hey,

21       your aunt got arrested for threatening her husband, were you,

22       like, shocked?

23               JUROR 61:  Yes.

24               MR. TAYLOR:  Okay.  It wasn't part of her character

25       --

1              JUROR 61:  No.

2              MR. TAYLOR:  -- to behave that way?

3              JUROR 61:  No.

4              MR. TAYLOR:  Okay.

5              JUROR 61:  No.

6              MR. TAYLOR:  When she was let go, were you

7     relieved?

8              JUROR 61:  Yes.

9              MR. TAYLOR:  Okay.  You said, I guess, I couldn't

10    key in when you answered the judge's questions, you didn't

11    really make a statement about whether or not she did it, you

12    just kind of said, well, they let her go.  Did you have any

13    belief when you heard that information that she actually did

14    or didn't do it?

15             JUROR 61:  They were arguing, so yes, it could have

16    happened.

17             MR. TAYLOR:  Remember earlier, Mr. Sizemore had

18    asked some of the jurors if they'd ever been falsely accused

19    of anything and, kind of, everybody said no at first, but

20    then eventually everybody, kind of, said, well, you know,

21    brothers and sisters, that kind of stuff?  Do you think your

22    aunt was falsely accused in that circumstance?

23             JUROR 61:  No.

24             MR. TAYLOR:  Okay.  But you don't know enough to

25    know either way, right?

1                    JUROR 61:  Correct, I was not here.

2                    MR. TAYLOR:  You didn't get to hear all the facts

3          and see all the evidence, right?

4                    JUROR 61:  No.

5                    MR. TAYLOR:  So you, essentially, reserved judgment

6          until you knew more, right?

7                    JUROR 61:  Yes.

8                    MR. TAYLOR:  Do you understand that's what we're

9          going to ask you to do here today?

10                   JUROR 61:  Yes.

11                   MR. TAYLOR:  Do you feel comfortable doing that?

12                   JUROR 61:  Yes.

13                   MR. TAYLOR:  Do you think you can be fair and

14         impartial?

15                   JUROR 61:  Yes.

16                   MR. TAYLOR:  No further questions, Your Honor.

17                   THE COURT:  Mr. Sizemore?

18                   MR. SIZEMORE:  I don't have any questions, thank

19         you.

20                   THE COURT:  Any for cause, Mr. Sizemore?

21                   MR. SIZEMORE:  None for cause.  Thank you.

22                   THE COURT:  Any for cause, Mr. Taylor?

23                   MR. TAYLOR:  None for cause, Your Honor.

24                   THE COURT:  Preemptory challenges, Mr. Taylor?

25                   MR. TAYLOR:  None, no preemptory challenges, Your

1      Honor.

2                THE COURT:  Mr. Sizemore?

3                MR. SIZEMORE:  Defense is satisfied, Your Honor.

4      We have a jury.

5                THE COURT:  Okay, we have a jury.

6                (At 10:25 a.m., jury impaneled)

7                THE COURT:  Okay.  So you are jurors, so I

8      appreciate your answers and putting up with our questions

9      over and over again.  It gets to be a little tedious, but we

10     do appreciate it and we need to pick a fair and, a fair jury.

11     I'm going to let everyone else can leave, but please

12     remember, you have to call Friday, March 8th, after 5:30 for

13     further instructions.  Okay?  Okay, Jurors, I'm going to give

14     you a break and you can go into the jury room.  You can take

15     off your coats, if you wish.  There are lockers for the

16     women's' purses if you wish to lock up your purse, that's

17     fine.  It is a secured area, to let you know.  But there's

18     some coffee back there and someone might feel like a cup of

19     coffee at this time, okay?  And there are restrooms.

20               COURT CLERK:  Can we leave their cards at their

21     seats, please?

22               THE COURT:  Okay.  You can leave your cards on the

23     seats.

24               COURT CLERK:  Okay.

25               THE COURT:  Okay?  Thank you.

```
 1                    (At 10:27 a.m., jury taken out)

 2                    MR. TAYLOR:  Your Honor, when, when do you want us

 3          back?

 4                    THE COURT:  I'm going to say like in ten minutes.

 5          Does that sound good?

 6                    MR. TAYLOR:  Sounds fine.

 7                    THE COURT:  Give you enough time?  Okay, would

 8          counsel please --

 9                    (At 10:28 a.m., Court recessed)

10                    (At 11:01 a.m., Court reconvened)

11                    THE COURT:  -- Fischer, are you ready to proceed?

12                    MR. TAYLOR:  Michael Taylor for the People, yes,

13          Your Honor, we are.

14                    MR. SIZEMORE:  Rolland Sizemore with and on behalf

15          of Gary Fischer.  Yes, Your Honor.

16                    THE COURT:  Okay, then we'll call in the jury and

17          then I'll swear them in and then do preliminary instructions.

18          Mr. Taylor, the jury instructions I wanted for you were the

19          ending instructions, not the beginning instructions.

20                    MR. TAYLOR:  Like the final jury instructions?

21                    THE COURT:  To your best guess.

22                    MR. TAYLOR:  Well, right, um --

23                    THE COURT:  I know that --

24                    MR. TAYLOR:  We don't necessarily know who is going

25          to testify or what, what the issues are, so I have draft
```

1          copies of final instructions, but --

2                    THE COURT:  Okay.

3                    MR. TAYLOR:  -- to have printed them without

4          knowing what the proofs are, it's kind of --

5                    THE COURT:  I know, but I used to get everything

6          ready except defendant not testifying or testifying, you

7          know, usually.  But, again, I don't know what the defense is

8          --

9                    MR. TAYLOR:  I will have a tentative draft that I

10         can share with defense counsel and the Court at lunchtime and

11         just it will, we'll kind of modify as needed.

12                   THE COURT:  That'd be great because usually I like

13         to get that over with and I might let the jury go a little

14         bit early, so if we can, I mean, it depends where we are in

15         the trial.  So --

16                   MR. TAYLOR:  Right.

17                   THE COURT:  -- I won't even say anything.  Never

18         mind.

19                   MR. TAYLOR:  Okay.

20                   THE BAILIFF:  All rise for the jury.

21                   (At 11:03 a.m., jury brought in)

22                   THE COURT:  Okay, you have some notebooks on your

23         chairs there.  You all set?  Okay, you may be seated.  Ladies

24         and gentlemen, when you come in, you can be seated

25         immediately.  We stand for you and then I tell everyone else

1      to have a seat, okay?  Because you're the judges in this case

2      that we all stand for you, okay?  When you come in, just have

3      a seat.  I have some preliminary instructions for you.  We've

4      given you notebooks with yellow pads in them and pens.

5      Those, I'm going to explain more fully in just a few minutes,

6      okay?

7              All right, ladies and gentlemen of the jury, you

8      have been chosen to decide a criminal charge made by the

9      State of Michigan against one of your fellow citizens.  I

10     will now ask you to stand and swear to perform your duty, to

11     try the case justly, and to reach a true verdict.  If your

12     religious beliefs do not permit you to take an oath, you may

13     instead affirm to try the case justly and reach a true

14     verdict.  If you'd stand this time and raise your right hand.

15     Here is your oath:  each of you do solemnly swear or affirm

16     that in this action now before the Court, you will justly

17     decide the questions submitted to you, that unless you are

18     discharged by the Court or from further deliberations, you

19     will render a true verdict and you will render your verdict

20     only on the evidence introduced and in accordance with the

21     instructions of the Court, so help you God?

22             JURY:  I do.

23             (At 11:05 a.m., impaneled jury sworn in)

24             THE COURT:  Okay.  Everyone say that?

25             JURY:  Yes.

1          THE COURT:  Okay, thank you.  You can be seated now

2     and make yourself comfortable.  Now I will explain some of

3     the legal principles you will need to know and the procedure

4     we will follow in this case.  A trial follows this procedure:

5     first the prosecutor makes an opening statement where he

6     gives his theories about the case.  The defendant's lawyer

7     does not have to make an opening statement, but he may make

8     an opening statement after the prosecutor makes his or he may

9     wait until later.  These statements are not evidence; they

10    are only meant to help you understand how each side views the

11    case.

12          To prove the charges, the prosecutor must prove the

13    following, the following beyond a reasonable doubt.  And I'm

14    going to give you the elements of each of the charges, okay?

15    At the end, you'll have these in your packet, so you don't

16    have to write them down right now, but you, some people can

17    write them down if you wish, but these are the elements.  The

18    defendant is charged with home invasion in the first degree.

19    To prove this charge, the prosecutor must prove each of the

20    following elements beyond a reasonable doubt.

21          First, that the defendant entered a dwelling

22    without permission.  It does not matter whether the defendant

23    got his entire body inside.  If the defendant put any part of

24    his body into the dwelling without permission, that is enough

25    to count as an entry.

1          Second, that when the defendant entered was present

2     in or was leaving the dwelling, he committed the offense of

3     assault.  An assault is an attempt to commit a battery or an

4     act that would cause a reasonable person to fear or apprehend

5     immediate battery.  A battery is a forceful, violent, or

6     offensive touching of the person or something closely

7     connected with the person of another.

8          Third, that when the defendant entered, was present

9     in, or was leaving the dwelling, another person was lawfully

10    present in the dwelling.

11         Interfering with a crime report, committing a

12    crime, the defendant is charged with interfering with a crime

13    report, committing a crime.  To prove this charge, the

14    prosecutor must prove each of the following elements beyond a

15    reasonable doubt.

16         First, that the defendant unlawfully used physical

17    force against another person.

18         Second, when the defendant used the force, it was

19    to prevent or attempt to prevent another person from

20    reporting a crime.

21         Third, the violation involved committing or

22    attempting to commit the home, the crime of home invasion

23    first degree.

24         Count three, resisting, obstructing a police

25    officer.  The defendant is charged with the crime of

1     assaulting, battering, wounding, resisting, obstructing,

2     opposing, or endangering a police officer who is performing

3     his duties.  To prove this charge, the prosecutor must prove

4     each of the following elements beyond a reasonable doubt.

5          First, that the defendant assaulted, battered,

6     wounded, resisted, obstructed, opposed, or endangered

7     Sergeant David Fogo, who is a police officer.  Obstruct

8     includes the use or threatened use of physical interference

9     or force or a knowingly failure to comply with a lawful

10     command.

11          Second, that the defendant knew or had reason to

12     know that Sergeant David Fogo was a police officer performing

13     his duties at the time.

14          Third, that Sergeant David Fogo gave the defendant

15     a lawful command, was making a lawful arrest, or was

16     otherwise performing a lawful act.

17          An arrest is legal if it's made by an officer who

18     has reasonable cause to believe that a crime was committed by

19     the defendant.  Reasonable cause means having enough

20     information to lead an ordinary, careful person to believe

21     that the defendant had committed a crime.  It is not

22     necessary for you to find the defendant guilty of that crime

23     in order to find that the arrest is legal.  In determining

24     whether an officer had probable cause to believe that the

25     defendant committed a crime, you should consider all

1   information known to the police officers or law enforcement

2   personnel involved in the case.  It is not necessary that the

3   arresting officer had probable cause based on his own

4   knowledge if law enforcement personnel collectively have

5   probable cause to believe that a crime was committed by the

6   defendant.  You are only required to find that the police had

7   probable cause to find that the arrest is legal.

8          A police officer has the legal authority to give

9   verbal commands to a defendant when he has probable cause to

10  believe the defendant has committed a crime when, or when he

11  is attempting to legally arrest a defendant.  The prosecutor

12  must prove beyond a reasonable doubt that the arrest was

13  legal or that each of the officers were within their legal

14  authority.  It is up to you to decide whether each officer's

15  actions were legal, according to the law as I've just

16  described it to you.

17         The defendant is charged with the crime of assault,

18  an infliction of serious injury.  To prove this charge, the

19  prosecutor must prove each of the following elements beyond a

20  reasonable doubt.

21         First, that the defendant tried to physically

22  injure another person.

23         Second, that the defendant intended to injure

24  Heather Miner or intended to make Heather Miner reasonable

25  fear an immediate battery.

1          Third, that the assault caused a serious or

2    aggravated injury.  A serious or aggravated injury is a

3    physical injury that requires immediate medical treatment or

4    that causes disfigurement, impairment of health, or

5    impairment of part of the body.

6          The prosecutor must also prove beyond a reasonable

7    doubt that the crime occurred on or about September 18, 2018

8    within Livingston County.

9          Next, the prosecutor presents his evidence.  The

10   prosecutor may call witnesses to testify and may show you

11   exhibits, like documents or objects.  The defendant's lawyer

12   has a right to cross-examine the prosecutor's witnesses.

13   After the prosecutor has presented all of his evidence, the

14   defendant's attorney may also offer evidence, but does not

15   have to.  By law, the defendant does not have to prove his

16   innocence or produce any evidence.  If the defense does not,

17   does call any witnesses, the prosecutor has a right to cross-

18   examine them.  The prosecutor may also call witnesses to

19   contradict the testimony of the defense witnesses.

20         After all the evidence has been presented, the

21   prosecutor and the defendant's lawyer will make their closing

22   arguments.  Like opening statements, these are not evidence;

23   they are only meant to help you understand the evidence and

24   the way each side sees the case.  You must base your verdict

25   only on the evidence.

1          You have been give -- you will be given a written

2     copy of the instructions I've just read you.  You may refer

3     to them during the trial.  This is something that I used to

4     do.  I didn't do it this time, but you will get a written

5     copy at the end of the trial of the instructions that I have

6     read, okay?  Since no one can predict the course of a trial,

7     these instructions may change at the end of the trial.  At

8     the close of the trial, I will provide you of the copy of my

9     final instructions, which are the important ones, for your

10    use during deliberations.

11         My responsibilities as the judge in this trial are

12    to make sure that the trial is run fairly and efficiently, to

13    make decisions about evidence, and to instruct you about the

14    law that applies to this case.  You must take the law as I

15    give it to you.  Nothing I say is meant to reflect my

16    opinions about the facts of the case.  As jurors, you are the

17    ones who will decide this case.  Your responsibility as

18    jurors is to decide what the facts of this case are.  This is

19    your job and no one else's.  You must think about all of the

20    evidence and all of the testimony and then decide what each

21    piece of evidence means and how important you think it is.

22    This includes how much you believe what each of the witnesses

23    said.  What you decide about any fact in this case is final.

24         When it is time for you to decide the case, you are

25    only allowed to consider the evidence that was admitted in

1   the case.  The evidence includes only the sworn testimony the

2   witnesses, the exhibits admitted into evidence, and anything

3   else I tell you to consider as evidence.

4          It is important for you to decide what the facts of

5   this case are.  You must decide which witnesses you believe

6   and how important you think their testimony is.  You do not

7   have to accept or reject everything a witness says.  You are

8   free to believe all, none, or part of any person's testimony.

9   In deciding which testimony you believe, you should rely on

10  your own common sense and everyday experience.  However, in

11  deciding whether you believe a witnesses' testimony, you must

12  set aside any bias or prejudice you have based on race,

13  gender, or national original of the witness.  There is no

14  fixed set of rules for judging whether you believe a witness,

15  but it may help you to think about these questions.  Was the

16  witness able to see or hear clearly?  How long was the

17  witness watching or listening?  Was anything else going on

18  that might have distracted the witness?  Does the witness

19  seem to have a good memory?  Does the witness seem, does the

20  witness look -- how does the witness look and act while

21  testifying?  Does the witness seem to be making an honest

22  effort to tell the truth or does a witness seem to evade the

23  questions or argue with the lawyers?  Does a witness' age or

24  maturity affect how you judge his or her testimony?  Does a

25  witness have any bias or prejudice or any personal interest

1    in how this case is decided?  Have there been any promises,

2    threats, suggestions, or other influences that affect how the

3    witness testifies?  In general, does the witness have any

4    special reason to tell the truth or any special reason to

5    lie?  All in all, how reasonable does the witness' testimony

6    seem when you think about all the other evidence in the case?

7            The questions the lawyers ask the witnesses are not

8    evidence; only the answers are evidence.  Is very careful,

9    and I'm going to tell you an example of this.  Each side has

10   a right to cross-examine the other side's witnesses.  So if I

11   was, if a lawyer asked, isn't it true the judge's robes are

12   purple.  If the witness answers no, then that's the answer.

13   That's the evidence, okay?  Even though it assumes that my

14   robes are purple.  So you have to be very careful that even

15   though the attorneys are allowed to lead the, the witness,

16   that you listen to the answers, okay?  You should not think

17   that something is true just because the lawyers ask questions

18   that assume or suggest that it is.  I may ask questions of

19   some of the witnesses.  These questions are not meant to

20   reflect my opinions about the evidence.  If I ask questions,

21   my only reason would be to ask about things that may not have

22   been fully explored.

23           During the trial, you may think of an important

24   question that would help you to understand the facts in this

25   case.  You are allowed to ask such questions.  You should

1        wait to ask questions until after a witness has finished

2        testifying and both sides have finished their questioning.

3        If you still have an important question after this, do not

4        ask it yourself.  Raise your hand, write the question down,

5        and pass it to the bailiff, who will give it to me.  Do not

6        show your question to the other law-, or to the other jurors.

7        If your question is not asked, it is because I determined

8        under the law that the question should not be asked.  Do not

9        speculate about why the question was not asked.  In other

10       words, you should draw no conclusions or inferences about the

11       facts of the case, nor should you speculate about what the

12       answer might have been.  Also, in considering the evidence,

13       you should not give greater weight to testimony merely

14       because it was given in an answer to questions submitted by

15       members of the jury.  On the other hand, if you cannot hear

16       what a witness or a lawyer says, please raise your hand

17       immediately and ask to have the question or answer repeated.

18              During the trial, the lawyers may object to certain

19       questions or statements made by the other lawyers or

20       witnesses.  I will rule on these objections according to the

21       law.  My rulings are not meant to reflect my opinion about

22       the facts of the case.  Sometimes the lawyers, the parties,

23       and I will have discussions out of your hearing.  Also, while

24       you are in the jury room, I may have to take care of other

25       matters to take care of other things that have nothing to do

1        with this case.  Please pay no attention to these

2        interruptions.

3               You must not discuss the case with anyone,

4        including your family or friends.  You must not even discuss

5        it with other jurors until the time comes for you to decide

6        the case.  When it is time for you to decide the case, I will

7        send you to the jury room for that purpose.  Then, you should

8        discuss the case among yourselves, but only in the jury room

9        and only when all of the jurors are there.  When the trail is

10       over, you may, if you wish, discuss the case with anyone.

11              When you go home tonight, it's going to be a big

12       question of your spouse or your significant other that what,

13       what's going on, what, what kind of case do you have, what's,

14       what's happening.  You have to say the judge told me that I

15       can't talk about it.  That's your answer, okay?  And you

16       can't do that until the time comes for deliberations, all

17       right?  After that, you can talk about it as much as you

18       want.  But before that, you can't.

19              If I call for a recess during the trial, I will

20       either send you back to the jury room or allow you to leave

21       the courtroom on your own and go about your business, but you

22       must not discuss the case with anyone or let anyone discuss

23       it with you or in your presence.  If someone tries to tell

24       them, tell them, tries to do that, tell him or her to stop

25       and explain that as a juror you are not allowed to discuss

1   the case.  If he or she continues, leave and report the

2   incident to me as soon as you return to court.

3           You must not talk to the defendant, the lawyers,

4   or the witnesses about anything at all, even if it has

5   nothing to do with the case.  And once again, I've been in

6   line at a fast food restaurant and noticed that there was a

7   juror there and I don't talk to them and it's not because I'm

8   being rude, it's because I'm not allowed to, okay?  It is

9   very important that you only get information about the case

10  in court when you are acting as the jury and when the

11  defendant, the lawyers, and I are all here.

12          The restrictions I'm about to describe are meant to

13  ensure that the parties get a fair trial.  In our judicial

14  system, it is crucial that jurors are not influenced by

15  anything or anyone outside the courtroom.  Now that many

16  jurors have easy access to information through handheld

17  devices and other technology, jurors may be tempted to use

18  these devices to learn more about some aspect of the case,

19  but if a juror were to do this, it would harm the parties.

20  The parties' attorneys would have no way of knowing that a

21  juror has gotten outside information and would have no chance

22  to object if that information was false, untrustworthy, or

23  irrelevant.  Remember, no matter how careful and

24  conscientious news reporters, family members, friends, and

25  other people outside the courtroom may be, information about

1       the case from television, radio, the internet, and social

2       media will inevitably be incomplete and could be incorrect.

3       Please, bare these things in mind as I read the following

4       instructions.

5                  These restrictions apply from the moment until I

6       discharge you from jury service.  You must decide this case

7       based solely on the evidence you see and hear in this

8       courtroom.  You must not consider information that comes from

9       anywhere else.  This means that during the trial, you must

10      not read, watch, or listen to news reports about the case

11      whether in newspapers, on television, on the radio, or on the

12      internet.  You also must not research any aspect of the case

13      during the trial.  This means that, means research using a

14      cell phone, computer, or other electronic device to search

15      the internet, as well as research with traditional sources

16      like dictionaries, reference manuals, newspapers, or

17      magazines.  You must not investigate the case on your own or

18      conduct any experiments concerning the case, including

19      investigation or experiments using the internet, computers,

20      cellular phones, or other electronic devices.  You must not

21      visit the scene of any even at issue in this trial.  If it is

22      necessary for you to view or visit the scene, the court staff

23      will take you there as a group under court supervision.  You

24      must not consider as evidence any personal knowledge you have

25      of the scene.

1          Before your deliberations, you must not discuss

2     this case with anyone, even with your fellow jurors.  After

3     you begin deliberations, you should discuss the case with

4     your fellow jurors, but you must still not discuss the case

5     with anyone else until I discharge you from jury service.

6     Until I have discharged you from your jury service, you must

7     not share any information about the case by any means,

8     including cellular phones or social media.  If you discover

9     that a juror has violated my instructions, report it to the

10    bailiff.

11         You may also take notes during the trail if you

12    wish, but, of course, you don't have to.  If you do take

13    notes, you should be careful that it does not distract you

14    from paying attention to all the evidence.  When you go to a

15    jury room to decide your verdict, you may use your notes to

16    help you remember what happened in the courtroom.  If you

17    take notes, do not let anyone except the other jurors see

18    them during the deliberations.  You must turn them over to

19    the bailiff during recesses.  What I have you do is put them

20    on your seat, on your chairs, and we lock the courtroom door.

21    No one will see your notes, okay?  Your notes will not be

22    examined by anyone and when your jury service concludes, your

23    notes will be collected and destroyed.  So no one is going to

24    see your notes.

25         When you see that we have chosen a jury of 14

1     people.  After you have heard all the evidence and my

2     instructions, we will draw lots to decide which two of you

3     will be dismissed in order to form a jury of 12.  And we do

4     that so that if someone is sick or someone has an emergency

5     that we still have enough jurors to go through with

6     deliberations; we don't have to go through the picking of a

7     jury again.  But you don't know which ones are going to be

8     picked, so it's important that you listen because it's done

9     by lot; it's just picked by circumstances, picked out of a, I

10    don't know, a box, and, and your name, if your name is read,

11    then you're going to be excused and you don't deliberate.

12    But you don't know which one of you is, it's going to happen

13    to.  So it's important that you all listen very carefully

14    because you may be going to deliberations.  Possible penalty

15    should not influence your decision; it is the duty of the

16    judge to fix the penalty within the limits provided by law.

17    I may give you more instructions during the trial and at the

18    end of the trial I will give you detailed instructions about

19    the law in this case.  You should consider all of my

20    instructions as a connected series.  Taken all together, they

21    are the law you must follow.

22              After all the evidence has been presented and the

23    lawyers have been, have given their arguments, I will give

24    you detailed instructions about the rules of law that apply

25    to this case.  Then, you will go to the jury room to decide

1    on your verdict.  A verdict must be unanimous.  That means

2    every juror must agree on it and it must reflect the

3    individual decision of each juror.  It is important for you

4    to keep an open mind and not make a decision about anything

5    in this case until you go to the jury room to decide the

6    case.

7         Okay, those are call preliminary jury instructions,

8    kind of telling you what's going to happen in this trial and

9    we're going to start with opening statements by Mr. Taylor.

10        MR. TAYLOR:  Thank you, Your Honor.

11        So as you may be able to tell from the charges that

12   are read here, this is a case about a home invasion between

13   two people who knew each other.  The evidence that you're

14   going to see in this case is going to establish that on

15   September 18, 2018 in Howell, here in Livingston County, that

16   the victim in this case, Heather Miner, was at home and

17   getting ready to get into bed.  Now, Heather Miner is going

18   to testify in this case and she's going to tell you that

19   she's known the defendant, Gary Fischer, for a number of

20   years, that they were not in what you would think of as a

21   traditional relationship, but that they would occasionally be

22   intimate.

23        At some point prior to September 18th, Ms. Miner is

24   going to describe to you that she had an argument with an ex-

25   boyfriend over a dog and that based on that argument, the

1     defendant intervened and created a scene.  Ms. Miner, after

2     the argument she had with the defendant, decided that she

3     wasn't going to deal with him anymore, she blocked his number

4     from phone calls and texts.  Ms. Miner is going to tell you

5     that up until the point she decided to go to bed, the

6     defendant was still attempting to contact her, even though

7     she didn't want to have contact with him, and she could tell

8     because her phone would indicate when she was receiving texts

9     and blocked calls.

10          Ms. Miner is going to testify that when she got

11     into bed, she closed her eyes and went to go to sleep and the

12     next thing she knew, Mr. Fischer had entered her home and was

13     climbing into bed.  You're going to hear Ms. Miner testify

14     that at that point, they had an argument because she thought

15     the defendant had been drinking and didn't want him drinking

16     and driving to come over to her house.  She told him he had

17     to leave.  And that when she told him he had to leave, he

18     started to attack her.  Ms. Miner is going to tell you that

19     the defendant delivered several punches to the side of her

20     head throughout the altercation, he decided to slam her head

21     into the floor a number of times, and that she went for her

22     phone to call 911.  You're going to hear Ms. Miner detail for

23     you the transaction that occurs, but you're also going to get

24     to hear that 911 call that she ultimately gets to make.  Ms.

25     Miner is going to tell you that throughout the assault on her

1      in her own home, for which she says the defendant never had

2      permission to enter, that they fought over that phone.  They

3      fought over that phone to the point where she ended up

4      retrieving a kitchen knife to try to defend herself.  Ms.

5      Miner is going to tell you that at some point in the attack,

6      the defendant got the phone away from her.  He took the phone

7      and took it outside of the house.  Ms. Miner is going to tell

8      you that the defendant held her phone outside of her own home

9      and made her promise she wasn't going to call 911 before he'd

10     give it back.  Ms. Miner is going to tell you that she made

11     that agreement so she could get her phone back and then she

12     sprinted back into her house and locked the door.  And as

13     she's attempting to talk to 911 about what's been happening

14     in her home, the defendant's going to be back in her home.

15     Ms. Miner is going to tell you that before this night, the

16     doors to her home weren't damaged and that after the

17     defendant re-entered her home, the doors had been, or one of

18     the doors had been kicked in.  You're going to get to see

19     photos of that doorframe where it's damaged.  You're going to

20     see the interior of her home where the drywall is smashed and

21     chairs are flipped over and lamps are broken.  Ms. Miner is

22     going to be on that 911 call, holding a tough front to the

23     defendant while pleading to the dispatcher to please send

24     someone to help her.

25           You're going to hear that someone did come to help.

 1    Sergeant Fogo arrives on scene having been dispatched and

 2    getting relayed the information that Ms. Miner is feeding to

 3    911.  And that as he's approaching Ms. Miner's home, he sees

 4    a description of the suspect that's been narrated over the

 5    radio leaving the home.  You're going to hear Sergeant Fogo,

 6    based on the information that he had, believing that this

 7    person had just attacked a woman in her home, he's going to

 8    give that, give the defendant a command, police, show me your

 9    hands.  Sergeant Fogo is going to tell you that at that

10    point, the defendant moved to the other side of a vehicle in

11    the driveway and then attempted to flee.  You're going to

12    hear Sergeant Fogo say he gave several more commands and that

13    the defendant in his flight ran into a trash can and fell to

14    the ground.  At that point, Sergeant Fogo tried to subdue

15    him, but the defendant tried to get up and run again.  Again,

16    Sergeant Fogo indicated that he was the police, the defendant

17    what, what Sergeant Fogo would call passive resistant,

18    meaning instead of actively trying to push Sergeant Fogo off

19    of him, he just refused to bend his body to be handcuffed.

20         You're going to hear officers assisted at s-, on

21    scene, that they interviewed Ms. Miner, they observed her

22    injuries and took photographs of them.  You're going to hear

23    those officers testify about what they saw inside that

24    residence, the injuries they saw.  Again, Ms. Miner is going

25    to tell you that she initially refused an ambulance ride to

1     the hospital because she had a dog that she needed somebody

2     to take care of and she didn't want to go to the hospital

3     lone after what just happened.  She's going to tell you that

4     she go to the emergency room.  She went to the emergency room

5     to be treated for the injuries that she had all over her

6     body, including a broken tooth.  She's going to tell you that

7     after she left the emergency room, she went to a dentist to

8     have her broken tooth assessed so that they could do a repair

9     and that she's had, had to have a number of procedures to fix

10    what was done that night.

11          You're not only going to hear the witnesses testify

12    to these things, but you're going to see the photographic

13    evidence and hear the audio yourself.  And as we talked about

14    during jury selection, you're going to be asked if the facts

15    that you hear, should you believe it beyond a reasonable

16    doubt, prove the elements of the crimes that the defendant is

17    charged with.  So I'm going to go over those right now.

18          The first count is home invasion first degree.  And

19    it has a pretty technical legal sounding name to it, but

20    ultimately, it makes sense when you think about it.  So the

21    elements here are that the defendant made entry into a home

22    that he didn't have permission to enter, right?  As we talked

23    about, the evidence is going to show you that Ms. Miner never

24    told him he could come into her home when she was in bed.

25    And that certainly, by shutting and locking the door after

 1          she got her phone back, she made it clear that the defendant

 2          was not permitted to come into her home, thus how he had to

 3          kick the door in to get back inside.  You're going to -- see

 4          the next element here is, is that while entering into,

 5          present in, or exiting the home, the defendant committed an

 6          assault.  Assault is either attempting to batter somebody or

 7          making somebody fear an imminent batter.  Well, not only did

 8          the defendant make Heather Miner fear at imminent battery,

 9          that harmful or offensive touching, he actually injured her,

10          right?  And that, and this is, kind of, implicit, that

11          another person was lawfully present in the home.  Obviously,

12          Heather Miner, the person was assaulted in her home, was

13          lawfully present in her own home.  That's the elements for

14          home invasion.  People don't get to come into your house and

15          beat you up.  That's what the law says.

16                    Count two, interfering with a crime report by

17          committing a crime.  You're going to hear that the elements

18          here are the defendant unlawfully used physical force against

19          another person.  As we've just described, he attacked Ms.

20          Miner in her home.  That's the evidence you're going to hear.

21          That he used that physical force in an attempt to prevent or

22          did prevent someone from reporting a crime.  You're going to

23          hear Ms. Miner talk about how the defendant physically

24          removed the phone from her hands and that they, when it hit

25          the floor, they tussled over it and the defendant got it and

1    got it away and then she had to get it back from him. You're

2    going to hear in the 911 call, Ms. Miner, in an effort to

3    make the defendant think she's not calling 911, will only

4    speak to the dispatch when the defendant's not in the room

5    and then she moves the phone away from her face so that it

6    doesn't look like she's on it. She -- you're going to hear

7    Ms. Miner tell the dispatcher I can't let him hear me talking

8    to you or he'll hit me again. So the element there that he

9    used physical force in an attempt to prevent somebody or did

10   prevent somebody from reporting a crime. And that that

11   offense that he was committing in order to prevent somebody

12   from committing a crime was that home invasion, right? That

13   he was attacking Ms. Miner in her home, that was the crime

14   that she was trying to report, and that he continued to

15   assault her in order to prevent her from reporting that

16   crime. So those two counts are very related and we

17   understand how they work together.

18          The third count here is that resisting, obstructing

19   a police officer. Now, there's a, there's some legal

20   language that the judge read to you in the jury instruction

21   there about what you have to conclude about what Sergeant

22   Fogo knew when he gave the defendant those commands. That if

23   Sergeant Fogo had reason to believe the defendant, or

24   probable cause to believe the defendant had committed a

25   crime, then he could make an arrest. Or that if he believed

1    a crime was committed, he could give the defendant lawful

2    commands as, in an effort to respond to that crime, right?

3            So you're going to hear Sergeant Fogo talk about

4    the information that was fed to him through dispatch, through

5    his observations he could make on scene, and his knowledge

6    through training and experience of what the evidence that was

7    being presented to him meant in his mind.  He's going to tell

8    you that based on the dispatches that he received and the

9    observations he made when he arrived on scene, he believed

10    the person who had assaulted Ms. Miner in her home was

11    attempting to flee the home and that he gave a lawful

12    command, police show me your hands, so that he could make a

13    stop so that everyone in the situation was therefore safe.

14    He wanted to see the defendant's hands so that he knew the

15    defendant was unarmed, otherwise it could be a different kind

16    of situation.  So Sergeant Fogo is going to tell you as a

17    uniformed police officer, he gave that command through his

18    lawful duties to investigate and apprehend a suspect in a

19    crime.

20            You're going to hear Sergeant Fogo then say after

21    he gave that first command, if that weren't enough, that the

22    defendant tried to evade him and escape and that there were

23    multiple other commands and physical restraints that were

24    attempted to be used to get him to come into compliance just

25    so that Sergeant Fogo could secure him.  So, again, a police

1    officer acting in conformance with his lawful duties, giving

2    a command, making an arrest, and that the defendant either

3    opposed, obstructed, battered, or endangered Sergeant Fogo.

4    So the question I'm going to ask you, as it pertains to that

5    element, is did the defendant, through his actions, make

6    Sergeant Fogo's job more difficult in effectuating his

7    arrest?  Did he oppose Sergeant Fogo by disobeying those

8    lawful commands?  And if the answer is yes, then you, then

9    the answer would be the defendant is guilty of that offense

10   as well; so resisting obstructing a police officer.

11        Now the last offense there is that assault with

12   serious injury.  So as I described to you, Ms. Miner is going

13   to explain how the injuries that she had experienced were

14   inflicted.  So you're going to hear her say that the

15   defendant unlawfully used physical force against her and

16   caused that physical bodily injury, including scrapes and

17   bruises and head injury and the broken tooth.  Now the judge

18   is going to give you the instruction that says that if the

19   defendant intended to commit that injury and that injury

20   required immediate medical attention, then the defendant

21   would be guilty of that offense if you believe the evidence

22   beyond a reasonable doubt.  So you have to make a conclusion

23   about a couple of other things, not just that the defendant

24   assaulted or battered Ms. Miner, but that when he did it, he

25   intended to injure her.  You're going to hear Ms. Miner say

1 that after she attempted to get the defendant out of her

2 house, he made several statements to her, now I have to kick

3 your ass and I'll kill you, right?  Those are pretty good

4 indicators of what was going through his mind at that point,

5 right?  I'll kill you is a pretty good indication that you

6 want some harm to come to that person.

7    You're g-, you're going to hear that Ms. Miner,

8 again, was observed by the, all the officers to have facial

9 injuries, bodily injuries, and that she ultimately had to go

10 to a dentist to have some of that damage repaired, that she

11 had to have a new crown put on her front tooth, not her front

12 center tooth, but one of her front teeth.  And so she did

13 receive medical attention and it was, essentially, as soon as

14 somebody could get to the house to take care of her dogs and

15 go to the hospital with her.

16    So after you've heard all this evidence and you've

17 seen the photographs and listened to the audio, at the end of

18 the trial, you'll be given a further set of instructions and

19 then asked to go deliberate.  And each of you will have to

20 consider the evidence for yourself and collectively and

21 decide whether or not you believe I've proven beyond a

22 reasonable doubt the defendant committed each of the offenses

23 we've charged him with.  In doing that, you have to weigh all

24 of the evidence and listen to all of the witnesses and decide

25 whether you believe what they have to say or what the

1    inferences I'm asking you to make from the evidence in this

2    case.  But at the end of it, as Mr. Sizemore said, you have

3    to use your common sense.  You have to use what you know to

4    be reasonable and compare it to what you hear come from the

5    witness.  Because it's not just enough that Ms. Miner was

6    injured.  It's not just enough that she was injured in her

7    home, right?  We have to find that all of the elements of

8    each of the offenses were there in order to find the

9    defendant guilty of each of those crimes that he's charged

10   with.  So at the end of this trial, I'll come back before

11   you, I'll summarize what I saw come through as the evidence,

12   and I'm going to ask that you find the defendant guilty as

13   charged and that he did commit each and every one of the

14   crimes for which he is charged.  Thank you.

15          THE COURT:  All right, thank you, Mr. Taylor.  Mr.

16   Sizemore, are you going to give your opening statement now or

17   wait until later?

18          MR. SIZEMORE:  We're going to defer, Your Honor.

19          THE COURT:  Okay, then call your first witness.

20          MR. TAYLOR:  Your Honor, I would call Heather Miner

21   to the stand.  She's probably going to be a longer witness; I

22   don't know if the Court wants to take a break at midpoint or

23   you want to just see how far we can get before we go to

24   lunch?

25          THE COURT:  I usually like to push on.

1          MR. TAYLOR:  Okay.

2          UNIDENTIFIED SPEAKER:  Officer, may I have a pen,

3     may I have a pen?  This one is cont-, continuously drying

4     out.

5          THE COURT:  You need another pen?  Cer-, certainly.

6     That one work?  I gave you a bad pen.  If you'd come right up

7     here, please.  And raise your right hand, please.  Do you

8     swear to tell the truth, the whole truth, and nothing but the

9     truth so help you God?

10          MS. MINER:  Yes, I do.

11                         HEATHER MINER

12          (At 11:42 a.m., witness sworn by the Court and

13               testified as follows)

14          THE COURT:  Okay.  Just have a seat there, please,

15     make yourself comfortable, and to let you know, you have to

16     answer verbally because she's recording what you have to say

17     and she can't get the nods of the head and try not to say uh-

18     huh or uh-uh because they sound so close that it's hard for

19     her to understand.

20          THE WITNESS:  Okay.

21          THE COURT:  Okay?

22          THE WITNESS:  Okay.

23          THE COURT:  All right, will you please state your

24     full name and spell your last name?

25          THE WITNESS:  Heather Marie Miner, M-i-n-e-r.

```
 1                    THE COURT:  Thank you.  Go ahead, Mr. Taylor.
 2                         DIRECT EXAMINATION
 3   BY MR. TAYLOR:
 4   Q    Ms. Miner, what city do you live in?
 5   A    Howell, Michigan.
 6   Q    Is that here in Livingston County?
 7   A    Yes.
 8   Q    Do you recall the date of September 18, 2018?
 9   A    Yes, I do.
10   Q    And were you living in Howell City at that point?
11   A    Yes, I was.
12   Q    Okay.  Do you know a person named Gary Thomas Fischer?
13   A    Yes, I do.
14   Q    And how do you know Gary?
15   A    I'm not exactly sure how, I can't remember, I think we met
16        through the internet --
17   Q    Okay.
18   A    -- we met on the internet.
19   Q    I'll need you to speak up a little bit.
20   A    Okay.  We met on the internet.
21   Q    Okay.  And how long have you known Mr. Fischer?
22   A    Maybe since 2015.
23   Q    Okay.
24   A    I can't remember exactly.  I can't remember exactly how long
25        or what year I met him.
```

```
 1   Q     And do you see the person that I've described as Gary Fischer

 2         in the courtroom here today?

 3   A     Yes, I do.

 4   Q     Could you point him out and describe what he's wearing?

 5   A     Grey shirt and vest.

 6   Q     Okay.

 7   A     Blue tie.

 8               MR. TAYLOR:  Your Honor, would the record reflect

 9         the witness has identified the defendant?

10               THE COURT:  It shall.

11               (At 11:44 a.m., witness identified defendant)

12   BY MR. TAYLOR:

13   Q     Now, you said you met Mr. Fischer on the internet.  Did, when

14         was the first time you met in person?

15   A     I'm trying to think of what year that was, I'm sorry.  It was

16         2015, June of two thousand, July of 2015.

17   Q     Okay.  And in the three or so years that you knew Mr. Fischer

18         before the September 18, 2018 day, how many times do you

19         think you saw him in person?

20   A     Twenty.

21   Q     Okay.  And did you meet up in public or what was your

22         arrangement?

23   A     He actually came over to my house.

24   Q     Okay.  Did he have a key to your house?

25   A     No.
```

1    Q    Did you invite him over when he would come over?

2    A    Yes.

3    Q    Okay.  And what was the nature of your relationship with him?

4         Were you guys dating, was it just platonic, or how did that

5         go?

6    A    When we first met, we were, sort of, seeing each other and we

7         were sleeping together.  And then he didn't talk for a long

8         time.  And then I was in a relationship and I think Gary went

9         to jail for something and then I can't remember what it was,

10        but right after that, we met up again, it was last year in

11        like February or March.

12   Q    Okay.  So you had an intervening period where you weren't

13        talking to him?

14   A    Uh-huh.

15   Q    Do you remember when that started?  I'm sorry, you have to

16        say yes.

17   A    Yes, I'm sorry, yes.  There were many times when, there would

18        be many periods where we were not speaking.

19   Q    You said that you had started another relationship.

20   A    Uh-huh.  I had, I had been back with my ex at a time, had to

21        come and move back in with me.

22   Q    Okay.  What's your ex's name?

23   A    Shawn Cotton.

24   Q    Okay.  So Mr. Cotton moved back into you, was at that Howell

25        City address?

1   A   Yes.

2   Q   And when Mr. Cotton moved into you, do you, in with you, do

3       you remember what, what timeframe that was?

4   A   He, Shawn Cotton moved in with me in September 2016.

5   Q   Okay.  And was there a time where he moved out?

6   A   June of 2018.

7   Q   Okay.  So about three months prior to that September 18, 2018

8       today we were talking about earlier?

9   A   Yes.

10  Q   Had anyone else moved into your house in the three months

11      since Mr. Cotton left?

12  A   No.

13  Q   Okay.  Did -- and you said you started talking to Mr. Fischer

14      again?

15  A   Yes.

16  Q   How many times do you think you saw Mr. Fischer from the time

17      Mr. Cotton moved out until September 18, 2018?

18  A   Maybe 10.

19  Q   Okay.  So in three months, you saw him ten times?

20  A   I would say.

21  Q   Okay.

22  A   Maybe, maybe seven to ten; I'm not exactly sure how many,

23      but…

24  Q   And where, where did you see each other at?

25  A   My house.

```
 1  Q    Okay.  And how would it be that he would come to your house?

 2  A    Well, he had bought a vehicle, like a van or something.

 3  Q    Oh, no, no, I should have been more specific, I'm not asking

 4       like how he physically conveyed himself to you house, I mean

 5       did you invite him over --

 6  A    Oh --

 7  Q    Did he have --

 8  A    Oh, yeah, we would, um, well, there were times that Gary

 9       would come over uninvited and I would have to make him leave,

10       but there were also times that I invited Gary to come over.

11  Q    Okay.

12  A    And the times that he was invited, I gave him my garage code

13       to enter through the garage.

14  Q    Okay.

15  A    He was doing work for me in my house, as well, so he changed

16       and fixed my garage door and changed my locks after Shawn

17       moved out.

18  Q    Okay.

19  A    So that's why there was like three times that I saw him there

20       that he was actually doing work for me, I think, and also

21       going to paint, but never ended up painting.

22  Q    Okay.  So there were times where you let him in and times

23       that you didn't, is that correct?

24  A    Right.

25  Q    So was there ever a point in time where you told Mr. Fischer
```

1        he can come over whenever he wants?

2    A   No.

3    Q   Was there ever a point in time where you gave him a key to

4        your house or told him he could come in without talking to

5        you?

6    A   No.

7    Q   Okay.  Now I'd like to talk to you a little bit about what

8        your house looks like.  Is it, sort of, a standalone house,

9        is it a townhouse, is it an apartment, is it a mobile home?

10       Could you just describe a little bit what it looks like?

11   A   It's a stacked condo in the middle of about eight other

12       condos.

13   Q   Okay.

14   A   So --

15   Q   Are they connected?

16   A   Uh-huh.

17   Q   All the condos are connected?

18   A   Uh-huh, they, yes, they are all connected.

19   Q   Okay.

20   A   So they, my condo shares walls on both sides --

21   Q   All right.

22   A   -- to neighbors.

23   Q   You said that Mr. Fischer changed your garage door.  Is your

24       garage attached or unattached?

25   A   Attached.

1   Q   Okay.

2   A   It's the underneath of my condo.

3   Q   All right.  Does the garage have a doorway that goes to the

4       interior of your home?

5   A   Yes.

6   Q   All right.  And earlier, you indicated that you had given Mr.

7       Fischer your garage code to get in.  Is that correct?

8   A   Yes.

9   Q   And --

10  A   Well, he actually set my garage code because he fixed --

11  Q   Oh--

12  A   -- he fixed the garage, so he, he naturally had the garage

13      code.

14  Q   Okay.  The door that you have in between your garage and the

15      interior home, is that normally locked?

16  A   I typically lock it before I go to bed at night.

17  Q   Okay.

18  A   Um, on September 17th, I did not.

19  Q   Okay.  You, where is your bedroom compared to the entry doors

20      to your home?

21  A   So there's two entry doors to my home.  But like I said, it's

22      a stacked condo.  And since it's in the middle of a long row,

23      there's a front door along on the front side of the building,

24      and then there's the garage door in the back; it's a single

25      stall garage.

```
 1   Q    Okay.
 2   A    And that goes up and then there's a door that goes to, like,
 3        a foyer area that goes right up the stairs because it's a
 4        stacked condo, so if you went, if you go in the garage, then
 5        there's another door, sort of, to the left at the back of the
 6        garage, and if you go in that door, then there's a hallway
 7        that leads forward to the front door or a stairway that goes
 8        up to my condo.
 9   Q    Okay.  So both of the entries to your home are on the ground
10        level and then your living space is above the garage, is that
11        right?
12   A    Yes.
13   Q    Okay.
14   A    Well --
15   Q    Um --
16   A    Well, somebody else's living space is actually above my
17        garage, but tech-, but I mean, technically somebody else's
18        living space is above my garage, but mine is in front of
19        their living space on top of my garage.
20   Q    Okay.  So there's, basically, two residences on that floor?
21   A    Uh-huh.
22   Q    Is that a yes?
23   A    Yes, sorry.
24   Q    Sorry.
25   A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | And then you said that your stacked condos are in a row.  How |
| 2 | | many are next to each other? |
| 3 | A | I think that there's eight in, I'm trying to think, there's |
| 4 | | one, two, three, four, five, mine, six, seven, eight, there |
| 5 | | might even be ten.  I don't know if there's two units on the |
| 6 | | end or not. |
| 7 | Q | And where is yours in relation to those eight or ten? |
| 8 | A | Smack dab in the middle. |
| 9 | Q | Okay.  So if I, if I was looking at the front door of your |
| 10 | | house, is there any paths in between any of the condos that |
| 11 | | would let me get to your garage or do I have to go all the |
| 12 | | way around? |
| 13 | A | You have to go all the way around. |
| 14 | Q | And so you'd have to go around four to five other condos? |
| 15 | A | Yes. |
| 16 | Q | Okay. |
| 17 | A | Either direction. |
| 18 | Q | All right.  Do you have deadbolts or chains or anything like |
| 19 | | that? |
| 20 | A | I do now; I did not. |
| 21 | Q | At the time? |
| 22 | A | I did not have deadbolts at the time. |
| 23 | Q | Okay.  Now, we talked about your ex, Mr. Cotton.  Had you |
| 24 | | been talking to him leading up to September 17th into the |
| 25 | | 18th? |

1    A    No, he, he and his, his sons had taken my dog.

2    Q    Okay.  Where did he take your dog from?

3    A    My condo.

4    Q    Okay.

5    A    I, when, when my ex moved out, I gave his kids the key to my

6         condo and said this is still home for you, I love you, you're

7         still my boys, you can still come and go, and here's a key,

8         make sure your parents know where you are.

9    Q    Okay.  When they took your dog, how did you feel about that?

10   A    Heartbroken.

11   Q    Okay.  Did you share that information with Mr. Fischer?

12   A    Yes.

13   Q    And are you aware if he did anything in response to that

14        information?

15   A    He agreed to help me try to get my dog back.

16   Q    Okay.  And do you know what, if anything, he did to that end?

17   A    On, on September 17th, he did go to where he knows Maggie is

18        located to, sort of, I don't, I don't know what, I don't

19        what, I don't know because we had agreed we were no longer

20        going to try and get her because my mom had told me that I

21        could get in trouble for doing so.

22   Q    Okay.  So is Maggie your dog?

23   A    Yeah.

24   Q    And Mr. Fischer was going to where he thought she might be?

25   A    Yeah, well, I, I don't -- he wasn't supposed to.  On Sunday

1      the 16th, we were, sort of, looking for Maggie, trying to

2      figure out where Shawn was keeping her, hoping to get her

3      back.  And then my mom called and said you can get in a lot

4      of trouble for doing that, so knock it off.  So we stopped

5      and went back to my place and a, and agreed and said, you

6      know, even Gary said my mom made the right decision; probably

7      it's not a good idea to do this.

8  Q   So Gary, you're talking about Mr. Fischer here?

9  A   Yes.

10 Q   He agreed with your mother that you guys should call off the

11     attempt to get Maggie back?

12 A   Yes.

13 Q   All right.

14 A   And then --

15 Q   Did --

16 A   Then the next day at, like, 5:09, I got a text from him at

17     the end of the work day that said I'm wrapping up from work,

18     am I going to Howell or, or Livonia.  To which --

19 Q   As we, we say him, are you talking about Mr. Fischer?

20 A   From Mr. Fischer, yes.

21 Q   Okay, you got a text from Mr. Fischer.

22 A   Uh-huh.

23 Q   What was that in reference to?

24 A   Well, I, I didn't respond because I thought it was a

25     ridiculous text because I thought, well, we just talked

1      yesterday, we both know we're not going to try to get Maggie

2      back, so I didn't respond.  But what I assumed the text was

3      about was coming over so we could try to get Maggie.

4  Q    Okay.  And at some point, did that conversation reinitiate?

5  A    I just went home and, um, ignored the text from Gary.  And

6      then I don't know how much later it was, maybe an hour and a

7      half, maybe, at the most, I started receiving phone calls

8      from Gary, one after the other.  So I think the second call I

9      answered because I thought it must be maybe there was

10     something wrong.  And he explained to me that he said you're

11     going to be really upset with me.  I said why.  And he said I

12     did something.  What did you do.  He said, well, I went to

13     try to get Maggie.  I said oh my God, Gary, you're going to

14     get me in trouble, Shawn has my address, it's my address he's

15     going to give the cops when he calls the cops, you're crazy,

16     why did you do that.  You know, that was a terrible idea.

17     And then, honestly, the first thing I said was did you get

18     her.

19  Q    Right.

20  A    And he said no.  And --

21  Q    So what did Mr. Fischer say happened?

22  A    He said that he was, well, where Shawn lives, I don't know

23     where, he didn't, he didn't give me, like, a specific

24     location.  But that he saw, he did see Maggie come out with

25     Shawn outside and that he walked towards Maggie to get her or

1     maybe to approach her or I don't know.  And Shawn recognized

2     Gary at that time and called him out for being there, trying

3     to get the dog and, and, and he told me, and I don't remember

4     it all what they said to each other, but he did tell me at

5     that time that they had a conversation.

6  Q  When you say he, you're talking about Mr. Fischer?

7  A  G-, Gary, yup, Gary told me that he --

8  Q  And you talked to Mr. Cotton?

9  A  Uh-huh.

10 Q  Is that yes?

11 A  Yes, yes, that he spoke with Mr. Cotton.

12 Q  Um, and they had a conversation.  Did Mr. Fischer say what

13    happened after that?

14 A  I don't remember his words exactly.  I know that he left

15    there and then proceeded to call, try to call me.  But --

16 Q  Okay.

17 A  But I can't remember exactly what the end was with Shawn.

18 Q  After Mr. Fischer relayed to you what happened between him

19    and Mr. Cotton, how were you feeling?

20 A  Mad.

21 Q  Okay.  And is that because you talked about him potentially

22    getting you in trouble with the cops?

23 A  Yes.

24 Q  All right.  Did you say anything to Mr. Fischer at the end of

25    that conversation?

| | | |
|---|---|---|
| 1 | A | Yeah, I said thanks a lot, now I got to get out of here, so I |
| 2 | | packed up my, my, my current dog and jumped in the car and |
| 3 | | left because I was afraid the cops were going to come over |
| 4 | | and try to talk to me about something I didn't know about. |
| 5 | Q | Okay.  And did you go back to your house that night? |
| 6 | A | Later that night about 9:30, and, and Gary did call me and |
| 7 | | text me multiple times.  I just went and sat in a parking lot |
| 8 | | at Jonah's market.  And Gary proceeded to text and call and |
| 9 | | he said things like I can't believe you're mad at me, this is |
| 10 | | what you, this is what you said you wanted just yesterday, |
| 11 | | you know, like, why are you acting this way.  And I responded |
| 12 | | with, you know what, I'm not mad at you, no more covert |
| 13 | | operations, you know, we're not getting Maggie, so that's |
| 14 | | enough.  And, and, you know, he kind of seemed like he was |
| 15 | | upset with me for being upset with him.  So eventually, I |
| 16 | | said I'm not, I'm not dealing, I'm not going to talk to you |
| 17 | | anymore.  I'm going, and I went home around 9:30 and he had |
| 18 | | called again or text; I can't remember exactly how, which |
| 19 | | order was the last thing, a call or a text.  But the last |
| 20 | | thing that I communicated to Gary is, okay, you're scaring |
| 21 | | me, I'm going to block you right now, and I'm not going to |
| 22 | | answer any more from you. |
| 23 | Q | Okay.  When you block someone on your phone, can you still |
| 24 | | tell if they're trying to call or text you? |
| 25 | A | If you go, well, when you block somebody on my phone, if they |

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | call, it comes up with the little blue circle saying you             |
| 2  |   | didn't answer it if they called, if, if that person that you         |
| 3  |   | blocked called.  If they text you, their, your block messages        |
| 4  |   | on an android go to a blocked messages folder, so you can            |
| 5  |   | always go and see what somebody that you blocked sent you.           |
| 6  | Q | Okay.  And do --                                                     |
| 7  | A | Which I hadn't not, had not done until after the officers            |
| 8  |   | came.                                                                |
| 9  | Q | Okay.  At some point, did you look back and try to see how           |
| 10 |   | many times Mr. Fischer had tried to contact you after you           |
| 11 |   | told him you were blocking him?                                      |
| 12 | A | Not until after the of-, not until after everything occurred.        |
| 13 | Q | But now you have?                                                    |
| 14 | A | Yes.                                                                 |
| 15 | Q | And how many times was that?                                         |
| 16 | A | I have 23 missed calls.                                              |
| 17 | Q | Okay.  And between -- when was the last time you talked to           |
| 18 |   | him that day?                                                        |
| 19 | A | I don't know.  I can't --                                            |
| 20 | Q | Was that, was that after that about 9:00 conversation we were        |
| 21 |   | just talking about?                                                  |
| 22 | A | Uh-huh.  I believe it was between 9:00, 9:00 and 9:30.               |
| 23 | Q | Okay.                                                                |
| 24 | A | Ma-, but I, I don't have a real concept of time, like, it            |
| 25 |   | could have been 10:30.  So I'm going to say between 9:00 and         |

```
 1          10:30 --

 2    Q     All right.

 3    A     -- was for sure the last time.

 4    Q     And then when was the next time you saw Mr. Fischer again?

 5          What, what time on the clock?  Do you remember?

 6    A     I have no idea what time it was when I woke up and he was in

 7          my house.

 8    Q     Okay.  Was it still that same night?

 9    A     Yes.

10    Q     And had, you hadn't talked to him since you told him you were

11          blocking him?

12    A     No.  My he-, I put my phone down, face down, under my pillow,

13          and went to sleep.

14    Q     Okay.

15                THE COURT:  Mr. Taylor, keep your spot there.  I'm

16          going to let the jury go to lunch and if the jury can get

17          back about 1:00, that's great.  If you can't get back until

18          1:15, I understand.  Sometimes the fast food is not fast

19          food, you wait in line.  Um, but you're not to discuss the

20          case at all.  When you do come back, you're going to meet in

21          the jury assembly room where we were this morning.  You're

22          all going to go there and then the bailiff will come and get

23          you afterwards, okay?  But don't discuss the case with

24          anyone, okay?  Thank you.

25                THE BAILIFF:  All rise for the jury.
```

```
1                      (At 12:00 p.m., jury taken out)
2                THE COURT:  Okay, ma'am, you can step down, okay?
3                THE WITNESS:  Thank you.
4                THE COURT:  Don't discuss your testimony with
5          anybody, okay?  Okay.
6                THE WITNESS:  Come back at the same time?
7                THE COURT:  Come back about 1:00, yeah.  And the
8          doors will be locked, so if you wish to leave your things in
9          here, that's fine.
10               MR. TAYLOR:  I'm going to leave the exhibits with
11         your staff.
12               THE COURT:  Okay.
13                     (At 12:01 p.m., Court recessed)
14                     (At 1:11 p.m., Court reconvened)
15               THE COURT:  Fourteen jurors have made it back.  I
16         want -- proceed then, the People of the State of Michigan
17         versus Gary Thomas Fischer.
18               MR. TAYLOR:  We are, Your Honor.
19               MR. SIZEMORE:  Yes, Your Honor.
20               THE COURT:  Where is your witness?
21               MR. TAYLOR:  Your Honor, may Mr. Sizemore and I
22         approach briefly?
23               THE COURT:  Could you get her?
24                     (At 1:12 p.m., bench conference on the record)
25               MR. TAYLOR:  So I just, I didn't want it to seem
```

1     really word, Ms. Miner's grandmother, she found out she has

2     cancer over the lunch break, so she's kind of upset about it.

3                    MR. SIZEMORE:  Oh.

4                    MR. TAYLOR:  So it's, you know, but she said she's,

5     she's okay, she's going to testify.  But I just want, if

6     there's like a, arrant emotional outburst, it's, I just want

7     everybody to be kind of understanding of what's going on.

8                    THE COURT:  Are you going to bring that out?

9                    MR. TAYLOR:  No, not unless it ne-, it needs to be,

10    but --

11                   THE COURT:  Well, if there's just a spontaneous

12    outburst, then I'd bring it out because --

13                   MR. TAYLOR:  I, I just told her that if she was

14    having, struggling, that she could just let us know she needs

15    a second and we'll, we'll try to help her out.  So…

16                   THE COURT:  That would be fine.

17                   MR. TAYLOR:  Okay.

18                   THE COURT:  Okay, come on up here.

19                   (At 1:12 p.m., bench conference concluded)

20                   THE COURT:  Okay, we're on the record.

21                   COURT CLERK:  Yeah.

22                   THE COURT:  Okay, People versus Gary Fischer, file

23    18-25329-FH.  Ma'am, you've already been sworn in, so you're

24    all set.  Just have a seat, okay?

25                   THE WITNESS:  Thank you.

```
 1                    THE COURT:  Uh-huh.  Okay, appearances from the

 2          attorneys.

 3                    MR. TAYLOR:  Michael Taylor for the People.

 4                    MR. SIZEMORE:  Rolland Sizemore appearing with and

 5          on behalf of Gary Fischer, Your Honor.

 6                    THE COURT:  Are you ready for the jury?

 7                    MR. TAYLOR:  We are.

 8                    MR. SIZEMORE:  Yes.

 9                    THE COURT:  Okay.

10                    THE BAILIFF:  All rise for the jury.

11                    (At 1:14 p.m., jury brought in)

12                    THE COURT:  The jury is present and seated.  You

13          may be seated.  Are you ready to continue with this witness?

14                    MR. TAYLOR:  I am, Your Honor.

15                    THE COURT:  Okay.  And as I have indicated, she's

16          already been sworn in, so it continues.

17                    MR. TAYLOR:  Thank you.

18   BY MR. TAYLOR:

19   Q    So when we left off, we had talked a little bit about the

20        time period after you told Mr. Fischer you were blocking him

21        and when you woke up.  And you had indicated that it was the

22        same night, though you weren't sure exactly what time it was.

23   A    Uh-huh, yes.

24   Q    Um --

25   A    I would say it was either 9:30 or 10:30 if I had to guess,
```

```
 1        but I'm not sure.
 2   Q    That, that was the last time you had talked to him?
 3   A    Or communicated in any way.
 4   Q    Okay.
 5   A    I can't remember which kind of communication was my last
 6        communication, text or verbal, but the last thing that was
 7        said is I'm blocking and then I blocked.
 8   Q    Do you remember what the next communication you made with
 9        your phone was after that?
10   A    When, when he took it away from me.
11   Q    Okay, what was the communication that you were attempting to
12        make at that point?
13   A    To call the police.
14   Q    Okay.  So between the time you told Mr. Fischer you were
15        blocking him until the time that you indicated he took your
16        phone and you were attempting to call the police, how many
17        times did he attempt to contact you while, while he was
18        blocked?
19   A    Well, I later checked my phone after the police were there
20        and I had 23 missed calls, I believe, and 11 blocked text
21        messages.
22   Q    Okay.  So, um, you indicated that it was about 9:30 or 10:30,
23        somewhere in that frame, when you stopped talking to him.
24        What'd you do after that?
25   A    Went to sleep.
```

1   Q     Okay.  Did you m-, were you in bed when you sent him that

2           text or did you have some time before you got into bed?

3   A     I, I was in bed when I sent that text.

4   Q     Okay.

5   A     I literally sent it, put my phone over, and put it under my

6           pillow, and went to sleep.

7   Q     Okay.  Do you remember what you were wearing on that day when

8           you went to bed?

9   A     Yes.

10  Q     What were you wearing?

11  A     A sundress, a black striped sundress, well, it's red, green,

12         black, yellow.

13  Q     Okay, so you were wearing some sort of dress.  Is that what

14         you were sleeping in?

15  A     Yeah, it, I was wearing it as, like, a nightgown.

16  Q     Okay.  Now you indicated earlier that at some point in the

17         night, you woke up.  What do you remember seeing?  What was

18         the first thing you remember seeing when you woke up?

19  A     Well, I woke up because my puppy was, in July, I, as I told

20         you, my dog was kidnapped by Shawn.  That was my Boxer.

21  Q     Okay.

22  A     In July, I got a puppy, which is an Akita.  Her name is Kai.

23         So on, on the day of September 17th, Kai had gotten fixed at

24         the vet's office.  I went to sleep.  I was laying on my side

25         facing the door.  And I woke up to hearing Kai whimpering

1      like she was in pain and I opened my eyes and the light was

2      on in my room, which it hadn't been when I fell asleep.  And

3      so I kind of looked around and when I looked to my left, Gary

4      was climbing into my bed on, on my left.

5  Q   And how did you feel when you saw that?

6  A   I was not very nice.

7  Q   Okay.  When you say not very nice, I mean, what was going

8      through your mind at that point?

9  A   What are you doing here, why, what's going on, how did you

10     get here, why are you here.

11 Q   Okay.  Did you say any of that out loud?

12 A   Uh-huh.

13 Q   Is that a yes?

14 A   Yes, I did.

15 Q   Okay.

16 A   Yes, I did.  I said all those things out loud.

17 Q   And did you notice anything about Mr. Fischer?

18 A   I definitely noticed immediately that he was very

19     intoxicated.

20 Q   Okay.  Well, I guess that's sort of a conclusion that you

21     made.  What, what kinds of things were you seeing, smelling,

22     or hearing that made you believe that?

23 A   Okay, well, I could definitely smell tequila.  I could tell

24     that he wasn't making sense.  He was telling me be nice and

25     it wasn't in response to the words that I was saying to him,

1        which was, you know, with cuss words, what are you doing

2        here, get out of my bed, what are you doing here.  And he

3        just kept saying you're so mean, stop, stop.  And I said, no,

4        you need to, you know, you need to get out, you need to get

5        out.

6    Q   Okay.

7    A   And I, I reached over.

8    Q   And, um, after he had said be nice, what was your response?

9    A   My response was to scream at him.

10   Q   Okay.  And what were you screaming?

11   A   No, I don't have to be nice, you're in my house, why are you

12       in my house, what the heck are you doing here.

13   Q   Okay.  But Mr. Fischer had been in your house before, right?

14   A   Yes.

15   Q   And was it unusual to wake up and see him in your house?

16   A   Yes.

17   Q   Okay.  Um, did he seem surprised at your reaction?

18   A   No, no.

19   Q   Okay.

20   A   Not at all.

21   Q   So you said you didn't have to be nice because he was in your

22       house.  Did you ask him to leave?

23   A   Yeah.  Yes, I did ask him to leave and he said no.

24   Q   Okay.  What was your response to him refusing to leave?

25   A   Well, I was, I was in my bed, obviously, and he had, he had,

1     like, sort of, climbed in and was pulling, he was, sort of,

2     like this when I, when I woke up and I looked over, he was

3     like, like climbing in, like sneaking like he was going to go

4     to sleep.  And then we, we exchanged words and I was like

5     what are you doing, you know, get out of here, what the hell

6     is wrong with you.  And I took my feet and I pushed, I used

7     my feet and I, I pushed him that way up the bed using my

8     feet.

9  Q   Okay.  So I don't think we went over this earlier, your room,

10     is the headboard up against a wall?

11  A   Yeah.  So if here's my bedroom door, here is my king size bed

12     and the headboard is here.

13  Q   Okay.  So is, I guess for the record purposes, if I'm

14     understanding you correctly, your, the door to your bedroom

15     is by the right foot side part of your bed, is that correct?

16  A   The door to my bedroom is on the, when I sleep on my right

17     shoulder, my door is in front of me.

18  Q   Okay.  So were you sleeping on the side of the bed closest to

19     the door --

20  A   Yes.

21  Q   -- or the opposite side?

22  A   I was sleeping on the side closest to the door.

23  Q   Okay.

24  A   Which is --

25  Q   And when Mr. Fischer tried to climb into bed with you, was he

```
 1       on the side furthest from the door?

 2  A    Yes.

 3  Q    All right.  And when you pushed him off the bed with your

 4       feet, did you push him, again, towards that side that's

 5       furthest from the bedroom door?

 6  A    Yes.

 7  Q    And did he actually fall off the bed?

 8  A    He didn't fall.  He, he moved and turned his feet and got off

 9       the bed.  He, he, like, o-, obeyed the push from my feet.

10  Q    Okay.

11  A    He, he got out of the bed and he stood up and I continued to

12       climb over to that side and he had things that he had put

13       down before he went to climb into bed, like his shoes and

14       some things.  And I reached down and I picked them up and I

15       put my hands on his back and started to walk him around the

16       bed and say, you know, it's time for you to go, and was

17       leading him around the bed back towards the door, which is

18       over here.

19  Q    Okay.  Did you ever mention to him anything about him being

20       intoxicated or, or anything to that affect?

21  A    Yes, I did.

22  Q    Okay.  And what was the nature of that conversation?

23  A    To my knowledge, Gary didn't have a driver's license.  And I

24       said why were you driving?  You're obviously drunk or

25       something, what's wrong.  And he said that's why I can't
```

```
 1           leave, I'm, I'm obviously drinking, you can't make me drive.
 2    Q      Okay.  So is this going on while you're trying to push him
 3           out of your room?
 4    A      Yes.
 5    Q      All right.  And so what you said was that you had some of his
 6           belongings in one hand and you were, kind of, pushing him
 7           towards the other side of the bed with your other hand.
 8    A      Uh-huh.
 9    Q      What is he doing during that time period?
10    A      I mean, when I say pushing, I just mean guiding.  I wasn't
11           having to push really hard around the side of the bed until
12           we got over here.
13    Q      Okay.  Was he, was he, sort of, I guess --
14    A      Voluntarily walking.
15    Q      -- to u-, to use your words there, like, when you were
16           pushing him with your feet, he, kind of, just accepted the
17           push.
18    A      Yes.
19    Q      Was that what was happening when you were, kind of, had your
20           hand on his back?
21    A      Yes.
22    Q      All right.  At some point, did he start resisting that?
23    A      As we approached by the door and, and I was saying, you know,
24           you have to leave, he said I'm not leaving.
25    Q      Was that your bedroom door we're talking about?
```

```
 1   A    Yes, my bedroom door on, on the right side of my bed.  I said
 2        yes you have to leave and he said you can't make me leave.
 3        And I said yes, if I can't, then the cops can.  And I turned
 4        and went over to my bed to grab the cell phone from
 5        underneath my pillow and, and I got it in my hand and when I
 6        did, is, I think, probably when it freaked him out, I'm not
 7        sure why.  But he, that's when he grabbed my phone, I had put
 8        it in, in my right hand because I reached under and I grabbed
 9        it and he, he grabbed my arm somehow and twist it behind me
10        like this and, and took the phone from me right there.
11   Q    Okay.  So let me ask you a little bit about that.  Did -- you
12        said before you pick up your phone that if you couldn't, the
13        police could?
14   A    Uh-huh, yes, I did say that.
15   Q    And then you picked up your phone?
16   A    Yes.
17   Q    And then he twisted your arm and took the phone?
18   A    Yes.
19   Q    When he twisted your arm, did you give him any permission to
20        do that?
21   A    No.
22   Q    And when he took, when he twisted your arm, was that harmful
23        or offensive to you?
24   A    Yes, it hurt, it hurt a lot --
25   Q    Okay.
```

```
 1   A      -- actually.  I still have an injury in my arm.

 2   Q      Did you let go of the phone at that point?

 3   A      Yes, he took, he, he, he actually obtained it from me.

 4   Q      Once he had the phone out of your hands, what did you do

 5          next?

 6   A      I reacted by fighting violently to get it back.

 7   Q      Okay.  Did you strike him?

 8   A      I shoved him and I struck him and I, and the door to my

 9          bedroom, which is where, when, when, when I had walked him

10          around the bed, as far as we had gotten was the door is when

11          he started to say or show resistance, like, I'm, I'm not

12          going to go, you can't make me.  And that's when I turned

13          around and I grabbed the phone and he grabbed it from me.  So

14          the door was, I can't remember exactly how much open, but at,

15          at that point, once he grabbed the phone from me, I shoved

16          him too.  And outside of my bedroom door, so here's my door

17          opens like this, there's a hallway, and then there's a

18          closet, a linen closet on the other side.  And, um, so he

19          took the phone and then I reacted back and the next thing I

20          know we were pushed up against that linen closet.

21   Q      Okay.  When you say we, did you, were you --

22   A      I was --

23   Q      -- pushing him up against --

24   A      I was pushed up against him at the linen closet, yes.

25   Q      Okay.  Um, and so you had pushed him out of your bedroom door
```

```
 1        at that point?

 2   A    Uh-huh, and I was trying to, I was trying to swing at him.

 3   Q    When you say swing, were those punches --

 4   A    Yes.

 5   Q    -- or slaps or what?

 6   A    I was trying to punch him.

 7   Q    Okay.  Closed fist?

 8   A    Yes.

 9   Q    And did you connect with any of those punches?

10   A    I did.

11   Q    Okay.  What was his response to you striking him?

12   A    To strike me back.

13   Q    Okay.  And did he hit you with an open hand, a closed hand?

14   A    The first, the first that I remember was he had the phone in

15        his hand and he smashed the, the phone against my head and

16        it, sort of, that's the first thing I remember.

17   Q    So you're gesturing to the right back part of your head?

18   A    Uh-huh.

19   Q    Is that a yes?

20   A    Yes.

21   Q    Okay.

22   A    That's right.

23   Q    And that was because you were fact to face with him?

24   A    Uh-huh.

25   Q    Is that correct?
```

1    A    Yes.

2    Q    And so while his back is to the linen closet, that's when he

3         reaches and hits you on the side of head with the phone?

4    A    Yeah.

5    Q    All right.

6    A    I was facing, like, if he was facing this way and I'm facing

7         him and I'm trying to grab at the phone and he's taller than

8         me, so he had it in this hand and he just, just smashed it

9         against my head.

10   Q    Once you got hit in the head with the phone, what, what

11        happened next?

12   A    I became pretty hysterical.

13   Q    Okay.  And when, what do you mean by hysterical?

14   A    Well, I, I started screaming for him to leave and, you know,

15        get out and stop, and he said you're going to regret this.

16        And we, you know, began fighting.

17   Q    Okay.

18   A    Fist fighting.

19   Q    And so you, were you exchanging punches at that point?

20   A    Um, well, yes.

21   Q    Okay.  And you indicated that Mr. Fischer is taller than you.

22   A    Uh-huh.

23   Q    Where, were you both standing the entire time that this is

24        going on?

25   A    No, well, I, there's p-, there's parts that I can't remember

1    exactly, like how we got from one point to another, but we

2    went from the, the closet and he hit me over the head with

3    the phone and that really upset me, and I kind of got away

4    from him.  And I don't remember what happened next, but, or

5    how we came back together, but then the next thing is he's

6    got me pinned down to the ground like, so here's the lin-,

7    here's my bedroom door and here's the linen closet and this

8    is a hallway, and if you come down the hallway, right here is

9    my dining room.  So had him against the linen closet there

10   and then he hit me with the phone and, and then the next

11   thing I know is we're out here almost to my dining room.

12   And, and, and he was on top of me on the floor.

13 Q   Okay, when you say he was on top of you, um, were, was your

14   back on the floor --

15 A   Yes.

16 Q   -- was your side on the floor, or your chest on the floor?

17 A   My back was on the floor.

18 Q   Okay.  And you were facing the ceiling?

19 A   Well, I guess, I was, kind of, facing sideways because he had

20   his hand on my face.

21 Q   Okay.  But your sho-, were your shoulders touching the floor?

22 A   I don't know if my shoulders were touching the floor to be

23   honest.

24 Q   Um, when you say --

25 A   My backside was on the floor, my butt was touching the floor.

120

1    Q    Okay.  When you say Mr. Fischer was on top of you, was he

2         next to you, was he straddling over top of you, was he

3         standing above you?  Could you elaborate a little bit more

4         there?

5    A    I guess you could say standing over me, but, but I think

6         probably maybe on his knees.  I can't tell, I can't tell.  I

7         know that, um, at some point he grabbed a hold of my face and

8         just smashed my head into the floor like three times in that

9         position.

10   Q    Okay.  What part of your head hit the floor?

11   A    The same part that, that he had with the phone actually.

12   Q    Okay.

13   A    So I had three large goose eggs over here from, one from the

14        phone, two I'm assuming from the floor.

15             MR. SIZEMORE:  Objection for speculation.

16             MR. TAYLOR:  I -- I don't -- I'll, I'll, I strike

17        the response I guess.  I don't, it doesn't matter to me.

18             THE COURT:  I -- what's speculative?

19             MR. TAYLOR:  She's, he --

20             MR. SIZEMORE:  She says that she had three bumps on

21        her head, one came from the phone and the other two she

22        doesn't know.  She assumes they came from the floor.  I don't

23        think that's --

24             MR. TAYLOR:  Can I follow -- I'll, I'll rephrase

25        the question if I can follow up.

```
1                    THE COURT:  All right.
2  BY MR. TAYLOR:
3  Q     Ma'am, did you have three large goose eggs before Mr. Fischer
4        started bouncing your head off the floor?
5  A     No.
6  Q     Okay.  But after he hit your head on, with the phone, and
7        then bounced your head off the floor, then you had three
8        goose eggs, is that correct?
9  A     Yes.
10 Q     Okay.  So you don't know exactly which bumps came from which
11       strike, but you, your recollection is that --
12                   MR. SIZEMORE:  Objection, leading.
13 BY MR. TAYLOR:
14 Q     What is your recollection as to the cause of those bumps?
15 A     Well, I know for sure that the one that was higher on this,
16       it's still there, kind of, is from my phone.  I, I just, I
17       felt it, it hurt, and it just, you can tell where it hit.
18       The ones lower, I, I'm, you could just feel it when you hit,
19       I could feel this bone right here.  So I believe they're from
20       when my head slammed against the floor.
21 Q     Okay.  So after your head hits the floor that third time,
22       what do you remember seeing at that point?
23 A     Um, Gary released me for some reason and went to the
24       refrigerator and I was saying, you know, you got to leave,
25       you got to leave.  And he opened the refrigerator and got a
```

1    cherry coke out and he was saying, like, you know, you're,

2    this is your fault, why did you, why did you act this way,

3    and he slammed the refrigerator door and he said I'm not f-

4    ing leaving and I just ran towards him at that time, he had

5    the, a full coke in his hand, and he'd slammed the

6    refrigerator, it rattled everything.  And I ran toward him

7    and pushed him into the, the cabinets in my kitchen and was

8    trying to push his face and I said you have to leave, you

9    give me my phone, you've got to leave now, give me my phone.

10   And I was pushing his face like this into the kitchen cabinet

11   and there was a knob, there was a knob on the cabinet I was

12   trying to, I was trying to hit his head on the knob because I

13   thought it would knock him out.  But it didn't work, but it

14   really made him mad.

15   Q   Okay.  And how did you know he became really mad at that

16       point?

17   A   Because that's when he said you're going to get it.

18   Q   Okay.  And when he said that, what went through your mind?

19   A   Oh, crap.

20   Q   Okay.  What was the next thing that Gary Fischer did?

21   A   The next thing is he threw me down in the living room again,

22       I have a, that dining room table that was there, he, he threw

23       me into the table, which flew into the wall and took a chunk

24       out of the wall, but I went down to the ground and he got on

25       top of me and -- I'm sorry --

```
 1   Q    It's okay.
 2                 (At 1:33 p.m., witness demonstrates action)
 3   A    And he was just, just swinging, but I was protecting my face,
 4        so he just kept hitting me in the same spots on my head.
 5   Q    Okay.  And you're, just for the record, you're gesturing with
 6        your arms up, elbows in front of your face, and so you're
 7        pointing to the side of your head on the right back side by
 8        your ear, is that correct?
 9   A    At that time, yeah, just, just back here.  So I hadn't,
10        hadn't gotten injury over here at that time yet.
11   Q    Okay.  Was there a time where you did get an injury on the
12        other side?
13   A    Yes.
14   Q    Okay.  Was that following the second time where you, you were
15        on the floor?
16   A    Yes.
17   Q    Okay.
18   A    Well, so the second time, when he was punching, then he, sort
19        of, had me pinned and he, he was almost, like, perpendicular
20        to me and was laying over me.  So his face was, kind of,
21        right here.  And --
22   Q    And just for the record, again, you're gesturing on your
23        chest on your left side?
24   A    On my, yeah, on my chest, his face was like here and his body
25        was over me going this way.
```

1   Q     Okay.

2   A     And I, um, I reached up between his legs and, and grabbed and

3          squeezed his private parts as hard as I could to try to get

4          him to release me.

5   Q     All right.  Did he let go at that point?

6   A     He released the phone at that time.  I guess it hurt.  He,

7          he, well, no, I'm sorry, I have to back up, I squeezed and he

8          turned his head because he moaned, so his, his head turned

9          facing me like this and I bit, I bit his face at that time.

10  Q     Okay.

11  A     And, and, and it, that's when I realized that my tooth was

12         gone, that I hadn't noticed it before, but it was already

13         gone at that point because when I bit down, I could see the

14         blood and I could feel the pain from the tooth being going.

15  Q     Okay.  So there's a lot we just talked about there; let's try

16         to unpackage that a little bit.  So he was laying with his

17         head across your chest and his body, the remainder of the

18         weight was on the opposite side of you, is that correct?

19  A     Well, I was, I was like this way and he was, kind of,

20         perpendicular to me.

21  Q     Okay.  And so he still had your phone at that point?

22  A     Yup.

23  Q     Um --

24  A     He, he, he was actually, like, using it.

25  Q     Okay.  So at, at some point, you said you squeezed his

```
 1        genitals, or privates, I think was the word you used; at that

 2        point is when, is that when he turned his face to face to

 3        face with you?

 4  A     Yes.

 5  Q     And why did you decide to bite him?

 6  A     Because I was trying to get him off me and I wanted to get

 7        away.  Up until that point, I thought that I could maybe win

 8        in, in, in an altercation, but at that point, I realized I

 9        wasn't going to.  So I was just was trying to get away.

10        Before that, I'd been trying to get my phone thinking I'm

11        going to get the phone and call the police and he's going to

12        leave.

13  Q     Okay.

14  A     But I realized at that point on the floor that that wasn't

15        going to happen.

16  Q     Once you bit down on his face, first off, what part of his

17        face did you bite, did you bite, do you remember?

18  A     Um, I believe it was his eyelid, one of, one of his, up here,

19        his eyebrows.

20  Q     Okay.  And do you remember if he said or did anything at that

21        point?

22  A     Yeah.  He, he yelled bitch and he threw my phone, he released

23        my phone.  And as soon as he released it, he realized what

24        he'd done, that he'd just released the phone that he was

25        fighting with me over.  So he released me to go for the
```

1          phone.

2    Q     Okay.

3    A     And that's when I just ran, I just jump up and ran down the

4          stairs to leave the house.

5    Q     Okay.  So you bite his face, he lets go of the phone, and

6          picks the phone back up.  Where are you while he's scrambling

7          for the phone?

8    A     Running for the stairs.  I, I'm just scrambling to get off

9          the floor to get to the stairway because I'm only about ten

10         feet from the stairway.

11   Q     Okay.  And where did the phone go to when he let go of it?

12   A     So in m-, so here's that hallway I was telling you, and then

13         here's my dining room, and then there's the door to my son's

14         room, so there's a wall there.  Where we were is, sort of, in

15         front of the dining room, by that wall.  When he threw the

16         phone, it, it hit the wall to my son's room, that my TV is

17         on, and it let, he, he threw it so hard, it put a dent in the

18         wall that deep when he threw it.  So it hit there, and that's

19         where he went towards it and I, my staircase is over here, so

20         he, he threw the phone and then went for the phone and I just

21         crawled, ran towards the stairs and got up and ran down.

22   Q     Okay.  So, and I just want to make sure the record is clear,

23         the television wall is opposite from your stairs?

24   A     The television wall, so here's my staircase --

25   Q     Right.

```
 1   A    -- and then here's my dining room, and here's the wall that
 2        the TV is on.
 3   Q    Okay.
 4   A    And then there's another wall that is just like the front
 5        wall to the bedroom here.
 6   Q    So you've said that you made, you sprinted towards your
 7        stairs.  Now I think earlier when we talked, you said right
 8        at the bottom of the stairs is a foyer area.
 9   A    Uh-huh.
10   Q    Is that what you said?
11   A    Uh-huh, yes.
12   Q    And outside that door right there, is that your front door or
13        your garage?
14   A    So if you go straight down my stairs, there's a door in the
15        foyer that goes out to the garage and then, and then there's
16        the garage door.
17   Q    Okay.
18   A    If you go down my stairs and turn a sharp right and come
19        around, you can go to the front of the house.
20   Q    Okay.
21   A    Which is not what I did.
22   Q    So after you bit his face and ran down the stairs, which door
23        did you go to?
24   A    The, he had left the door open to my garage and the, and the
25        garage door.
```

1   Q   Okay.

2   A   So I just kept running where I could see out.

3   Q   Was that door just like wide open?

4   A   Wide open.

5   Q   Okay.  And at some point, you, did you get out of the garage?

6   A   Yeah, and the garage was also open.  So I ran out of, I ran

7       outside and a couple of the neighbors' cars, I was screaming

8       for help, but it, I don't know what time it was, but I think,

9       I think at, you know, after the fact, I figured it was around

10      midnight, I think.  Um, um, I went around a couple cars and

11      then I cowered down and I was just trying to figure out what

12      to do.

13  Q   Okay.  So you said you were screaming for help.  Were you

14      literally yelling the word help out loud?

15  A   Yes.

16  Q   Okay.  And did anybody respond?  Did you see anybody outside?

17  A   Nobody was outside --

18  Q   Okay.

19  A   -- and nobody responded.

20  Q   Outside your condo, are there street lights?

21  A   I don't, I'm not, I don't know on the back.  I know on the

22      front, there is, but I don't know back --

23  Q   Okay.

24  A   -- on the parking lot.  There's people's garage lights back

25      there, but I don't --

| | | |
|---|---|---|
| 1 | Q | All right. |
| 2 | A | -- recall on -- |
| 3 | Q | Was it well enough lit that you could see if anybody else was |
| 4 | | outside? |
| 5 | A | Yes. |
| 6 | Q | Okay.  And there wasn't anybody outside? |
| 7 | A | There was nobody out there. |
| 8 | Q | All right.  Who was the next person you saw when you were |
| 9 | | outside? |
| 10 | A | Gary. |
| 11 | Q | Okay.  And describe for me how you came to see? |
| 12 | A | Well, when I left the garage, I ran around and I hid next to |
| 13 | | a car and I was trying to figure out what I was going to do |
| 14 | | because, obviously, I had just left him in my house and, and |
| 15 | | with my phone.  So I, I, I started realizing, oh my gosh, my |
| 16 | | puppy is in there, who was too small to hop off the bed, and, |
| 17 | | and, you know, this whole thing got started with Maggie, |
| 18 | | right?  So I was afraid he was going to something to my dog. |
| 19 | | So I ran the rest of the way around the whole complex, so, |
| 20 | | because you can't just go to the front of my front door to |
| 21 | | try to sneak back in.  So I ran all the way around the |
| 22 | | complex to the front and then in the cove where my front |
| 23 | | door is, there are four front doors, mine and three of my |
| 24 | | neighbors.  And I pounded on every door and my door, |
| 25 | | unfortunately, was locked.  So I couldn't get in right there, |

1    but I knocked on all my neighbor's and was screaming for them

2    to come out, but nobody heard me.

3  Q  Okay.

4  A  So then I, I left that, the cove entrance to my condo and ran

5    the rest of the way around the building to come back around

6    the other side and ended up back behind my garage again and

7    Gary was out there at that time.

8  Q  Was Gary in the garage or outside of the garage at that

9    point?

10 A  Standing outside the garage at the, um, like at the far end

11    of the vehicles that park past the garage, right.

12 Q  Okay.  And did he have your phone in his hand at that point?

13 A  He did, he had my phone directly in his hand and, and he was

14    acting, he totally changed his demeanor.

15 Q  So when he was outside in the public area, you said his

16    demeanor changed.  What was he like?

17 A  He just looked at me really calmly and said are you ready to

18    deal with this rationally, I'll give you back your phone, if

19    you're rational and don't call the police.

20 Q  Okay.  And what did you say?

21 A  I, I looked around me and I could see that my garage door was

22    still open, the door to my house was still open in my garage,

23    and I could see that he was drunk, that he was intoxicated

24    enough that I thought I could grab that phone, the way he was

25    standing, it just hit me.  I just said, okay, I promise, I

1       grabbed the phone out of his hand as fast as I could, and I

2       ran in the house.

3   Q   Okay.

4   A   Through the garage.  Because it was, like, literally at the

5       end of the driveway so it was a straight shot.

6   Q   So where was he when you ran into your house?

7   A   Ch-, he chased after me.

8   Q   All right.  Did you make it into the garage?

9   A   Yes.

10  Q   And were you able to close the big garage door?

11  A   No.

12  Q   Okay.  Did you make it into the internal part of your house?

13  A   Yes.

14  Q   And were you able to close the door behind you?

15  A   A-, as he, I, I, I was able to shut the door on him and he

16      pulled his hand back and then I got it shut and locked.

17  Q   Okay.  You locked it?

18  A   Uh-huh.

19  Q   Is that a yes?

20  A   Yes, yes --

21  Q   All right.

22  A   -- that's, that's it, yes.

23  Q   Once you got back inside your house and locked the door, what

24      did you do?

25  A   I ran to the front to lock, make sure the front door was

1    locked, even though I had just been outside and knew it was

2    locked, I just, I went and checked it, and then I turned

3    around and I ran up the stairs into my kitchen and I went to

4    the butcher's block and grabbed a knife.  And then I ran into

5    my bedroom and then into my bathroom and called 911.

6  Q    Okay.  So you were in your bathroom when you first called

7    911?

8  A    Yes.

9  Q    All right.  And while you were on, did someone from 911

10    answer your call?

11  A    Yes.

12  Q    And while you were on the phone with 911, were you able to

13    tell where Gary was?

14  A    No, I was not.  But I, I, I heard some loudness down in my

15    house, so I, I had a feeling he was coming, so I was trying

16    to tell them to the best of my rec-, I can't remember exactly

17    how the conversation went, but that, you know, I got to hide

18    my phone, I don't want him to know because I knew he was

19    coming.

20  Q    Um, that, that knife that you grabbed, is, was that like a

21    steak knife, a butcher knife, or something else?

22  A    It was a butcher knife.

23  Q    And do you remember what color it was?

24  A    Silver.

25  Q    The whole thing?

1   A      Yes.

2   Q      And the phone that you had at that point in time, was it a

3          smart phone?  Was it a flip phone?  What kind of phone was

4          it?

5   A      It was a smart phone.  It was a Galaxy S9 plus.

6   Q      Okay.  So does it got like the glass screen?

7   A      Yes.

8   Q      And did you have a case on it or no?

9   A      No case.

10  Q      Okay.  What was the condition of that phone after you guys

11         had been fighting over it?  Could you tell?

12  A      The next time I actually looked -- well, when I called 911,

13         the screen, you could see it, it was, like, bent, kind of,

14         like, I don't know how, but it was, kind of, like, bent.

15  Q      Okay.

16  A      And the screen was just cracked, just shattered, just, there

17         was no, you know what it looks like when you shatter the

18         front of your screen.

19  Q      Could -- were you still able to dial out though?

20  A      Yes.

21  Q      Okay.

22  A      Uh-huh.

23  Q      And so you indicated earlier you told 911 that you didn't

24         want him to see you on the phone, is that right?

25  A      Yes.

1   Q   And was there a point in time where you again saw Gary
2       Fischer?
3   A   Yes.
4   Q   Were you still on the phone with 911?
5   A   Yes.
6   Q   How, or were you able to tell how he got back in?
7   A   I was not sure how he got back in, but I assumed that he had
8       busted his way in.
9   Q   Okay.  So --
10  A   Because I, I heard a noise downstairs, but I didn't know what
11      the noise was at that point.
12  Q   Um, where were you when you saw him again in your home?
13  A   In my b-, I was in my bathroom in the doorway from my
14      bathroom to my bedroom and he was walking back into my
15      bedroom.
16  Q   And did he say anything to you when he saw you again?
17  A   Yes, he did.
18  Q   Okay.  And what did he say?
19  A   He said you better hope that you land that knife or I will
20      cut you into pieces.
21  Q   Okay.  So you had the knife still?
22  A   Yes.
23  Q   And he, he said that you better hope you land that knife?
24  A   I can't remember his exact verbatim, but he said you better
25      hope that you kill me with that knife or I will cut you into

```
 1              f-ing pieces.
 2   Q    Okay.  So after he said that, what happened next?
 3   A    I, I was suddenly, like, terrified again because I thought I
 4        felt safe up until then, not safe, but I thought I was okay
 5        with a knife, and then he said that, and I thought oh, sh-,
 6        crap, I'm, I'm screwed now.  But I was thankful that I had
 7        911 on the phone and I didn't hang-up.  I just stopped
 8        talking to them and I kept it in my hand.
 9   Q    So did you have the knife and the phone in the same hand or
10        different hands?
11   A    No, I had the knife in my right hand and my phone in my left
12        hand.
13   Q    Okay.  Did you threaten him with that knife?  Did you, like,
14        show it to him like you would use it?
15   A    I just held it right here and when I said just stay away from
16        me, Gary, just stay away, just leave, just leave, please
17        leave.
18   Q    Okay.  And did he leave after you showed him the knife?
19   A    No.
20   Q    Okay.  What happened next?
21   A    He tried to fight me for the knife.  Um, we --
22   Q    Did he approach you while you were still armed with that
23        knife?
24   A    Yes.
25   Q    And where were you standing at that point?
```

1  A    Um, well, was in the doorway to my bathroom from my bedroom.

2  Q    Okay.

3  A    And then I, I don't remember exactly how or what occurred,

4       but ended up, he threw me on the bed and I still had the

5       knife in my hand and my phone in the other hand.  And he was

6       trying to get the knife away from me and we were just, almost

7       like wrestling or something, and I don't know how, he pulled,

8       tried to pull the knife across, like, from underneath me, he

9       was trying to reach underneath me, but he didn't get the

10      knife away from me, but he stopped and, and, and, and, and

11      got off of me.  I, and I, even if you look I might seem that

12      I don't, I just don't remember exactly what happened right

13      then.

14 Q    Do you know if anyone got cut with that knife?

15 A    The only person that I know of that got cut was me.

16 Q    Okay.  You got cut with that knife?

17 A    Uh-huh.

18 Q    Is that a yes?

19 A    Yes, yes.

20 Q    Okay.  So Mr. Fischer's struggling with you to try to get the

21      knife away, at some point, does he get off of you?

22 A    Yes, at some point.

23 Q    All right.  Where, where did you end up after that?

24 A    Um, I ran out into the living room to try to get away from

25      him and, um, he chased me and then chased me around the

```
 1         living room and I just held the knife up and I l-, kept my
 2         left hand down on the phone.  And he sort of chased me
 3         around, around the house and, I don't, I, I can't, I mean, he
 4         swung on me a couple times, but I can't really remember
 5         exactly at what point I, I, I just threw myself down in a
 6         ball on the floor in the dining room because he, I don't know
 7         if it's that he saw the police lights from outside, but
 8         suddenly he just backed up off me and, and, and yelled fuck.
 9         And --
10  Q    I'm sorry, did you just say the f word?
11  A    Yes.
12  Q    Okay.  So that's Mr. Fischer said?
13  A    Yes.
14  Q    And so after he backed off of you, you said you were on the
15         floor in a, kind of with your fists balled up in front of
16         your face?
17  A    I had, I had the knife here and the phone here and I was
18         just, like, just leave, Gary, you know, just leave.
19  Q    Um --
20  A    And, and --
21  Q    Did, did he back off at that point?
22  A    So I think that, I saw, like, a blue light outside of my
23         slider, which is, kind of, to the right.  And I think that he
24         saw that same light.  And --
25              MR. SIZEMORE:  Objection, speculation.
```

1          MR. TAYLOR:  I think it's a reasonable perception

2     based on her observations under 701.

3          THE WITNESS:  Um --

4          THE COURT:  I'll overrule.

5          MR. TAYLOR:  He was attacking her and then she saw

6     a flicker of a blue light and then he stopped.  I don't think

7     it's unreasonable for her in her lay opinion to think that

8     that was the basis for why he stopped.

9          THE COURT:  I'm going to overrule the objection.

10 BY MR. TAYLOR:

11 Q    So after he saw -- or after you saw the blue light, anyway,

12      he backed off of you.  Where did he go?

13 A    He, he just, sort of, backed up.  He looked around, he, kind

14      of, like, did this on his head a couple times.

15 Q    Okay.  And when you say did this, just for the record --

16 A    Uh-huh.

17 Q    -- you're taking both hands, palms inside, and tapping the

18      top of your head?

19 A    Yeah.

20 Q    Okay.

21 A    He just started, like, pounding on his head like that and,

22      and, you know, kind of, like, looked out of his mind.  And

23      then he started picking up my furniture and just chucking it

24      at me.

25 Q    Okay.  He was, when you say chucking your --

1  A    Like just throwing the furniture at me.

2  Q    What kind of furniture was he throwing?

3  A    Um, two bar stools, a chair, and a, um, a big bench.

4  Q    Okay.  Where did those pieces of furniture hit?

5  A    Um, well, they, they hit the walls, dent and put holes in the

6       walls, and broke the ceiling fan, um, and, and light, and,

7       um, they hit the far wall where the sliding glass door is,

8       which I thought was going to break, but it did not.

9  Q    Okay.  Um, so after he, or d-, there was a -- was there a

10      point at which he stopped throwing the furniture?

11 A    Yeah.  When he stopped throwing the furniture, he turned

12      around and walked down the stairs.

13 Q    Okay.  Had you seen, could you see where he was going or did

14      you stay in the house?

15 A    I just stayed cowered in that position for, um, I don't know

16      how long, and then I picked the phone back up to my ear to

17      see if 911 was there.  And said, you know, are you there, can

18      you help me.  And they said you hav-, you know, is he gone,

19      and I said I don't know and they said well, we need to know.

20      And I can't remember exactly the conversation, but I said,

21      well, they told me I had to go find the officers or something

22      like that and I said, well, I have a knife in my hand, please

23      make sure that they're not going to shoot me.

24 Q    Okay.

25 A    And, um --

1    Q    So did you stay in the kitchen where you were at that point?

2    A    No.

3    Q    Where did you go?

4    A    They instructed me to go down the stairs, so I went down the

5         stairs with the knife and, and my phone.  And you know how I

6         told you have to, kind of, like do a 360, I don't know why

7         because I could see that my garage door was p-, the door to

8         my garage was partially opened, and I'm assuming that's where

9         the police were; I know how that's where they were.  But I, I

10        circumvented that to go around to the front door, um, and

11        then I heard, like, or I saw something out of the corner of

12        my eye and the door started to open and I thought it was Gary

13        again, but that's when it was, it was actually Officer

14        Alicia, who said d-, you know, drop the knife.

15   Q    And did you drop the knife?

16   A    Yes.

17   Q    Okay.

18   A    I dropped the knife and my cell phone right there.

19   Q    All right.  Um, after Officer, you said Officer Alicia, is

20        that Alicia Vallance?

21   A    Yes.

22   Q    After you saw Officer Vallance, did you go outside or did,

23        did she stay with you inside?

24   A    Um, she had me go to the ambulance.

25   Q    Okay.  Was there ambulance on, outside when you got outside?

1  A    By the time that she walked me out there, it was there.

2  Q    Okay.  How long after you saw Gary go down the steps did you

3       see the ambulance?

4  A    I have, I really don't know.

5  Q    Okay.  Was it hours or minutes or --

6  A    I would think minutes.

7  Q    Okay.  And, um, did you talk to the police that night about

8       what had happened up until the point where they got there?

9  A    Yes, I had.  I spoke with Alicia and Officer Fogo and, um,

10      then they brought, um, in paper to, to, to fill out a, a

11      report.

12 Q    Okay.

13 A    And --

14 Q    Um, so I, I'm going to go over some exhibits with you, if, if

15      you could.

16            MR. TAYLOR:  Your Honor, would the Court allow me

17      to use the television for audio recording?

18            THE COURT:  Yes.

19            MR. TAYLOR:  Are we on the right input?  I think

20      it's supposed to be PC.  It's number eight.  Yup.  And then

21      on your computer, you have to pick the, this table for it to

22      feed into the audio.  That (indecipherable) about right.

23      Okay, for this purpose is, I'm just going to be exhibiting

24      the audio anyway, so we'll work out the video feed if we need

25      to in a minute.  Your Honor, the, the audio I'm going to play

1          is nine minutes and twenty seconds long, so --

2                    THE COURT:  Is this an exhibit?

3                    MR. TAYLOR:  This is, I'm going to refer to this as

4          People's exhibit 22.  This has been admitted by stipulation.

5          I'm going to play the entire audio in its entirety based on

6          the stipulation of the parties.

7                    THE COURT:  Okay.  Is that correct, Mr. Sizemore?

8                    MR. SIZEMORE:  The stipulation part is, absolutely.

9                    THE COURT:  Okay.

10                   (At 1:54 p.m., PX#22 audio started)

11                   (At 2:03 p.m., PX#22 audio ended)

12   BY MR. TAYLOR:

13   Q    That entire 911 call that we just listened to, did that take

14        place inside your home?

15   A    Yes.

16   Q    All right.  And earlier when you testified, you had talked a

17        little bit about, um, that there was an ambulance there when

18        Officer Valance walked you out.  Where was the ambulance

19        parked?

20   A    Sort of at the end of my neighbor's driveway behind, back,

21        you know, it was back by the garages, but down a couple,

22        couple, couple garages to the left, I think.

23   Q    Okay.  Did you go see some paramedics when you went outside?

24   A    Yes, I did.

25   Q    And did they look at all your cuts?

```
 1   A     Yes, they did.

 2   Q     Um, what kind of injuries did you have?

 3   A     Mostly just bruising, um, you know, the, the, it was a very

 4         minor scrape on my leg from my knife, which I believe I

 5         probably did myself; I, I don't know, but, um, um, mostly

 6         just, um, goose eggs all over my head from, and bruising to

 7         my body.

 8   Q     Um, after --

 9   A     And my, oh, and, and my tooth was gone, um, I did have, um,

10         some bruising on my, on my jaw.

11   Q     Do you remember if anyone documented those injuries?

12   A     Yes, I do.

13   Q     And how did that happen?

14   A     Um, Alicia, um, I believe was who documented the injuries and

15         she took pictures.  Um, we went in the bathroom and took

16         pictures.

17   Q     Okay.  You went in the bathroom and took pictures?

18   A     Uh-huh.

19   Q     Why was that?

20   A     Because they were of my body.

21   Q     Okay.  When you got done talking to the paramedics, were they

22         going to take you to the hospital?

23   A     They wanted to take me, they asked to take me to the

24         hospital, but I refused repeatedly.

25   Q     Okay.  Why did you do that?
```

1    A    I was worried about my dog.

2    Q    All right.  Did you end up going to hospital at some point

3         that night?

4    A    I went, um, Office Fogo said I couldn't stay home alone, so

5         they had my, my brother, my brother came and stayed with me

6         and then took me first thing in the morning.

7    Q    Okay.  About how many hours later do you think that was?

8    A    Well, I think that the police left at about 3:00 and my

9         brother and I went to the hospital at about 9:30.

10   Q    Okay, so about six hours later?

11   A    Uh-huh.

12   Q    Did you sleep in between?

13   A    Yes, I did.

14   Q    Um, after you went to that hospital -- did you go to the ER,

15        the emergency room?

16   A    That's right, I did.

17   Q    Um, did they, did they -- I'm not going to ask you what was

18        said while you were there, but did you get some treatment

19        while you were there?

20   A    Yes, they performed, they did a CAT scan --

21             MR. SIZEMORE:  Objection, Your Honor, to any

22        results of any testing that was done.  It's hearsay.

23             THE COURT:  I'm sorry?

24             MR. SIZEMORE:  I would object anything that the

25        doctors told her as hearsay, including --

1              THE COURT:  Well, I think that's what the

2      prosecutor asked is don't say what the --

3              MR. SIZEMORE:  I know that's what the prosecutor

4      asked, but she's starting to talk about the specific --

5              THE COURT:  No, she said that I was taking --

6              THE WITNESS:  Actually, I was saying --

7              THE COURT:  Just one second.

8              MR. TAYLOR:  Ma'am, you have to wait for the judge

9      to rule.

10              THE COURT:  She said that I was going to have a CAT

11      scan.

12              MR. SIZEMORE:  Agreed.

13              THE COURT:  She can testify to that.

14              MR. SIZEMORE:  I just don't want her to testify

15      about any results.  That was just being, trying to be a

16      little proactive.

17              MR. TAYLOR:  Ma'am, do you understand that, that

18      what the defense attorney is saying is we don't want to know

19      what the doctors told you about your treatment, we just want

20      to know what you went through.

21              THE WITNESS:  They didn't tell me anything either

22      way.

23              MR. TAYLOR:  Okay.

24  BY MR. TAYLOR:

25  Q    But did you, you said you were getting a CAT scan done?

```
 1   A      Yup.  They did, I, I can't remember if it's a CAT scan or
 2          MRI, I, I turned in all my paperwork to --
 3   Q      Okay.  So where did they scan you?
 4   A      Um, they scanned my head.
 5   Q      Okay.
 6   A      Um, and my chest.  They did my jaw.
 7   Q      All right.  After you had all those scans done, did you have
 8          to follow up with the doctor again?
 9   A      Yes.
10   Q      Okay.  And about your tooth, did you have to see anybody
11          about that?
12   A      Yeah.  I had to have four oral surgeries.
13   Q      Okay.  To fix the tooth that was broken out?
14   A      Yes, because I had to, it, it was actually my real tooth that
15          was broken; I thought it was one of my, I have this bridge.
16   Q      Okay.
17   A      Over here.  But it wasn't, it was actually my real tooth, so
18          it caused damage to the, the location from my bridge --
19   Q      Okay.  So you said you had to have four oral surgeries?
20   A      Uh-huh.  I had four, well, I've had, I'm sorry, I've had
21          procedures on --
22   Q      Okay, not necessarily all surgeries.
23   A      Right, two were surgeries, two were not.
24   Q      Um, was your, were they able to, sort of, I don't know, fix
25          whatever happened with your tooth?
```

1   A   Yeah, I have a fake tooth here now.

2   Q   Okay.

3   A   And, um --

4   Q   Um, and did you see that dentist, at least, the same day you

5       went to the hospital?

6   A   Yes, I did.

7   Q   Okay.  So that was the, that was hours following --

8   A   That's right.

9   Q   -- when the police left your home?

10  A   Well, um, right.  I left the hospital and went directly to my

11      dentist's office.

12  Q   Okay.

13  A   And they got me in right then and there.

14          MR. TAYLOR:  If I could get the TV to work, I'd

15      like to go over some of the photos.  It's got to be on number

16      eight, which is the PCN.  So there should be a button for you

17      to select the cart over here.  Are you seeing my screen on

18      your computer?

19          COURT CLERK:  Yes.

20          MR. TAYLOR:  Okay.  All right, we'll do it the old

21      fashioned way; that's okay.

22          THE COURT:  Do you want me to get Carl?

23          MR. TAYLOR:  May I approach?  So to display

24      computers from the console tables, um, it's always got to be

25      on input A and make sure it shows up on the record, it goes

1    through your computer, and your computer has to select that

2    as the output.  So, may I approach, Your Honor?

3                 THE COURT:  Yes, uh-huh.  Want me to call Carl?

4                 MR. TAYLOR:  Your Honor, I have several photos.

5    May I have continuing permission to approach the witness?

6                 THE COURT:  Yes, just one second.

7                 MR. TAYLOR:  Okay.

8                 THE COURT:  Let's see if we can't --

9                 MR. TAYLOR:  I know Mr. Sizemore needs a little

10   break here in a few minutes away.  I don't know if the Court

11   would indulge for a brief recess?

12                THE COURT:  Oh, but are you going to be able to go

13   in and do it right away?  No, 2:30?

14                MR. SIZEMORE:  Everyone, everyone knows what's

15   going on, so I can go whenever.  I've, I've communicated with

16   the Court and the prosecutor.

17                THE COURT:  You can go in and --

18                MR. SIZEMORE:  I can get it done right now if the

19   Court would like.

20                THE COURT:  Okay.

21                MR. SIZEMORE:  Yeah.

22                THE COURT:  All right, all right.  We'll take a

23   brief recess then.  All rise for the jury.

24                THE BAILIFF:  All rise for the jury.

25                (At 2:12 p.m., jury taken out)

```
 1                    (At 2:13 p.m., Court recessed)

 2                    (At 2:39 p.m., Court reconvened)

 3               THE COURT:  Okay, calling the matter of People

 4          versus Gary Fischer.  You can be seated.  Are you ready?

 5               MR. TAYLOR:  We are.  Michael Taylor for the

 6          People.

 7               MR. SIZEMORE:  Rolland Sizemore with and on behalf

 8          of Gary Fischer.  Your Honor, we're ready.

 9               THE COURT:  Okay, we're ready for the jury.

10               THE BAILIFF:  Please rise for the jury.

11                    (At 2:40 p.m., jury brought in)

12               THE COURT:  Okay, you may be seated.  Recalling the

13          case of People versus Gary Fischer.  We're ready to proceed.

14               MR. TAYLOR:  Again, may I approach the witness,

15          Your Honor?

16               THE COURT:  Yes, please.

17  BY MR. TAYLOR:

18  Q    So I'm approaching with the admitted exhibits one through 21

19          with the exception of 12.  I'm going to hand those to the

20          witness and we're going to go through them with a publication

21          on the court TV, okay?

22  A    Okay.

23               THE COURT:  The defense attorney has stipulated to

24          these being admitted, which means that he agrees that these

25          would be admitted, okay?
```

```
 1  BY MR. TAYLOR:
 2  Q    All right, so I'm going to go in sequential order with these.
 3       All right, referring first to People's 1.  Can you explain
 4       what People's 1 is to the jury?
 5  A    Me.
 6  Q    Yup.
 7  A    Um, and where my tooth ca-, um, got knocked out.
 8  Q    Okay.  So this area that I'm going to mouse over here, did
 9       you have a tooth there prior to this photo being taken?
10  A    Yes, I did.
11  Q    And then is that the tooth that you remarked earlier that had
12       gotten knocked out while you were in the fight with Mr.
13       Fischer?
14  A    Yes, it is.
15  Q    All right.  And can you describe what's in People's 2?
16  A    That's my living room, that's my end table next to the couch.
17  Q    Okay.  And, um, that d-, that object in the middle of the
18       photo there, what's that?
19  A    Um, that's the light.  Not typically laying down like that.
20  Q    Okay.  Um, were those objects, um, in that fashion before
21       your altercation with Mr. Fischer?
22  A    The light was not, no.  I don't know about the others.  I
23       don't know what I, I can't say they were moved at all, but
24       the light was definitely standing up before.
25  Q    Okay.
```

1    A    Before --

2    Q    People's 3 here, what's that?

3    A    Um, that's the wall, um, where, that, that's the wall that I

4         was showing you that the TV is on that's above that brown

5         table there.  Um --

6    Q    Okay.

7    A    -- and then that's the dining room table and the furniture

8         that he threw, you can see the two barstools over there.  Um,

9         that's one of the dining room chairs that he threw and then

10        the bench and the table.

11   Q    Okay.  And he threw all of those pieces that you just

12        described?

13   A    Y-, well, he didn't actually pick up the table; he, he, he

14        did move the table, but the other things he actually picked

15        up and threw, yes.

16   Q    Okay.  And that wall there with that small table in front of

17        it, is that the wall where your phone went after he let go of

18        it?

19   A    Yes, yes it is.  You can't s-, you can't see in that picture.

20        I don't know how much you can zoom in.

21             THE COURT:  If you look at your photographs,

22        they're a little bit clearer; it might show --

23             THE WITNESS:  Okay.  You can see on that way, you

24        see the white gouge on the edge.

25   BY MR. TAYLOR:

1    Q      Okay.

2    A      That's part, that's one of the places where when the first

3           time he shoved me into the table, the whole table and I went

4           into the wall.

5                      THE COURT:  You're talking about here?

6                      THE WITNESS:  Yes.

7                      THE COURT:  The corner of the wall?

8                      THE WITNESS:  Yes.

9                      THE COURT:  Okay.

10                     THE WITNESS:  Yup.

11   BY MR. TAYLOR:

12   Q      So on the right quadrant of that photo there, um, about 3/4

13          of the way up to the left of a white door, is that a gauge

14          mark that you're talking about?

15   A      Yes.

16   Q      Okay.  Do you recognize what's in People's 5?

17   A      Yes.  That's --

18   Q      Oh, excuse me, uh, 4?

19   A      Yes, that's the, um, that's the gouge in the wall where the,

20          where the table --

21   Q      Okay, so this is a close-up of what you had just been talking

22          about?

23   A      That's right.

24   Q      All right.  And that was from when he shoved the table you

25          said?

```
 1  A   Well, me into the table and the table, we, kind of, all went

 2      into the wall.

 3  Q   Okay.  When you say me, did you shove the table or did he

 4      shove you into the table?

 5  A   He, he shoved me into the table.

 6  Q   Okay.  Then People's 5, what's that?

 7  A   That's the ceiling fan.

 8  Q   Okay.

 9  A   It was not broken before he threw the barstool at it.

10  Q   Okay.  So that, that glass fixture there, that was broken by

11      a barstool?

12  A   Yes.

13  Q   All right.  Uh, People's 6, do you recognize that?

14  A   Yes.

15  Q   Okay.  Where is that photo taken?

16  A   That's my foyer.

17  Q   That door that's open there at the top of the photo, is that

18      the garage door or your front door?

19  A   That's the front door.

20  Q   Okay.  And, um, it's kind of hard to make out, but just above

21      and to the left of that cell phone in the photo, is that a

22      knife?

23  A   Yes, that's the knife that I grabbed.

24  Q   Okay.  Um, close, number 7, photo, People's 7, is that a,

25      what is that of?
```

1   A   That's, that's the knife that I had in my hand.

2   Q   Okay.  That knife and that phone, is that where you left them

3       when Officer Vallance came in?

4   A   Yup.

5   Q   You just dropped them?

6   A   Just like that.

7   Q   Okay.  And so is that about where you were standing --

8   A   Yes.

9   Q   -- when she came through the door?

10  A   That's exactly where I was standing, yup.

11  Q   People's number 8, do you recognize that photo?

12  A   This is from outside my front door looking in.  So to, if you

13      were to, like, walk in that door right to the right on the

14      floor would be where you s-, just saw the knife.

15  Q   Okay.

16  A   Um, and the door, as you can see, the frame is completely

17      busted in half --

18  Q   Okay.

19  A   -- on the right-hand side.

20  Q   So in the lower right-hand corner, just above the time/date

21      stamp, is that where you're talking about when you were

22      talking about the doorframe?

23  A   That's correct.

24  Q   And was it like that before Mr. Fischer came into your house?

25  A   No, it was not.

1   Q     Okay.  Do you recognize the People's 9?

2   A     Yes.

3   Q     And what is that of?

4   A     That's the same doorway.  Um, so you can see the split down

5           the frame from where it was busted open, that allowed the

6           door to give way so he could get in.

7   Q     Again, that wasn't --

8   A     It's --

9   Q     -- like that before Mr. Fischer came into your house?

10  A     It was not; it was intact.

11           THE COURT:  It's sideways, right?

12           MR. TAYLOR:  That is sideways, yes.

13           THE WITNESS:  Yeah.

14           MR. TAYLOR:  So the --

15           THE COURT:  Okay.

16           MR. TAYLOR:  -- so just as we're looking at it, the

17       floor --

18           THE COURT:  It's a little confusing.

19           MR. TAYLOR:  -- is on the left side of the photo

20       and the ceiling would be on the right side.

21           THE WITNESS:  Yeah, this is, this is it, upside.

22           THE COURT:  Okay.

23           MR. TAYLOR:  And, of course, the jury will have the

24       original photos to consider as well.

25           THE COURT:  Yeah, that's -- just wanted to make

1      sure.  Thank you.

2  BY MR. TAYLOR:

3  Q    Going on to People's 10.  Do you recognize that?

4  A    Yes, that's the same doorframe from inside.

5  Q    Okay.  And now, is that a, that white piece that is sticking

6       out at, across the middle of that photo, is that door trim?

7  A    Um, they're -- the long piece that goes the full length, that

8       was ripped off, is trim.  But then the busted off piece is

9       the actual frame to the door.

10 Q    Okay.

11 A    See where the underneath is tan from the white?

12 Q    Right.

13 A    That's where it's actually busted.

14 Q    And then, so, almost the dead center of the photo there,

15      there, there appears to be one darkened notch where that

16      frame is broken.  Is that where your door latches?

17 A    That's correct.

18 Q    And there is no, no notch there for a deadbolt in this photo,

19      is that correct?

20 A    That's correct.

21 Q    Again, People's 11.  What's that?

22 A    That's the same doorframe.  That's the, um, trim that came

23      off.

24 Q    Okay.  Is that the upper portion of the door?

25 A    Yes.  The up, upper and left.

157

1    Q    All right.  Going on to People's 13.  Do you recognize that

2         photo?

3    A    Yes.

4    Q    And what's that?

5    A    It's where I bit Gary.

6    Q    You said that's where you bit Gary.  So is that Gary's face?

7    A    Yes, that's Gary's face.

8    Q    And that's how you remember seeing it on the night of

9         September 18, 2018?

10   A    Yes.

11   Q    And that appears to be his right eyebrow, uh, at the c-, the

12        edge of his eyebrow closest to the ear, is that correct?

13   A    That's correct.

14   Q    And those, those red marks there, you, you understand, uh, is

15        your belief that you left those by biting him?

16   A    Yes, that's exactly how I left them.

17   Q    And is that the injury you gave him just prior to him

18        releasing your phone?

19   A    That is correct.

20   Q    Okay.  This is People's 14.  Do you recognize that?

21   A    Yes.

22   Q    And what is that?

23   A    My breast.

24   Q    Okay.  And in the center of that photo, there seems to be a

25        different set of colors.

```
 1   A    It's, there's, there was hand marks all over, bruised from

 2        being grabbed there and --

 3   Q    Okay.  So that was, that discoloration is bruising?

 4   A    Yes, yup.

 5   Q    All right.

 6   A    Yes, it is.

 7   Q    People's 15, do you recognize that?

 8   A    Yes, that's my, my, my right arm.

 9   Q    All right.  And that, in the center of your right arm, what's

10        that coloration?

11   A    That's also a bruise from being grabbed there.

12   Q    Okay.  People's 16, what's that?

13   A    That's where the knife, that's where I got the small cut from

14        the knife.

15   Q    Okay.  And that knife was still in your hand when you got

16        those cuts?

17   A    Yes.

18   Q    People's 17, is that, is that also your right arm?

19   A    Yes.

20   Q    It's just a longer view of it?

21   A    Yes.

22   Q    Okay.  And is that in the, in your bathroom there?

23   A    Yes, it is.

24   Q    All right.  People's 18, do you recognize that?

25   A    Yes, I do.
```

1    Q    And what is that photo of?

2    A    That's the side of my face, um, right here.

3    Q    Okay.  Again, all of these photos that we're going over,

4         those were taken either on the 18th after you saw the police

5         or on the 19th, is that correct?

6    A    Yeah, these were, these were taken on the, um, 18th before,

7         before they left.

8    Q    Okay.

9    A    That morning.

10   Q    And did you have any these bruising, cuts or other injuries

11        before Mr. Fischer came to your house that night?

12   A    No, I did not.

13   Q    So all of these injuries you sustained during the

14        confrontation with him, is that correct?

15   A    That's correct.

16   Q    Uh, People's 18, do you recognize that?

17   A    Yup, that's my back shoulder here.

18   Q    And then you're pointing to your left side with your hand, is

19        that right?

20   A    Yes, it was back here.

21   Q    So that's your left shoulder.  And what's that coloration

22        there in the photo?

23   A    Bruises from fingers.

24   Q    Okay.  So that was, you understand that he, Mr. Fischer, left

25        those on you?  Is that correct?

1   A    Yes, yeah, he did that to me.

2   Q    And your belief is that those were from fingers?

3   A    Yes.

4   Q    Okay.  Number 20, do you recognize that?

5   A    Yup, that's my fat lip.

6   Q    Okay.  Was that taken on the 18th?

7   A    I think so, yes.

8   Q    Okay.  I'm going to, I guess the reason why I'm asking that

9        is in this photo, it looks like there's a tooth up top.

10  A    It wasn't this tooth, it was the next one.

11  Q    Okay.  So the, the one to the left of the leftmost tooth in

12       this photo is the one that was missing?

13  A    So, the tooth that came up in that thing is this one.

14  Q    Okay.  Could you show the jury just where you're pointing?

15       All right, you're pointing to your upper row of teeth, like,

16       what, two teeth left of center?

17  A    Yeah.  Yeah, so --

18  Q    Okay.

19  A    -- I don't know, I can't tell.  I can't remember if that is

20       that night or if that was after she -- because she did come

21       back to take more pictures either the next day or the day

22       after.

23  Q    Okay.  When you went to the dentist following the ER, did

24       they put a temporary crown on?

25  A    Yeah, yes, they did.

1    Q    Okay.  So --

2    A    It could be then; I'm, I can't remember.

3    Q    All right.  And then 21, is that a more clear close-up?

4    A    Oh, yeah, that's, that's with the, um, that's with the

5         temporary cap, yup.

6    Q    Okay.  So --

7    A    Oh, yeah, it is the next one, I'm sorry, it was that one.

8    Q    Okay, you just gave me a comment, what was that?

9    A    Um, I, I was just trying to, it's hard for me to figure out

10        which teeth it is without touching it.  And so this is the

11        next one over.  So in that picture, that has to be after my

12        dentist appointment.

13   Q    Okay.  So you, your understanding would be that this was

14        taken on the 19th --

15   A    Yeah.

16   Q    -- when you saw Alicia Valance again?

17   A    Yes.

18   Q    All right.  Now when you saw Sergeant Fogo and Officer

19        Valance, were they wearing police uniforms?

20   A    Yes, they were.

21   Q    Okay.  And that was on the night of the 18th?

22   A    Yes.

23   Q    And what was your understanding of why they came to your

24        house?

25   A    Because I had called 911.

1   Q   Okay.  All right, um, without that temporary crown on your

2       tooth, would your tooth still be missing right there?

3   A   Yes.

4   Q   Okay.  So last question, I guess, I'm going to ask you is,

5       um, when you were first interviewed by the police, how long

6       after the last physical altercation with Mr. Fischer did you

7       start talking with the police?

8   A   My concept of time is, kind of, messed up.  So --

9   Q   Okay.

10  A   -- I'm not --

11  Q   That's fine.  Let's talk about that.  Um, you said earlier

12      that you couldn't exactly remember bits and pieces of, kind

13      of, the transaction of how you got to certain places.  What

14      was going on that made you not able to observe or, or record

15      what was happening?

16  A   I, I mean, we were screaming and fighting and trying, trying

17      to get away from him or scream for help and just chaos.  But,

18      um --

19  Q   So --

20  A   -- I didn't h-, I didn't ever, I don't, I didn't ever look at

21      a clock or, or to determine what time it was because I, I

22      sent him a text saying I'm blocking you and I went to sleep

23      and I, and then the next time I actually knew what time it

24      was was like when my brother got there after all of it was

25      said and done.

1   Q   Um, the, from the 911 call, we could, kind of, hear what was

2       going on with you emotionally.  How did you feel -- or what

3       was going through your head at the time that the police got

4       there and you were talking to the police about what happened?

5   A   Well, I, I still believed, I believed he was trying to kill

6       me.  I wanted to get away from him and I wanted to be safe.

7   Q   All right.  Did you feel like your thoughts were clear at

8       that point or was -- how, how did you feel?

9   A   Um, I, um, I felt traumatized.

10  Q   Okay.  Now, you said you talked to Officer Vallance --

11  A   I was in shock.

12  Q   -- the next day after you had been to the doctor and been to

13      the dentist.  Did you have a little bit of more time to cool

14      and collect and get your thoughts together?

15  A   I can't remember if I reiterated what happened to her the

16      next time I saw her or if we just, kind of, had small talk.

17      We maybe had, we maybe reviewed, I can't remember if we

18      actually went back over.

19  Q   Okay.

20  A   Literally, at all, I can't remember if we went back over it.

21      I'm sorry.

22  Q   Was there a second time that you did talk to her that you

23      remember about the incident?

24  A   Yes.

25  Q   Okay.  And when you talked to her, did you review your first

164

```
 1        statement on the night of the incident when you talked to the

 2        police?

 3   A    Like actually looked back at the written statement?

 4   Q    Right.

 5   A    I can't remember.

 6   Q    Okay.  Um, did you, when you gave your statement to the

 7        police, did you try to be as accurate and as honest as you

 8        could be?

 9   A    Yes.

10   Q    Okay.

11   A    They did, they did tell me in the hospital that, you know --

12   Q    Well, hold on, I can't ask --

13   A    Okay.

14   Q    -- you about what happened in the hospital, okay?

15   A    Oh, okay.  Sorry, I just know that's probably what, I think

16        there's things I can't, I don't re-, I don't recall.

17   Q    Okay.  All right, well, thank you very much for answering my

18        questions today.  I don't have anything further, but Mr.

19        Sizemore might.

20              MR. TAYLOR:  Do you want me to leave this up or

21        take it?

22              MR. SIZEMORE:  You can take it.

23              MR. TAYLOR:  Okay.

24                      CROSS-EXAMINATION

25   BY MR. SIZEMORE:
```

```
 1   Q    And I'm going to ask you a series of questions.  If you don't
 2        understand something, I need you to let me know that, okay?
 3        A lot of times I'll be thinking while I'm trying to ask
 4        questions and the questions come out really long and really
 5        confusing.  So if you don't understand, I need to know.
 6   A    Okay.
 7   Q    Usually my fault, okay?
 8   A    Okay.
 9   Q    First thing I want to talk to you about is your relationship
10        with Gary Fischer.  Um, it seemed that, um, during your, your
11        direct with, with the prosecutor that you had a relationship
12        that lasted off and on for maybe three years.  Is that right?
13   A    Yes.
14   Q    And I think you -- would you consider yourself a
15        boyfriend/girlfriend with him at any time at all?
16   A    No.
17   Q    No?  Did you ever tell him you loved him?  Did he ever say
18        that to you?
19   A    Yes.
20   Q    Okay.  Was there a time -- there was a time you were
21        romantically involved with him, right?
22   A    Yes.
23   Q    And was there more than one period of time?  I mean, did you
24        guys break-up and then maybe get back together later or was
25        this basically a three year relationship?
```

```
 1   A   We were never in a relationship.  We would hook-up, for lack
 2       of a better term.
 3   Q   Okay.  But you, you said that you guys told each other you
 4       loved each other.
 5   A   Yeah.
 6   Q   So there was some sort of emotion involved, right?
 7   A   Yeah, but that doesn't necessarily make a relationship.
 8   Q   It doesn't?
 9   A   I love a lot of people.  No.
10   Q   Oh.
11   A   I love a lot of people.
12   Q   What makes a relationship then?
13   A   Confirming a relationship.
14   Q   Confirming it?
15   A   Uh-huh, yeah, like, we're in a relationship.  He was in a
16       relationship with another female.
17   Q   Okay.  And you were in another relationship with this Shawn
18       person?
19   A   At points of our --
20   Q   At points, right?
21   A   Yeah, uh-huh.
22   Q   But you two continued to have a sexual relationship, how
23       about that?
24   A   We did.
25   Q   Okay.
```

1    A    We did.

2    Q    And I think you said that, um, you met online?

3    A    Yes.

4    Q    Where online did you meet?

5    A    I believe we met on Tinder, but I can't remember exactly

6         which site, but I think it was Tinder.

7    Q    Tinder, okay.  So I don't know Tinder at all, but Tinder is,

8         if I, if I understand right, a site that you would go and

9         meet people with, and get into relationship exactly like you

10        just described with Mr. Fischer.

11   A    Uh-huh.

12   Q    Kind of casual, more physical, not really a long-term

13        emotional relationship, right?

14   A    That's my understanding of it as well.

15   Q    Okay.  And that's basically what you thought you had from

16        2015 to end of 2018, is that right?

17   A    It is indeed, yes.

18   Q    Okay.  But Mr. Fischer would do things for you, like, I think

19        you said he installed your garage door opener --

20   A    Uh-huh.

21   Q    -- right?

22   A    Well, he fixed it.

23   Q    Fixed your garage door opener, changed the locks on your

24        house after Shawn moved out, is that right?

25   A    That is correct.

1    Q    Um, and you guys would go places, did you ever go to El Pina

2         with him?

3    A    I did ride with him to El Pina.

4    Q    Okay.

5    A    To pick up a, a vehicle that he purchased.

6    Q    Was that a van or a car?

7    A    A car.

8    Q    Okay.  Um, and you have, you have a son, you have two sons,

9         is that right?

10   A    Yup.

11   Q    Would either of them hang out with you and Mr. Fischer?

12   A    They've been in the same vicinity of me and Gary, yes.

13   Q    Vicinity, meaning town, vicinity meaning the same room?

14   A    We've been in, we've been in the same house.  We may, I can't

15        recall if we ever had a out to dinner meal together, but we

16        never did anything together, together.

17   Q    They knew Gary?

18   A    They did know Gary.

19   Q    Okay.  And how old are your sons?

20   A    Eighteen and f-, fifteen.

21   Q    Okay.  Um, do you ever meet on your lunch breaks --

22   A    Yeah.

23   Q    -- in your cars and eat together?

24   A    Me and Gary?

25   Q    Yeah.

```
1   A   Well, yeah, sometimes we would meet and hook up on lunch

2       times, yes.

3   Q   Okay.  Um, and so this wasn't any, sort of, more relationship

4       than just a casual hook-up for you, even though you knew your

5       children, you were hanging out, eating lunch together --

6   A   That's right.

7   Q   -- taking trips to El Pina; that was all it was?

8   A   It wasn't a trip to El Pina.  We drove to El Pina and back.

9   Q   Okay.  All right, so he had at least sometimes prior

10      September of 2018 come over to your house unannounced, right?

11  A   Yeah, and was asked to leave every time.

12  Q   Okay.  Every single time?

13  A   Every time he showed up unannounced without my permission, he

14      was asked or forced to leave.

15  Q   Forced how, physically?

16  A   Me saying leave.

17  Q   Okay.  You said asked or forced.  What's the difference?

18  A   Because I would say Gary, please leave.  And he would say no.

19      And I'd say no, yes, you have to leave.

20  Q   Would you put your hands on him?

21  A   No.

22  Q   Would you push him?

23  A   No.

24  Q   But on the September 17th or 18th date of 2018, you did those

25      things, right?
```

1   A   I did in reaction, yes.

2   Q   No, no, you did those things, yes.

3   A   In reaction, yes.

4   Q   Okay.  So if I understand right, you were getting into bed or

5       you were in the bed.

6   A   I was asleep in bed.

7   Q   And you were awakened to Mr. Fischer climbing into bed?

8   A   Yes.

9   Q   You weren't awakened by Mr. Fischer hitting you, were you?

10  A   No.

11  Q   Matter of fact, he wasn't touching you at all?

12  A   No.

13  Q   He was just climbing into the bed.

14  A   That's right.

15  Q   What was he wearing?

16  A   I believe he was wearing a t-shirt and shorts; not 100% sure

17      anymore.

18  Q   Okay.  And if I remember right, you said you were wearing a

19      sundress?

20  A   Uh-huh.

21  Q   Is that what you typically sleep in is a sundress?

22  A   It's a nightgown sundress, yeah, it is exactly what I

23      typically sleep in.

24  Q   I don't know what a nightgown sundress is.

25  A   You should look it up.

1   Q   Maybe I should.  Maybe you could explain it for me though

2       since we're here.

3   A   Here it is.

4   Q   Okay.  So --

5   A   It's exactly what a nightgown sundress looks like.

6   Q   I can see the top two inches of that.  Can you describe the

7       length for us maybe?

8   A   Sure, it's down below the knee and it's a formfitting

9       sundress the whole length.

10  Q   Okay.  And is that what you typically would wear to go to

11      bed?

12  A   Sure, absolutely.

13  Q   Okay.  Were you smoking marijuana on that day?

14  A   I'm sure I was.

15  Q   You're sure you were?

16  A   Yes, I was.

17  Q   How much?

18  A   I -- what do you mean how much?

19  Q   Well, I, I don't think that's a confusing question.  How much

20      marijuana did you smoke on that day?

21  A   Um, I smoked a bowl.

22  Q   One bowl?

23  A   Uh-huh.

24  Q   When you say a bowl, you mean a pipe.

25  A   A bowl.

1   Q   How big is your bowl?

2   A   About like that.

3   Q   Okay.  So what time did you smoke your bowl?

4   A   About 6:30.

5   Q   About 6:30?

6   A   Uh-huh.

7   Q   And what time did Mr., was Mr. Fischer attempting to get into

8       your bed?

9   A   As I already stated, I'm not sure what time he was trying to

10      get in my bed because I didn't look at my phone.

11  Q   Okay.  Were you looking at your phone when you were smoking

12      your bowl?

13  A   Actually, yes, I was.

14  Q   Okay.  So you're sure that was around 6:30?

15  A   Positive.

16  Q   Had you had any more marijuana later that night than 6:30?

17  A   No.

18  Q   Do you have a medical marijuana card?

19  A   I did.  I do not any longer.

20  Q   Did you in September of 2018?

21  A   No, I did not in September of 2018.

22  Q   So the marijuana that you were smoking in September of 2018

23      was illegal marijuana, right?

24          MR. TAYLOR:  Your Honor, I'm going to object as to

25      irrelevant.

1          MR. SIZEMORE:  Well, I think it goes to her state

2     of mind on that day.  I'm entitled to inquire how much she

3     used and if it was legal or not.

4          MR. TAYLOR:  And I certainly don't have an

5     objection to him asking questions --

6          THE COURT:  And you have gone through that.

7          MR. TAYLOR:  -- about her state of mind or her

8     ability to recall things, whether or some, something is or is

9     not illegal has no relevance to her state of mind.

10          THE COURT:  I agree.  The fact that she smoked

11     marijuana and how much is relevant; as to legality, it's not

12     really relevant.

13          MR. SIZEMORE:  I want to ask her a question, Judge,

14     and if, if the Court, if this is still subject to the

15     objection, I'll withdraw.  But I want the Court, I'm not

16     trying to play games here, but I want to ask one more

17     question.  How about this, I intend to ask her next if she

18     thought that she was smoking legally or illegally.  Would the

19     Court allow that question or not?

20          MR. TAYLOR:  Your Honor, I'm going to object to

21     that question because she's not on trial for possession of

22     marijuana.

23          MR. SIZEMORE:  No.

24          MR. TAYLOR:  The defendant is on trial for home

25     invasion, so unless it goes to her credibility, her state of

```
 1          mind, whether she was or wasn't smoking marijuana is only

 2          relevant to what she can recall on the day of the incident.

 3                    MR. SIZEMORE:  Okay.  I'll withdraw.  I won't ask

 4          that question.  I appreciate it.

 5                    THE COURT:  All right.

 6   BY MR. SIZEMORE:

 7   Q      Let me ask you this, did your consumption of marijuana on

 8          that evening have any effect on your ability to recall the

 9          events of that night?

10   A      Um, I don't see how it could because once things, well, once

11          Gary showed up, I was woken up and in shock and my sense that

12          my, I'm as, I was as heightened to each moment, except for

13          the moments that I've been very clear I can't remember, which

14          are typically right after, you know, a moment where we were

15          actually swinging on each other and landing punches.

16   Q      Could you explain that to me a little bit more clearly?  Are

17          you saying there are some things you remember vividly and

18          some things you don't?

19   A      I remember everything that I have explained vividly.

20   Q      Do you remember being interviewed by Officer Vallance on

21          September 18th, approximately 6:45 p.m. on page 3 and saying

22          that your memory was foggy, you do not remember all of the

23          details?  Do you remember saying that?

24   A      I remember saying at specific points regarding the location

25          of the knife and when Gary threw me on the bed to try to get
```

1    the knife away from me that I was not 100% sure how I still

2    obtained the knife and that was foggy to me, which was the

3    same thing I said here today.

4  Q  So the only thing that you're foggy on is how you got the

5    knife?

6  A  No, how I, how he didn't get the knife from me after throwing

7    me on the bed.

8  Q  So the knife is the only thing that you're foggy about?

9  A  Well, basically, yes.

10 Q  Okay.  That tape, Mr. Taylor played the 911 call, and if I

11   heard right, I can hear you yelling at Mr. Fischer that he's

12   got to leave.  Did you hear that at the beginning of the

13   tape?

14 A  I heard it in the tape, yes.

15 Q  Did you hear Mr. Fischer then saying to you I'm trying to

16   leave?  Did you hear that?

17 A  Yeah, I did.

18 Q  And did you hear him yell, or I'm sorry, did you hear

19   yourself yell, you're not leaving fast enough?

20 A  Yes.

21 Q  Is that right?

22 A  Yes.

23 Q  So he was trying to leave?

24 A  No, he was not trying to leave.  He was standing in my

25   kitchen.

1   Q   Okay.  But he was saying I'm trying to leave, is that right?

2   A   Which was not true though; he was not actually trying to

3       leave.

4   Q   Was he saying that or not?

5   A   Well, you heard him say it, right?

6   Q   Did you hear him say it?

7   A   I heard him say it because I responded to it.

8   Q   Okay, that was the question.  Okay, you listen to the

9       questions and answer them and it'll be fine.  So then I heard

10      Mr. Fischer ask while you were yelling at him, he said I'm

11      the bad guy here.  Did you hear him say that?

12  A   Uh-huh.

13  Q   Yes?

14  A   Yes, I heard him.

15  Q   Was he yelling that or was he calm when he said that?  He was

16      calm, right?

17  A   At that point in time, sure.

18  Q   And you were yelling at him, right?

19  A   Yes.

20  Q   And you were swearing at him at that point?

21  A   Yes.

22  Q   He wasn't yelling or swearing at you?

23  A   No.

24  Q   And matter of fact, you told him I'm calling 911 now while

25      you had the phone in your hand and you had already dialed and

177

1       hit send, right?

2    A  Uh-huh.

3    Q  Is that yes?

4    A  Yes.

5    Q  And he said I don't care, go ahead.  Is that right?

6    A  Is that what you heard?

7    Q  I'm asking you if you heard that.

8    A  I don't recall those words specifically.  Is that what was

9       said?  You'd have to play it again.  I'm not 100% sure if

10      that was his reaction.

11   Q  So you are a little foggy on some details?

12   A  I don't know verbatim of his response to me saying I'm

13      calling 911.

14   Q  I heard a distinct difference in your tone of your voice when

15      you were on the phone talking to the 911 dispatcher and then

16      when you were yelling at Mr. Fischer.  Did you hear the

17      difference in your voice on that tape?

18   A  Yeah, I sure did.

19   Q  You were aggressive and yelling and swearing at Mr. Fischer -

20      -

21   A  Yeah, because he broke into my house.

22   Q  And you -- yes or no?

23   A  Yes, I was yelling --

24   Q  Okay.

25   A  -- and swearing at him because he broke in my house.

1  Q    And then you were whimpering and asking for help.

2  A    He broke in my house.

3  Q    Ma'am, I'm talking.

4  A    So am I.

5  Q    It's my turn to ask you a question.  Please listen to the

6       question and answer the question, okay?

7  A    Then let me finish when I answer.

8  Q    This is a yes or no question.  When you were talking to the

9       911 dispatcher, you did not swear at him, did you?

10 A    No, I asked for help.

11 Q    You did not yell at the 911 dispatcher, did you?

12 A    No.

13 Q    You were, in fact, I, my word, you were whimpering to the 911

14      dispatcher, right?

15 A    I was asking for help.

16 Q    Meanwhile, you were yelling at Mr. Fischer?

17 A    Uh-huh.

18 Q    Yes?

19 A    Because he had just beat the hell out of me.

20 Q    Interesting, you testified that the first physical contact

21      between you and Mr. Fischer on this night was you kicking him

22      out of the bed, right?

23 A    That's right.

24 Q    And then once you kicked him out of the bed, you continued to

25      push him, physically, with your hands out of your bedroom, is

1          that right?

2    A    Yes, I did.

3    Q    He was not touching you at all, was he?

4    A    No, he had broke in my house --

5    Q    Ma'am, it's a yes or no question.  He was not touching you.

6          You touched him --

7    A    Please don't point at me like that.

8    Q    You touched him first, didn't you?

9    A    Yes, I did touch him first.

10   Q    Okay.  You were the first person that actually started

11         throwing punches, right?

12   A    No.  He grabbed my arm and --

13   Q    Did you throw a punch?

14   A    -- wrenched it behind my back and then I threw a punch, yes.

15   Q    Okay.  Several punches, is that right?

16   A    Well, it was mutual.

17   Q    It was mutual, wasn't it?

18   A    Uh-huh.

19   Q    So you kicked him, you pushed him, and punched him.

20   A    Where did I kick him?  When did I kick him?

21   Q    When you were in the bed, when he was in the bed.

22   A    Oh, no, no, no.

23   Q    You --

24   A    I did not say I kicked him.

25   Q    You didn't?

```
 1   A    So please don't lie --

 2   Q    Then what did you do?

 3   A    -- on, on up there, Mr. Sizemore; that is not what I said.

 4   Q    What did you say?

 5   A    I said I put my feet against him and pushed him out of my

 6        bed, which is what I did, I did not kicked him.  I put my

 7        feet, I sat right here and I showed you, I put my feet up

 8        against him and I pushed him out of my bed and then I scooted

 9        across the bed, got out of the bed, picked up his things, put

10        my hand in the middle of his back, and guided him around the

11        bed.

12   Q    What things?

13   A    That's exactly what I said.

14   Q    What things?

15   A    His shoes and I think his keys.

16   Q    His keys and his shoes.  What did you do with the keys and

17        the shoes?

18   A    Held them in my other hand while I had the hand and I pushed

19        him around the bed.

20   Q    Did you ever give him his keys and his shoes back?

21   A    Yeah, when we got around to the other side, I handed them to

22        him.

23   Q    Okay.  So once again, the first physical conduct that,

24        contact that you had with him was your feet on his body?

25   A    That's right.
```

1    Q    Okay.

2    A    Because he climbed into my bed --

3    Q    Did he give you --

4    A    He climbed in my bed.  Am I missing something?  I'm not

5         allowed to kick him out of my bed with my feet?  I don't

6         understand that.  He got in my bed.  You're actually looking

7         at me like I'm bad for pushing him out of my bed.

8    Q    Are you done?

9    A    Are you?

10             MR. TAYLOR:  Your Honor, may we approach?

11             THE COURT:  Yes.

12             (At 3:14 p.m., bench conference on the record)

13             MR. TAYLOR:  (indecipherable) state, I would ask

14        that you instruct her to be less argumentative with Mr.

15        Sizemore.

16             THE COURT:  Okay.

17             MR. TAYLOR:  Unless you want her to continue being,

18        I just think it would be faster just to make --

19             (At 3:14 p.m., bench conference concluded)

20             THE COURT:  Ma'am, it will be a lot faster if Mr.

21        Sizemore asks the question and you answer the question.  You

22        have, you have the ability to answer the question completely,

23        however the prosecutor have a right to come back up and

24        clarify some things if things need to be clarify.  You

25        understand?

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  Okay.

 3                    THE WITNESS:  I'm sorry.  Thank you.

 4                    THE COURT:  That's all right.  Just answer Mr.

 5          Sizemore's questions and we'll be moving on.

 6                    MR. SIZEMORE:  Thank you, Your Honor.

 7   BY MR. SIZEMORE:

 8   Q    At one point, you testified that Mr. Fischer said to you,

 9        you'd better hope you land that knife of I will cut you into

10        fucking pieces.

11   A    Slice you into fucking pieces.

12   Q    Slice you into fucking pieces.  But that wasn't caught on the

13        911 tape, was it?

14   A    You know, I was listening and I didn't hear it there, but I

15        think it was probably during one of the muffled moments

16        because it was when I was at the doorway between the bathroom

17        and the bedroom and it wasn't very far; it would be right in

18        the very beginning when, when I got thrown on the bed for

19        some period of time that I, I don't, I don't know why you

20        couldn't hear it; I don't know if my hand was over the

21        mouthpiece.  I couldn't tell you, if you didn't hear it.

22   Q    Did you hear it?

23   A    I did hear it.

24   Q    And was it during one of the muffled times at the beginning

25        of the tape?  Did you hear it when we played the tape here in
```

1      court?

2   A   No, I did not hear it.

3   Q   You just heard it --

4   A   I d-

5   Q   (indecipherable)

6   A   I couldn't audibly hear a lot of things; I couldn't hear, I

7       didn't, I, I couldn't hear a lot of things on the tape to

8       tell you what was being said, but I heard it when it

9       happened.

10  Q   Did Mr. Fischer seemed confused by your reaction when you saw

11      him getting into your bed?

12  A   No.

13  Q   You said he seemed very intoxicated and you could smell

14      tequila, is that right?

15  A   Uh-huh, yes.

16  Q   You, you've seen him intoxicated before?

17  A   A couple of times.

18  Q   Okay.  So you know what he looks like when he's intoxicated,

19      is that right?

20  A   I would say yes, I would think.

21  Q   Okay.  Is he, was he a little intoxicated, was he a lot

22      intoxicated, was he drunk?

23  A   He was --

24  Q   How would you --

25  A   He was heavily in-, I didn't, I didn't, I could smell

```
 1        alcohol, but I thought it was something else, not, because it
 2        didn't, I didn't, you're asking me to speculate, right?  So -
 3        -
 4   Q    I'm asking you if what you saw was consistent with how you've
 5        seen him act when he's intoxicated.  You're the one that said
 6        he was drunk.  You've said that several times.  So I'm asking
 7        you, how do you know?
 8   A    He was something; I don't, I, I assumed because I smelled
 9        tequila that it was drunk, but it could have been high or
10        jacked up.  I don't know because it was really irrational.
11   Q    Is there anything else that you've testified to that you're
12        making assumptions about that you're not sure of?
13   A    I don't understand what you're asking me.
14   Q    Okay.  Well, you've testified for a couple of hours that he
15        was drunk and now that I'm asking you about it, you're saying
16        you're assuming that he was drunk because you smelled tequila
17        and he was acting goofy, but it could have been something
18        else.  My question to you is you sounded pretty sure of that
19        when you first testified to it; Is there anything else that
20        you might have sounded sure about that you're not sure of?
21   A    I'm not unsure of anything.  The only thing I was saying to
22        you that I assumed is that it could have been more than
23        alcohol.  I can't swear to you that it's just that he was
24        drunk.  I'm trying to not lie.  I know for sure he was drunk.
25        He may have also been on something else; I don't know.
```

1   Q   Do you know how he got into your house the first time that

2       night?

3   A   Through my garage door.

4   Q   Do you know that?

5   A   Yes, I do know that.

6   Q   How do you know that?

7   A   Because when I escaped from his, um, beating me up, I went

8       down the stairs to an open door and an open garage door.

9   Q   So the, okay, the garage door was open, the overhead door was

10      open, the door from your house into the garage was open?

11  A   Both were open.

12  Q   And those were both closed when you went to bed?

13  A   That's correct.

14  Q   And not locked?

15  A   Correct.

16  Q    You said that you, you testified that you normally lock that

17      door, but you didn't lock it on that night.  Why not?

18  A   I just forgot.  It was no, I didn't have a specific reason, I

19      just didn't go back downstairs and lock it.  I never, I never

20      thought about it.

21  Q   Are you sure of that?  There was no particular reason that

22      you did that?

23  A   As far as I know.

24  Q   Okay.  And have you forgotten to lock it since then?

25  A   Um, I've gotten the garage code changed and --

1    Q    Do you lock your door every night when you go to bed?

2    A    The inside door to the garage?  Not every night.  Sometimes I

3         forget.

4    Q    The second time he came in your house, how did he get in?

5    A    He broke in.

6    Q    How do you know that?

7    A    Because the, he kicked the door in.

8    Q    How do you know that?

9    A    I don't understand what you're a-

10   Q    Did you hear the door get kicked in?

11   A    Yes.

12   Q    You did?

13   A    I --

14   Q    Did you tell the police you heard the door get kicked in?

15   A    I told them I could hear something happening.

16   Q    Isn't it true that when the police were asking you how he got

17        in, you weren't sure; they actually told you that it looked

18        like the front door had been kicked in?

19   A    I, I'm, I'm not, I'm not following what you're asking me

20        because we're talking about, you're asking me questions now

21        after the fact and I know the door was kicked in.  Are you

22        asking me at that point in time, at that night, did I know

23        exactly which door he busted in?  I didn't know which door he

24        busted in; I just knew that he busted in a door.  It could

25        have been the backdoor or the front door until I had gone

```
 1              downstairs to find out it was the front door.

 2   Q    So what your testimony is today is that you heard a door

 3        being broken in, is that right?

 4   A    I could hear him breaking in, yes.

 5   Q    And you didn't tell that to the police?

 6   A    Yes, I did.

 7   Q    Okay.  Which police officer did you tell that to?

 8   A    Uh, I, anyone that's asked me.

 9   Q    Ev-

10   A    Like --

11   Q    So you told it to Sergeant Fogo?

12   A    As far as I know.

13   Q    Okay.

14   A    I --

15   Q    And --

16   A    I, if I didn't --

17   Q    You --

18   A    I -- all I can tell you is that I, I said I grabbed my knife,

19        I went in my bathroom, and I called 911, and you, and calling

20        911, all of a sudden, I heard something, I knew Gary was

21        coming back.  So that's when I tried to hide my phone so that

22        he, as he walked in is when I saw him, so I didn't know which

23        door he busted in.  I just had heard some noise and then he

24        was there and that's exactly what I've said to anyone that's

25        asked because that's what happened.
```

1   Q     Do you remember telling Officer Vallance that you had locked

2         both of your outside doors?

3                     THE COURT:  Sergeant Fogo?  Could you --

4                     MR. FOGO:  I'm sorry?

5                     THE COURT:  -- give her a glass of water?

6                     THE WITNESS:  Can I get a glass of water?

7                     MR. FOGO:  May I approach?

8                     THE COURT:  Thank you.

9   BY MR. SIZEMORE:

10  Q     Okay, are you ready?

11  A     Yeah.

12  Q     Do you remember telling Officer Vallance that Gary somehow

13        got back into the residence; she assumed he kicked in one of

14        the doors since she had locked them both.  Do you remember

15        telling her that?

16  A     Uh-huh.

17  Q     So had you locked both doors?

18  A     When I --

19  Q     You just testified that one of the doors was unlocked.

20  A     Actually, you're confusing two different times.  So you're,

21        you're trying to mislead the situation.

22  Q     Is that what I'm trying to do?  Just answer the question.  If

23        I'm wrong --

24  A     You're wrong.

25  Q     -- just tell me I'm wrong.

```
 1   A      You're wrong.

 2   Q      Okay.  How?

 3   A      Would you like me to explain that?

 4   Q      Yes, please.

 5   A      Okay.  I did not lock the door to the garage from the garage

 6          to the house, excuse me.  Am I allowed to roll my eyes at

 7          you?

 8   Q      You've been doing it.

 9   A      I don't think so.

10                 MR. TAYLOR:  Your Honor, I'm going to object.

11                 THE COURT:  Let's, excuse me --

12   BY MR. SIZEMORE:

13   Q      Answer the question.

14   A      The door was not --

15                 THE COURT:  Excuse me.

16                 THE WITNESS:  The door was unlocked.

17                 MR. TAYLOR:  Ma'am, you have to wait for the judge.

18                 THE COURT:  Excuse me, wait.

19                 THE WITNESS:  Sorry.

20                 THE COURT:  We're done with the, um, rolling eyes

21          or whatever.  Just answer the questions.  Just ask the

22          questions.  And hopefully, um, they won't be so fast that she

23          doesn't have time to answer the question.  Give her time to

24          answer the question.  Sometimes, you, you go over and she's

25          saying, no that's not what I said.
```

```
 1                    MR. SIZEMORE:  Okay.

 2   BY MR. SIZEMORE:

 3   Q    Can you explain to me then when did you lock both doors?

 4   A    Sure.  After I got away from Gary, ran out around the house,

 5        all the way around the circle, got the, Gary came out after

 6        me, I got my phone from him and ran back in the house and as

 7        he got to me, I shut the door on his arm, he pulled his arm

 8        back, I shut the door, I locked it, I ran to the front door

 9        and made sure it was locked, and then turned and ran around

10        up the stairs to get my knife and call 911.

11   Q    Okay.  And where were Gary's car keys and his cell phone at

12        that time?

13   A    I have no idea.

14   Q    Would it surprise you to know they were inside your house?

15   A    I, I wouldn't surprise me one way or the other.  I, I --

16   Q    W-

17   A    -- he chased me outside because I ran away from him.  What,

18        what he did with his phone and his keys, I don't know.

19   Q    Well, did you, you had his keys, right?

20   A    Why would I have his keys?

21   Q    You said you picked up his keys.

22   A    And I also said I gave them back to him.

23   Q    When did you give them back to him?

24   A    At the end of my, in my room before we came around.  You just

25        asked me that and I explained it to you.
```

```
 1   Q    I don't remember that, ma'am; I'm asking again.  When did you
 2        give him his car keys?
 3   A    I handed him the things that I had grabbed from him as we
 4        were walking around the bed, I put the things to him as we
 5        came around this side of the bed.
 6   Q    You put the things to him?
 7   A    I put -
 8   Q    What do you mean by that?
 9   A    I set them to his chest and he grabbed them with his arms.
10   Q    His car keys?
11   A    I don't know what all was in there, honestly, I don't know,
12        it was his, if it was his keys --
13   Q    Are you sure his car keys were there or are you just guessing
14        that his car keys were there?
15   A    I'm pretty, I'm pretty sure his keys were there.
16   Q     You testified earlier that it was his shoes as well.  Are
17        you sure of that?
18   A    One hundred percent positive it was his shoes.
19   Q    Anything else?
20   A    I don't recall.
21   Q    Cell phone, wallet?
22   A    Don't recall.
23   Q    Did you ever see his cell phone or his wallet that night?
24   A    I don't recall.
25   Q    Didn't he tell you I need my keys if you want me to leave?
```

```
1   A     I don't recall hearing that at all; I would have had his, I

2         would have been obtaining his keys from him or stopping him

3         from leaving.  So, no, I don't, I don't know that.  If he

4         said that, he was, he was missing his keys of his own accord

5         and not me.

6   Q     Because you'd pushed them onto his chest is what you're

7         saying.

8   A     Everything that I was aware of that he left on the side of

9         the bed, I handed to him at the end of the bed as I pushed

10        him around.  Whether or not he had his keys --

11               MR. TAYLOR:  Ma'am, you can continue to answer.

12        It's being recorded.

13               THE WITNESS:  Whether or not he had his keys,

14        whether or that it was in that stack, I, I honestly can only

15        really 100% visualize his shoes.

16               MR. SIZEMORE:  One second please, Your Honor.

17        Thank you.

18               THE COURT:  Mr. Taylor?

19                        REDIRECT EXAMINATION

20  BY MR. TAYLOR:

21  Q     Heather, you seem upset.  Is that fair to say?

22  A     Yes.

23  Q     As you sit here today and you're testifying to the jury, why

24        is it that you're upset?

25  A     Well, I'm upset because I think when somebody does something
```

1          wrong, they should be held accountable for it.

2     Q    Um, Mr. Sizemore had asked you some questions about you being

3          the first one to put your hands on Mr. Fischer, is that

4          right?

5     A    Yes.

6     Q    And you admit that that's true?

7     A    Yes, it is.

8     Q    Okay.  Do you feel justified in putting your hands on him?

9     A    I feel as though if anybody intruded in my home, I can

10         justify it would get them out by whatever means necessary.

11    Q    Okay.  And when you were asked about Mr. Fischer's keys and

12         his wallet and all that, were you concerned with whether or

13         not he got his things back that night?

14    A    No.

15    Q    And what was your primary concern?

16    A    Getting him out.

17    Q    Okay.  Prior to September 17th into the 18th, um, have you

18         ever been in a fistfight before?

19    A    Yes.

20    Q    Okay.  Um, in the altercation that took place in your home

21         that night, uh, would you, can you tell us what your focus

22         was on throughout the times where you were punching one

23         another?

24    A    When I was actually punching Gary, it was to get my phone.

25    Q    Okay.

194

1    A    Um, but I, um, once, once the thing happened where I bit him,

2          I never, I never got another punch in on Gary.

3    Q    Okay.  You talked about today a number of times where you

4          were struck in the head or your head was striking off the

5          floor.  Um, following those strikes to your head, did you

6          have trouble with knowing where you were, what was going on?

7    A    At, in the moment?  In that actual moment of it happening, I,

8          I mean, there, over time, I have developed, I feel some

9          memory issues as a result of the concussion.  But I did not,

10         I feel like, other than the moments that, from the very

11         beginning were cloud that I, that I said from the beginning

12         and can't really say specifically right there what happened,

13         nothing has changed in my memory of that night.

14    Q    Okay.  And so the, the details that you gave us about the

15         sequence of events, who was where, what was being said, I

16         guess, I'm going to put this in the same terms Mr. Sizemore

17         did, are you filling the gaps in or guessing or are the

18         things that you said happened, those are the things you

19         remember vividly happening?

20    A    Everything that I identified specifically, I remember

21         vividly.

22    Q    Okay.

23    A    I d-, let me say this, the thing that I'm not 100% sure is if

24         his keys were with his shoes or not.

25    Q    Okay.

```
 1  A    I just cannot remember.

 2  Q    As you sit here today, does it even still matter to you

 3       whether his keys were in your house?

 4  A    No, I didn't --

 5  Q    Would you still have wanted him to get out right then and

 6       there?

 7  A    Absolutely.  I never, I, I couldn't have cared less about his

 8       keys.

 9            MR. TAYLOR:  No further questions, Your Honor.

10            MR. SIZEMORE:  Nothing further, Your Honor.  Thank

11       you.

12            THE COURT:  Okay, jury, this is your opportunity to

13       ask the witness any questions that you may have, but you have

14       to write it down on that piece of paper and, um, identify

15       yourself and let the bailiff know that you have a question.

16       Thank you.  Okay, will counsel please approach?

17            (At 3:32 p.m., bench conference on the record)

18            THE COURT:  This wasn't written on the right type

19       of paper, but it says why won't there photographs of the

20       goose eggs.

21            MR. TAYLOR:  Um, I don't know if she can answer it;

22       you can ask her.

23            THE COURT:  Yeah, okay.

24            MR. TAYLOR:  She might not know.

25            THE COURT:  Do you have any objection to me asking
```

1          her that?

2                    MR. SIZEMORE:  She's not going to know that.  It's

3          going to call for speculation or hearsay.  She doesn't know.

4                    MR. TAYLOR:  Unless somebody told her, then it's

5          going to be hearsay, so I mean, I don't --

6                    THE COURT:  I think he hair would be covering it

7          up.

8                    MR. SIZEMORE:  But you could ask a cop that

9          question.

10                   THE COURT:  I don't --

11                   MR. TAYLOR:  We can ask the cop that question.  I,

12         I guess what I would ask the Court to do is just reserve that

13         question and see if it still needs to be asked after he's

14         testified.  I mean, I get why they want to know, but she

15         didn't take the photos.

16                   THE COURT:  All right.  And there's this, this one.

17                   MR. TAYLOR:  (indecipherable) tooth knocked out.

18                   MR. SIZEMORE:  Uh-huh.

19                   THE COURT:  Wait a second, wait a second.

20                   MR. TAYLOR:  Want us to initial it?

21                   THE COURT:  No objection?  No objection.

22                   MR. SIZEMORE:  All right, (indecipherable).

23                   MR. TAYLOR:  Yeah, I know, right?

24                   THE COURT:  Thank you.

25                   (At 3:33 p.m., bench conference ended)

1          MR. TAYLOR:  Here's the originals.  Your Honor,

2     does the Court want me to put the photo back on the monitor

3     or do you want to just publish to the jury and --

4          THE COURT:  Why don't you just publish it to the

5     jury, the specific one.

6          MR. TAYLOR:  It's the first photo.

7          THE COURT:  Let me ask the question first.  It

8     says, um, one of the questions, um, we believe would be more,

9     um, would be better answered by one of the police officers.

10    We'll see if what the police officers have to say about the

11    photographs because they're the ones that took the

12    photographs, so we can ask them the question.  As to, um, can

13    she point out the tooth again and can we see the picture with

14    the tooth knocked out.  And, um, he has them in his hand.  If

15    he could publish that to the jury.

16         MR. TAYLOR:  The very top.  May I (indecipherable)

17    it to the bailiff?

18         THE COURT:  Yes, please.

19         MR. TAYLOR:  It's the very top one.  And I believe

20    the, um, last two photos are of the replaced tooth, so the

21    jury has all of the exhibits, the photo exhibits that have

22    been admitted.

23         THE WITNESS:  Those, those last two are the

24    temporary.  I don't know if that matters.

25         MR. TAYLOR:  That's okay.  They can look at it.

1              THE COURT:  Okay.  You can hand those to the

2       bailiff.  Any other questions for this witness?  And there

3       are none.  Okay, you may step down.

4              THE WITNESS:  Thank you.

5              (At 3:35 p.m., witness excused)

6              MR. TAYLOR:  I'll take those back from the Court.

7       Thank you.

8              THE COURT:  And if you'd call your next witness,

9       please.

10             MR. TAYLOR:  I would call Sergeant Fogo to the

11      stand.

12             THE COURT:  Okay.  Do you swear to tell the truth,

13      the whole truth, and nothing but the truth so help you God?

14             MR. FOGO:  I do.

15                          DAVID FOGO

16             (At 3:36 p.m., witness sworn by the Court and

17             testified as follows)

18             THE COURT:  Okay.  Just have a seat, please.  State

19      your name and spell your last name for the record.

20             THE WITNESS:  I'm Sergeant David Fogo, F-o-g-o.

21                      DIRECT EXAMINATION

22   BY MR. TAYLOR:

23   Q    Where do you work?

24   A    The City of Howell Police Department.

25   Q    And how long have you been in law enforcement?

                              199

```
 1   A     Twenty-four years.

 2   Q     Okay.  All with Howell or did you work in another place?

 3   A     No, I worked for the Village of Fowlerville for just about

 4         eight years prior to coming to Howell.

 5   Q     What are your duties at Howell police?

 6   A     Um, as a Sergeant, I'm in charge of a road patrol team.  And

 7         then those aspects are to supervise those officers and

 8         respond to handle any calls or traffic issues that also

 9         arise.

10   Q     Um, in your 2 1/2 decades of law enforcement, have you

11         investigated home invasions and domestic violence type

12         offenses?

13   A     Yes.

14   Q     About how many would you say?

15   A     I don't have a specific number, but probably double digits.

16   Q     Okay.  And, um, have you had any training or experience that

17         allows you to investigate domestic violence crimes?

18   A     Yes.  I've had domestic violence training specifically

19         through the prosecutor attorneys association.  There's also

20         classes that I've through Michigan State Police.  And then

21         I'm also trained as a, what we call an evidence technician.

22         So there's some aspects of that, that lead into the domestic

23         violence as well.

24   Q     Okay.  Um, when you are dispatched to a call where there's a

25         possible domestic, what kinds of things are you looking for
```

1        as far as information before you even get to the scene?

2   A    I'm looking for information, hopefully our dispatch is able

3        to obtain information as far as, uh, who's involved, whether

4        it's what type of relationship, how many people are involved,

5        if it's actually just been an argument or if there's been

6        some sort of physical confrontation, um, whether there's

7        weapons involved or even if there's any injuries.

8   Q    Okay.  Are there any bits of information, not just that

9        pertain to investigating the case, that might pertain

10       specifically to you and your safety that you want to know

11       about before you get there?

12  A    Well, for me specifically, it's more has there been an

13       assault that's occurred and if there's any weapons involved.

14  Q    Okay.  And is that weapons concern about your own safety as

15       well?

16  A    Correct.

17  Q    All right.  Is, when you approach a scene where there's been

18       a domestic call, do you approach differently if you're not

19       told certain information, like whether there's a weapon?

20  A    Depending on the circumstances, correct.  And depending on

21       the type of information we get and whether we're specifically

22       familiar with an exact location, um, or a specific residence,

23       we may park down the street or, or even go past a location

24       and then double back to it on foot, that sort of thing.

25  Q    Okay.

1   A   For the, for our safety so we can, kind of, sneak up a little

2       more.

3   Q   Um, when you get called to a, an active domestic or an active

4       dispute, do you approach that differently than you would if

5       the offender or the p-, the suspect has left the scene?

6   A   Yes, if --

7   Q   And what's the difference?

8   A   If we're told that the suspect or the person that, that is

9       being told to us or described to us as the suspect or the bad

10      guy, our sense of safety and security is a little less, um,

11      just because the person that was potentially the violent

12      person has left.  On the other hand if, if we don't have that

13      information, then we're approaching in that more safe manner.

14      You know, a lot of times we'll, we'll wait for a second

15      person, a second officer to get there if we can.

16  Q   Okay.  When you arrive on scene, how do you treat the

17      different people that you encounter?  What do you do to make

18      sure that you're safe and that everyone else is safe?

19  A   First thing, one of the main things we're always taught is

20      these are what hurt people.  Whether it's these used

21      physically or something in them, a gun, a knife, a rock,

22      whatever.  So we always like to see people's hands.  You

23      know, as long as I can see your hands, then I feel safer.

24  Q   Okay.  Do you try to isolate specific individuals to talk to

25      them one-on-one or do you try to talk to everybody at the

1       same time?

2 A   No, we try and isolate everybody, even if we're not sure who

3       our potential suspect or victim or witnesses are; we try and

4       talk to everybody separately and not where they can hear each

5       other if at all possible.

6 Q   Okay.  And when you show up to a scene where you don't

7       necessarily know what's going on, do you give commands to

8       individuals to keep them separated or so that you can ensure

9       your own safety?

10 A   Yes.

11 Q   All right.  And once you have information that a act of

12       violence has occurred, what kinds of commands do you give

13       people when you show up on scene?

14 A   Um, I would have to give general -- specifics all depend on

15       what I'm, what I'm seeing.

16 Q   Okay.

17 A   But, again --

18 Q   I guess is it fair to say then you, you come armed with the

19       information dispatch gives you and then you make observations

20       when you show up?

21 A   Correct.

22 Q   Um, all right, so given that experience and that training,

23       were you dispatched to a call on September, on or about

24       September 18, 2018 in the City of Howell?

25 A   Yes, I was.

1   Q   And that's here in Livingston County?

2   A   Yes, it is.

3   Q   Um, what was the general nature of that dispatch, if you

4       remember?

5   A   The dispatch I believe you're referring to is the one on

6       Welen Street, which occurred j-, a little while after

7       midnight, about what we call zero fifty-five hours, which is

8       55 minutes after midnight.  Um, I was dispatched, what first

9       came out as what we call a verbal domestic, which commonly

10      means dispatch has gotten a call, a 911 call, and people are

11      arguing.

12  Q   Okay.  And is there a different kind of domestic than verbal

13      domestic you get dispatched to?

14  A   Yes.  Once they, and I say they, once dispatch confirms or

15      has enough idea that something physical has happened, they'll

16      do what we call upgrade up to what they, dispatch us now to a

17      physical domestic, meaning something physical has happened

18      between two parties.

19  Q   Is your approach to the scene different based on those two

20      types of dispatch?

21  A   Yes, just as we spoke earlier with the safety issues.

22  Q   Um, so on the night of the 18th, um, you got, did you get an

23      indication that it was upgraded to a physical domestic?

24  A   Yes.

25  Q   And was there any other information, besides it's a physical

1           domestic, that dispatch relayed to you?

2   A   They conveyed to me that, um, what they have is an open line,

3       which means they, they can hear people, but they haven't been

4       able to communicate commonly.  And --

5   Q   Is that a concern for you when you're showing up to a scene

6       that there's an open line, but no caller on it?

7   A   Yes.

8   Q   And why is that?

9   A   Because we have no clue what's going on inside.

10  Q   Okay.

11  A   They've got something going on, but we don't know what it is.

12  Q   What would your expectation normally be of a 911 call?  Would

13      the caller stay on the line?

14  A   Yes.

15  Q   And what kinds of concerns do you show up with when the

16      person who made the 911 call isn't responding to the

17      dispatcher?

18  A   Um, a lot of things go through my head, um, something's

19      happened to the person that called 911, um, was it an

20      accidental call, are they actually just arguing or and now

21      they meant to hang up, they didn't.  But there, through the

22      calls that I've had in the past, there's a lot of things --

23  Q   Okay.

24  A   -- that lead concern.

25  Q   So, uh, a verbal domestic open line, gets upgraded to a

1      physical domestic.  What else did they tell you?

2   A   Um, they upgraded it to the physical domestic because they

3      heard some, some talk between the people on this open line

4      about hitting.

5   Q   Okay.  And that was relayed to you?

6   A   Correct.

7   Q   Um, was there any other information relayed to you about the

8      caller?

9   A   Prior to me getting out of the car, I, I don't believe so.

10  Q   Okay.  Do you recall from memory, today as you sit here,

11     whether that's true or not?  Are you certain that there was

12     no other information given to you?

13  A   I, I know there was other information, but it, at which point

14     I'm not sure I obtained it.

15  Q   Okay.  Um, did you narrate what you recalled after the fact

16     in a report?

17  A   Yes.

18  Q   Would seeing your report help refresh your recollection as to

19     what information dispatch was giving you as you were

20     approaching the scene?

21  A   Yes.

22  Q   Okay.

23           MR. TAYLOR:  Your Honor, may I approach the witness

24     with Howell Police Department report 1807488?

25           THE COURT:  Yes.

1          MR. TAYLOR:  And I believe that'd be, information

2     is on page 3.  May I approach?

3          THE COURT:  Yes.

4          THE WITNESS:  I'm not seeing what other information

5     --

6  BY MR. TAYLOR:

7  Q   Okay, so reviewing your report, that's the only information

8     you can recall?

9  A   Yes.

10 Q   All right.  So as you arrive on scene there at the, excuse

11    me, the 055 hours, what, what are your observations when you

12    arrive on scene?

13 A   As I pull onto Wellen, as the previous witness described,

14    it's a multi-unit condominium.  So on the back side where the

15    drive is, there's multiple garage doors.  And as I'm pulling

16    onto the road, I notice that only one of them is open and the

17    lights are on inside.  As, uh, I realize that I'm, I'm not at

18    the residence, I continue past it with my lights off and park

19    past that location and then exit my patrol car.

20 Q   Okay.  Did, after the dispatch radioed that it was a physical

21    domestic, did they ever clarify to you whether the caller was

22    male or female?

23 A   I do not believe they did.  Oh, yes.  There was, there was a

24    transmission, um, that I recall hearing that, um, stated that

25    there was a male that was exiting the residence.

1    Q    Okay.  And the caller was male or female, do you know?

2    A    Female.

3    Q    Okay.  And that was based on dispatch information?

4    A    Correct.

5    Q    All right.  So you show up, you drive by, you have

6         information that the caller is female, it's been upgraded on

7         an open line to a physical domestic.  And when you arrived,

8         there's a male exiting the house, is that correct?

9    A    Correct.

10   Q    So did you turn back around and, and reapproach the residence

11        with your lights on?

12   A    No.  As when I saw the male, I was already out of my car on

13        foot.

14   Q    Okay.  Did you activate your overhead lights at all at that

15        point?

16   A    No.

17   Q    Do you know if any other units arrived at any point and

18        turned their overhead lights on?

19   A    I do know that when Officer Vallance was responding, at one

20        point she had her overhead lights on.

21   Q    Okay.  Um, so you were out on foot, you observed the male.

22        Did you -- can you identify the male that you observed here

23        in the courtroom today?

24   A    I can.

25   Q    And who is that?

1  A   Mr. Fischer sitting at the --

2  Q   All right.

3  A   -- other table.

4  Q   And were you able to see him clearly that night?

5  A   Yes, I was.

6  Q   Uh, how far apart were you from, were you from him when you

7      saw him?

8  A   When I first saw him, probably 75 to 100, no, probably 60 to

9      70 feet.

10 Q   Okay, 60 to 70 feet.  Um, so 20, 25 yards?

11 A   Correct.

12 Q   Then the area you were, were there lights on to where you

13     could clearly see him?

14 A   Yes.  Where I, where I saw him, he was exiting the, the door

15     that leads from the garage to the residence, the overhead

16     garage door was open, and all the lights are on.  So I could

17     clearly see him as he's exiting.  I was still out in the

18     roadway where it's dark.

19 Q   Okay.  So he might not have been able to see you at that

20     point, is that fair?

21 A   At, when I first saw him, I do not believe he could see me.

22 Q   Okay.  Did you continue to approach him?

23 A   Yes, I did.

24 Q   All right.  How far did you get from him before you started

25     talking to him, if you did?

1   A   Approximately the distance we are now.

2   Q   Okay.  So the way I estimate it, that's probably between ten

3       and 15 feet.

4   A   Correct.

5   Q   Uh, could you see him clearly?

6   A   Yes.

7   Q   And were you clearly illuminated?

8   A   I was, I could see the light on my, myself, that was

9       emanating from the garage.

10  Q   Okay.  So --

11  A   I also had a flashlight that I had shined on him as I started

12      speaking with him.

13  Q   All right.  So when you first arrived, you arrived in a

14      patrol vehicle.  Was it marked?

15  A   Yes.

16  Q   But you didn't have your lights on?

17  A   No, I did not.

18  Q   And it, fair to say, you parked it and it was dark?

19  A   Yes.

20  Q   Okay.  So when you approached Mr. Fischer, it wasn't until

21      you were ten to 15 feet away before you were visible and,

22      like you said, illuminated by the garage light and your

23      flashlight?

24  A   Correct.

25  Q   Were you dressed similarly on September 18th as you were, are

1        sitting here today?

2    A   Exactly as I am, except I was wearing short-sleeved shirt and

3        I would have had a white t-shirt on instead of the mock

4        turtle neck.

5    Q   Were you still wearing Howell Police uniform?

6    A   Yes.

7    Q   Badge?

8    A   Yes

9    Q   Duty belt?

10   A   Yes.

11   Q   Firearm?

12   A   Yes.

13   Q   Taser?

14   A   Yes.

15   Q   Okay.  Uh, fair to say you looked like an official police

16       officer?

17   A   Yes.

18   Q   Okay.  So as you approached Mr. Fischer and you're ten to 15

19       feet away, um, were you still getting information from

20       dispatch at this point?

21   A   They may have been conveying something, but I was, I was too

22       concerned with my interaction with him; I wouldn't have heard

23       it.

24   Q   So what was your concern when you first approached, excuse

25       me, approached Mr. Fischer?

211

| 1 | A | When I first observed Mr. Fischer, as I stated, he was coming |
| 2 | | through that hallway from the residence to the garage and I |
| 3 | | could hear a commotion, I could hear some banging and that |
| 4 | | sort of thing.  And as he exited, he slammed that door that |
| 5 | | leads from the garage, from the residence to the garage. |
| 6 | Q | Okay.  Was that door open before he walked through it? |
| 7 | A | Yes. |
| 8 | Q | And did it stay closed once he slammed it? |
| 9 | A | That I don't know. |
| 10 | Q | Okay.  So, um, once he starts to exit the residence and he |
| 11 | | slams that door, what was your thought process there? |
| 12 | A | Um, that he's mad. |
| 13 | Q | Okay. |
| 14 | A | He's heightened or upset or mad. |
| 15 | Q | All right.  W-, did you have any personal concerns about your |
| 16 | | safety at that point? |
| 17 | A | Yes. |
| 18 | Q | And what were those concerns? |
| 19 | A | I don't know what's happened inside that residence, I've got |
| 20 | | someone coming at me that's potentially mad, upset.  I don't |
| 21 | | know if they've committed a crime or been the victim of a |
| 22 | | crime. |
| 23 | Q | Okay.  So you're there to investigate, fair to say? |
| 24 | A | Correct. |
| 25 | Q | You have Mr. Fischer approaching you.  He's acting, I think |

1       as you said, mad.  Um, what do you do to make sure that

2       you're safe?

3   A   I shine my flashlight at him, I identified myself as police,

4       and said let me see your hands.

5   Q   Okay.  So, uh, were you still between ten and 15 feet away

6       from him when you gave him that command?

7   A   Yes.

8   Q   And why did you give him that command?

9   A   Because I wanted to see his hands.  I wanted to make sure he

10      didn't have anything that was going to hurt me.

11  Q   Okay.  Now if I'm just walking down the street not doing

12      anything wrong, minding my own business, do you just

13      generally go up to pedestrians and say show me your hands?

14  A   No.

15  Q   Okay.  So you, you do that when you think that there's a

16      safety issue, is that fair?

17  A   Correct.

18  Q   Um, so when you told Mr. Fischer that you were a police

19      officer and to show you his hands, did he comply with that

20      command?

21  A   No.

22  Q   What did he do instead?

23  A   He took one or two more steps towards me and where I'm

24      approaching the garage, I'm next to a vehicle, there's a

25      vehicle to my right.  He is coming at me.  I give him the

| | | |
|---|---|---|
| 1 | | command, police let me see your hands.  He takes another step |
| 2 | | or two and then he goes to the far passenger side of that |
| 3 | | same vehicle and starts to run. |
| 4 | Q | Okay.  So instead of showing you his hands, he goes around |
| 5 | | the other side of the vehicle? |
| 6 | A | Correct. |
| 7 | Q | And then when you say he starts to run, uh, when he took off |
| 8 | | running, was there still that vehicle in between you and him? |
| 9 | A | Yes, there was. |
| 10 | Q | All right.  So did you have to go around that vehicle to |
| 11 | | catch up to him? |
| 12 | A | Yeah, so I then had to turn and go back the way I came. |
| 13 | Q | Okay.  And did you chase him? |
| 14 | A | Yes. |
| 15 | Q | Why'd you do that? |
| 16 | A | Um, I'm responding to what I now believe is a physical |
| 17 | | altercation between two parties.  I've got one person that's |
| 18 | | come out of the residence visibly upset and seems aggressive. |
| 19 | | I've given him commands.  He's defied those and now he's |
| 20 | | taking off running.  He's, he's got something to hide.  He's |
| 21 | | -- |
| 22 | Q | Okay. |
| 23 | A | -- I need to speak with this guy, I need to keep him from |
| 24 | | leaving because I don't know what's happened upstairs. |
| 25 | Q | All right.  So in pursuit of that attempt to stop him and |

1    investigate what you think may be a crime in progress, did

2    you give him any additional commands?

3  A   Yes.  So --

4  Q   What did you say to him?

5  A   As he continues running past that vehicle, um, I vividly

6    remember thinking in my mind he's going to come up behind and

7    we're going to fight.

8  Q   Okay.

9  A   That's what came to my mind.  I started reaching for my taser

10   thinking that that was probably the best thing at that point.

11   Then I heard a loud commotion, a loud bang, and I realized he

12   ran into, what my generation would call, Mr. Rubbish Car, a

13   large plastic trash dumpster and he fell to the ground.  At

14   that point, I yelled to him to stay down.  He didn't.  He got

15   up.  As he was getting up, I was able to reach, um, and he

16   was now r-, starting to go away from me again and I was able

17   to grab a hold of, I believe, a shirt, whatever he was

18   wearing on his body.  And I'm still yelling, again, for him

19   to stop.  He didn't.  We kept running and I was able to get

20   an arm around his shoulder area and using my weight, we went

21   to the ground.

22  Q   Okay.  So, um, did you ride in the ground on his back?

23  A   Yes.

24  Q   And was he chest down when he hit the ground?

25  A   Yes.

```
 1  Q    So, I guess, I'm going to ask this just to clarify, you said
 2       a rubbish dumpster.  Are we talking about the city issues,
 3       like, 4 1/2 foot tall --
 4  A    Yeah, one you --
 5  Q    -- plastic monster trash can?
 6  A    -- would have up by your house that you'd put your bags in
 7       and then you'd take it out to the curb.
 8  Q    Okay.  So it's, it's the trash can for the home?
 9  A    Yes.
10  Q    Um, so he hits the ground, gets up, and then you said you b-,
11       did you, like, drape it around him or were you trying to put
12       him in a headlock?  Kind of, how did you use your arm?
13  A    No, I was just, I was trying to get around his shoulders so
14       that I could stop him physically from running and we were
15       still moving.  So I did this, I don't believe I had both arms
16       around him; I just had the one and then I just basically made
17       myself dead weight to take us to the ground.
18  Q    Okay.  And when he hit the ground, I think you said chest
19       first, did he become compliant when he hit the ground?
20  A    No, not at first.
21  Q    Okay.  What was he doing once you were on top of him on the
22       ground?
23  A    Um, he was still squirmy.  And specific words, I don't
24       recall.  But I was trying to get him to stop so that I could
25       put him in handcuffs.
```

1   Q   Okay.  Why'd you need to put him in handcuffs?

2   A   Because he's being physically aggressive now.  Um, he's

3       actively, physically resisting me, um, and I nee to control

4       him and the best way that we can control somebody is with the

5       hands secured behind the back.

6   Q   Okay.  And so, um, do you recall anything he was saying when

7       you were on top of him on the ground?

8   A   Not specifically.  At one point, he did ask, I shouldn't say

9       he did, I believe he asked me who it was and I, again, said

10      police.  And at that point, he became what we call passive --

11  Q   Okay.

12  A   -- which is, he is now on the ground and he's just not doing

13      anything; he's just holding his arms out and I'm trying to

14      pull those arms back and he's just keeping them stiff.

15  Q   So, um, when he's keeping his arms stiff and you, kind of,

16      had -- just for the record, you had your hands up, like, kind

17      of, in front of your face, almost like a superman pose there.

18      Um, is that what was going on?

19  A   You'd have to refer --

20  Q   Sorry, so is this what he was doing with his arms?  Could you

21      redemonstrate that?

22  A   He, specifically where they were once we were on the ground,

23      um, I don't know at first, at one point, he had them out.

24      What position they were in, I don't recall.

25  Q   Okay.

```
 1   A    They were out on the pavement flat.

 2   Q    All right.  I just wanted to clarify --

 3   A    Okay.

 4   Q    -- that they weren't underneath him or anything like that.

 5   A    I don't recall specifically the whole time, but at, when I

 6        refer to him being passive and just laying there, they were

 7        flat on the pavement.

 8   Q    Okay.  And when his arms were out stretched and flat on the

 9        pavement, were you attempting to put his hands behind his

10        back?

11   A    Yes.

12   Q    And were you using manual force to do that?

13   A    Yes, just my, my strength.

14   Q    And was he compliant when you were trying to physically

15        restrain him?

16   A    At first he was not, um, and then I had gotten to my radio,

17        this on my lapel right here is the microphone for my radio.

18        I was able to reach there and I basically told dispatch that

19        I'm fighting with one.

20   Q    Okay.

21   A    It's just, you, I use the word fight just because that

22        heightens everybody's, they know I'm struggling with

23        somebody, I'm dealing with a situation I need help.

24   Q    Okay.  And so, uh, what was your expectation in response to

25        that call out?
```

1    A    That I would get assistance from other officers.

2    Q    Okay.  So, uh, after you called out that you were in a fight

3         with one, did, were you able to get his hands behind his back

4         physically?

5    A    Yes.  Actually, once I made that transmission, I believe Mr.

6         Fischer's response was no you're not and then he cooperated

7         and I was able to get him into handcuffs.

8    Q    Okay.  So, uh, at that point, you were able to get him in

9         handcuffs.  What did you do with him then?

10   A    We stayed right there on the ground.  As short as that

11        situation is, it's very physically straining and demanding.

12        Um, I'm out of breath, he's out of breath.  We stayed right

13        there, um, until another officer got there and --

14   Q    All right.  And --

15   A    -- I was comfortable with the situation.

16   Q    Do you recall who the first officer on scene was to assist

17        you?

18   A    Officer Vallance.

19   Q    Okay.  Is that Officer Alicia Vallance?

20   A    Yes, it is.

21   Q    And, um, was she dispatched to the same call initially or

22        were, were, did she come in response to your request for

23        backup?

24   A    When I was dispatched this call, she was already at the

25        Livingston County jail taking care of a situation that had

1    happened prior.  She was booking somebody in jail.  She

2    automatically, um, started responding to my call once she was

3    done at the jail, which is common practice.  We're going to

4    go until we know they don't need our assistance.  But at that

5    point, she was just driving normal traffic.

6  Q    Okay.  Um, so once Office Vallance got there, did you remain

7    in the driveway with Mr. Fischer?

8  A    For a brief moment, and then we worked on getting him up and

9    into my patrol car.

10  Q    Okay.  So did Officer Vallance physically assist you in

11    getting Mr. Fischer into the patrol car?

12  A    I don't believe so.

13  Q    I mean, did he walk of his own accord to get into the car?

14  A    Yes.

15  Q    All right.  And so once, once you had made that radio call

16    that you were in a fight with one, from that point going

17    forward, did he physically resist you any further?

18  A    No, he did not.

19  Q    Did he obey all of your commands at that point?

20  A    Yes, he did.

21  Q    Okay.  Um, what -- did you put him in the back of a patrol

22    vehicle?

23  A    Yes, mine.

24  Q    And did he stay locked in there during your investigation?

25  A    Yes.

```
 1   Q    Okay.  Um, what steps did you take after securing Mr. Fischer
 2        into your vehicle?
 3   A    The, the steps I took, I remained at my vehicle with Mr.,
 4        excuse me, Mr. Fischer.  Um, I did document some injuries
 5        that he had.  I wasn't sure if they were from the altercation
 6        he and I had or if they were from something that happened
 7        prior, so I did document a few injuries that he had while he
 8        was seated in the patrol car, took a few pictures of him, but
 9        I remained with him until there was no other reason for him
10        to remain on scene.  Um, I was conveyed information by the
11        other officer that had gotten on scene that there was a
12        physical altercation and he was the suspect and, uh, that we
13        had probable cause to arrest him for domestic violence.
14   Q    Did you ever speak personally on the night in question, the
15        18th, to Heather Miner?
16   A    Yes, I did.
17   Q    Okay.  Uh, at some point in your discussion with her, did she
18        ever explain to you whether she heard, uh, Mr. Fischer
19        damaging her doors?
20   A    Yes.
21   Q    What was her recollection at that point?
22   A    So after I took Mr. Fischer from the scene and he was placed
23        in the Livingston County jail, I returned to the residence.
24        Officer Vallance was still there.  And she was speaking with
25        Heather Miner.  And because I hadn't had any contact with her
```

1      prior to that, I asked her just to, kind of, briefly go

2      through things.  And as she was going through the, through

3      her, her recollection, she stated she, she could hear Gary

4      beating on something downstairs and then the next thing she

5      knew he was back in the residence.

6  Q   Okay.  Did she said beating on something or did she say

7      anything specific?

8  A   I would have to recall.

9  Q   Would reviewing your report refresh your recollection?

10 A   Yes, it would.

11 Q   Please do.  I believe it's page, on mine, it's page 6, but

12     it's the last full paragraph of your initial report.

13 A   She stated she could hear Mr. Fischer beating on the doors

14     and the next thing she knew, she was stating, he was standing

15     there.

16 Q   So is that par-, or that statement that you just read to the

17     jury here from your report based on that prior recollection,

18     was that statement made the night of September 18, 2018 on

19     scene?

20 A   Yes, it was.

21 Q   Okay.  Um, so after Ms. Miner reiterated the events that had

22     occurred, what were your next steps?

23 A   The only thing that I did after that, after briefly speaking

24     with Office Vallance downstairs, is then authored a report

25     and put everything together.

1    Q    Okay.  Um, on scene, do you recall if your, any of your

2         assisting officers were documenting with photographs?

3    A    Yes.

4    Q    And who was doing that?

5    A    Deputy Mac-, McNamara from the Livingston County Sheriff's

6         Department.

7    Q    Okay.

8    A    And Officer Vallance took, um, some follow up photos that

9         following day.

10   Q    Okay.  Um, do you ever take photos when you do

11        investigations?

12   A    Oh, yes.

13   Q    And what are the kinds of things that you try to photograph?

14   A    Um, the, what they try and teach you is to try and picture

15        the scene for anybody that's no there.

16   Q    Okay.

17   A    The, you know, the entryways, all the way through the

18        residence, through what we would call the crime scene or the

19        areas of concern.  And then anything that was a result of the

20        altercation, injuries, whether it's to the victim or the

21        suspect and whether they're caused by either party.

22   Q    Okay.  Are there things that you sometimes find difficult to

23        photograph, textures, reflective surfaces, those kinds of

24        things?

25   A    Oh, yeah.

1   Q     What do you do to document something that won't show up right

2         on a camera?

3   A     It would, there's multiple different things that we might do.

4         So I would need --

5   Q     Okay.

6   A     -- to have something a little more specific.

7   Q     All right, so if, for instance, like the television screen,

8         if you try to take a picture of it, sometimes it has that

9         weird, like, scroll in it and you can't make out the image.

10  A     Uh-huh.

11  Q     Is there another way, besides photographing it, that you

12        could document what you are observing with your own eyes?

13  A     Just by explaining it.

14  Q     Okay.  So you would document that in your report?

15  A     Correct.

16  Q     All right.  Um, you indicated earlier that after you were,

17        you made the call out that you were in a fight with one, that

18        Mr. Fischer became compliant.  What was -- did you have a

19        chance to talk to him at all?

20  A     We had conversation, yes.

21  Q     Okay.  And what was his demeanor?  I'm not going to ask you

22        specifically what he was saying, but what was his general

23        attitude?

24  A     Um, I can tell he had been drinking, um, I could smell

25        intoxicants as he spoke.  But he was generally very

| | | |
|---|---|---|
| 1 | | cooperative and cordial. |
| 2 | Q | Okay. |
| 3 | A | At that point. |
| 4 | Q | And was, when you got him to the jail, did you have to do |
| 5 | | anything to document booking him in? |
| 6 | A | I took photos of, of the injuries that he had, um, there at |
| 7 | | the jail. |
| 8 | Q | Okay.  And was he compliant with that process? |
| 9 | A | Yes, he was. |
| 10 | Q | All right. |
| 11 | A | To an extent. |
| 12 | Q | Um, were you the officer in charge of this investigation? |
| 13 | A | Yes, but Officer Vallance and I both had quite a bit of |
| 14 | | involvement in it.  So, but -- |
| 15 | Q | Um, was there a follow-up interview on September 19, 2018 |
| 16 | | that was conducted? |
| 17 | A | Yes, there was. |
| 18 | Q | And who did that? |
| 19 | A | Officer Vallance. |
| 20 | Q | Okay.  And any reason why she did it and not you? |
| 21 | A | Um, I had a feeling there were going to be follow-up pictures |
| 22 | | that needed to be done and with a female victim, I would send |
| 23 | | a female officer to do that for me in case there's photos of |
| 24 | | intimate nature that need to be taken. |
| 25 | Q | Uh, there were a number of items, I think, that were, sort |

```
 1            of, discussed in the case so far, but I just want to clarify
 2            with you, if you know.  Were you able to recover or find
 3            Heather Miner's phone?
 4   A   I personally didn't --
 5   Q   Okay.
 6   A   -- recover it, but it was located.
 7   Q   How about Mr. Fischer's phone and keys, did you ever find
 8            those things?
 9   A   His phone I don't recall; his keys were in Ms. Miner's
10            residence --
11   Q   Okay.
12   A   -- and then later I had a different officer, Officer
13            VanBuzkirk, transport those keys to the jail --
14   Q   Okay.
15   A   -- and put in his property.
16   Q   So at some point, another officer went back to the residence
17            and retrieved whatever Mr. Fischer had there?
18   A   The keys I know.
19   Q   Okay.
20   A   His wallet was in his vehicle, which was parked down the
21            road.
22   Q   His wallet was in his vehicle?
23   A   Correct.
24   Q   All right.  I'm sorry, I don't think I understood.  You said
25            his vehicle was parked on the road?
```

```
 1   A    Correct.

 2   Q    Um, so when, when you described your first encounter with

 3        him, you indicated you were walking up a driveway, right?

 4   A    Correct.

 5   Q    And that there were vehicles in the driveway, is that

 6        correct?

 7   A    There was at least the one vehicle that ended up between the

 8        two of us, yes.

 9   Q    Do you recall if there was space for any other vehicles to go

10        in that driveway?

11   A    I don't recall.

12   Q    Okay.  Was the area where Mr. Fischer's vehicle was with the

13        wallet in it, was that like a guest parking lot or something

14        like that?

15   A    It's on street parking, that's a little ways down the road,

16        about a block down the road.

17   Q    Okay.  A block down the road?  Um, did you attempt to go back

18        to his car that, on September 18th for any reason?

19   A    I did prior to taking Mr. Fischer to jail, he was still with

20        me and we went to his vehicle to secure his wallet.

21   Q    Okay.  Why did --

22   A    At his request.

23   Q    -- did, why did you make the decision to go to his car?

24   A    Um, he stated there was a large sum of money in his v-, in

25        his wallet, which he thought was in his car.  So we went and
```

```
 1            retrieved that --

 2    Q    Okay.  So --

 3    A    -- so that we could secure that.

 4    Q    -- he, did he, he wanted to make sure it didn't get lost or

 5         stolen?

 6    A    Correct.

 7    Q    Okay, okay.  Um, when you were on scene or when you returned

 8         to the scene, was EMS there?

 9    A    They had, the paramedics had come prior to me leaving with

10         Mr. Fischer.

11    Q    Okay.  And do you recall whether they evaluated Ms. Miner in

12         any way?

13    A    I saw her walk out towards the ambulance.  After that, I

14         don't know what occurred.

15    Q    Okay.  But you didn't speak to them?

16    A    No, I did not.

17    Q    All right.  And, okay, so a minute ago, you indicated you

18         thought that Mr. Fischer had been drinking because you could

19         smell intoxicants.  Was there any other signs or symptoms of

20         intoxication that you observed as a police officer?

21    A    Um, his speech was slurred, his eyes were very glassy and

22         watery, I couldn't tell if that was actually from maybe some

23         crying that had occurred.  Again, I don't know exactly what

24         happened upstairs.  But in my experience, it's pretty evident

25         to tell when somebody's been drinking by odor and, and
```

228

1        visible, and he had been drinking and he acknowledged that he

2        had some beer.

3    Q   Okay.  Um, when you secured him in your vehicle, when you

4        transported him to the jail, when you booked him at the jail

5        and took photographs of him, did he seem to have any

6        difficulty comprehending what you were saying to him or did

7        he seem pretty clear headed?

8    A   He was pretty clear headed.

9    Q   Okay.  Was he behaving rationally?

10   A   Yeah, he was a little verbally defiant at times, but

11       physically he never resisted any further.

12   Q   Okay.  Based on your experience, was his behavior typically

13       of, of that process?

14   A   Yes.

15   Q   Okay.  Um, did you have any concerns that he didn't

16       understand what was happening or anything like that?

17   A   No, I did not.

18   Q   All right, I have no further questions for you at this time.

19              THE COURT:  If we could, please, approach the

20       bench, both attorneys.

21              (At 4:11 p.m., bench conference on the record)

22              MR. TAYLOR:  So a hole in my pants

23       (indecipherable).

24              MR. SIZEMORE:  I've ruined so many ties on those.

25              THE COURT:  What?

1          MR. TAYLOR:  The, the Velcro for the skirts, I keep

2     rubbing up against it when I walk by.

3          MR. SIZEMORE:  I used to yell at Judge Reader about

4     that.

5          MR. TAYLOR:  So, um, I'm not going to ask to admit

6     that.

7          THE COURT:  You're not?

8          MR. TAYLOR:  No, I mean --

9          THE COURT:  Because he just got done saying how

10    cordial and wonderful he was.

11         MR. TAYLOR:  Well, he was verbally defiant.

12         THE COURT:  He was friendly and --

13         MR. TAYLOR:  I don't, I don't want to inject that

14    if it's going to be a --

15         THE COURT:  All right.

16         MR. TAYLOR:  -- argument at issue.

17         THE COURT:  I wasn't going to let it in initially,

18    but after his testimony --

19         MR. TAYLOR:  That's okay.

20         THE COURT:  -- I thought.

21         MR. TAYLOR:  He seemed to be a nice guy, I'm going

22    to let it slide.

23         UNIDENTIFIED SPEAKER:  It's malpractice day.

24         THE COURT:  Okay.

25         MR. SIZEMORE:  Was --

1               THE COURT:  We're going to probably have to end at

2       4:30; I have an arraignment to do.

3               MR. TAYLOR:  How long do you think you'd be with

4       Vallance?  Long?

5               MR. SIZEMORE:  Longer than him.

6               MR. TAYLOR:  Okay.

7               MR. SIZEMORE:  Only because she did the

8       interviewing.  So yeah, maybe a half hour with her, maybe.

9               MR. TAYLOR:  All right.  So I guess we'll have --

10              MR. SIZEMORE:  So come back and do Vallance --

11              MR. TAYLOR:  -- Vallance in the morning; she's my

12      last witness.

13              THE COURT:  Okay.

14              MR. TAYLOR:  So then whether or not the defendant

15      testifies, we'll be ready to do closings by lunchtime.

16              MR. SIZEMORE:  Yeah.

17              MR. TAYLOR:  and I, I did a pretty standard set of

18      final instructions.

19              THE COURT:  Would you look those over tonight?

20              MR. SIZEMORE:  I will.  He sent them to me over

21      lunch.  I looked at them already a little bit.

22              MR. TAYLOR:  And I brought you a copy too.

23              MR. SIZEMORE:  Oh, you did.

24              MR. TAYLOR:  I'll give it to you.

25              MR. SIZEMORE:  Thank you.

```
1                    MR. TAYLOR:  Yeah.

2                    THE COURT:  Is there anything that you, stick

3          something in mine?

4                    MR. SIZEMORE:  The only thing I'm thinking about

5          are lesser and I didn't get to the elements so I didn't see

6          if you were requesting any lessers or not.

7                    MR. TAYLOR:  I'm not because they're kind of tied

8          together.

9                    MR. SIZEMORE:  Yeah.

10                   MR. TAYLOR:  It's, kind of, an all or nothing with

11         it, um, you know, because the lesser would be like illegal

12         entry or assault and battery and that kind of stuff.

13                   MR. SIZEMORE:  Yeah.

14                   MR. TAYLOR:  And I don't have any reason to ask for

15         that.  I don't --

16                   MR. SIZEMORE:  Ain't nobody got time for that.  All

17         right.

18                   THE COURT:  So we're not doing lessers?

19                   MR. SIZEMORE:  Doesn't sound like it.  I don't

20         think so, I'm going to talk to my client tonight and let you

21         know in the morning, but I don't think so.

22                   THE COURT:  Okay.

23                   MR. SIZEMORE:  I don't like lessers in general.

24                   MR. TAYLOR:  It gives an opportunity to compromise,

25         we want to know --
```

```
 1              MR. SIZEMORE:  I would kind of want to compromise

 2        with this one.

 3              THE COURT:  Okay, you have about 15 minutes, okay?

 4              MR. SIZEMORE:  Yeah, that'd be fine.

 5              (At 4:13 p.m., bench conference ended)

 6                    CROSS-EXAMINATION

 7   BY MR. SIZEMORE:

 8   Q    Hello, how are you?

 9   A    Good, and you?

10   Q    I'm all right.  It's been a long day, but we're getting

11        through it okay, right?  Now, you've been a police officer

12        for 24 years, right?  Which is --

13   A    Correctly, yes.

14   Q    -- exactly as long as I've been a lawyer, so I got an idea.

15        You have dealt with several intoxicated people over those 24

16        years.

17   A    Correct.

18   Q    And what shift do you typically work?

19   A    Out of my 24 years, I would say 19 of those have been

20        nightshift.

21   Q    Nightshift, so --

22   A    Between afternoons and midnight.

23   Q    Almost daily, then, you saw intoxicated people --

24   A    Yeah.

25   Q    -- for 19 years, right?
```

```
 1   A    Yes.

 2   Q    Mr. Fischer was intoxicated when you saw him that night?

 3   A    His level, I know he had been drinking.

 4   Q    Well, you testified that he had slurred, slurred words.

 5   A    Correct.

 6   Q    Speech.  Watery eyes, but you weren't sure if he was crying

 7        or not.

 8   A    Correct.

 9   Q    I think you said red glassy eyes, but I'm not sure.  We know

10        that you smelled alcohol or smelled intoxicants on him,

11        right?

12   A    Correct.

13   Q    Those are all things that you look for, like, if you're going

14        to pull over a drunk driver --

15   A    Correct.

16   Q    -- those are cues that you would see.  How about his physical

17        dexterity, tripped over a garbage can.  Did you see that

18        garbage can before he hit it or do you know if it was in the

19        driveway or in the yard or --

20   A    It was right next to the, to the rear of the vehicle that was

21        in between us.  So I don't know if he saw it or not.

22   Q    Okay.  When you, then, went over there, he was still on the

23        ground from having tripped over that can?

24   A    He was on the ground and working, in the process of getting

25        up.
```

```
 1   Q     Trying to get up, right.

 2   A     Yes.

 3   Q     Now, you said that when you got there, the garage door was

 4         open, there was a light coming, I believe, out of the garage?

 5   A     The light was emanating out, correct.

 6   Q     Okay.  You had your lights off in your car, you were standing

 7         down by your car near the end of the driveway when he was

 8         exiting the garage.  Am I --

 9   A     My car was parked a driveway or two down.

10   Q     Down the road.  You drove past.

11   A     I, I got out of my car --

12   Q     Uh-huh.

13   A     And was walking up to the open garage door as I saw Mr.

14         Fischer coming out.

15   Q     Okay, so you, the problem with what I said that you took

16         issue with was by the road in the driveway.  You were closer

17         to the garage.

18   A     Right.  And my patrol vehicle wasn't right there.  It was, it

19         was a driveway or so down.

20   Q     But it was dark out, it was 1:00 in the morning or very close

21         to one in the morning?

22   A     Correct.

23   Q     September, so it was dark.  And are there street lights in

24         that area?

25   A     I don't know, I don't recall.  I don't believe there are
```

```
 1        street lights.  I believe there are some on the garages, but
 2        it would depend on if the resident has them turned on or not.
 3   Q    So I think you testified that at least at the very beginning
 4        when you saw Mr. Fischer coming out, you were confident you
 5        could see him, but that you were not vis-, I don't want to
 6        say visible --
 7   A    Correct.
 8   Q    -- because maybe you were visible, but you were not obvious
 9        out there --
10   A    Correct.
11   Q    Is that right?
12   A    Correct.
13   Q    And I think you said you had a flashlight and you were
14        shining the flashlight at him?
15   A    At one point, when I identified myself and I was in the, the
16        light emanating from the garage, I shined a flashlight and
17        identified myself.
18   Q    Do you have a metal badge on your summer uniform or is it one
19        of those patches?
20   A    This, it's this exact badge right here.
21   Q    That badge, okay.
22   A    Same one.
23   Q    Um, so it was probably reflecting the light, I got to
24        believe.
25   A    Potentially, yes.
```

1    Q    It's silver, it's metal, so right?  But you had the light on

2         him, is that right?  The flashlight.

3    A    Correct.

4    Q    Now, I know you probably weren't aiming at his face, but were

5         you illuminating his face with that flashlight at all?

6    A    Actually, no I was, I was illuminating towards the waist --

7    Q    Okay.

8    A    -- which is about where his hands would be.

9    Q    So that he could still see?

10   A    Well, because my concern is his hands.

11   Q    Sure.

12   A    So that's, I was wanting to make sure I could see hands.

13   Q    Okay.  Was he saying anything back to you when you were

14        telling him that you're the police and he needs to stop, show

15        me your hands?

16   A    I don't believe he said anything.

17   Q    Okay.  But that's when he ran, started w-, he was walking, if

18        I believe, walking down the driveway, and then he ran.

19   A    He, he was still in the garage.

20   Q    In the garage, okay.

21   A    He was, basically, starting to exit the garage and I

22        identified myself police, let me see your hands, and that's

23        when he turned to go to the other side of the vehicle and

24        started to run.

25   Q    Okay.  So then, again, correct me if I'm wrong, because I'm

```
 1        wrong sometimes, you got over there when he was, now he was

 2        starting to get up from hitting the garbage can, you get

 3        around the car, I think you said you had, you were thinking

 4        about grabbing your taser --

 5   A    Correct.

 6   Q    -- at one point because you didn't know what level of

 7        interaction you were going to have.  That he went passive

 8        when you identified yourself again as police.

 9   A    Not at that point.

10   Q    Oh, I'm sorry.

11   A    No.  When --

12   Q    So --

13   A    -- at the point, he ran around the vehicle and he hit the

14        garbage can, he fell to the ground.

15   Q    Right.

16   A    He's on the ground, I yelled to him to stay down.  He got up

17        and started running away from me and that's when I was able

18        to grab a hold of him.  Then I took him to the ground.

19   Q    That's right.  And then you were describing how you took your

20        one arm --

21   A    Correct.

22   Q    -- around him and the dead weight.  Okay.

23   A    Correct.

24   Q    Um, was he saying anything during any of that?

25   A    I don't recall him saying anything.
```

1   Q     Um, do you have any doubt that he understood what you were

2           saying to him?  Is there any part of you that thinks that

3           maybe this guy was really drunk and didn't know who I was?

4   A     No.

5   Q     No?  You're sure of it?

6   A     When I first identified myself police, let me see your hands,

7           that's when he went to that other side of the vehicle and

8           started to run.

9   Q     Okay.

10  A     That indicates to me that he knew exactly who I was and he

11         was trying to get away.

12  Q     Trying to get away from you.

13  A     Once maybe he realized that this wasn't going to be an easy

14         thing to do, that's when he decided it's time to just

15         cooperate, it is the police, I'm just going to cooperate.

16  Q     Once he came to his senses-ish.

17  A     Sure.

18  Q     Something like that.  Was he wearing shoes?

19  A     Yes.

20  Q     What kind of shoes?

21  A     I only recall from seeing them in the photos, so --

22  Q     Okay.

23  A     -- I don't know the kind.

24  Q     His car keys were found inside the residence, is that right?

25  A     Yes.

1   Q    They were not --

2   A    Not, not by me.  It was conveyed to me later that they were

3        found.

4   Q    When you arrested him, you did a pat-down; I assumed you

5        search his person, is that right?

6   A    Correct.

7   Q    You didn't find any car keys on him, right?

8   A    No, I did not.

9   Q    Was, what was he wearing, clothes wise?

10  A    A t-shirt and shorts.

11  Q    T-shirt and shorts.  So were the shoes, if you remember,

12       flip-flops, tennis shoes, boots?

13  A    No, they were tennis shoes.

14  Q    Tennis shoes.  Did you ever find his phone?

15  A    I don't recall if we did or not.

16  Q    Okay.  And you said his wallet was in his car.

17  A    Correct.

18  Q    So he didn't have a wallet on him when you arrested him,

19       correct?

20  A    No, he did not.

21  Q    He did not have car keys on him?

22  A    Correct.

23  Q    And he did not have a cell phone on him when you arrested

24       him?

25  A    Correct.

```
 1   Q   Did he have anything on him when you arrested him?

 2   A   I don't recall him having anything in his, on his person.

 3   Q   Did you, were you in charge of processing the scene for

 4       evidence at all?  As the officer in charge, was that one of

 5       your responsibilities?

 6   A   It falls under my responsibilities and I had, I had directed

 7       Officer Vallance to take care of that.

 8   Q   Okay.  So, yes?

 9   A   Yes.

10   Q   Um, did anyone look at the front door for a shoe print?

11   A   We inspected the front door.  I don't recall there being a

12       shoe print.

13   Q   Do you know how that front door was opened?

14   A   I would only have to speculate.

15   Q   So you don't know if someone used a bar and pry it with, do

16       you?

17   A   You're correct.

18   Q   You don't know if someone kicked it with their foot?

19   A   Correct.

20   Q   You don't know if someone was running and fell down into the

21       door and accidentally busted the door, do you?

22   A   It's be hard for them in the location of that door to run and

23       fall and cause that damage, but -- just by the way the doors

24       are set up, but…

25   Q   Did you feel the back of, um, um, I'm drawing a blank, give
```

1     me one second, did you draw, I'm sorry, did you feel the back

2     of Ms. Miner's head to feel these goose eggs at all?

3  A   No, I did not.

4  Q   Do you know if Officer Vallance did?

5  A   I do not know.  And commonly, we, she may have done that, I

6     don't know, but commonly, that's not something we do because

7     I'm not going to aggravate an injury if somebody has an

8     injury.  That's for the medical field to, to do.

9  Q   But you document and you certainly would write down injuries

10    if you saw them, right?

11  A  Correct.

12  Q  You wouldn't f-, you don't feel for injuries where someone's

13    complaining of pain, but you don't see anything?  Even

14    gingerly or gently?

15  A  I do not.

16  Q  Okay.  Did that happen in this case?  Did she complain of

17    pain to her head and you just didn't check?

18  A  I didn't, I don't recall if she specifically told me that she

19    had injuries to her head, um, but typically, if somebody

20    tells me they have an injury to their head, I'm not a medical

21    professional, I don't touch them.  That's why we call the

22    paramedics to the scene.

23  Q  Do you remember interviewing Heather Miner, um, that evening,

24    or that morning, I guess?

25  A  I spoke with her.  It wasn't really an interview, per se, but

1    yes, we talked about the incident.

2  Q  Well, you reduced it to, one, two, three, four, five, six

3    paragraphs into your, in your police report.  So…

4  A  Correct.

5  Q  You had a pretty good conversation with her, sizable.

6  A  When, when somebody says interview, typically I picture

7    somebody sitting down, question/answer, back and forth, kind

8    of like we're doing now.

9  Q  Understood.

10  A  It wasn't like that; it was in her residence.  I just kind of

11    asked her to tell me what had occurred just so I had a

12    picture of what happened.

13  Q  Okay.  When you asked her what had occurred, she kind of gave

14    you a narrative about how the night progressed, right?

15  A  Correct.

16  Q  And in her narrative, when you asked her what occurred that

17    night, she never told you that she started hitting or pushing

18    Mr. Fischer first, did she?

19  A  I recall, I didn't specifically put it in here, I recall

20    discussion, I don't know if it was between officers or not,

21    that she had put her feet on him like she described and

22    pushed him out of the bed; I do recall that.

23  Q  Okay.  But when you wrote in your report, Miner stated she

24    repeatedly asked Fischer to leave and he wouldn't, Miner

25    stated that Fischer then hit her on the head with his fists

1    and she hit him back.  That doesn't say anything about her

2    putting her feet on him or trying to push him out of her

3    bedroom, right?

4  A  That, that would leave me to believe that she didn't directly

5    tell me that, um, because I would have documented that if she

6    directly told me that.

7  Q  Also, if she would have tried to give him his shoes and his

8    car keys back and told you that, you would have documented

9    that as well?

10  A  Yes.

11  Q  Do you have any information where those keys were found

12    inside of her house?

13  A  No, I do not.

14  Q  Is it something that you had known and then maybe, uh, might

15    have forgotten or is it something you never knew?

16  A  No, because I recall just the information being conveyed to

17    me over the radio that the keys had been found and that's

18    when, uh, I believe I had Officer Vanbuzkirk, who started at

19    2 a.m. for us that morning, go get those keys and take them

20    up to the jail to be placed in his property.

21  Q  And did you ask Ms. Miner, when you were talking to her, if

22    she had been drinking that night?

23  A  I don't recall if I asked her or not.

24  Q  Did you have any indications that she had been smoking

25    marijuana or consuming any sort of controlled substance at

1       all?

2   A   No.

3                   MR. SIZEMORE:  One second, please, Your Honor.

4   BY MR. SIZEMORE:

5   Q   Did there come a point on the 18th when you actually had Mr.

6       Fischer's phone in your possession?

7   A   I don't recall, as I stated, I, it may have been in the

8       vehicle with his wallet, um, I can try and refresh my memory

9       from the report, but --

10  Q   Yeah, maybe you, I mean, honestly I'm having a hard time

11      figuring out something that you wrote in here, so --

12  A   Okay.

13  Q   -- in a very real way, maybe you can refresh me on page five

14      towards the bottom under transport.

15  A   I think our page numbers are different, but I've got it right

16      here.

17                  MR. TAYLOR:  They've got a cover sheet we don't

18      have, so --

19  BY MR. SIZEMORE:

20  Q   Okay.

21  A   Oh, yeah, so, um, his phone was in his car, uh, let me go

22      back one more paragraph, I, I don't recall where the phone

23      was located, but I did have it in my patrol car and after I

24      had already left Mr. Fischer at the jail, I noticed I still

25      had it.  So I had Officer Vanbuzkirk (phonetic) take the

                                245

1          phone to the jail as well.

2     Q    Okay.  So at some point, you had the phone, you just can't

3          remember right now?

4     A    I just don't remember.

5     Q    If you want to --

6     A    Yup.

7     Q    -- happens to me all the time.

8     A    That wasn't a, an important piece to the situation at the

9          time.

10    Q    But the important part, actually, for me then is that he

11         didn't have it on his person.  When you were arresting him

12         and searching him, you did not document --

13    A    I don't recall finding it on his person.

14    Q    Okay.

15    A    I would have to speculate it was in his car with his wallet.

16    Q    Thank you.  Thank you very much, sir.

17              MR. TAYLOR:  So I know we only have a few minutes,

18         so I'll be brief.

19                        REDIRECT EXAMINATION

20    BY MR. TAYLOR:

21    Q    Mr. Sizemore asked you some questions about would you have

22         documented certain things in your report.  Specifically

23         relating to Ms. Minor and a head injury, she did tell you

24         that she, the defendant had hit her head off the floor,

25         right?

1  A   Yes.

2  Q   Okay.  And, um, the fact that the defendant's phone was in

3      your patrol vehicle before you took him to the jail, uh, you

4      didn't recover that from inside the residence, right?

5  A   I do not believe it was --

6  Q   So --

7  A   -- from inside the residence, no.

8  Q   So, I mean, I guess I'm defining the parameters here, but

9      either it was on his person when you arrested him or it was

10     in his car when you retrieved some of his other belongings?

11 A   Correct.

12 Q   Okay.  Um, Mr. Sizemore had asked you some questions about

13     his client and signs of intoxication and whether you thought

14     that he might have ran into that trashcan because he was just

15     drunk.  Do you ever do investigations for impaired drivers

16     involving something besides alcohol?

17 A   Yes.

18 Q   Are you trained to observe signs of impairment by something

19     other than alcohol?

20 A   Yes.

21 Q   And does that include marijuana?

22 A   Yes.

23 Q   And so if you had noticed signs of confusion or memory lapse

24     or anything that you thought might be attributable to

25     controlled substances when you interviewed Ms. Miner, would

1          you have documented that in your report?

2    A     Yes.

3    Q     Okay.  And you did not?

4    A     Correct.

5    Q     Mr. Sizemore had asked you some, some questions about some,

6          some factual allegations that were notably absent from your

7          narrative.  You said that you thought that maybe it was

8          officers talking, but there was a comment about Ms. Miner

9          pushing the defendant out of her bed with his feet.  Was

10         that, would that fact have been relevant if you had heard it

11         directly, um, as to whether or not there was a crime that

12         took place in that home?

13   A     No.

14   Q     Okay.  Why, why wouldn't that be a significant fact to you?

15   A     Can you rephrase the original question?

16   Q     Okay.  So if Ms. Miner had mentioned that she had pushed him

17         out of her bed with her feet --

18   A     Okay.

19   Q     -- would that fact, in and of itself, affect whether or not

20         you believed a crime had occurred?

21   A     No, because there's always interaction between parties

22         involved in, in --

23   Q     Okay.

24   A     -- a physical altercation.

25   Q     So when you made the decision to arrest and then to transport

248

1         Mr. Fischer to the jail, that wasn't based on that encounter

2         in Ms. Miner's bedroom there or you don't know?

3    A    At that point, I didn't know specifics as to what had

4         occurred between the two.  I only knew that I had officers

5         conveying to me that we had probable cause to make an arrest

6         for a domestic violence.

7    Q    And, and it was your understanding that Alicia Vallance was

8         the officer that was talking to Ms. Miner at that point?

9    A    Yes.

10   Q    All right.  And is she the one that confirmed for you that

11        there was probable cause to arrest?

12   A    I don't remember if I heard it directly from her or one of

13        the deputies, but it was conveyed to me, yes.

14   Q    Okay.  I have no further questions, thank you.  I don't know

15        if the jury has any questions.

16             THE COURT:  Jury, how many questions?  Please

17        approach.

18             (At 4:31 p.m., bench conference on the record)

19             THE COURT:  Thank you.  Time of 911 call

20        (indecipherable) Sergeant Fogo.  And did they do a

21        breathalyzer.

22             MR. TAYLOR:  I don't have any objection to those.

23        If he knows them, I'm sure he can look at his report if he

24        doesn't.

25             MR. SIZEMORE:  That's fine; I don't have an

1          objection.

2                    THE COURT:  He probably didn't do it, but the jail

3          would have done it.

4                    MR. TAYLOR:  Yeah, so I don't know if he can answer

5          it.

6                    MR. SIZEMORE:  We don't have that.

7                    MR. TAYLOR:  So, that's fine.

8                    THE COURT:  All right.

9                    MR. SIZEMORE:  Do we want us to --

10                   THE COURT:  Yes, please.  Thank you.

11                   (At 4:32 p.m., bench conference concluded)

12                   THE COURT:  All right, Sergeant Fogo, the question

13         is, what was the time of the 911 call?

14                   THE WITNESS:  I would have to, to get the specific

15         time, I would have to refer to what we call the call notes,

16         which are the time stamps and information that are placed

17         into the call by central dispatch.

18                   MR. TAYLOR:  If you saw that information, would

19         that refresh your memory?

20                   THE WITNESS:  Yes, it would.

21                   MR. TAYLOR:  Your Honor, may I approach the

22         witness?

23                   THE COURT:  Yes, please.

24                   MR. TAYLOR:  This is the 911 call.

25                   THE WITNESS:  So, specifically, the time the call

1      was received into 911, is that what we're looking for?

2                THE COURT:  Was what?

3                THE WITNESS:  Specifically the time it was received

4      into 911?

5                THE COURT:  Yes.

6                THE WITNESS:  The time received was 00 52 minutes

7      and 35 seconds.  So that would be 52 minutes after midnight.

8                THE COURT:  Okay.  And what time did you arrive?

9                THE WITNESS:  I arrived on scene at zero 58.  I was

10     dispatched, if you would like me to provide that, ma'am?

11               THE COURT:  Okay.

12               THE WITNESS:  I was dispatched at zero 54 and 36

13     seconds.  So I was dispatched approximately two minutes after

14     the call was received and arrived just about 5 1/2 minutes --

15     did I say seconds previously?  So I was dispatched about two

16     minutes after it was received and arrived approximately 5 1/2

17     minutes after I was, or after it was received, three minutes,

18     3 1/2 minutes after I was dispatched.

19               THE COURT:  Okay.  There's another question, did

20     they do a breathalyzer or blood alcohol test on Mr. Fischer?

21               THE WITNESS:  One was not done that I was aware of

22     or provided information to about.

23               THE COURT:  But the jail could have done one?

24               THE WITNESS:  They possibly could have, but I don't

25     know if they did.

1          MR. TAYLOR:  I have no follow-ups based on the

2     Courts question and the jury's question.

3          THE COURT:  Okay.

4          MR. SIZEMORE:  No follow-up.

5          THE COURT:  All right.

6          MR. TAYLOR:  I'd ask the witness be excused.

7          THE COURT:  Anybody else have any questions for

8     this witness?

9          MR. TAYLOR:  Oh, there is one, Your Honor.

10          THE COURT:  I'm sorry?

11          MR. TAYLOR:  There is a question.

12          THE COURT:  Okay, very good.  Okay, please

13     approach.

14          (At 4:36 p.m., bench conference on the record)

15          THE COURT:  How many times did Officer Fogo

16     identify himself as a police officer during, I think,

17     altercation with defendant.

18          MR. SIZEMORE:  Oh, yeah.  Yup.

19          (At 4:36 p.m., bench conference concluded)

20          THE COURT:  Okay, Sergeant Fogo, how many times did

21     you identify yourself as a police officer during the

22     altercation with defendant?

23          THE WITNESS:  During the actual altercation, there

24     was the one time at my initial approach with him and then

25     once we were on the ground a second time that I specifically

252

1    said police.

2              THE COURT:  Okay.

3              MR. TAYLOR:  No follow-ups, Your Honor.

4              THE COURT:  Anybody else have any questions?  None,

5    okay.  Ladies and gentlemen, I'm going to let you go.  Sir,

6    you can step down.

7              THE WITNESS:  Thank you.

8              (At 4:37 p.m., witness excused)

9              THE COURT:  If you could be back here at 8:30

10   tomorrow, um, I don't know how many more witness we have

11   exactly, but you know, we're doing well as far as we're

12   proceeding and moving this case along and attorneys are

13   moving the case along.  So, um, we'll see about it tomorrow,

14   okay?  See you at 8:30.  Yes, ma'am?

15             UNIDENTIFIED SPEAKER:  Do we meet in the initial

16   meeting room from this morning?

17             THE COURT:  Yes.  Meet in the, thank you for

18   bringing that up, in the administration room, okay?

19             MR. TAYLOR:  So is that jury assembly room A?

20             THE COURT:  The jury assembly room, yup, meet

21   there.  Thank you for reminding me.  Don't discuss the case,

22   like I said, tell your spouse whatever, I can't talk about

23   this case, the judge would be very upset if I did, and so I

24   can't talk about the case now, but right after it, I will be

25   able to tell you all about it, okay?  Because curiosity, I

1    mean, I'm sure they're curious as to where you've been all

2    day and what you've been doing.  So, all right?  Thank you

3    very much.  Don't discuss the case and you're all set.

4             THE BAILIFF:  Please rise for the jury.

5             (At 4:38 p.m., jury taken out)

6             UNIDENTIFIED SPEAKER:  Should we leave our books on

7    the seat?

8             THE COURT:  Yes, you can leave your books on the

9    seat.  Again, the courtroom will be locked.  Okay, you may be

10   seated.  Would the attorneys please approach me for just one

11   second?

12            (At 4:39 p.m., bench conference on the record)

13            THE COURT:  You can go off the record.

14            (At 4:39 p.m., proceedings concluded)

15                          **********

16

17

18

19

20

21

22

23

24

25

1  STATE OF MICHIGAN          )
                              )
2  COUNTY OF LIVINGSTON       )

3       I certify that this transcript, consisting of 254 pages, is a

4  complete, true, and correct transcript, of the proceedings and

5  testimony taken in this case on March 4, 2019.

6

7                                   _____
                                    Emily Whetsell, CER9160
8                                   Certified Electronic Recorder
                                    204 South Highlander Way
9                                   Howell, MI  48843
                                    (517) 540-7532
10
   Dated:  July 14, 2019.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25