1                        STATE OF MICHIGAN

2              IN THE 44TH CIRCUIT COURT (LIVINGSTON COUNTY)

3    PEOPLE OF THE STATE OF MICHIGAN,

4    v                                  Case Number: 18-25329-FH

5    GARY THOMAS FISCHER,

6            Defendant.
     _____/

7

8                     JURY TRIAL - VOLUME II

9         BEFORE THE HONORABLE SUZANNE GEDDIS, CIRCUIT JUDGE

10            Howell, Michigan - Tuesday, March 5, 2019

11
     APPEARANCES:
12
     For the People:            MR. MICHAEL TAYLOR (P49497)
13                              Assistant Prosecuting Attorney
                                210 South Highlander Way
14                              Howell, Michigan 48843
                                (517) 546-1850
15

16   For the Defendant:         MR. ROLLAND SIZEMORE (P52758)
                                Attorney at Law
17                              207 N. Michigan Ave., #202
                                Howell, Michigan 48843
18                              (517) 548-2411

19

20
     TRANSCRIBED BY:            Ms. Emily Whetsell, CER9160
21                              Certified Electric Recorder
                                (941) 928-4627
22

23

24

25

1

TABLE OF CONTENTS

2

PAGE

3   WITNESSES:      PEOPLE

4   ALICIA VALLANCE

5       Direct Examination by Mr. Taylor          4
        Cross-Examination by Mr. Sizemore         20
6       Redirect Examination by Mr. Taylor        34

7   WITNESSES:      DEFENDANT

8   NONE

9

10  People's Closing Argument                     54

11  Defendant's Closing Argument                  73

12  People's Rebuttal                             83

13  Final Jury Instructions                       96

14  Bailiff Oath                                  114

15  Verdict                                       121

16  EXHIBITS:                    IDENTIFIED   ADMITTED

17  NONE

18

19

20

21

22

23

24

25

1                    Howell, Michigan

2                    Tuesday, March 5, 2019 - 8:48 a.m.

3                    THE COURT:  -- on the record, People versus Gary

4         Fischer, your appearances, please?

5                    MR. TAYLOR:  Michael Taylor for the People.

6                    MR. SIZEMORE:  Good morning, Your Honor, Rolland

7         Sizemore appearing with and on behalf of Gary Fischer.

8                    THE COURT:  And this is a continuation of a jury

9         trial regarding Gary Fischer, um, it should be noted, I don't

10        think I placed it on the record, that we have kept the

11        defendant separate from the jury so that they do not know

12        that the defendant is incarcerated.  He's wearing plain

13        clothes and we've done, I think, a yeoman's job in keeping,

14        um, the jury contained in one area of the building until the

15        defendant comes out and, um, so that no one knows that he's

16        incarcerated, actually.  You agree with that?

17                   MR. SIZEMORE:  Yes, I do, Your Honor.  Thank you.

18                   THE COURT:  Okay.  And so this is file 18-25329-FH.

19        Are you ready for the jury?

20                   MR. TAYLOR:  We are.

21                   MR. SIZEMORE:  Yes, Your Honor.  Okay, bring the

22        jury in.

23                   THE BAILIFF:  All rise for the jury.

24                   (At 8:50 a.m., jury brought in)

25                   THE COURT:  You may be seated.  Good morning,

1        Jurors.

2                    JURY:  Good morning.

3                    THE COURT:  Thank you for being here.  Um, we're

4        doing the continuation of People versus Gary Fischer and I

5        believe it's the prosecutor's turn to call his next witness.

6                    MR. TAYLOR:  If I may, Your Honor?

7                    THE COURT:  Yes, please.

8                    MR. TAYLOR:  I would call Officer Alicia Vallance

9        to the stand.

10                   THE COURT:  Raise your right hand.  Do you swear to

11       tell the truth, the whole truth, and nothing but the truth so

12       help you God?

13                   MS. VALLANCE:  Yes.

14                              ALICIA VALLANCE

15                   (At 8:51 a.m., witness sworn by the Court and

16                    testified as follows)

17                   THE COURT:  Okay, just have a seat there, please.

18       Make yourself comfortable as you can in that seat with the

19       belt and everything that you wear and state your full name

20       and spell your last name for the record.

21                   THE WITNESS:  Alicia Vallance, V-a-l-l-a-n-c-e.

22                          DIRECT EXAMINATION

23  BY MR. TAYLOR:

24  Q     And where do you work?

25  A     For the Howell Police Department.

4

1    Q    How long have you worked as a police officer?

2    A    About four years.

3    Q    Okay.  And what is your current assignment?

4    A    I'm assigned to, as a road patrol.

5    Q    Road patrol.  Were you working that detail in September 18,

6         2018?

7    A    Yes.

8    Q    And you worked the City of Howell in Livingston County?

9    A    Correct, yes.

10   Q    Um, do you recall what you were doing about 52 minutes after

11        midnight that day?

12   A    I had just, I was lodging someone at the Livingston County

13        jail.  And then as soon as I was done with that, there was

14        another call that had come out and I began to respond to that

15        call.

16   Q    Okay.  What, what was it that drew, well, let me ask you this

17        first, what shift were you working at that point in time?

18   A    I was working 2:00 p.m. to 2:00 a.m.

19   Q    Okay.  So at 52 minutes after midnight, you'd be about an

20        hour from getting off shift?

21   A    Yes.

22   Q    Um, and so you were at the jail and then you said you, you

23        heard a call come out.  What was the call?

24   A    They called it out as a domestic verbal, um, with an open

25        line to 911.

1   Q   Okay.  Did you immediately leave the jail at that point?

2   A   A few minutes after that, yes.

3   Q   Okay.  Um, what was it that, that got you to leave the jail,

4       I mean quicker?

5   A   Sergeant Fogo was responding and I was going to assist him,

6       um, when he, I believe he stated that he was almost there and

7       I began to head that way.

8   Q   Okay.  Were there any other dispatches that came out while

9       you were in the process of leaving the jail?

10  A   Yes.

11  Q   And what was that?

12  A   I heard Sergeant Fogo say that he was fighting with one.

13  Q   Okay.  So where did you go at that point?

14  A   I went to 1629 Wallen Street.

15  Q   Okay.  And did you see Sergeant Fogo when you got there?

16  A   Yes.

17  Q   Uh, what was he doing?

18  A   He was on the ground with a male subject that was in custody.

19  Q   Okay.  What information did you have besides the domestic

20      call out and that Sergeant Fogo was fighting with one?

21  A   I don't believe there was any more information that I can

22      recall.

23  Q   So when you arrived on scene and Sergeant Fogo had the male

24      subject in custody, what steps, if any, did you take next?

25  A   I had brief contact with him.  He advised me to go inside and

1       make contact with the other half to try and determine what

2       happened.

3    Q  Okay.  Were you at the front or rear of the entrance?  I

4       guess I should rephrase that.  Were you at the man door at

5       the one side of the building or the open garage door on the

6       other side of the building?

7    A  I responded in through the garage.

8    Q  Okay.  When -- did you make entry into the home?

9    A  I did.

10   Q  And can you tell me the steps that led up to that?

11   A  I walked up to the door and due to the circumstances, I

12      opened the door.  Um, when I opened the door, I observed a

13      female holding a knife standing in a hallway.

14   Q  Okay.  Was that -- what, what was your response when you saw

15      her holding a knife?

16   A  I told her to drop the knife.

17   Q  And what did she do?

18   A  She immediately dropped the knife.

19   Q  Okay.  Was she holding anything else at the time?

20   A  Yeah, she had a phone in her other hand.  So she had a knife

21      in one hand and the phone in the other hand.

22   Q  When you told her to drop the knife, what did she do?

23   A  She, well, she dropped everything she had in her hands.

24   Q  Okay.  And, um, what was her demeanor?

25   A  She was visibly upset and crying.

1   Q   Could you explain to me a little bit more, like, what you

2       could see about her physical state?

3   A   I could see that she was crying, she had tears on her face.

4       I also saw blood on her face by her nose and her mouth.

5   Q   Okay.  Could you see her teeth at that point?

6   A   Once she came closer to me, yes.

7   Q   Okay.  What did you notice about them, if anything?

8   A   That one of her teeth was broken.

9   Q   Okay.  Um, at that point, did, did either you or the female

10      that you saw say anything?

11  A   Yes.

12  Q   And what was said?

13  A   Well, I began to ask her what had happened and she said that

14      she was attacked by Gary Fischer.

15  Q   Okay.  Um, were you able to later identify that female?

16  A   Yes.

17  Q   And what's her name?

18  A   Her name is Heather Miner.

19  Q   Okay.  So when Ms. Miner was explaining to you what happened,

20      what was, explain for the jury, if you could, her tone, kind

21      of, how she was speaking to you, you know, was it rapid,

22      what, what was going on with that?

23  A   I would describe it as hysterical.  She was distraught, very

24      upset.

25  Q   Um, did you, did you find it difficult to follow what she was

8

```
 1        saying at that point in time?

 2   A    Yes, it took several -- I had asked questions several times

 3        to get answers to try and clarify.

 4   Q    Okay.  At some point through that conversation, did she seem

 5        to calm down?

 6   A    Later on, I believe she did.

 7   Q    Okay.  So initially, while you were talking to her, she's in

 8        that hysterical state?

 9   A    Yes.

10   Q    All right.  Um, once she made the statement to you that Gary

11        Fischer attacked her, did you follow up and ask her what

12        exactly happened?

13   A    Yes.

14   Q    And did she give you a response to that?

15             MR. SIZEMORE:  Your Honor, at this time, I'm,

16        although I'm not objecting because Mr. Taylor's done a fine

17        job of laying the foundation, but to protect the record, I'd

18        ask him to put on the, on the record the hearsay exception

19        that he's using.

20             THE COURT:  That's fine.

21             MR. TAYLOR:  Your Honor, the, I think there is an

22        evidentiary record here that would substantiate that the

23        Officer Vallance was a uniformed police officer responding to

24        a domestic violence situation.  Ms. Miner, as the victim of

25        domestic violence, would be able to narrate the infliction of
```

1    her injuries to that officer under MCL 768.27 B, or C, excuse

2    me.

3              MR. SIZEMORE:  I have no objections; I just wanted

4    it on the record.

5              THE COURT:  Okay, very good.

6  BY MR. TAYLOR:

7  Q    So, I'm sorry, Ms. Miner was explaining to you the sequence

8       of events that had led to the infliction of those injuries.

9  A    Correct.

10 Q    And what was that?

11 A    She had said that Gary had come into her house and attempted

12      to get into her bed.  Do you want me to continue?

13 Q    Yes.

14 A    Okay.  She said that when he got into her bed, she had told

15      him that he needed to leave several times.  And then there

16      was a struggle after that.

17 Q    Okay.  Did she explain, did she explain whether she had let

18      him in or not?

19 A    Yes.

20 Q    And what did she say?

21 A    She said that he did not have permission to be in her house.

22 Q    Uh, did she explain what happened after she told, told him to

23      leave?

24 A    Yes.

25 Q    And what'd she say?

```
 1   A     That there was a, that they had fought physically.

 2   Q     Okay.  So she described to you that they had both, they

 3         fought physically, when you say fought, does that mean both

 4         of them or that it was one sided?

 5   A     They fought together, yes.

 6   Q     Um, did she give you a sequence of events that led up between

 7         the time where they started fighting and when you got there?

 8   A     Yes.

 9   Q     And are you familiar with that?

10   A     What I wrote in my report is what I recall.  I --

11   Q     Okay.  So would you, would reading your report refresh your

12         recollection about the events?

13   A     Yes.

14   Q     All right.  I'm going to --

15               MR. TAYLOR:  If I may approach the witness?

16               THE COURT:  Yes.

17               MR. TAYLOR:  It's going to be supplemental report

18         page, is it, 1, 2, 3.

19   BY MR. TAYLOR:

20   Q     Go ahead and just review that.  Thank you.  I'm going to

21         retrieve that back.  So after she said that she told Mr.

22         Fischer to leave, um, what was the next thing she told you

23         happened?

24   A     She had told him to leave and then she had, he refused to

25         leave, and she had pushed him to try and get him out of, um,
```

1          the bedroom that they were in.

2    Q     Okay.  Then what?

3    A     She said that they began to push back and forth between each

4          other and that he was still refusing to leave.

5    Q     All right.  At some point, did she describe to you whether

6          she tried to call for help?

7    A     Yes.

8    Q     And what was her statement as to that?

9    A     She said that she had tried to call for help and he had taken

10         her phone at some point during the struggle.

11   Q     Okay.  Did you notice, um, besides the injuries we talked

12         about, the blood on her face, the broken tooth, did, did she

13         have any other visible injuries that you could see at that

14         point?

15   A     She did have blood on her nose as well.

16   Q     Okay.  Um, after you spoke to her, did you attempt to

17         document those injuries in any way?

18   A     Yes.

19   Q     Okay.  And how did you do that?

20   A     I took photographs of the injuries.

21   Q     So what are the kinds of injuries that you recall taking

22         photographs of?

23   A     I remember taking pictures of her face.  I believe I followed

24         up later that same day and had taken more in-depth photos.

25   Q     Okay.  Did you take photos of any bruising she had?

1  A   I believe so, yes.

2  Q   Um, let me ask you this, did she describe to you whether she

3      had any head injuries?

4  A   I believe she said that her head was hurting.  I did request

5      EMS at some point during the contact with her to evaluate

6      her.

7  Q   Okay.  And, um, do you recall if you took any photographs of,

8      of her head or the back of her head where her hair is?

9  A   I don't recall off of memory, no.

10 Q   Okay.  If you did not do that, is there any reason why you

11     did or didn't take photos of the back of her head?

12 A   I would have taken photographs of anything that I could see

13     that was injured, as far as a obvious injury.

14 Q   Okay.  So anything under the hairline, would you have been

15     able to photograph that?

16 A   No.

17 Q   Okay.  Is it a practice of yours if somebody has bumps or

18     contusions on their head that you would feel it with your

19     hand to verify that it's there?

20 A   No.

21 Q   Okay.  Why not?

22 A   I don't touch injuries.

23 Q   Um, so I just wanted to bring that point you just raised,

24     which is that at some point you said that you followed back

25     up with Ms. Miner later that day, is that correct?

13

1   A   Correct.

2   Q   Oh, is that a practice you normally do after you've

3       interviewed somebody is go back to their home?

4   A   Depending on the circumstance, yes.

5   Q   Okay.  Why'd you do it in this case?

6   A   Due to how hysterical she was when I had originally spoken

7       with her, I wanted to make sure that I had her statement

8       correct.

9   Q   Okay.  Did you go over the statement you previously wrote

10      down from her?

11  A   Yes.

12  Q   And, I guess just so that we can cover that process, are you

13      like transcribing what she's saying to you at the time she's

14      saying it or do you interview her and then go back later on

15      and type it from memory?

16  A   It depends on the circumstance in the case.

17  Q   Okay.  In this case, what'd you do?

18  A   I believe I wrote some things down and other things I, um,

19      just were off of memory.

20  Q   Okay.  So your report here is based on your recollection, not

21      necessarily, like, a recording of what she said.  Is that

22      correct?

23  A   Correct.

24  Q   Okay.  So then you came back and did you show her what you

25      had written down as far as what you thought she said?

1  A   I did not show her, no.

2  Q   Okay.  You just explained it to her?

3  A   Yes.  I asked her questions to just get clarification that I

4      had everything correct.

5  Q   And did she make some clarifications for you?

6  A   She did.

7  Q   Was there anything that you had originally thought that she

8      said that was corrected at the second interview, something

9      that was inconsistent?

10 A   Yes.

11 Q   And what was that?

12 A   She had originally told me that she was chased with the

13     knife.  I clarified that she said she had the knife in her

14     possession and was chased while she had the knife in her

15     possession.

16 Q   Okay.  And is that the knife she still had in her hand when

17     you first saw her?

18 A   Yes.

19 Q   All right.  What was her demeanor the second time you

20     interviewed her?

21 A   She was still upset, but more calm.

22 Q   Okay.  Um, are you trained to investigate impaired driving,

23     for instance?

24 A   Yes.

25 Q   Okay.  And when you spoke to Ms. Miner the first time, other

15

```
 1        than her hysterical demeanor, did you notice anything about
 2        her that made you assume or suspect that she might be
 3        impaired?
 4   A    No.
 5   Q    Okay.  So, um, was she oriented to, you know, time and place?
 6   A    Yes.
 7   Q    Did she understand that you are a police officer and explain
 8        to you cogent responses to your questions?
 9   A    Yes.
10   Q    Um, the second time you talked to her, later on, on the 18th,
11        um, did she explain to you whether she had a clear memory or
12        whether there were any things that were foggy?
13   A    Yes.
14   Q    What'd she say?
15   A    She said that she did have a foggy memory, but she would try
16        to clarify anything that I needed clarified.
17   Q    Okay.  Have you interviewed many people who have been in
18        physical altercations?
19   A    Yes.
20   Q    The scenario in this case where you interviewed her on scene
21        immediately after you responded and then interviewed her a
22        second time where some time had passed, is, were you
23        surprised at the change in her demeanor or her ability to
24        respond to your questions?
25   A    No.
```

1   Q   Okay.  The fact that she has used her feet to push Mr.
2       Fischer off of her bed when he was in her house, was that
3       relevant to your determination as to whether or not a crime
4       occurred?
5   A   No.
6   Q   Did you document or did you walk through her condo to look at
7       any of the other potential evidence in the scene?
8   A   Yes.
9   Q   And what did you observe?
10  A   I observed, um, furniture upside down, there was broken, um,
11      a piece of a lamp, a glass piece of a lamp that had been
12      shattered across the whole entire living room area.  I
13      believe there was a, like, a hole in the wall; it was a mess.
14  Q   Okay.  Um, did you ever get a chance to look at the door
15      opposite of the garage door, that front door?
16  A   Yes.
17  Q   And what was the state of that door when you showed up?
18  A   The trim had been broken off and it was no longer on the
19      hinges.
20  Q   So, uh, was the door open or closed when you looked at it?
21  A   I believe it was closed or --
22  Q   So would you, were you able to see whether there was any shoe
23      marks or pry marks or anything on the door that would give
24      you a clue as to the exact mechanism that got it open?
25  A   I don't recall.

1    Q    Okay.  And the area immediately outside of her condo where

2         that broken front door was, can you describe the area there?

3    A    Um, it's like a, I guess I could describe it as, like, a U.

4         There's other doorways in that area.  So her door was, um, if

5         you're looking at it, it was on the left-hand side and there

6         would have been either one or two doors, a center, and then

7         one on this side as well, I believe.

8    Q    Okay.  In that area where all four of those doors are, is

9         there a lot of running room in there?

10   A    No.

11   Q    What kind of quarters is it?

12   A    It's very small.

13   Q    Okay.  So, uh, the doorframe or the door being broken where

14        it was, um, did you have any other clues or, or information

15        that helped you figure out how that door got open?

16   A    Um, her statement of what she told me that she believed

17        happened.

18   Q    Okay.  So you don't have any other information, other than

19        what she said and what you, what you saw there?

20   A    Correct.

21   Q    Okay.  After you spoke to Ms. Miner, did you, I guess, do you

22        know if EMS or, or paramedics were on scene at that point?

23   A    They did arrive on scene, yes.

24   Q    Okay.  Did you call for them or did somebody else call for

25        them?

```
1   A      I did.

2   Q      Okay.  Why did you call for EMS?

3   A      Based off of the injuries that I observed and her statement

4          that she had been hit in the head repeatedly.

5   Q      Okay.  What was your concern there?

6   A      That she could have some sort of a serious injury to her

7          head.

8   Q      Okay.  Did you stay with her after EMS left?

9   A      Yes.

10  Q      And, um, when you followed back up with her hours later, did

11         you notice anything about her body as far as her wrists go?

12  A      I don't recall.

13  Q      Um, if, if you looked at page 3 of your report, would that

14         refresh your memory?

15  A      Yes.

16  Q      Okay.  Very, very last paragraph.  Did that refresh your

17         memory?

18  A      Yes.

19  Q      Okay.  What did you notice about her wrists?

20  A      On the follow-up contact with her, that she had a hospital

21         bracelet on.

22  Q      Okay.  So she had been to the hospital in the hours between

23         when you were there on scene and when you came back?

24  A      Correct.

25  Q      Um, did you have any indication while you were talking to her
```

```
 1            that, I guess, are you able to, based on our training, to

 2            detect impairment?  Are you aware of whether a head injuries

 3            could also exhibit those same signs?  For instance, like, if

 4            you have a head injury, do you have sometimes neurological

 5            problems that might help, might interfere with your ability

 6            to do some tasks?

 7  A         Yes.

 8  Q         Okay.  Did you have any of those concerns while you were

 9            speaking to Ms. Miner?

10  A         Not to my memory, no.

11  Q         Were you the one or did another officer take the photos of

12            the interior of Ms. Miner's residence?

13  A         Another officer did.

14  Q         Okay.  So you primarily focused on just her injuries?

15  A         Correct.

16  Q         All right.  All right, thank you.  I have no further

17            questions for you right now.

18                    THE COURT:  Mr. Sizemore.

19                    MR. SIZEMORE:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21  BY MR. SIZEMORE:

22  Q         When you interviewed, um, Ms. Miner the first time, did you

23            ask her if she had been drinking?

24  A         Not to my memory.

25  Q         Did you ask her if she had ingested any sort of controlled
```

1        substance at all?

2   A    Not to my memory.  I don't recall exactly.

3   Q    Did you ask her if she had any medicine that she was taking?

4   A    No.

5   Q    Is there a reason that you wouldn't ask her any of those

6        questions?

7   A    Um, it didn't appear relevant at that time.

8   Q    Did she seem, when you first met her, did she seem like she

9        was lucent, coherent, and able to have a conversation with

10       you?

11  A    She was hysterical, but able to answer the questions that I

12       was asking.

13  Q    Okay.  So the foggy memory comment, that came in the second

14       interview.  That wasn't the first interview, right?

15  A    Correct.

16  Q    The first interview, which occurred within minutes of any

17       alleged incident in the house, she was clear, according to

18       your observations, right?  Clear headed, I mean.

19  A    Other than her demeanor of being hysterical.

20  Q    I understand, you said hysterical a couple times.  We get it,

21       she was emotional.  But her ability to recall and recount the

22       incident was unaffected in your experience.

23  A    She answered the questions that I asked.

24  Q    You had no suspicion, at that time, that she was high on

25       marijuana, right?

1   A   Correct.

2   Q   No suspicion that she was drunk on alcohol?

3   A   Correct.

4   Q   Okay.  No reason to believe by what you saw and observed that

5       she was concussed or had amnesia or anything like that,

6       right?

7   A   Correct.

8   Q   Okay.  You said, when you testified, that when you walked in,

9       first walked into the condo, she was holding a knife in one

10      hand and her cell phone in the other, is that right?

11  A   Yes.

12  Q   And you told her to drop the knife and she dropped both

13      things.  Is that right?

14  A   Yes.

15  Q   Did she set them down on the floor or did she literally drop

16      them?

17  A   She dropped them.

18  Q   Okay.  And we know from the People's exhibits that that was a

19      tile floor, is that right?

20  A   I would have to have my memory refreshed; I don't recall what

21      kind of floor it was.

22  Q   Okay.  Do you, when you wrote your report and wrote in your

23      report that when you walked in, there was a smashed phone at

24      her feet, do you remember writing that in your report?

25  A   If it's in my report, then yes.

```
 1   Q   Okay.  I'm asking you if you remember putting that in your
 2       report?
 3   A   Yes.
 4   Q   You do?
 5   A   Yes.
 6   Q   So are you changing your testimony then, was the phone
 7       already at her feet when you walked in or did she drop it
 8       after you told her to drop the knife?
 9   A   To my memory, she dropped it when I told her to drop the
10       knife.
11   Q   Okay.  Um, did you have occasion to see that phone before she
12       dropped it?  You didn't, right?
13   A   No.
14   Q   Okay.  Um, and your, your characterization of that phone in
15       this report was that it was a smashed cell phone.
16   A   Correct.
17   Q   What was smashed on it?
18   A   The screen.
19   Q   How smashed was it?
20   A   I don't recall how sm-
21   Q   Did you take a picture of it?
22   A   I believe a photograph was taken of it; I don't recall if I
23       took it or if the other officer took a picture of it.
24   Q   Did you take a pic-, did you take a picture of the damage
25       done to that phone?
```

1    A    I don't believe it was me that took the picture.

2    Q    Okay.  Um, did you seize the phone as evidence?

3    A    Yes.

4    Q    Okay.  Is the phone here?  No?

5    A    I have no idea.

6    Q    Okay.  The phone was functional when you arrived, correct?

7    A    I wouldn't be able to testify to that.

8    Q    Was she on the phone with dispatch when you got there still?

9    A    I did not know at the time if she was or not.

10   Q    Okay.  Do you know now?

11   A    Yes.

12   Q    She was, right?

13   A    Yes.

14   Q    Okay.  On that phone?

15   A    Yes.

16   Q    Which would indicate the phone was functional, right?

17   A    In a way, yes.

18   Q    In a way?

19   A    I mean, that, if the phone call was still going, I would

20        assume yes.

21   Q    Okay.  Let me ask you this, were you able to look at the

22        phone to document these 23 phone calls that she said she got,

23        um, that night from Mr. Fischer?

24   A    No.

25   Q    Okay.  Is it, were you not able to do that?  Did you try and

```
 1          weren't able to get it to work?  Or did you not try?
 2  A    We did look at it at some point.  I don't remember exactly
 3          what time.  I was not able to due to the screen being
 4          shattered to see anything.
 5  Q    And it's possible that that phone shattered when she dropped
 6          it when you told her to drop the knife, right?
 7  A    It's a possibility.
 8  Q    Did she ever, ever tell you that Mr. Fischer was hitting her
 9          in her head with her cell phone?
10  A    I believe so, yes.
11  Q    When did she tell you that?
12  A    I'd have to refer back to my report --
13  Q    Okay.
14  A    -- if that was the first --
15  Q    Please do.
16              MR. TAYLOR:  May I approach, Your Honor?
17              THE COURT:  Yes.
18              MR. SIZEMORE:  Oh, I'm sorry, I thought you had
19          one.
20              MR. TAYLOR:  No.  I didn't put her on the stand
21          with that.  I wanted her to be able to testify without it.
22          Um, it's (indecipherable).
23              THE WITNESS:  Thank you.
24  BY MR. SIZEMORE:
25  Q    Okay.  Does that refresh your memory about whether or not she
```

said to you that she was hit with the phone?
A Yes.
Q Okay. W-, did she say that to you?
A It’s not in my police report.
Q Okay. So you don’t have any indication that she ever told you that she was hit with a cell phone, correct?
A Not off of my report, no.
Q Well, you don’t remember it happening, do you? Do you remember her saying that?
A Not at this time, no.
Q Okay. And you didn’t put it in your report, right?
A Correct.
Q And you were trained and you’ve been a police officer now for four years, you understand that you put important details into your report; I know it’s not verbatim, but you probably try to put everything in there, right?
A I do try, yes.
Q Okay. Were you taking notes when you took, when you interviewed her both times?
A I know I took notes the second time; I don’t recall the first time if I did or not.
Q Okay. And do you have a, do you have a little notepad that you carry that you do take your notes on?
A Yes.
Q And did you destroy those notes after you wrote your report?

```
 1   A     I believe so, yes.

 2   Q     Typically, that's what you do, right?

 3   A     Yes.

 4   Q     That's what you're trained to do, right?

 5   A     Yes, I don't keep them.

 6   Q     Okay.  You don't have them here, do you?

 7   A     No.

 8   Q     Okay.  So we can't look at those to see if they refresh your

 9         memory?

10   A     No.

11   Q     Okay.  Did you seize the phone and send it for fingerprints

12         to see if Mr. Fischer's prints were ever on the phone?

13   A     We did seize the phone; we did not send it for fingerprints,

14         to my knowledge.

15   Q     Okay.  Um, when she showed you her tooth that she says was

16         knocked out, it was on her right side of her mouth, right?

17   A     I don't recall what side of her mouth it was on.

18   Q     You don't recall that?

19   A     Not at this time.

20   Q     Okay, okay.  When she told you she had bumps on her head, she

21         pointed to the right side back of her head, correct?

22   A     Again, I don't remember what side at this time.

23   Q     You don't remember that?  Okay.  Do you remember whether Mr.

24         Fischer is right-handed or left-handed?

25   A     I would have no knowledge of that.
```

```
 1  Q    No knowledge of that.  Now, there was some testimony about
 2       something that Ms. Miner told you in the first interview that
 3       may have been incorrect that you cleared up in the second
 4       interview.  You know, we kind of went over that like it was
 5       no big deal, but it was who had the knife, right?  Didn't she
 6       tell you in the first interview that she was being chased
 7       with a knife?  Mr. Fischer had a knife, was chasing her
 8       around the house, correct?
 9  A    Her first statement was that she was chased with a knife.
10  Q    Okay.  And then the second statement that you got that you
11       saw, or you met her hours later after she had been in the
12       hospital, you followed up on that and she said no, I had a
13       knife.  Is that right?
14  A    Yeah, she said she was chased with a knife in her possession.
15  Q    In her possession.  So she originally said Mr. Fischer had a
16       knife.
17            MR. TAYLOR:  Your Honor, I'm going to object.  It's
18       not what the witness said.
19            THE COURT:  I'm going to sustain that objection.
20       She said that she was being chased --
21            MR. TAYLOR:  With a knife.
22            THE COURT:  -- by him with a knife.  It could have
23       meant her or him.
24  BY MR. SIZEMORE:
25  Q    Wait a minute.  When she told you about the knife the first
```

```
 1          time, I don't want to be equivocal about this, and if I'm
 2          wrong, you let me know, she told you affirmatively he had a
 3          knife, right?
 4   A      Her statement to me was that she was a chase with a knife.
 5   Q      How did you take that to mean?  She had a knife or he had a
 6          knife?
 7   A      Initially?
 8   Q      Yes.
 9   A      That he had the knife.
10   Q      You said that you believe there was a hole in the wall
11          somewhere in the house.  Can you describe it?
12   A      I'd have to look at pictures to remember the --
13   Q      So you don't have a memory of a hole in the wall, you just
14          seem to think that there was one.
15   A      I remember there being one; I just don't recall where it was.
16   Q      How big was it?
17   A      I would have to refresh my memory.  I -- it was a mess.
18   Q      On her second interview, when you met her after she had been
19          to the hospital, and you know this because she had a hospital
20          bracelet on, right?
21   A      Yes.
22   Q      You, uh, described her in that interview as foggy.  She said
23          that, she's foggy and doesn't remember details, is that
24          right?
25   A      Those were her, yes, those were her words.
```

1   Q   At that interview, did you inquire to her as to whether she
2       was given any pain meds or any medicine while she was at the
3       hospital that might affect her ability to recall?
4   A   I don't believe I asked that question.
5   Q   Okay.  But even after she said that she, that her memory was
6       foggy, did you follow up on that and ask her why?
7   A   I don't recall.
8   Q   Do you know whether she was prescribed any medicine and
9       administered any medicine at the hospital?
10  A   I don't believe we discussed that.
11  Q   You -- I'm sorry?
12  A   I don't believe we discussed that.
13  Q   Okay.  Do we have the records from the hospital to show what
14      medicine she, medication she was on?
15  A   I don't believe so.
16  Q   Did you make contact with anyone at the hospital to find out
17      what her injuries were, what kind of treatment she was given?
18  A   No.
19  Q   Did we, did you or anybody, to your knowledge, uh, get her
20      phone records from, records from her cell phone to document
21      her, the phone calls or any texts that was going on between
22      these two?
23  A   I know she attempted to get them and then we seized the phone
24      and it was turned over to our detective.  I'm not sure what
25      steps were taken.

1   Q    You've never seen those though, right?

2   A    No.

3   Q    She wasn't able to show you anything on her phone as far as

4        call record or any of that?

5   A    No.

6   Q    Do you remember looking at the front door, the damage on the

7        front door?

8   A    Yes.

9   Q    Okay.  Now you said it wasn't on the hinges anymore, is that

10       right?

11  A    Yes.

12  Q    Okay.  And then you said that it was closed when you saw it.

13  A    Yes.

14  Q    So was it completely off the hinges and closed?

15  A    I believe it was somewhat hanging.

16  Q    Hanging, okay.  Did you look for any shoe prints or any marks

17       on the door that would indicate a tool or something else was

18       used?

19  A    I did look at the door; I don't recall seeing anything to my

20       memory.

21  Q    Did you take a picture of the door or did somebody else take

22       a picture of the door?

23  A    Someone else did.

24  Q    When you were interviewing Ms. Miner, she did not, she told

25       you I don't know how Gary got in the house the second time.

31

1      And you suggested, well, the front door looks like it's

2      kicked in, maybe that was it.  You said that, right?

3  A     Yes.

4  Q     Prior to that, she never told you that she thought one of the

5      doors was kicked in.  That was you saying that.

6  A     Correct, after I had observed that, I asked her if that may

7      have been how he got in.

8  Q     And she said she didn't know, right?

9  A     She said that that was possible.

10  Q     Well, she told you there was no damage to the door before the

11      incident, correct?

12  A     Yes.

13  Q     Um, but she never said anything to you, like, well I heard a

14      banging, I figured that was what was going on?

15  A     I don't recall.

16  Q     She never told you that she heard a loud banging, did she?

17  A     Not to my memory.

18  Q     Not that this is terribly important, but you put in your

19      report specifically that she told you that Mr. Fischer

20      grabbed a grape soda out of the refrigerator that was still

21      on the counter when you got there.  Is that right?

22  A     Yes.

23  Q     I'm, I'm just struck by the specificity in your report.  It

24      was a grape soda, is that right?  Are you sure of that?

25  A     If that's what's in my report, yes.

```
 1   Q    Okay.  I know that, I mean, it's not a giant deal, but if it
 2        was a cherry coke, would that be right?  Could that be, do
 3        you think?
 4   A    I don't remember at this point.
 5   Q    Okay.  Did you ever find her tooth?
 6   A    No.
 7   Q    Did anyone ever look for the tooth?
 8   A    I don't remember if we looked for that specifically.
 9              MR. SIZEMORE:  One second please, Your Honor.
10        Sorry about that.
11   BY MR. SIZEMORE:
12   Q    During your interview with her, she told you, or you observed
13        that there was a ceiling fan with a, a light and that the
14        globe on the light was broke, you saw that, right?
15   A    Yes.
16   Q    And I don't know if you took the picture of it, someone took
17        a picture of that, correct?
18   A    I did not take the picture.
19   Q    Okay.  And she was very specific with you about how that got
20        broke.  Do you remember what she said?
21   A    Yes.
22   Q    What did she tell you?
23   A    Well, she said that a, her purse was thrown.
24   Q    That Gary threw her purse, is that right?
25   A    Yes.
```

1   Q      And hit the fan?

2   A      She said that she believed it hit the sliding glass door, but

3          after I was there, observed the fan broke and realized that

4          that's what had been done.

5   Q      Okay.  And, but she was specific that that was a purse,

6          correct?

7   A      Yes.

8   Q      Okay.  All right, thank you.  Nothing further.

9                  THE COURT:  Mr. Taylor.

10                 MR. TAYLOR:  If I could just have --

11                        REDIRECT EXAMINATION

12  BY MR. TAYLOR:

13  Q      Officer, you know the difference between tile and linoleum?

14  A      It would depend on the circumstance, I suppose.

15  Q      I mean, you know tile is a ceramic --

16  A      Yes.

17  Q      -- hard piece of material; linoleum is plastic that's made to

18         look like tile?

19  A      Yes.

20  Q      Okay.  One harder than the other?

21  A      Yes.

22                 MR. TAYLOR:  I'm going to approach with People's 6,

23         if I may?

24                 THE COURT:  Yes, uh-huh.

25  BY MR. TAYLOR:

1    Q     Do you see that?  It's People's 6.

2    A     Yes.

3    Q     It's got that cell phone and that knife there.

4    A     Yes.

5    Q     You see how perfect the pattern is on that, that flooring

6        there?

7    A     Yes.

8    Q     Is, does that refresh your recollection as to whether that's

9        plastic flooring or ceramic flooring?

10    A     I believe it's plastic flooring.

11    Q     Um, that cell phone that you recovered, you ever had a smart

12        phone with a cracked screen?

13    A     Have I?

14    Q     Yes.

15    A     Yes.

16    Q     Okay.  So you know what it looks like when you drop your

17        phone and it cracks the screen, right?

18    A     Yes.

19    Q     You ever dropped a phone from this high and the screen's so

20        damaged beyond repair that you can't see it anymore?

21    A     Not in my own experience, no.

22    Q     Okay.  Now, Mr. Sizemore had asked you about the comment

23        chased with a knife, and then she clarified she was being

24        chased and she was with the knife.

25    A     Yes.

1   Q   Right?  Um, you ever been in a fight before?

2   A   Yes.

3   Q   Okay.  On, on the job?

4   A   Yes.

5   Q   And when you're explaining what's happening, maybe on your

6       radio or to the other officers around you, do you speak the

7       same way you would if you were sitting on a couch hours

8       later?

9   A   No.

10  Q   Okay.  So did it seem odd to you that she said chased with a

11      knife and that's why you clarified that statement with her?

12      Or did she clarify that?  Let me rephrase, you interviewed

13      her a second time, right?

14  A   Correct.

15  Q   And at some point in that interview, the second time, the

16      comment about chased with a knife came up.  Who brought that

17      up?

18  A   I did.

19  Q   Okay.  And you asked her what happened there, right?

20  A   Yes.

21  Q   And what did she say?

22  A   She clarified.

23  Q   I had the knife; he was chasing me, right?

24  A   Right.

25  Q   So that, that discrepancy there, on whose part was the, the

```
 1         mistake?  Was it something that she had said to you the first
 2         night that she was wrong about or did you record it
 3         incorrectly?
 4    A    It was that she was wrong.
 5    Q    Okay.  So when you interviewed her the second time, you were
 6         attempting to make sure that you had the details as she
 7         recalled --
 8              MR. SIZEMORE:  Objection, leading.
 9              MR. TAYLOR:  I'll rephrase.
10              THE COURT:  Okay.
11  BY MR. TAYLOR:
12    Q    What was the reason why you were going through the
13         information with her a second time?
14    A    The severity of the difference of the crime.
15    Q    Okay.  The severity of the crime.  Let me ask you this, why
16         were you going through the information you had written down
17         the night before and asking her to clarify whether you had it
18         correct?  Did you have a suspicion that you might have some
19         of the stuff wrong?
20              MR. SIZEMORE:  Objection, leading.
21              MR. TAYLOR:  It's not leading, I asked her did it
22         happen.
23              THE COURT:  It's --
24              MR. SIZEMORE:  Well, you asked her why and then you
25         provided the answer right behind it.
```

```
 1                    MR. TAYLOR:  She can say no.  I'm not telling her
 2         what to say.
 3                    THE COURT:  Overruled.  Go ahead.
 4                    THE WITNESS:  Can you ask again?  Sorry.
 5  BY MR. TAYLOR:
 6  Q    You -- is -- did you provide her the statements that you
 7         thought she had made the night before?
 8  A    I asked her if what I had was correct.
 9  Q    Okay.  And where you had things that were incorrect, what was
10         her response to that information?
11  A    She clarified it for me.
12  Q    Okay.  So was she correcting you where you had it incorrectly
13         recorded what happened?
14  A    It was that her statement was that she gave me initially was
15         --
16  Q    Okay.  So she clarified what she had said the night before?
17  A    Yes.
18  Q    I just wanted to make sure we're all on the same page as to
19         what the distinctions were there.  Um, kind of, in keeping
20         with my, my question to you about having been in a fight
21         before, Mr. Sizemore had asked you several questions about
22         whether or not you had asked her questions about taking any
23         controlled substances or painkillers or anything from the
24         hospital.  And you said that you didn't ask about that.
25  A    To my knowledge, correct.
```

1  Q    Okay.  You know what clue is?  What circumstantial evidence

2       is, do you know what that is?

3  A    Yes.

4  Q    Okay.  So if there's something about someone that leads you

5       to believe that they're impaired, do you ask questions about

6       that?

7  A    Yes.

8  Q    If you don't see anything that would lead you to believe that

9       they were impaired in any way, would you take the time to ask

10      questions about it?

11 A    No.

12 Q    Okay.  When you show up to a house where somebody says hey

13      they got inside without my permission and you see a broken

14      door, what do you use that information for?

15 A    To, I guess, go, that's how I would start my investigation as

16      to what I'm going to ask.

17 Q    And when you see a door that's half open and a broken wooden

18      doorframe, what does that suggest to you in your

19      investigation?

20 A    That the door had been kicked in.

21 Q    Okay.  Um, now when you say kicked in, is that sort of a

22      colloquialism where you're just, sort of, paraphrasing that,

23      or are you saying that somebody actually with their foot

24      kicked that door in?

25 A    I'm just paraphrasing, I would say.  I wouldn't know

1              specifically because I wasn't there.

2        Q    Okay.  So you're just trying to deduce with circumstantial

3              evidence?

4        A    Yes.

5        Q    Was there anything about the descriptions that Ms. Miner gave

6              you about the course of events that conflicted with the

7              evidence you saw on scene that made you feel like you needed

8              to follow up?

9        A    With her a second time?

10       Q    No, I'm saying that -- let me ask you this, if, if you saw

11             Mr. Fischer at the jail with you when you left the jail and

12             then got to the scene and she claimed that he had done all

13             these things, wouldn't that, in your mind, go, well that

14             doesn't make any sense, I just saw him five minutes ago.

15       A    Yes.

16       Q    So you would try to investigate why there was a conflict,

17             right?

18       A    In that circumstance, yes.

19       Q    Okay.  So was there anything about what she was telling you

20             versus what you could see in her home that made you think

21             something's not adding up?

22       A    No.

23       Q    So when Mr. Sizemore asks you if you had sent the phone for

24             fingerprints, if you downloaded her phone records, if you

25             followed up with the hospital, why didn't you do that kind of

```
 1           stuff?
 2   A   Didn't seem relevant at the time.
 3   Q   Okay.  It's obviously important now, right?  We're on trial
 4           and we're contesting these facts, so would you agree that
 5           that kind of stuff would be helpful now?
 6   A   It could be, yes.
 7   Q   Okay.  Um, did Ms., I, I know that you told Mr. Sizemore you
 8           didn't actually go to the hospital to follow up with anybody,
 9           but when you spoke to Ms.  Miner the second day, did she show
10           you some medical records that you took photographs of?
11   A   I believe so.
12   Q   Okay.  So you, you were interested in it.  You just didn't
13           see anything that you thought was noteworthy?
14               MR. SIZEMORE:  Objection, leading.
15               MR. TAYLOR:  I'll withdraw the question.  Thank
16           you, I have no further questions, Your Honor.
17               MR. SIZEMORE:  No redirect, thank you.
18               THE COURT:  All right.
19               MR. TAYLOR:  Your Honor, the People would rest.
20               THE COURT:  Okay.  Thank you, you may be excused.
21           The People have rested.  Um, are you going to give an opening
22           statement?
23               MR. SIZEMORE:  We have a couple of matters we'd
24           like to take up outside the jury, jury's presence, Your
25           Honor.
```

1              THE COURT:  Okay.  Ladies and gentlemen, I'm going

2      to excuse you.

3              MR. TAYLOR:  I'm sorry, Your Honor, before we

4      excuse the witness, I didn't know if the jury had any

5      questions.

6              THE COURT:  Oh, I'm sorry.

7              MR. TAYLOR:  Sergeant Fogo --

8              THE COURT:  I should have asked that.  Does the

9      jury have any questions?

10             MR. SIZEMORE:  No, there is one, okay.

11             THE COURT:  Yes, they do, very good.  Thank you for

12     reminding me.  Thank you.  Okay, please approach.

13             (At 9:39 a.m., bench conference on the record)

14             MR. SIZEMORE:  (indecipherable) officer states,

15     officer states the door was closed, open the door

16     (indecipherable).  Is that linoleum?

17             THE COURT:  I'm sorry?

18             MR. TAYLOR:  It's cut into sheets; you can see big,

19     long lines in it.

20             MR. SIZEMORE:  Yeah.

21             THE COURT:  Which photograph do you guys want me to

22     show?

23             MR. TAYLOR:  I think I'll use six.

24             MR. SIZEMORE:  Six was the one that he already

25     used.

42

1             THE COURT:  Is this the one like that?

2             MR. SIZEMORE:  Here you go.

3             THE COURT:  Thank you.

4             MR. TAYLOR:  Do you want me to just pass this to

5     the bailiff?

6             MR. TAYLOR:  That would be fine.  Thank you.

7             (At 9:40 a.m., bench conference concluded)

8             MR. SIZEMORE:  They're going to want to take

9     pictures.

10            THE COURT:  Okay, I'm going to ask you some

11    questions first before we show you that, before we show you

12    the photograph.  It says in her report, did she state that

13    she said her head hurt or that she had bumps on her head.

14            THE WITNESS:  She had told me that she was struck

15    in the head.

16            THE COURT:  That she was struck in the head?

17            THE WITNESS:  Correct.

18            THE COURT:  Okay.  Um, we're going to show you the

19    photos of the front door and it says photos of the front door

20    open with damage, but officer states the door was closed.

21    Who opened the door?  Was it closed or open?  Do you recall?

22            THE WITNESS:  I'd have to look at the picture.  I

23    don't recall.

24            THE COURT:  Look at, at what photograph?

25            THE WITNESS:  If there was a photograph of the

43

1          door, that's how it was.

2                    THE COURT:  The photograph of the door?

3                    THE WITNESS:  However it was photographed would be

4          how it was found.

5                    THE COURT:  I can't tell, is it exhibit 8 the --

6                    MR. TAYLOR:  So, 8, 9, 10, and 11, I think, are all

7          of that door.

8                    THE COURT:  All right.

9                    MR. TAYLOR:  Your Honor, may I approach the witness

10         with copies of those --

11                   THE COURT:  Yes.

12                   MR. TAYLOR:  -- photos?  Did that refresh your

13         memory?

14                   THE WITNESS:  Yes.

15                   THE COURT:  Okay.  Um, do you know if the door was

16         open or closed?

17                   THE WITNESS:  When I got there, I believe the door

18         was closed.  I didn't take the pictures, um, so I don't know

19         if someone did open it for the picture.  But to my memory, as

20         I testified, it was closed or somewhat closed.

21                   THE COURT:  You believe it was closed, but you

22         don't know if it was open or closed by someone else.

23                   THE WITNESS:  When the picture was taken, I'm not

24         sure if someone had moved the door.  I was talking to the

25         victim at the time the pictures were taken.

1              THE COURT:  Okay.  And, um, they would like to see

2        the photograph of how, I guess, did you, the hall floor.  And

3        I believe that's exhibit number, is it 8?

4              MR. SIZEMORE:  Six, Judge.

5              THE COURT:  Six?  It's on the back, it should be

6        exhibit six is the photograph of the hall, six.

7              MR. TAYLOR:  And, Your Honor, just for the jury's

8        edification, they will get copies of the exhibits to take

9        back into deliberations.  So I don't think --

10             THE COURT:  Yes.

11             MR. TAYLOR:  -- that this is the last time they're

12       going to get to see these.

13             THE COURT:  Okay, and the last question, was there

14       anything else you wanted to say?  The last questions that I

15       asked you, are you all set?

16             THE WITNESS:  Um, if I could just clarify --

17             THE COURT:  With --

18             THE WITNESS:  About the question.

19             THE COURT:  Which one?

20             THE WITNESS:  About the door and if it was open.

21             THE COURT:  Okay.  Um, the photos show the front

22       door open with damage, but officer states the door was

23       closed.  Who opened the door?  Was it closed or open?

24             THE WITNESS:  So to my memory when I got there, the

25       door was closed.  I don't know, because I didn't take the

45

1          pictures, if someone else had opened the door to take the

2          pictures because I was not standing right next to them when

3          they took the pictures.

4                    THE COURT:  All right.  And we have another

5          question?

6                    (At 9:49 a.m., bench conference on the record)

7                    MR. SIZEMORE:  All right.

8                    THE COURT:  Thank you.  Okay, back on the record.

9                    (At 9:49 a.m., bench conference concluded)

10                   THE COURT:  Okay, what time did the officer go back

11         later that day?

12                   THE WITNESS:  I'd have to refer to my report for

13         the exact time.

14                   THE COURT:  Okay.

15                   MR. TAYLOR:  May I approach the witness --

16                   THE COURT:  Yes.

17                   MR. TAYLOR:  -- with her report?

18                   THE COURT:  Uh-huh.

19                   MR. TAYLOR:  That would be page 3 of her sup.,

20         second paragraph from the bottom.

21                   THE WITNESS:  Eighteen forty-five, which would be

22         6:45 p.m.

23                   THE COURT:  Six forty-five?

24                   THE WITNESS:  Yes.

25                   THE COURT:  P.m.?

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.  And the question, I think it's

3         referring to the victim, was her tooth fully gone or cracked

4         where the officer was, when the officer was initially there?

5         Do you recall?

6              THE WITNESS:  I believe it was cracked.

7              THE COURT:  It was cracked?

8              THE WITNESS:  Broken, yes.

9              THE COURT:  Broken or cracked?

10             THE WITNESS:  Broken.

11             MR. TAYLOR:  So, can I follow up with that

12        question?

13             THE COURT:  Yes.

14             MR. TAYLOR:  If, um, may I approach the witness

15        with People's one?

16             THE COURT:  Yes.

17   BY MR. TAYLOR:

18   Q    Officer, you see that photo?

19   A    Yes.

20   Q    Is that photo consistent with what you could see when you

21        first approached Ms. Miner?

22   A    Yes.

23   Q    Okay.  So that gap between two of her teeth there, do you

24        know if there was a part of her tooth that was still visible

25        or was the tooth completely missing?

 1  A     I can see the top of it that it looks like there is a small

 2        piece of it still there.

 3  Q     So when you say broken, are you saying that the tooth was

 4        broken off or that -- can you clarify that statement?

 5  A     That it was broken off, is what it appeared to be.

 6              MR. TAYLOR:  Okay, I have no follow-ups for that,

 7        Your Honor.

 8              THE COURT:  Okay.

 9              MR. SIZEMORE:  I do.

10  BY MR. SIZEMORE:

11  Q     So I just want to make sure, is this the way that her mouth

12        looked the first time you saw her on that night or that

13        morning?

14  A     Yes.

15  Q     This, so when you say cracked, you, this is what it was, it

16        was gone?  I know there's a part of it there and I'm not

17        trying to trap you or make it too broad up in the semantics,

18        but your original answer was cracked and in my mind, what I

19        pictured was a cracked in a tooth.

20  A     Cracked off.

21  Q     Cracked off.

22  A     Broken off.

23  Q     Okay, got you.

24  A     Yes.

25  Q     Thank you.

1                     MR. TAYLOR:  No further questions.

2                     THE COURT:  Okay.  May this witness be excused?

3                     MR. SIZEMORE:  Yes, please.

4                     THE COURT:  Are the jurors all set?  Yes, okay.

5        Thank you.

6                     THE WITNESS:  You're welcome.

7                     (At 9:52 a.m., witness excused)

8                     MR. TAYLOR:  Thank you.

9                     THE COURT:  Thank you for reminding me.

10                    MR. TAYLOR:  As I indicated, Your Honor, the People

11       would rest now.

12                    THE COURT:  Okay, very good.  Um, jury I'm going to

13       give you a break for a few minutes.  Um, if you could take

14       them out.  Don't discuss the case.  We're not ready, yet, for

15       that.

16                    THE BAILIFF:  All rise for the jury.

17                    THE COURT:  The People have rested.

18                    (At 9:52 a.m., jury taken out)

19                    THE COURT:  Okay, the door is closed, the jury is

20       out.  Mr. Sizemore?

21                    MR. SIZEMORE:  Yes, Your Honor.  What's that?  Your

22       Honor, um, I intend, my, my q-, my reason for asking the

23       Court to send the jury out was, my intention was to put a

24       record on about my client testifying.  My client has

25       indicated to me, he'd like to talk to me for a few minutes

1         before we put that on the record.  So if we could take a

2         second, maybe I could go in the back.

3                   THE COURT:  A few minutes, okay?

4                   MR. SIZEMORE:  Thank you.

5                   THE COURT:  Thank you.

6                   (At 9:53 a.m., Court recessed)

7                   (At 10:15 a.m., Court reconvened)

8                   THE COURT:  Mr. Sizemore, this instruction under

9         the --

10                  (At 10:15:17 a.m., recording stopped)

11                  (At 10:15:28 a.m., recording started)

12                  THE COURT:  -- correct?

13                  MR. SIZEMORE:  Yes.

14                  THE COURT:  Okay.

15                  MR. SIZEMORE:  Um, yes, I am.

16                  THE COURT:  Okay.  This is the case of People

17        versus Fischer.  Your appearances, please.

18                  MR. TAYLOR:  Michael Taylor for the People.

19                  MR. SIZEMORE:  Uh, Rolland Sizemore appearing with

20        and on behalf of Gary Fischer, Your Honor.

21                  THE COURT:  And the jury is out at this time and,

22        um, Mr. Fischer is in the courtroom.  And, um, you

23        understand, Mr. Fischer, that you have the absolute right to

24        testify in this case?

25                  MR. FISCHER:  Yes.

1                    THE COURT:  You also have the absolute right to,

2          not to testify.  Do you understand that?

3                    MR. FISCHER:  I do.

4                    THE COURT:  And what is your choice?

5                    MR. FISCHER:  I'm not going to testify.

6                    THE COURT:  Okay.  And that is your own choice?

7                    MR. FISCHER:  That is my own choice.

8                    THE COURT:  Okay.  Do you have any other questions?

9                    MR. SIZEMORE:  Yes, but can we have him sworn?

10                    THE COURT:  Oh, could you raise your right hand?

11          Do you swear to tell the truth, the whole truth, and nothing

12          but the truth so help you God?

13                              GARY FISCHER

14                    (At 10:16 a.m., defendant sworn in by the Court)

15                    MR. FISCHER:  Yes.

16                    THE COURT:  You affirm everything that we've gone

17          over?

18                    MR. FISCHER:  Yes.

19                    THE COURT:  Okay.

20                    MR. SIZEMORE:  Thank you, Your Honor.  Gary, you

21          and I spoke last night about testify and, as a matter of

22          fact, we had spent the evening apart planning on your

23          testifying, is that right?

24                    MR. FISCHER:  Yes.

25                    MR. SIZEMORE:  And you talked to your family and

1       you talked to some people in the jail and then you and I had

2       another chance to talk about that again this morning, right?

3                    MR. FISCHER:  We did.

4                    MR. SIZEMORE:  And your decision is based on not

5       only my advice, but also the advice of your family and other

6       people that you've talked to, right?

7                    MR. FISCHER:  That's right.

8                    MR. SIZEMORE:  And your own personal feelings?

9                    MR. FISCHER:  And my own personal feelings, yes.

10                   MR. SIZEMORE:  Thank you.  All right, thank you,

11      Your Honor.

12                   THE COURT:  And you do wish to have the 3.3

13      defendant not testifying instruction read?

14                   MR. SIZEMORE:  I do, Your Honor.  Thank you.

15                   THE COURT:  Okay.  All right, are you, uh, ready

16      for closing arguments?

17                   MR. TAYLOR:  So long as, I think the final set of

18      jury instructions that we have are agreed upon.  The draft

19      that I sent to the Court looks like the Court's copy as well.

20                   THE COURT:  Yes.

21                   MR. TAYLOR:  Yes, I am prepared for closing.

22                   MR. SIZEMORE:  I --

23                   THE COURT:  I will allow Mr. Sizemore to tell the

24      jury that, um, he's waiving his opening statement and, um,

25      but you'll be giving a closing one and that will prepare them

1          for that.

2                    MR. SIZEMORE:  Sure, we do that, absolutely.

3                    THE COURT:  That makes sense to them.

4                    MR. SIZEMORE:  Yes.

5                    THE COURT:  Okay, so they don't think that you've

6          forgotten.  Is there anything else that I should, that we

7          should bring up before the jury comes in or are you ready for

8          the jury?

9                    MR. TAYLOR:  I'm ready for the jury.

10                    THE COURT:  Ready for the jury?

11                    MR. SIZEMORE:  Five minute closing?

12                    MR. TAYLOR:  Well, I know I need at least nine

13          minutes and twenty seconds, so --

14                    MR. SIZEMORE:  Are you going to play the whole

15          thing again?  Okay.

16                    THE BAILIFF:  Please rise for the jury.

17                    (At 10:18 a.m., jury brought in)

18                    THE COURT:  Thank you.  Thank you, Jury.  Please be

19          seated.  Mr. Sizemore.

20                    MR. SIZEMORE:  Yes, Your Honor, thank you.  Your

21          Honor, I had initially, at the beginning of the trial,

22          indicated to the Court and to the jury that I would reserve

23          my opening and give an opening at the beginning of my case.

24          Based on the way the trial has gone and, um, the proofs, the

25          way the proofs have come in, we are not going to present a

1    case to the jury.  So I have no need for an opening and I am

2    waiving my opening and will pursuit, uh, go right to

3    closings.

4              THE COURT:  Okay.  So you're resting?

5              MR. SIZEMORE:  Yes.

6              THE COURT:  Okay.  And, um, closing argument?

7              MR. TAYLOR:  Thank you, Your Honor.  Uh, may I use

8    the television again?

9              THE COURT:  Yes, of course.

10             MR. TAYLOR:  It would be on, I think HDMI two or

11   three, remember?  Here we go.  Okay, so while it won't play

12   the audio through -- that's fine.  We'll do it, we'll do it

13   however we need to.

14             COURT CLERK:  No, it was, it was playing through.

15             MR. TAYLOR:  The TV?

16             COURT CLERK:  Yeah.  I'll turn it up.

17             THE COURT:  Just wasn't loud.

18             COURT CLERK:  Yes.

19             MR. TAYLOR:  You got to put it back on -- there we

20   go.  I'm at the bottom; we'll need to go up.  It's channel.

21   I'll need it pretty high so they can hear it.

22             THE COURT:  Keep going.

23             MR. TAYLOR:  Thank you.  So, first I want to thank

24   everyone here for your patience and your attention; I noticed

25   that you were asking several questions throughout the case,

1   which showed me that you're in tuned to what was going on and

2   that's what we both hope for.  We want jurors that are going

3   to seriously weigh the evidence in the case and then come to

4   a decision about what we believe happened.  And that's a

5   difficult task because none of you were there.  So you, you

6   very, very carefully looked at the evidence and that was

7   clear based on your attention and your behavior throughout

8   the case.

9       I came to you in the opening and I said that you

10  would see a case that involved an illegal entry into the

11  victim, Heather Miner's house, by the defendant, Gary

12  Fischer, in Howell City in Livingston County in the State of

13  Michigan on September 18, 2018.  And front to back, that's

14  what you saw.  Every bit of evidence that you saw in this

15  case, every bit of testimony that you heard establishing

16  exactly that.  There are elements and I'm going to go over

17  them with you, but what you don't get to see months later in

18  a courtroom where I had Ms. Miner sitting on a stand asking

19  questions of an attorney is what she must have looked like to

20  Officer Vallance when Officer Vallance came through that door

21  and she was clutching a knife and a phone, a way to protect

22  herself in one hand and a call for help in the other.  And I

23  think that distinction parallels itself pretty well with what

24  you heard in the 911 call.  Because make no mistake about it,

25  Heather Miner was in a fight.  She was in a physical

1    fistfight with somebody who's much bigger than her.  She

2    didn't have the choice of backing down.  She needed to hold

3    her own until help arrived.  And that's exactly what she did.

4    You could hear it in the 911 call, he's in the room, she,

5    she's screaming at him, trying to hold an offense, and as

6    soon as he walks out of the room, she's pleading for 911 to

7    get somebody there fast enough to help her.  You're going to

8    get to listen to this 911 call and see these photos again.

9    You're going to get to take that stuff back into the jury

10   room, if you want, or come back out here and listen to it

11   again.  But when you listen to the 911 call, I want you to

12   hear what's going on there.  For 9 1/2 minutes, she's telling

13   Gary Fischer to get out of her house and he's saying I'm

14   leaving, I'm leaving.  It doesn't take 9 1/2 minutes to get

15   out of the house.

16           For 9 1/2 minutes, you hear this exchange.  You

17   hear him leaving the room, her pleading with 911, her

18   frantically crying for help, and then acknowledging when he

19   comes back in the room.  You're actually going to hear if you

20   listen closely enough where she's running, as she told you,

21   with the knife in her hands away from Gary Fischer where

22   she's saying don't come near me, don't come near me.  All of

23   this takes place in Heather Miner's home in the place she

24   closes her eyes and goes to sleep at night; in the one place

25   in the world where above all else, she should feel safe.

1    Someone came in her house without her permission and attacked

2    her when she tried to make them leave.

3         If you take away the dynamic of, of they were

4    intimate before or that he had helped her around the house

5    with some, some fix-it jobs, anyone comes in your house in

6    the middle of the night at 1:00 in the morning without your

7    permission, what do you get to do?  You get to make them

8    leave.  And if they refuse to leave, you get to push them out

9    the door.  I don't think any of us would bat an eye at that.

10   If one of you woke up in the middle of the night with me in

11   your house, I wouldn't expect you to be treating me with

12   kids' gloves and I don't think that it's fair to put Ms.

13   Miner in a position where we ask her to do something

14   different than what we would do.  If someone comes into your

15   house, you get to make them leave.  Conversely, if you break

16   into somebody's house, you don't get to fight with them to

17   stay.  If they try to push you out the door, you got to go.

18   You don't get to turn and hit them or take their phone to

19   stop them from calling 911.  You have to leave because if

20   you're in the middle of committing a crime, that illegal

21   entry into somebody else's house, you have no legal right to

22   defend yourself there.  You've got to go.

23        So Ms. Miner wakes up to the guy she blocked.  She

24   said I'm done talking to you.  I'm going, I'm going to bed.

25   She leaves that conversation with a signal to him, I don't

1    want to associate with you anymore.  And the next thing she

2    wakes up to, he's crawling into her bed.  She told you he

3    smelled like tequila, he seemed intoxicated, he refused to

4    leave, she pushed him off the bed with her feet, grabbed his

5    stuff, shoved it to him, and pushed him out of her bedroom

6    door.  And then he said I'm not leaving.  Imagine the

7    absurdity in her shoes there.  He's not even allowed to be

8    here and now he's saying he won't leave.  So she says well,

9    if I can't make you leave, I'm sure the cops will and she

10   goes to call 911.  She goes to her bed, she grabs the phone,

11   and instead of leaving, Gary Fischer grabs her wrist, twists

12   her arm, and takes the phone from her.  At that point, the

13   thing that she has that will help her out in that situation

14   has gone now, right?  Her ability to call for help is gone.

15   And you want to know what's scary about that?  That fear that

16   she must have felt when he took her phone was, was confirmed

17   after he started to attack her and she fled to her neighbor's

18   houses and started beating on all their doors and no one

19   answered.  Even outside of her house, she was alone with the

20   person that could hurt her.  No one came to help.

21        She ended up back in her house, locked both doors,

22   and grabbed a knife.  Sitting in that sanctuary, holding a

23   bladed kitchen knife, waiting for help to come.  And there

24   was so many questions in this case about, well, how do we

25   know that he kicked the door or pried the door open or -- it

1    doesn't matter, right?  That door was locked.  That is as

2    clear of a signal as you can get that you're not welcome

3    inside.  And that doorframe gave way.  It wasn't by turning

4    the doorknob.  He busted that door in to get back inside.  So

5    if there was any question, any question in his mind of

6    whether or not he was allowed to be in that house, I think

7    her locking him out was probably a very clear signal, no, you

8    are not allowed in here.  So for him to bust back in and

9    reinitiate the confrontation, there is no excuse for that.

10         You have photos of the doorframe.  You have photos

11   of her injuries.  You have photos of his face, confirming

12   exactly what she told you, that she bit him to get him off of

13   her and to let go of the phone.  Every bit of evidence that

14   you have in front of you confirms exactly what she said

15   happened.  But what's more is you've got a portion of the

16   crime live on audio; you got to hear it yourself.  And you

17   get to hear it again right now.  It's not coming through.

18              THE COURT:  We need it louder.

19              MR. TAYLOR:  Can you just switch it over to his

20   table on PCA?  You're going to have to put it on PCA input

21   unless it comes through.  You got it?  Is it on?

22              COURT CLERK:  Yes.

23              MR. TAYLOR:  PCA?  Is it coming through on your

24   screen?

25              COURT CLERK:  Oh, no.

1          MR. TAYLOR:  Do you have it on left cart or left

2     table?

3          COURT CLERK:  Yes.

4          MR. TAYLOR:  We'll just crank it up and do it over

5     here.

6          (At 10:31 a.m., audio started)

7          MR. TAYLOR:  I'm not high fiving you, you need to

8     get out right now.

9          THE COURT:  Can you turn it up more?  I saw the

10    volume and it was only halfway.  Turn it up as loud as it can

11    go.  I can't hear it.

12         COURT CLERK:  Maybe if you put it in front of the

13    mic, it might come through.

14         (At 10:33 a.m., audio stopped)

15         MR. TAYLOR:  Your Honor, I don't know what the

16    Court wants me to do because I tried playing it through the

17    Court's computer system, the jury is trying to hear it, so

18    any errant noise is distracting and they can't hear it.  So

19    I, I need some guidance here.  Either I need complete silence

20    on the courtroom or I got to be able to use the Court's

21    computer.

22         THE COURT:  Well, can you put it in front of, she

23    suggesting that you put it in front of the mic.

24         MR. TAYLOR:  I can't imagine it playing from one

25    speaker into a microphone is going to enhance the quality.

1    Is there a way we can put it in through the television

2    monitor?

3                COURT CLERK:  It appears that it's not working that

4    way.

5                MR. TAYLOR:  You may need to turn the volume down

6    now.

7                (At 10:35 a.m., audio started)

8                (At 10:35 a.m., audio paused)

9                MR. TAYLOR:  I'm calling the cops.  Do you think I

10   fucking care.  You knocked my teeth out.  Well, you bit my

11   eyeball.  Right, you can hear those.

12               (At 10:35 a.m., audio started)

13               (At 10:38 a.m., audio paused)

14               MR. TAYLOR:  Don't you come near me, don't you come

15   near me, don't you come near me.  Do you remember during the

16   trial, she has a knife in her hands at this point?  She told

17   you that Gary Fischer was chasing her around a table while

18   she had the phone and a knife.

19               (At 10:38 a.m., audio started)

20               (At 10:43 a.m., audio paused)

21               MR. TAYLOR:  You can actually Officer Alicia

22   Vallance command her to put the knife down before the phone

23   gets dropped.  Remember, every bit of that audio you heard

24   took place in the safest place in the world for that woman.

25   She begged the 911 dispatcher to please, please send someone

1    to help her.  And Gary Fischer never had to be there.  He

2    certainly didn't have to stay when she told him he had to

3    leave.  He didn't have to take her phone, he didn't have to

4    turn around and start throwing punches.  He didn't have to

5    come back into her house after she locked him out.  She

6    didn't do anything to ask for this to happen to her.  So when

7    you saw Heather Miner testify and she got a little upset,

8    rarely do I think I see righteous indignation as perfectly

9    exemplified as that.  If somebody breaks into my house,

10   crawls into my bed, twists my arm, and takes my phone away,

11   and I'm being accused of being a bad guy because I pushed

12   him?  Yeah, I think it's reasonable for her to be a little

13   upset.

14          Now, nothing against Mr. Sizemore, it's his job to

15   ask those questions, right?  He wants to make sure that

16   you're looking at the evidence critically from both sides and

17   to make sure that you're evaluating it for what it is.  But I

18   don't think any of us can sit here and shame Heather Miner

19   for the decisions she made that day.

20          Gary Fischer entered her home without permission,

21   re-entered her home without permission, assaulted her.  You

22   actually heard them struggling over the phone with the dial

23   tone of the keypad being hit.  I mean, those sounds are all

24   there on the audio, live.

25          He entered her home without permission, he

62

1       committed an assault inside her home, and Heather Miner was

2       lawfully present there in it.  Those are the elements of home

3       invasion first degree.

4               Can you put the TV back on?  Here, will you put it

5       on HDMI2?

6               (At 10:45 a.m., People display admitted photos on

7               the TV screen)

8               Knocked her tooth out in her own house.  She went

9       to bed with a full set of teeth.  But for Gary Fischer

10      decided to come over that night uninvited, she would still

11      have a full set of teeth.  Evidence that he committed the

12      crime.  Tossed over lamp, tossed over furniture.  I doubt Ms.

13      Miner had her living room in that state before Gary Fischer

14      decided to pay her a visit that night.

15              Now, you heard, uh, there was some questioning of

16      Officer Vallance about whether it was a purse that broke the

17      lamp or a piece of furniture that broke the lamp, but

18      remember, when Ms. Miner is having things thrown at her,

19      she's giving you her recollection as she sits here today, or

20      yesterday.  When somebody's throwing furniture at you,

21      there's a good chance you might not remember the exact

22      sequence of objects that are hurling through the air at your

23      body.  Damaged drywall, damaged light fixture.  The knife

24      that she was carrying that Officer Vallance said she told her

25      to drop and the phone on that floor, and this, this, I know

1    we all looked at this photo a couple of times, you can see

2    the scene and the linoleum right here at the bottom of the,

3    uh, picture here, right?  It's, it's, it's very clear.  And

4    you'll get to take these back into the jury room and look at

5    it.  The doorframe, I know it's an odd question to ask in a

6    jury trial of this sort, anybody sitting in this box really

7    care if he used his shoulder or his foot or some object to

8    bust through the door?  No, right?  A locked door, a damaged

9    doorframe is evidence that somebody broke and entered into a

10   house.  That's what the officers looked for and, oddly

11   enough, that's the evidence that you get.  And I want you to

12   remember, Gary Fischer, at some point, is outside that door

13   and the door won't open.  What thought must go through your

14   mind after you've been in a physical fight throwing punches

15   with somebody and then you end up outside their house behind

16   a locked door?  Probably don't want me back in there, right?

17   So, really, he kind of committed two home invasions that

18   night.

19        Ms. Miner gave you a description of the fight over

20   the phone and Mr. Fischer probably thought that this somehow

21   made him a victim because she bit him and you could hear it

22   in the audio, right?  He knocked her teeth out and he says

23   well, you bit my eye.  But what Ms. Miner really did is gave

24   us some evidence to corroborate her version of the events.

25   What this is is a wound that she gave him so that she could

1   get him off of her.  At some point, whatever you believe

2   about the exchange, his face was close enough to her mouth

3   that he could, that she could bite him, right?  That's the

4   only explanation for this injury.  He was on top of her, in

5   her home, pinning her to the ground, keeping her from calling

6   for help.  And the only thing she could think of to do to get

7   out of that situation was squeeze his genitals and bite his

8   face, put his flesh in her mouth and chomp down in hopes that

9   that would get him to let go.  That was the choice he forced

10   her to make in her own home.

11       Her breast was bruised, her arm was bruised, she's

12   got cuts on her legs, more bruises, bruising on her face, she

13   told you that this bruising here on her back, right where her

14   shoulder blade is, was consistent with her gripping her right

15   there, that she remembered him grabbing her right there and

16   that these marks were his fingers digging into her flesh.

17   She sought immediate medical attention and then she had her

18   tooth repaired at a dentist.  So you get, not only the before

19   medical treatment, but the after medical treatment.

20       And what do you have to question here, right?

21   Question everything, that's, kind of, your job, but the

22   evidence is the evidence.  What's missing?  So you heard some

23   cross-examination about whether she was, smoked marijuana

24   that day.  She smoked marijuana before somebody broke into

25   her house and beat her up; I guess he's not guilty.  No way.

1    Well, she, uh, after she had been in this fight, the officer

2    asked her a bunch of questions while she was hysterical, and

3    then she clarified that when she said chased with a knife

4    that she had the knife.  She didn't have to say that to the

5    officer, she wanted to make sure the officer was clear on

6    what really happened.  Um, oh yeah, here's a good one, she

7    said when she testified that it was a cherry coke that he

8    took out and slammed on the counter, but the officer

9    testified that she remembers seeing a grape pop on the

10   counter.  I guess he didn't do it, let's go home.  No.  The

11   fact of the matter here is, is that all of these details are

12   playing Monday morning quarterback and sitting there and

13   looking for things that are somehow inconsistent in a

14   position where we get to judge things that we weren't there

15   for, that we didn't experience, and we weren't asked to

16   recount shortly after being hit in the head.  So you are

17   allowed, as a jury, to make whatever decision you will about

18   the evidence.

19          I would ask you to be a little forgiving of Ms.

20   Miner's recollection, given that Mr. Fischer had been

21   bouncing her head off the floor before she was asked some of

22   those questions.  It turns out, getting hit in the head might

23   cloud your memory a little bit.  But she remembered the

24   details, the important ones to her.  I was safe in my house,

25   I told him I didn't want to talk to him, the next thing I

1    know he was in my house, and then he took my phone so I

2    couldn't call for help, he beat me up.  When you use force

3    against someone in an effort to prevent them from calling for

4    help, from reporting the crime that you're committing, that

5    in and of itself is a crime, and we know that in count two,

6    right?  Not only did he unlawfully use physical force against

7    her, he was committing a home invasion in the process, right?

8    He assaulted her to take her phone while he was unlawfully

9    present in her house.  So on count two, we have the unlaw-,

10    unlawful use of force to prevent or attempt to prevent her

11    calling for 911.  We know that she ultimately got through,

12    right, once she got her phone back.  And that he committed or

13    attempted to commit the crime of home invasion in the

14    process, right, the violation involved the home invasion.  So

15    you can see in count two, and it, kind of, just logically

16    makes sense, if you commit a crime against somebody and they

17    decide they're going to call the cops on you, you don't get

18    to commit another crime by physically taking their phone away

19    from them so they can't call for help.  Can you imagine any

20    worse feeling than having somebody intrude in your home and

21    then rob you of the one lifeline that will get somebody there

22    to help you?  The sensation of terror that went through

23    Heather Miner's body was obvious in that phone call.

24          There was some question of Sergeant Fogo about

25    whether he was illuminated or whether, uh, he was in the dark

1     for a while before he got up to the driveway, um, whether,

2     how many times he said he was a police officer, and I know

3     when we're sitting here in a trial, we have one witness at a

4     time, and things kind of get compartmentalized, but remember

5     the sequence of events.  You could hear on the phone call,

6     Gary I'm calling 911, you better leave before the police get

7     here.  There was more of an exchange and at some point, he

8     flees downstairs.  Heather Miner told him she was calling the

9     police.  He had just committed this crime.  The next person

10    he runs into outside yells police, show me your hands.  Is

11    there any reason why he would suspect that wasn't really a

12    police officer?  No, right?  He knew he was in trouble and

13    you want to know how you know he knew he was in trouble?

14    What did he do when the officer said show me your hands?

15    Well, if you're not really a police, I'm just going to ignore

16    you and keep going.  That's not what he did.  He changed

17    course and went around the other side of a vehicle to try to

18    evade that police officer, right?  He wanted to get away.

19    Evidence that he knew it was a police officer performing his

20    lawful duties.  Unfortunately for Gary Fischer, there was a

21    big trash can in the way and he failed to negotiate it.

22    Sergeant Fogo gives him a second command, stay on the ground.

23    He doesn't want to do that; he wants to get away.  So he

24    disobeys that second command and tries to run.  Sergeant Fogo

25    gets a hold of his shirt.  Now instead of just being like,

1    okay, you got me, Gary Fischer continues to move forward and

2    Sergeant Fogo has to wrap him with one arm and ride him to

3    the ground.  Is there any question that a police officer,

4    who's reporting to the scene of a fight, that tells you to

5    show your hands, that, that gives you a command to stay on

6    the ground, and that has to tackle you back to the ground to

7    get you down has either been endangered or opposed or

8    obstructed in the process, right, from performing his duties.

9    Sergeant Fogo was there to investigate the nature of that

10    call.  He was there to find out what was happening and in

11    that process.  He wanted to make sure that no one was in

12    danger that everyone stays secure on scene.  So he was doing

13    his job and investigating that call.  And the information

14    that he had kept involving to make it more and more likely

15    that the person that he saw running from the home was

16    probably going to be in trouble for something.  So when we

17    have police officers show up to investigate a crime, as

18    dangerous as a job as it is, the law commands that citizens

19    obey police officers when they're trying to do their job.  We

20    don't want police officers showing up to houses not knowing

21    what's inside, not knowing who's inside, or how dangerous

22    they ma-, might be, whether somebody's armed or not armed,

23    and having to put themselves in a situation where you don't

24    know who's hostile and then people just start doing whatever

25    they want.  A police officer gets to tell you, you got to sit

1      still for a minute until I find out what's happening here.

2      And that's not to say that Sergeant Fogo gets to just tell

3      anybody to do anything, but Gary Fischer knew why the officer

4      was there.  He knew the officer was responding to Heather

5      Miner's call for help.  He knew why they were there.  He knew

6      they were performing their lawful duties.  But when they gave

7      him that command, he knew that he wanted to get away from the

8      police and that's why he ran.  He absolutely obstructed and

9      resisted Sergeant Fogo.

10            So the last count here is the aggravated assault,

11     right?  The assault with infliction of serious injury.  The

12     elements there is that the defendant had to endanger

13     somebody, right?  And the evidence we have about him saying

14     I'll kill you and bouncing her head off the floor, uh,

15     knocking her teeth out, that's pretty good evidence that he

16     wanted her to be hurt.  Second, that he either did physically

17     touch her in a harmful or offensive way or make her fear

18     being touched in a harmful or offensive way, and that it

19     resulted in injury requiring immediate medical attention or

20     disfigurement, right?  And in this case, we kind of have

21     both.  She saw EMS on scene.  As soon as they cleared, she

22     found somebody to watch her dog and go with her to the

23     hospital.  She went to the hospital to the ER, got immediate

24     medical attention.  But, also, I think we recognize that

25     having somebody knock your teeth out is not the way we all

1    want to walk around looking, right?  This is a disfigurement

2    that is a result of his assault.  So all four elements of

3    aggravated assault are there as well.

4              Ladies and gentlemen, you have as much evidence as

5    you could have.  Now, Mr. Sizemore asked Officer Vallance,

6    did you send the broken screen phone for fingerprints, did

7    you, um, get her call records to see if he really tried to

8    call her 23 times.  Um, and the officer answered no, right?

9    I didn't, I didn't think it was going to be an important

10   piece of information at that point, so I, I didn't do that.

11   That's not to say that it's not something you can consider;

12   you certainly can.  You're the jury, that's your job to do.

13   But Officer Vallance told you when she shows up, she's

14   looking for information, she's investigating the tips and the

15   information she gets, and everything that she can see, just

16   like everything you could see, tells you that Heather Miner

17   was saying exactly what happened.  There is not a reason to

18   disbelieve her because there was nothing that conflicted with

19   what she had to say.

20             So all of the elements I've laid out for you in

21   this case, all of the photographs and the audio you get to

22   hear, they prove beyond a reasonable doubt that Gary Fischer

23   committed all four of these crimes.

24             Now, the judge is going to give you that

25   instruction, beyond a reasonable doubt, and that is a doubt

1    that is reasonable after a careful and just consideration of

2    the evidence.  It's a doubt that is not imaginary or

3    possible, but a rises o-, a reasonable doubt arises out of

4    the evidence or lack of evidence, right?  Now we can imagine

5    an infinite list of things that we could have done to get

6    more evidence.  We could have knocked on doors to see if

7    anybody woke up and remembered hearing anything.  We, we

8    could have tried to find surveillance video to see where he

9    went the night before or whatever, right?  You could have a

10   list of things that you would have also liked to have seen.

11   And that's not to say that Mr. Fischer shouldn't get the

12   benefit of that, that, that information.  The law says he's

13   presumed innocent until I prove he's guilty beyond a

14   reasonable doubt.  So you should evaluate that negatively

15   against my case.  I think that's fair.  What are you left

16   with then?  You're left with the evidence that you have that

17   clearly confirms he did commit this crime.  So I get to stand

18   in front of you and ask you to find him guilty because I'm

19   confident that I've supplied you with every bit of

20   information you need to make that decision.  So that's

21   exactly what I'm going to ask you to do.  Back in that jury

22   room, lay out all the photos, listen to the audio again, if

23   you have to, talk to each other, ask the questions that you

24   need to ask.  At the end of the day, your common sense should

25   tell you already, as you sit here having heard all the

1              evidence, he is so guilty of each of these offenses.

2                        THE COURT:  Mr. Sizemore, closing argument.

3                        MR. SIZEMORE:  I've spent a lot of time at the

4              beginning of trials talking about presumption of innocence; a

5              lot of time.  I've spent a lot of time during voir dire with

6              you talking about that.  And the judge, it's such an

7              important idea that you're read that instruction three times.

8              And the amount of lip service that gets paid to that, once

9              the trial actually starts, it's kind of striking because not

10             only are you allowed to critically examine her testimony and

11             all the testimony that you heard, it's your obligation to do

12             that.  And when there are holes in the testimony, things that

13             don't make sense or don't line up, it is your obligation to

14             examine that.  You're not only supposed to evaluate the

15             people's case based on the evidence that they present, but

16             also on the lack of evidence that they present.  And the

17             State will ask you to be comfortable and assume things that

18             they did not give you evidence on and they will say it over

19             and over again and they will tell you, oh, this is not a big

20             deal, just don't think about that.  And isn't Sizemore a

21             bully and wasn't he mean to Heather Miner yesterday when she

22             was not answering his questions.  And she did everything that

23             she could have done and I want you to feel sorry for her to

24             the point where he actually asked you to imagine being in her

25             position.  How would you feel if this were the case?  What's

1    the problem with that?  The problem with that is we not only

2    started with, but are left with something that I don't know

3    how reliable it actually is.  Because when you actually look

4    at the things that Mr. Taylor tells you to overlook, you have

5    questions.  Was there a fight that happened at that house

6    that night?  Yup.  I don't think there's any question about

7    that.  I've seen the picture.  I've seen the injuries to both

8    people.  I've seen it.  Ask yourself this, did Gary Fischer

9    go to that condo looking for a fight that night?  Ms. Miner

10   says yes.

11        What does the evidence say?  He went there after

12   having gone to retrieve her dog from her ex-boyfriend.  He

13   had been drinking.  She doesn't like it when he drinks.  He

14   got to the house, let himself in through a door that he has

15   let himself in, in the past.  Went in there and was getting

16   into bed.  He wasn't there riffling through her stuff, he

17   wasn't looking at her cell phone, he wasn't there to start a

18   fight, he didn't even try to wake her up.  He was getting

19   into bed.  Now, does that sound like somebody who she had

20   seen ten times, maybe, in the, what, three months prior?

21   Does that sound like a relationship where he has to break in

22   into that house because he doesn't have her permission?  Does

23   that make sense?  Why did he go there?  Her testimony is that

24   the first physical contact between the two of them is her

25   pushing him off her bed with her feet; not kicking him,

1          pushing him with her feet.  I laugh because if I stood in

2          front of a jury trying to explain when my client just pushed

3          someone with their feet, I can't imagine what the prosecutor

4          would say about that.  So she, I'm not claiming self defense,

5          Gary did not defend himself from her.  I'm not saying it was

6          unfair and he had to engage in this physical contact; not

7          what I'm saying.  But she was in for a dime, in for a dollar.

8          Did he break into that house to go there and assault her?

9          No.  Is there any evidence of that?  No.  Was there a fight

10         that happened after he went in there?  Yes.  Did he believe

11         he had permission to go in there?  Do you have any evidence

12         to the contrary?  Or are they asking you to assume that?

13         Because the constitution says the benefit of the doubt sits

14         at that table, not here.  You don't get to fill in blanks in

15         the favor of the State.  And you don't get to hide behind

16         circumstantial evidence when you really don't have any.  Are

17         the inconsistencies in Ms. Miner's testimony equally

18         important?  No.  Does it matter whether it was a can of grape

19         soda or cherry?  No.  I even said when I was asking the, the

20         Officer Vallance.  It's not that big of a deal, but it's

21         something I noticed.  Was that because Officer Vallance did a

22         bad job or is it because Heather Miner told her something

23         different?  I don't know.  We don't know that.  But it is

24         something that needed to be brought up.  Ms. Miner testified

25         that she was struck with a phone in the head, that she was

1    struck with fists, that she was pushed, that her head was

2    banged on the ground, that she was punched, such that a tooth

3    on the right side of her head was knocked out and that she

4    had bumps on the back of her head on the right side.  Those

5    of you who have been paying attention will notice that Mr.

6    Fischer has been taking notes with his right hand this entire

7    trial.

8              MR. TAYLOR:  Your Honor, I'm going to object --

9              MR. SIZEMORE:  He's --

10             MR. TAYLOR:  -- as to facts not in evidence.

11             THE COURT:  It's not in evidence.

12             MR. SIZEMORE:  The jury is entitled to notice

13   whatever they can notice in the courtroom.

14             MR. TAYLOR:  Your Honor, if it was part of the

15   record, he could argue it.  I'm not going to sit here and

16   fail to object to something that was never put into evidence

17   and then allow him to argue to the jury some inference --

18             MR. SIZEMORE:  Okay --

19             MR. TAYLOR:  -- I can't disprove.

20             THE COURT:  I'm going to sustain that objection.

21             MR. SIZEMORE:  In order for someone to be hurt on

22   the right side of their head, it follows that the person that

23   hit them, hit them with the left hand.  There's no evidence

24   that he did that.  There's no evidence that he ever possessed

25   her phone.  What evidence could they have gotten to give you

1        to show that he possessed her phone?  How about the phone?

2        Where's the phone?  They've got it.  I would like to see the

3        picture of the screen of that phone because she used that

4        phone to call 911.  We don't have a picture of the broken

5        phone.  We don't have the phone.  We don't have prints off

6        the phone.  We don't know who broke that phone or when it got

7        broke.  It very easily could have been broke when the officer

8        told her to drop it on the hard floor.  Does it make a

9        difference whether it's linoleum or tile?  Okay, it probably

10       does.  It's not carpet.  There's not padding under that

11       linoleum.  She dropped the phone on the floor.  Is that when

12       it broke?  We don't know.  What else don't we know?  We don't

13       have 23 phone calls.  We don't have any texts that she said

14       to you that she sent telling him not to come over.  Where are

15       they?  Who had the ability to give those to you, to show you

16       evidence, and didn't?  The State.  And they want you to hold

17       that against me and my client.  They don't want to take

18       accountability for that, but the constitution says that they

19       have to.

20            Here's something they don't want to talk about,

21       where were Mr. Fischer's car keys?  She wanted him to leave.

22       The keys were found inside the house.  How does he leave

23       without being able to get to his car, get to his wallet,

24       which was found locked in his car, and where was his cell

25       phone?  We didn't have any information about that.  All we

1    heard was 9 1/2 minutes of Mr. Fischer saying I will leave,

2    I'm leaving.  By the way, she was able to make the phone

3    call.  I didn't hear any attempts of him to stop her from

4    making that phone call.  I didn't hear him take the phone

5    from her.  I didn't hear him use any physical force to

6    prevent her from talking in that phone for almost ten

7    minutes.  In fact, what I heard, you might not know this,

8    when you call 911, it connects immediately.  It records

9    before they answer the phone.  You hit that second one, it's

10   recording.  That's what you heard on this tape.  You can

11   actually hear a ringtone at the beginning of the tape before

12   the operator says 911, what's your emergency, he sat and he

13   listened.  Mr. Fischer didn't know she was on the phone.  She

14   didn't know that she was connected and on the phone.  And did

15   you hear him trying to get the phone?  Did you hear him

16   telling her if you call 911, I'm going to get you, I'm going

17   to hurt you?  She said I'm calling the police.  He said fine,

18   call them.  That's the evidence you have.  The only words

19   that you heard him say at that scene at the beginning of this

20   phone call was call the cops, okay.

21          You hear Ms. Miner have two completely different

22   tones to her voice on that phone call, don't you?  You heard

23   her yelling at Gary.  You heard her threatening him.  You

24   heard her being aggressive and mean to him.  And then

25   alternating with hyperventilating, whispering, and crying

1      when she's on the phone talking to the 911 operator.  How do

2      you do that?  How do you make that switch that quickly?  Mr.

3      Taylor would suggest to you that that's just her natural

4      inclination at the time.  She was scared, she wanted help.  I

5      don't know that you could even do that, that you could be so

6      aggressive and yelling at someone in one second and then the

7      very next breath, turn it on and be that scared and

8      frightened.  She certainly wasn't a shrinking violet.  I

9      agree, I'm not, I'm not stupid and I'm not mean.  I

10     understand no one should feel unsafe in their own house, but

11     when your boyfriend is trying to crawl into bed and you start

12     kicking him, that's different than the situation that they're

13     trying to paint.

14             You have the inconsistency with the knife.  Now,

15     they are taking great measures to try to just gloss over

16     this.  But she told Officer Vallance she was being chased

17     with a knife.  She wasn't -- she didn't say I was being

18     chased and I had a knife.  She said she was chased with a

19     knife and they can color it anyway they want, they can try to

20     shade the edges of that one, well she said she was chased

21     with a knife.  The next day, when she was foggy and no one

22     bothered to ask her if she was under the influence of any

23     medication whatsoever, that's when she was asked again about

24     the knife and said no, no, I had a knife.  She didn't bring

25     that up, she didn't want to clear that up, it wasn't her idea

1    to go back and talk about that night; that was Officer

2    Vallance.  Incidentally, do we have any medical records?  Do

3    we know what went wrong with her?  I -- we don't.  We have

4    nothing.  I understand she had a tooth that was missing that

5    she says was because of this assault.  We don't know.  I

6    don't have any of that.  Who has access to that?  They do.

7    Wouldn't you like to have seen that?  That would have been

8    helpful.  It also would have told us what medication she was

9    prescribed that day.  We would have known how reliable her

10   statement was, what meds she had, because she got dental

11   surgery, she had pain meds.  So what was in her system?  We

12   don't know.  Why?  Because they didn't want to.  Not that

13   they couldn't, they didn't want to.  They want you to fill

14   those blanks in with guilty verdicts.

15          The light fixture, she said he threw a stool at the

16   light or he threw a bench at the light, that was her

17   testimony under oath.  It's not what she told Officer

18   Vallance.  She told Officer Vallance it was a purse, he threw

19   a purse, what was it?  There were no holes in the walls.

20   There was a gauge in the corner of one of the walls.  There's

21   no hole in the wall.  What they want to do is paint a picture

22   of him chucking furniture around this living room.  It looks

23   like there was a fight in those picture, but it was a fight.

24   That's all there is.  We don't have to be happy about it, we

25   don't have to excuse it, it's still wrong, but this was a

1   fight.  And by all the evidence that they've shown, it looks

2   like it was a pretty even fight.  They wanted to argue two

3   separate ways, Mr. Fischer was very intoxicated and we want

4   you jurors to hold that against him, we want you to, uh,

5   think, to assume, and to believe and vote that he was drunk

6   on his own accord and that he was there acting like a jerk

7   because he was drunk.  What they don't want you to think

8   about was how does alcohol affect your ability to make

9   decisions?  Was he drunk?  Did he, did he really know that

10   these were the police out front?  Should he have?  Yeah.

11   Okay.  He ran into a garbage can and fell down.  He was a

12   mess.  So they want you to, at one point, say he was so drunk

13   he was dangerous, but could that have affected his ability to

14   make decisions or perceive things?  Certainly could have.

15   They don't want to know that.  Incidentally, how drunk was

16   he?  We don't know.  Is there a way to determine how drunk

17   people are at any point in time?  Yup.  Who has control of

18   that?  The police.  Could they have given him a urine test,

19   blood test, or breath test?  Yes.  Would we have had some

20   idea then of how drunk he was?  Yes.  Is it admissible?  Yes.

21   So why don't we have it?  They don't want you to have it.

22        Ms. Miner testified she heard that door being broke

23   open.  That's not what she told the police.  She didn't know

24   how he got in the house.  She didn't know how he got in the

25   house until Officer Vallance suggested, well maybe it was the

1    front door, the one that's closed and broken off the hinges,

2    according to Office Vallance testimony.  People's evidence

3    doesn't reflect that.  The hinges all look in tact to me.

4    When she was asked about it, she said, well it was hanging by

5    a hinge, it was -- no, it wasn't.  The hinges were fine.  She

6    said that door was closed when she got there, that someone

7    opened it and took those pictures.  We don't even know.  Ask

8    yourselves, do you know that door was how Mr. Fischer got in

9    that house?  Or do they want you to assume that that's what

10   happened?  Do we know if that door was injured during the

11   fight?  Do we know if somebody else, a police officer, for

12   instance, might have broken that door?  Do we know if the

13   door was broken before this incident?  We don't really know

14   any of that.  The police can't tell you because they're

15   getting different stories.  So are they asking you to look at

16   the evidence and conclude that it happened or are they asking

17   you to make assumptions?

18         Ladies and gentlemen, this strikes me as a case

19   that the State would like to say is just so open and shut, we

20   just want, want to be done with it.  But they don't feel like

21   they want to give you all the evidence that I would insist

22   has to be given.  This feels like a case where they made

23   their minds up about Mr. Fischer a long time ago and because

24   they made their minds up and they were so sure about what

25   happened and about that he did it and he's a bad guy that

1     have just stopped.  They stopped.  That's what they want you

2     to do.  They want you to stop.  Yeah, okay, he's a bad guy,

3     you don't have to like him.  You don't have to bel-, you can,

4     you can believe in your heart that he did all these things.

5     But unless they prove it beyond a reasonable doubt, you

6     cannot vote guilty.  They have to prove it beyond a

7     reasonable doubt.  When you go back there to the jury room,

8     look at the evidence, listen to that tape, look at what

9     you've actually got.  Think about what they don't have, but

10    they're trying to tell you they do.  And then you come back

11    and you find him not guilty of home invasion.  You find him

12    not guilty of interfering with a call for help.  Thank you.

13                THE COURT:  Thank you.

14                MR. TAYLOR:  So, unfortunately because I have the

15    burden of proof, you have to hear from me one last time.

16                (indecipherable) how would you have known if my

17    laptop was broken, right?

18                So I have to, I get a chance to respond to the

19    things Mr. Sizemore just said to you because he gets to raise

20    points.  And the first one I want to address is the notion

21    that I want you to put yourself in Ms. Miner's shoes.  You

22    can't do that.  You cannot -- the reason we pick a jury who

23    doesn't know anything about the facts of the case is that you

24    have to be objective, right?  So when I say think about the

25    situation she was in or imagine this scenario, you cannot

1      live that out through your own life.  I'm asking you to

2      evaluate the reasonableness of decision making using your own

3      common sense and common experience.  So, please, do not

4      assume that I'm asking you to wonder if this crime had

5      happened to you, how would you feel.  That's not the case;

6      please don't do that.

7            The judge is going to give you a list of

8      instructions as soon as I'm done talking and they're very

9      long and they're all equally important.  But the ones that

10     are the most pressing to me at this moment are the elements

11     instructions for the tri-, the c-, the charges that are

12     alleged.  And the reason why I'm going to draw your attention

13     to some of those is because some of the things Mr. Sizemore

14     pointed out to you that you should question are things that

15     the elements don't call for.  For instance, he, uh, raised

16     the question to you, any evidence that Mr. Fischer went there

17     looking for a fight, that he went to Ms. Miner's home with

18     the intent to have a fight and I don't think there was any

19     evidence of that.  I don't think there was anyone that got on

20     the stand and testified or any bit of evidence that somebody

21     said he went into that house to fight.  No one said that,

22     right?

23           The elements of home invasion first degree: first,

24     the defendant entered a dwelling without permission.  Doesn't

25     matter why, right, just that he did.  He went in and she

1    didn't give him permission.  And I want to point out

2    something to you, take their knowledge of one another out of

3    it.  If he was a newspaper delivery boy, would she have to

4    affirmatively say don't come in my house or would that person

5    know you don't get to come into somebody's house unless they

6    invite you inside, right?  It's affirmative.  You have to

7    tell them they can come in.  They don't just get to choose to

8    do it.

9         Second, that when the defendant entered, was

10    present and or was leaving the dwelling, he committed the

11    offense of assault.  An assault is an attempt to commit a

12    battery or an act that would cause a reasonable person to

13    fear or apprehend an immediate battery.  A battery is the

14    forceful, violent, or offensive touching of the person or

15    something closely connected with a person.  He doesn't have

16    to go there wanting to fight.  He has to make an entry into

17    her home without permission and assault her when he's inside.

18    Those are the elements.

19         And third, that another person was lawfully

20    present, right?

21         So it doesn't matter if he went over there under

22    the best in intentions.  When he got inside her house and she

23    said you're not allowed to be here, you got to leave, any

24    physical force used against her at that point is a home

25    invasion.  These are the elements that you use in deciding

1    whether or not he's guilty.  Those are the questions you

2    answer.

3           But, I will point out something else, the judge is

4    going to tell you what evidence is.  Evidence are these

5    things, right, the photos that were taken the night of the

6    incident, the audio that we played for you.  Evidence is also

7    when someone sits in this chair, promises to tell the truth

8    to you under penalty of perjury, that's evidence, right?

9    What they swear to tell the truth happened, that's the

10   evidence, right?  So you do have some evidence that the

11   defendant knew he wasn't allowed in at the home, right?  Ms.

12   Miner said he's never been allowed in my house without me

13   inviting him and when he's come over uninvited, I forced him

14   to leave by telling him you can't be here, you have to go,

15   right?  That's evidence.  That's evidence that he should know

16   he's not allowed to go in there unless somebody says you can

17   go in, which I think is also, kind of, how we all behave, but

18   it's not as though there was some question about whether he

19   could come and go as he pleased or that he had a key to the

20   house.  She said he's never been in my house unless I said

21   yes.

22          Here's another little, um, the defendant is right

23   handed was what Mr. Sizemore said.  And we didn't get to s-,

24   hear any testimony about that.  But the contention is what

25   I'll raise to you, he says she had injuries to the right side

1    of her head, right?  And when I was standing face to face

2    with somebody else, the right side of my head is aligned with

3    their left hand, right?  So if she has injuries to the left

4    side of her head, somebody must have hit her with the left

5    hand, right?  That was Mr. Sizemore's contention.  Because if

6    Sergeant Fogo hit me with his left hand, it would land over

7    here.  Except, if you recall Heather Miner said she was on

8    her back on the ground and had her head to the side and the

9    defendant was slamming her head on the ground, right?  So if

10   somebody's head is turned sideways and you have an open

11   canvas here, any punch you throw lands on that side of their

12   face.  That doesn't require a doctor to say, right?  You

13   could just turn your head and figure that out yourself.  So

14   that's, that notion that somehow if she was telling the truth

15   about how he hit her, that they would be in some other

16   location, I guess it's a distraction from the fact that it

17   doesn't matter where he injured her, it only matters that he

18   was in her home punching her.

19           Another elements issue, count two, interfering with

20   a crime report.  The defendant is charged with interfering

21   with a crime report.  First, the defendant unlawfully used

22   physical force against another person.  Second, that when the

23   defendant used the force, it was to prevent or attempt to

24   prevent another person from reporting a crime.  Third, the

25   violation involved committing or attempting to commit the

87

1    crime of home invasion first degree.  Those are the elements.

2    Those are the only questions you answer as it pertains to

3    that count.  So the question about when did the phone get

4    broken.  Was it so damaged when they were fighting over it

5    that she couldn't have made a 911 call?  Well, she was on the

6    phone with 911, so probably not; probably still worked well

7    enough.  Did it get more broken or did it get broken when it

8    hit the floor in the hallway when the officer told her to

9    drop the knife?  What element is the phone was broken?  It

10   isn't one, right?  You don't have to break someone's phone to

11   commit this crime; you just have to try to prevent them from

12   calling the police by using physical force, right?  Mr.

13   Sizemore said that on the 911 call, you didn't hear him

14   trying to stop her from calling the police.  Now, you

15   remember Heather's testimony, right?  She got the phone back

16   from him outside by promising she wasn't going to tell the

17   police and then she went back inside her house.  So by the

18   time you hear her make the 911 call, the fight is already

19   pretty much over.  Then he chases her for a little bit while

20   she has the knife; you can kind of hear that going on if

21   you're listening to the call.  But at the end of the day, he

22   doesn't get to try to stop her from calling the police for

23   any reason, but especially, nonetheless, because he's

24   committed a crime against her.

25            There was this notion that because his keys were

1       inside the house that he couldn't leave until he found his

2       keys.  Somebody goes into a house, they don't have any

3       business being in to begin with, leaving something behind

4       certainly isn't a legal excuse to stay there, right?  You

5       don't get to kick somebody's door in because you forgot your

6       keys the first time you broke into their house.  That's

7       ridiculous.  So what am I supposed to do, leave my keys here?

8       Yeah, you sure are, right?  You've got to get out right now.

9            So, again, what element is I forgot my keys?  It's

10      not.  He didn't have any permission to be there, he didn't

11      have any permission to stay there, and he assaulted her.  I,

12      I was not shocked when Mr. Sizemore said, oh, but listen to

13      the 911 call, she's got two different tones to the people

14      she's talking to.  She was exchanging punches with one of

15      those people, so yeah.

16           I didn't want to use this analogy because I think

17      it somewhat demeans Ms. Miner, who is already kind of been

18      through a lot in this scenario, but when I saw the facts of

19      this case and heard the 911 call, I thought like a wounded

20      animal; you're trying, you're desperately trying to defend

21      yourself, but you're seriously hurt.  She is doing everything

22      she can do to ward off Gary Fischer from re-engaging in that

23      attack.  And at the same time, every time she gets a respite

24      where he's not standing in front of her, she turns and

25      whispers into the phone please help, please help, please

1    help. That's not someone who's being deceitful and you can

2    hear the sound of her voice. If there were no other

3    evidence, if there was no sign of struggle, if the, her place

4    wasn't trashed and the door wasn't knocked in, maybe you

5    could buy for a second that that was an act, that she was

6    somehow being super dramatic and just, just really playing

7    the part. But you can't look at this, these injuries, the

8    scene inside of her, her home, and think she wasn't really

9    afraid.

10         What element of any of the crimes alleged requires

11    me to prove that Gary Fischer was a certain amount of

12    intoxicated? None of them do, right? It might explain why

13    he was making some bad decisions, but every witness that

14    testified said he was coherent and he engaged in a

15    conversation. Now, Mr. Sizemore pointed that out in

16    reference, I think, especially to count three, which was the

17    resisting, obstructing a police officer. And, again, you

18    notice the theme to my rebuttal, it's that I'm taking you

19    back to the elements, to the, to the crimes that the judge is

20    going to ask you to decide whether or not they happened. And

21    for resisting and obstructing a police officer, as you'll see

22    that the judge gives you the elements, they are, that the

23    defendant knew or had reason to know was a police officer

24    performing his lawful duties. Knew or had reason to know.

25    I, I, short of the defendant telling the police I know you're

1    a police officer, I have really no way to show you that he

2    definitely knew that it was a police officer.  But that or

3    had reason to know is where you get to use your common sense

4    and judgment.  The statements that Ms. Miner made to him

5    before he left that apartment, the statements that the police

6    made to him on scene, his evasion of that officer.  Do you

7    think he had reason to know he encountered a police officer?

8    Yeah, right?  So if he was a little intoxicated or a lot

9    intoxicated, objectively, he had reason to know he was

10   encountering a police officer.  And you're not going to hear

11   the judge tell you that getting drunk is a defense to home

12   invasion or to interfering with a crime report or to

13   resisting and obstructing a police officer or aggravated

14   assault.  You don't get to say, oops, I was really drunk,

15   don't hold it against me.  That's not how the law works.  So

16   to the end that he may have been intoxicated, it might help

17   you understand the evidence, but it is not an element of the

18   crime.

19          So, ladies and gentlemen, there it is.  You don't

20   have any more evidence than when I first started talking, but

21   hopefully through hearing our argument, you understand the

22   points of law that you're supposed to go back there and

23   compare the facts to.  Listen carefully to the judge's

24   instructions and apply that law when you look at the evidence

25   in the back.  Mr. Sizemore was right about one thing, I think

 1      that you have enough evidence to make this decision.  I think

 2      you have enough evidence that when you walk out of that jury

 3      room after you've deliberated, you will have a firm

 4      conviction the defendant is guilty of all four offenses.  You

 5      will not leave this courthouse with any doubt in your mind

 6      you made the right call.  So, ladies and gentlemen, please be

 7      very critical of the evidence, be very critical of the

 8      testimony, apply the law exactly, and I'm confident that

 9      after all that, I will still have convinced you beyond a

10      reasonable doubt that he is guilty.

11              THE COURT:  All right, thank you, Mr. Taylor.  Um,

12      ladies and gentlemen, I think I'm going to send you to an

13      early lunch.  I do, I am going to make 14 copies of the jury

14      instructions, so you'll have them with you when you go back

15      to the jury room for deliberations.  So don't discuss the

16      case.  Again, you haven't been sent out for deliberations as

17      of yet, so, um, please, um, don't discuss it, okay?  We're

18      right to that, to that point, I don't want to have a

19      mistrial, okay?  And, um, when you get back, we'll be ready

20      with the 14 copies, one for each of you to go over the

21      instructions, and I will read the instructions to you, but

22      you'll be able to take those instructions back with you to

23      the jury room and sometimes that's helpful as well to be able

24      to read them, okay?  All right, thank you very much.  And

25      when you come back, meet in the jury assembly room, okay?

```
 1              Thank you.
 2                      UNIDENTIFIED SPEAKER:  What time?
 3                      THE COURT:  Um --
 4                      THE BAILIFF:  All rise for the jury.
 5                      THE COURT:  -- come back in about an hour, okay?
 6                      MR. TAYLOR:  So, 12:30?
 7                      THE COURT:  Yes, that'd be fine, 12:30-ish.  That'd
 8              be great.  Thank you.
 9                      (At 11:35 a.m., jury taken out)
10                      THE COURT:  -- need to be on the record that, as
11              far as the jury instructions, you're satisfied with the jury
12              instructions as to be read?
13                      MR. SIZEMORE:  Yes, Your Honor.
14                      THE COURT:  And --
15                      MR. TAYLOR:  You have a printed copy?
16                      MR. SIZEMORE:  As long as that's the, what you're
17              holding is the same copy that I had earlier, that's fine.
18                      THE COURT:  Yes, I have the copy and I'm going to
19              make 14 copes.  And, again, the verdict form will be at the
20              end.
21                      MR. TAYLOR:  Did you get a chance to --
22                      THE COURT:  And I will also give them that as well.
23              Okay?
24                      MR. SIZEMORE:  Thank you, Your Honor.
25                      THE COURT:  Go to lunch.
```

```
 1                    MR. TAYLOR:  Thank you.

 2                    MR. SIZEMORE:  Thank you.

 3                    THE COURT:  Enjoy lunch.

 4                    MR. TAYLOR:  So, Your Honor, um, uh, one question I

 5          had for the Court is I know that, um, we have the photocopies

 6          and the audio disc, one think my office has is a sanitized

 7          laptop, it doesn't have any software or files on it, but I

 8          could put a digital copy of the photos and the 911 calls so

 9          that they don't have to come back out if they want to review

10          portions of the 911 call.  Would counsel and the Court prefer

11          that or do you want them to come back out and try to play it

12          over the speakers?  It's just been such a debacle the whole

13          time.

14                    THE COURT:  It's, it's been frustrating.  Um --

15                    MR. TAYLOR:  And I can, I can bring a set of

16          headphones too so they can listen more clearly if they want.

17                    THE COURT:  Mr. Sizemore?

18                    MR. SIZEMORE:  I, I am familiar with their wiped

19          laptop and I'm fine with the jury having that in the jury

20          room --

21                    MR. TAYLOR:  Okay.

22                    MR. SIZEMORE:  -- and being able to play with --

23                    MR. TAYLOR:  I'll show him what's on it before we

24          send it back --

25                    THE COURT:  All right.
```

1            MR. TAYLOR:  -- but I think that might make it

2      easier.

3            THE COURT:  That would be appreciated.  All right,

4      thank you.

5            (At 11:37 a.m., Court recessed)

6            (At 12:45 a.m., Court reconvened)

7            MR. TAYLOR:  We are, Your Honor.

8            MR. SIZEMORE:  Yes, Your Honor.

9            THE COURT:  Again, this is Gary Fischer, file 18-

10     25329-FH.  And are you ready for the jury for the final

11     instructions?

12           MR. TAYLOR:  We are, Your Honor.

13           MR. SIZEMORE:  Ready, Your Honor.

14           THE COURT:  Okay.  And I don't know if they still

15     do this, but the theory of the case is being argued by both

16     counsel, correct?

17           MR. TAYLOR:  I'm sorry?

18           THE COURT:  We used to have a theory of the case;

19     did you know about that?

20           MR. SIZEMORE:  Yeah, we -- I didn't like that at

21     all.

22           THE COURT:  I know, but you argue it in --

23           MR. SIZEMORE:  We've argued our theories.

24           THE COURT:  -- your closing argument.

25           MR. SIZEMORE:  Yeah.

1              THE COURT:  Do you remember that, Mike?

2              MR. TAYLOR:  Uh, that was before my time.

3              THE BAILIFF:  All rise for the jury.

4              (At 12:46 a.m., jury brought in)

5              MR. TAYLOR:  I've only tried cases in the modern

6       era of jury instructions and questions and all of that.  So…

7              THE COURT:  Yeah.  And the jury reform.  You guys

8       are a mess coming in.

9              UNIDENTIFIED SPEAKER:  Big lunch.

10              THE COURT:  People having to squeeze over.  You may

11       be seated.  Good afternoon, ladies and gentlemen.  Thank you

12       for being prompt after lunch.  I hope you had a good lunch.

13       These are your final instructions, so this is the last part

14       of the, uh, of the trial.

15              I, we have given you copies of the written

16       instructions.  I would, um, some people learn by, by reading,

17       and some people learn by listening.  You can do either, okay?

18       You don't have to read along with me, but if you'd like to,

19       you're welcome to.  But you have these instructions to take

20       back with you to the jury room, okay?

21              Um, this is called jury, or part of jury reform.

22       And the Supreme Court made some changes where the jury gets

23       to ask questions; that was never allowed before.  And so that

24       was one of the changes that they made.  They also made the

25       changes of, you know, sending back jury instructions.  It's

1    always good to have the elements of the crime and things like

2    that, so you can follow along.  Okay?

3         I'm going to start with, it says 3.1.  Members of

4    the jury, the evidence the evidence and arguments in this

5    case are finished, and I will now instruct you on the law.

6    That is, I will explain the law that applies to this case.

7    Remember that you have taken an oath to return a true and

8    just verdict, based only on the evidence and my instructions

9    on the law.  You must not let sympathy or prejudice influence

10   your decision.

11        As jurors, you must decide what the facts of this

12   case are.  This is your job, and nobody else's.  You must

13   think about all the evidence and then decide what each piece

14   of evidence means and how important you think it is.  This

15   includes whether you believe what each of the witnesses said.

16   What you decide about any fact in this case is final.

17        It is my duty to instruct you on the law.  You must

18   take the law as I give it to you.  If a lawyer says something

19   different about the law, follow what I say.  At various

20   times, I have already given you some instructions about the

21   law.  You must take all my instructions together as the law

22   you are to follow.  You should not pay attention to some

23   instructions and ignore others.  To sum up, it is your job to

24   decide what the facts of this case are, to apply the law as I

25   give it to you, and, in that way, to decide the case.

1          A person accused of a crime is presumed to be

2     innocent.  This means that you must start with the

3     presumption that the defendant is innocent.  This presumption

4     continues throughout the trial and entitles the defendant to

5     a verdict of not guilty unless you are satisfied beyond a

6     reasonable doubt that he is guilty.

7          Every crime is made up of parts called elements.

8     The prosecutor must prove each element of the crime beyond a

9     reasonable doubt.  The defendant is not required to prove his

10    innocence or to do anything.  If you find that the prosecutor

11    has not proven every element beyond a reasonable doubt, then

12    you must find the defendant not guilty.

13         A reasonable doubt, and this is very important

14    because this is the definition, a reasonable doubt is a fair,

15    honest doubt growing out of the evidence or lack of evidence.

16    It is not merely an imaginary or possible doubt, but a doubt

17    based on reason and common sense.  A reasonable doubt is just

18    that: a doubt that is reasonable, after a careful and

19    considered examination of the facts and circumstances of this

20    case.

21         When you discuss the case and decide on your

22    verdict, you may only consider the evidence that has been

23    properly admitted in this case.  Therefore, it is important

24    for you to understand what is evidence and what is not

25    evidence.  Evidence includes only the sworn testimony of

1    witnesses, the exhibits admitted into evidence, and anything

2    else I told you to consider as evidence.

3    Many things are not evidence, and you must be

4    careful not to consider them as such.  I will now describe

5    some of the things that are not evidence.  The fact that the

6    defendant is charged with a crime and is on trial is not

7    evidence.  Likewise, the fact that he is charged with more

8    than one crime is not evidence.  The lawyers' statements and

9    arguments and any commentary are not evidence.  They are only

10   meant to help you understand the evidence and each side's

11   legal theories.  You should only accept things the lawyers

12   say that are supported by the evidence or by your own common

13   sense and general knowledge.  The lawyers' questions to the

14   witnesses, your questions to the witnesses, and my questions,

15   and I didn't have any questions, to the witnesses are also

16   not evidence.  You should consider these questions only as

17   they give meaning to the witnesses' answers.

18   My comments, rulings, questions, summary of the

19   evidence, and instructions are also not evidence.  It is my

20   duty to see that the trial is conducted according to the law

21   and to tell you the law that applies to this case.  However,

22   when I make a comment or give an instruction, I am not trying

23   to influence your vote or express a personal opinion about

24   the case.  If you believe that I have an opinion about how

25   you should decide this case, you must not pay any attention

1   to that opinion.  You are the only judges of the facts and

2   you should decide this case from the evidence.

3            At times during the trial, I have excluded evidence

4   that was offered or stricken testimony that was heard.  And I

5   don't think that happened in this case, but do not consider

6   those things in deciding the case.  Make your decision only

7   on the evidence that I let in, and nothing else.  Your

8   decision should be based on all the evidence, regardless of

9   which party produced it.

10            You should use your own common sense and general

11   knowledge in weighing and judging the evidence, but you

12   should not use any personal knowledge you may have about a

13   place, person, or event.  To repeat once more, you must

14   decide this case based only on the evidence admitted during

15   the trial.

16            As I said before, it is your job to decide what the

17   facts of this case are.  You must decide which witnesses you

18   believe and how important you think their testimony is.  You

19   do not have to accept or reject everything a witness said.

20   You are free to believe all, none, or part of any person's

21   testimony.  In deciding which testimony you believe, you

22   should rely on your own common sense and everyday experience.

23   However, in deciding whether you believe a witness'

24   testimony, you must set aside any bias or prejudice you may

25   have based on the race, gender, or national origin of the

1       witness.

2               And if you think that I've said these before, these

3       instructions, this part, before, I have.  In the beginning, I

4       gave you these instructions.  There is no fixed set of rules

5       for judging whether you believe a witness, but it may help

6       you to think about these questions.  Was the witness able to

7       see or hear clearly?  How long was the witness watching or

8       listening?  Was anything else going on that might have

9       distracted the witness?  Did the witness seem to have a good

10      memory?  How did the witness look and act while testifying?

11      Did the witness seem to be making an honest effort to tell

12      the truth or did the witness seem to evade the questions or

13      argue with the lawyers?  Does a witness' age and maturity

14      affect how you judge his or her testimony?  Does the witness

15      have any bias, prejudice, or personal interest in how this

16      case is decided?  Have there been any promises, threats,

17      suggestions, or other influences that affected how the

18      witness testified?  In general, does the witness have any

19      special reason to tell the truth or any special reason to

20      lie?  All in all, how reasonable does the witness' testimony

21      seem when you think about all the other evidence in the case?

22              Sometimes, the testimony of different witnesses

23      will not agree and you must decide which testimony you

24      accept.  You should think about whether the disagreement

25      involves something important or not and whether you think

1    someone is lying or simply mistaken.  People see and hear

2    things differently and witnesses may testify honestly, but

3    simply be wrong about what they thought they saw or

4    remembered.  It is also a good idea to think about which

5    testimony agrees best with the other evidence in the case.

6    However, you may conclude that a witness deliberately lied

7    about something that is important to how you decide the case.

8    If so, you may choose not to accept anything that witness

9    said.  On the other hand, if you think that the witness lied

10   about some things but told the truth about others, you may

11   simply accept the part you think is true and ignore the rest.

12        The prosecution has introduced evidence of a

13   statement that it claims the defendant made.  Before you

14   consider such an out-of-court statement against the

15   defendant, you must first find that the defendant actually

16   made the statement as given to you.  If you find that the

17   defendant did make the statement, you may give the statement

18   whatever weight you think it deserves.  In deciding this, you

19   should think about how and when the statement was made and

20   about all the other evidence in the case.  You may consider

21   the statement in deciding the facts of the case.

22        Every defendant has the absolute right not to

23   testify.  When you decide this case, you must not consider

24   the fact that he did not testify.  It must not affect your

25   verdict in any way.

1          Facts can be proved by direct evidence from a

2    witness or an exhibit.  Direct evidence is evidence about

3    what we actually see or hear.  For example, if you look

4    outside and see, in this case, snow falling, that is direct

5    evidence that it is snowing.  Facts can also be proved by

6    indirect, or circumstantial evidence.  Circumstantial

7    evidence is evidence that normally or reasonably leads to

8    other facts.  So, for example, if you see a person come in

9    from outside wearing a raincoat covered with small drops of

10   water, that would be circumstantial evidence that it is

11   raining or snowing.  You may consider circumstantial

12   evidence.  Circumstantial evidence by itself or a combination

13   of circumstantial evidence and direct evidence can be used to

14   prove the elements of a crime.  In other words, you should

15   consider all the evidence that you believe.

16          You should not decide the case based on which side

17   presented more witnesses.  Instead, you should think about

18   each witness and each piece of evidence and whether you

19   believe them.  Then, you must decide whether the testimony

20   and evidence you believe proves beyond a reasonable doubt

21   that the defendant is guilty.

22          You have heard testimony from a witness who is a

23   police officer.  That testimony is to be judged by the same

24   standards you used to evaluate the testimony of any other

25   witness.

1          If you believe that a witness previously made a

2     statement inconsistent with his or her testimony at this

3     trial, the only purpose for which that earlier statement can

4     be considered by you is in deciding whether the witness

5     testified truthfully in court.  The earlier statement is not

6     evidence that the d-, that what the d-, excuse me, the

7     earlier statement is not evidence that what the witness said

8     earlier is true.

9          Home invasion first degree, entering without

10    permission.  The defendant is charged with home invasion in

11    the first degree.  To prove this charge, the prosecutor must

12    prove each of the following elements beyond a reasonable

13    doubt.

14         First, that the defendant entered a dwelling

15    without permission.  It does not matter whether the defendant

16    got his entire body inside.  If the defendant put any part of

17    his body into the dwelling without permission, that is enough

18    to count as an entry.

19         Second, that when the defendant entered, was

20    present in, or was leaving the dwelling, he committed the

21    offense of assault.  An assault is an attempt to commit a

22    battery or an act that would cause a reasonable person to

23    fear or apprehend immediate battery.  A battery is a

24    forceful, violent, or offensive touching of the person or

25    something closely connected with the person of another.

1              Third, that when the defendant entered, was present

2       in, or was leaving the dwelling, another person was lawfully

3       present in the dwelling.

4              Interfering with a crime report, committing the

5       crime.  The defendant is charged with interfering with a

6       crime report, committing crime.  To prove this charge, the

7       prosecutor must prove each of the following elements beyond a

8       reasonable doubt.

9              First, that the defendant unlawfully used physical

10      force against another person.

11             Second, when the defendant used the force, it was

12      to prevent or attempt to prevent another person from

13      reporting a crime.

14             Third, the violation involved committing or

15      attempting to commit the crime of home invasion first degree.

16             Count three, police officer, assaulting, resisting,

17      obstructing.  The defendant is charged with the crime of

18      assaulting, battering, wounding, resisting, obstructing,

19      opposing, or endangering a police officer who is performing

20      his duties.  To prove this charge, the prosecutor must prove

21      each of the following elements beyond a reasonable doubt.

22             First, that the defendant assaulted, battered,

23      wounded, resisted or obstructed, opposed, or endangered

24      Sergeant David Fogo, who is a police officer.  Obstruct

25      includes the use or threat, use or threatened use of physical

1    interference or force or a knowing failure to comply with a

2    lawful command.

3         Second, that the defendant knew or had reason to

4    know that Sergeant David Fogo was a police officer performing

5    his duties at the time.

6         Third, that Sergeant David Fogo gave the defendant

7    a lawful command, making, was making a lawful arrest, or was

8    otherwise performing a lawful act.

9         An arrest is legal if it's made by an officer who

10   had reasonable cause to believe that a crime was committed by

11   the defendant.  Reasonable cause means having enough

12   information to lead an ordinary, careful person to believe

13   that the defendant had committed a crime.  It is not

14   necessary for you to find the defendant guilty of that crime

15   in order to find that the arrest is legal.  In determining

16   whether an officer had probable cause to believe the

17   defendant committed a crime, you should consider all

18   information known to the police officers or law enforcement

19   personnel involved in the case.  It is not necessary that the

20   arresting officer had probable cause based on his own

21   knowledge if law enforcement personnel collectively have

22   probable cause to believe that a crime was committed by the

23   defendant.  You are only required to find that the police had

24   probable cause to find that the arrest is legal.

25         A police officer has the legal authority to give

1          verbal commands to a defendant when he has probable cause to

2          believe the defendant has committed a crime when, or when he

3          is attempting to legally arrest a defendant.  The prosecutor

4          must prove beyond a reasonable doubt that the arrest was

5          legal or that each of the officers were within their legal

6          authority.  It is up to you to decide whether each officer's

7          actions were legal, according to the law as I've just

8          described it to you.

9                The defendant is charged with the crime of assault,

10         an infliction of serious injury.  To prove this charge, the

11         prosecutor must prove each of the following elements beyond a

12         reasonable doubt.

13               First, that the defendant tried to physically

14         injure another person.

15               Second, that the defendant intended to injure

16         Heather Miner or intended to make Heather Miner reasonable

17         fear an immediate battery.

18               Third, that the assault caused a serious or

19         aggravated injury.  A serious or aggravated injury is a

20         physical injury that requires immediate medical treatment or

21         that causes disfigurement, impairment of health, or

22         impairment of part of the body.

23               The prosecutor must also prove beyond a reasonable

24         doubt that the crime occurred on or about September 18, 2018

25         within Livingston County.

1          When you go to the jury room, you will be provided

2     with the written copy of the final jury instructions, you

3     already have them.  You should first choose a foreperson.

4     The foreperson should see to it that your discussions are

5     carried on in a business-like way and that everyone has a

6     fair chance to be heard.  During your deliberations, please

7     turn off your cell phones, you don't have cell phones, or

8     other communications equipment until we recess.

9          A verdict in a criminal case must be unanimous.  In

10    order to return a verdict, it is necessary that each of you

11    agrees on that verdict.  In the jury room, you will discuss

12    the case among yourselves, but ultimately each of you will

13    have to make up your own mind.  Any verdict must represent

14    the individual considered judgment of each juror.  It is your

15    duty as jurors to talk to each other and make every

16    reasonable effort to reach agreement.  Express your opinions

17    and the reasons for them, but keep an open mind as you listen

18    to your fellow jurors, rethink your opinions, and do not

19    hesitate to change your mind if you decide you are wrong.

20    Try your best to work out your differences.  However,

21    although you should try to reach agreement, none of you

22    should give up your honest opinion about the case just

23    because other jurors disagree with you or just for the sake

24    of reaching a verdict.  In the end, your voice, vote must be

25    your own and you must vote honestly and in good conscience.

1      If you have any questions about the jury instructions before

2      you begin deliberations or questions at the, about the

3      instructions that arise during deliberations, you may submit

4      them in writing in a sealed envelope to the bailiff.  There

5      should be envelopes in the jury room and, um, you can write

6      it down on a piece of paper and give it to the bailiff.

7              Possible penalty should not influence your

8      decision.  It is the duty of the judge to fix the penalty

9      within the limits provided by law.

10             If you want to communicate with me while you are in

11     the jury room, please have your foreperson write a note and

12     give it to the bailiff.  It is not proper for you to talk

13     directly with the judge, lawyers, court officers, or any

14     other people involved in the case.  As you discuss the case,

15     you must not let anyone, even me, know how your voting

16     stands.  Therefore, until you return with a unanimous

17     verdict, do not reveal this to anyone outside the jury room.

18             When you go to the jury room to deliberate, you may

19     take notes, your notes, and full instructions.  If you want

20     to look at any or all of the exhibits that have been

21     admitted, just ask for them.

22             I send in all the photographs -- I will be sending

23     in all of the photographs.  Um, what have we decided about

24     the computer?

25             MR. TAYLOR:  So, Your Honor, we have a clean laptop

1     that Mr. Sizemore have both looked at.  There's no other

2     files or anything on it, but the software the computer comes

3     with.  We have a, uh, I've labeled this special exhibit

4     number 23.  It's a photocopy, PDF, of all the photos, and an

5     audio file of the 911 call.  So I, I guess we would

6     stipulate, for appellate purposes, to have this admitted in

7     the record as a special exhibit for the jury to consider.

8     So, um, is that true?

9              THE COURT:  Is that true?

10            MR. SIZEMORE:  Yes.

11            MR. TAYLOR:  So, uh, I have a laptop bag with a

12     charge, a laptop, this USB drive with those two items on it,

13     and a set of headphones that I would ask to send back with

14     the jury.  They may not be surprised to find this out, given

15     the state of our IT in this case, but the laptop charger port

16     here is a little bad, so, uh, it won't run on a battery; it

17     has to be plugged in.

18            THE COURT:  Okay.  So they need to plug it in and

19     then you have a, um, what is that called?  The thing that you

20     put into the computer.

21            MR. TAYLOR:  It's a, I would call it a USB drive or

22     a thumb drive.

23            THE COURT:  The USB drive to put into the computer.

24     If you guys need help, let us know, okay?

25            When you go the jury room, you will be given a

1      written -- I already said that.

2              The defendant is charged with four counts, that is

3      with four crimes.  These are separate crimes and the

4      prosecutor is charging the defendant committed each of them.

5      You must consider each crime separately in light of all the

6      evidence in the case.  You may find the defendant guilty of

7      all or any one or a combination of these crimes or not

8      guilty.

9              I have prepared a verdict from the listing of

10     possible verdicts.  And I don't have a verdict form.  Here's

11     one.  You should all have a verdict form in your packet.  And

12     I give them to everyone; only one person has to fill it out

13     and that's the foreperson.  But I want you all to see what a

14     verdict form looks like and what, what they're looking at.

15     So as to count one, home invasion first degree, check only

16     one of the following verdicts: not guilty or guilty of home

17     invasion first degree.  Count two, um, interfering with a

18     crime report, committing a crime: not guilty or guilty of

19     interfering with a crime report, committing a crime.  Count

20     three, resisting obstructing a police officer, not guilty or

21     guilty of a police officer, assaulting, resisting,

22     obstructing.  And count four, assault and infliction of

23     serious injury, aggravated assault.  Check only one of the

24     following verdicts: not guilty or guilty of assault and

25     infliction of serious injury, aggravated assault.  And the

1        foreperson, it's kind of cut off here, but the foreperson

2        should sign the document, put their juror number, and date

3        it, okay?  But only the foreperson has to do that.  I just

4        give it to all of you so you know what the jury form looks

5        like, okay?

6                MR. TAYLOR:  Your Honor, does the Court want to

7        send back a copy of the verdict form where the bottom is

8        clean?

9                THE COURT:  If you have one, that'd be great.

10               MR. TAYLOR:  Yeah, okay.  So, Your Honor, I have

11       the exhibits, the verdict form, and the laptop bag.  Can I

12       turn that to the bailiff?

13               THE COURT:  Yes, please.  Now, the bailiff will be

14       sitting right outside the jury room and if you need or want

15       something, you're going to knock on the jury room or ring the

16       bell.  There's a thing that looks like a doorbell; I believe

17       that's beside the door, and you can ring that bell and the,

18       someone will answer you.  Um, we should pick off the two

19       jurors.  Some people are happy about this part and some

20       people are sad.  Um, but we're going to take off two of the

21       jurors at this time.  And I thank you for your service.

22               COURT CLERK:  The court would like to thank and

23       excuse juror number 14 in seat number 12.

24               (At 1:11 p.m., juror 14 excused)

25               THE COURT:  You can leave your things there; we'll

1    make sure that they're shredded as soon as, um, the jury

2    reaches a verdict.

3              MR. TAYLOR:  And, Your Honor, just because of the

4    nature of the, this case, I would ask that the Court instruct

5    that the alternate jurors to not discuss the case with anyone

6    and that the Court retains their notes in case, for whatever

7    reason, somebody else gets sick and we need to call somebody

8    back.

9              THE COURT:  Okay.  And then the second alternate?

10             COURT CLERK:  The court would like to also thank

11   and excuse juror number 9 in seat number 13.

12             (At 1:12 p.m., juror 9 excused)

13             THE COURT:  I'd like to thank you for your service.

14   And, again, we'll leave your notes and keep your notes in

15   case we have to call you back if something happened to

16   someone during deliberations that we could call you back.

17   So, ladies and gentlemen, you are the jury.  And all I have

18   to do is give the bailiff an oath and then you'll be ready.

19   Are they out of the jury room?

20             THE BAILIFF:  I'm going to let them gather their

21   things.

22             THE COURT:  They, they have to be out of the jury

23   room before I give you the oath.  They're out of the jury

24   room?

25             THE BAILIFF:  She's taking them out now.

1              THE COURT:  They're not out of the jury room.

2      Please show them the way out.  Do they know the way out?

3              THE BAILIFF:  Carla's taking them out, yup.

4              THE COURT:  Okay.

5              THE BAILIFF:  Okay.

6              THE COURT:  Okay, raise your right hand, please.

7      You do solemnly swear that you will, to the utmost of your

8      ability, keep the persons sworn as jurors on this trial from

9      separating from each other, that you will not suffer any

10     communications to be made to them or any of them, orally or

11     otherwise, that you will not communicate with them or any of

12     them, orally or otherwise, except upon the order of this

13     Court or to ask them if they have agreed upon a verdict until

14     they shall be discharged and that you will not, before they

15     render their verdict, communicate to any persons the state of

16     their deliberation or the verdict they have agreed upon, so

17     help you God?

18             THE BAILIFF:  I do.

19             (At 1:14 p.m., bailiff sworn by Court)

20             THE COURT:  Okay, very good.  Um, counsel, please

21     approach.

22             (At 1:14 p.m., bench conference on the record)

23             MR. TAYLOR:  Thank you, Your Honor.  I am satisfied

24     with the reading of the instructions and the verdict form.

25             MR. SIZEMORE:  So am I.

1              THE COURT:  Okay, very good.

2              (At 1:15 p.m., bench conference concluded)

3              THE COURT:  Okay, you may begin your deliberations,

4      okay?  Thank you.

5              THE BAILIFF:  All rise for the jury.

6              (At 1:15 p.m., jury taken out)

7              THE COURT:  Okay, we'll be in recess.  Don't go too

8      far.

9              MR. SIZEMORE:  I'm going to be in the lawyer's

10     lounge.  Do you have my cell number?

11             COURT CLERK:  Um --

12             MR. SIZEMORE:  I usually watch the TV.  Oh, I can't

13     watch this courtroom yet.  So…

14             THE COURT:  Well, we're going to have it hooked up,

15     but --

16             MR. SIZEMORE:  We're working on that.

17             MR. TAYLOR:  Felicia, do you have mine?

18             COURT CLERK:  I do have yours.

19             MR. TAYLOR:  I will find him if you can't reach

20     him.

21             COURT CLERK:  Okay.

22             MR. TAYLOR:  I'll be in the building as well.

23             MR. SIZEMORE:  All right, I'm just going, I'm just

24     going to the lawyer's lounge and I'll write it down.

25             COURT CLERK:  Okay.

1                    THE COURT:  Thank you.

2                    MR. TAYLOR:  You want me to just give it to him?

3                    THE BAILIFF:  All rise.

4                    THE COURT:  You may be seated.  He has my pen.

5          Looks exactly like it.  Mr. Taylor, you think Crout

6          (phonetic) is the first one to go?

7                    MR. TAYLOR:  It's the oldest case number.

8                    THE COURT:  Yes.

9                    MR. TAYLOR:  Um, none of the ones that are up next

10         week are --

11                   (At 1:16 p.m., Court recessed)

12                   (At 2:18 p.m., Court reconvened)

13                   THE COURT:  -- Fischer.  You should bring your guy

14         out.  But it's --

15                   MR. SIZEMORE:  What is this with -- the headphones

16         isn't working well.

17                   THE COURT:  What were you saying about technology?

18                   MR. TAYLOR:  I know.

19                   THE COURT:  Carla has speakers she said.

20                   MR. SIZEMORE:  Okay.

21                   MR. TAYLOR:  Yeah, I mean, I don't care how they

22         listen to it.

23                   THE COURT:  Why, why do they have headphones?

24                   MR. TAYLOR:  So --

25                   MR. SIZEMORE:  Because sometimes you can hear it

                                  116

1       better, especially background stuff, in those kinds of

2       recordings.

3                   THE COURT:  Okay.  Well, she's got speakers.  So

4       going to hook up the speakers.

5                   MR. TAYLOR:  I don't care if the Court supplies

6       them speakers.

7                   THE COURT:  But this thing about --

8                   MR. TAYLOR:  I was just --

9                   THE COURT:  -- Heather Miner, um, there is no

10      transcript.

11                  MR. TAYLOR:  I would just ask you to instruct them

12      to rely on their collective memory and notes.

13                  MR. SIZEMORE:  Yeah, yeah.

14                  THE COURT:  Okay.

15                  MR. SIZEMORE:  That is some special gift I got.

16                  THE COURT:  I'll be right back.  I want to tell

17      Paul that he has to hook up, um, Carla's speakers.

18                  COURT CLERK:  Okay.

19                  (At 2:19 p.m., Court recessed)

20                  (At 2:21 p.m., Court reconvened)

21                  THE COURT:  Okay, calling the matter of People

22      versus Fischer.  I received a note from the jury and, um, I

23      have shown the note to both counsel.  One question is can we

24      get the transcript of Heather Miner.  Um, that's not possible

25      because of the way we do things here, that they're going to

1     have to rely on the collective memories.  And then they

2     needed a speaker or different headphones because the

3     headphones aren't working well.  So what we are going to do

4     is hook up my court, um, my secretary's speakers and

5     hopefully that will be enough.  We don't have any other

6     headphones.

7             MR. SIZEMORE:  I don't.

8             MR. TAYLOR:  No, those are the ones we used to

9     review audio at my office, so…

10            THE COURT:  So, tho-, those are my answers.  Are

11    you satisfied with that?

12            MR. SIZEMORE:  Yes, thank you.

13            MR. TAYLOR:  Yes.

14            THE COURT:  Are you satisfied?  I'll being out the

15    jury.

16            THE BAILIFF:  All rise for the jury.

17            (At 2:23 p.m., jury brought in)

18            THE COURT:  But you didn't do it yet, did you?

19            COURT CLERK:  Paul has them.

20            THE COURT:  Well, I don't want you to do it yet

21    until I --

22            COURT CLERK:  Okay.

23            THE COURT:  -- tell what's going on.  Okay, thank

24    you.  Please be seated.  The jury is in the courtroom on the

25    case of People versus Fischer.  Your appearances, please.

1              MR. TAYLOR:  Michael Taylor for the People.

2              MR. SIZEMORE:  Rolland Sizemore appearing with and

3       on behalf of Gary Fischer.

4              THE COURT:  Okay.  Uh, jury, we received a note

5       that says can we get the transcript of Heather Miner.

6       Unfortunately, we do not have transcripts prepared.  That's

7       something that these are sent out to a private company and

8       they, um, do the transcripts.  Um, so we don't have

9       transcripts.  I'd ask you to rely on your collective memories

10      of, um, what Heather Miner said.  And then, um, possibly a

11      speaker or different headphones.  The headphones aren't

12      working well.  I'm sorry to hear that.  We're not technology,

13      obviously, we're not doing so well in this trial.  Usually,

14      we're above and beyond other courts.  But, um, um, my

15      secretary has said that she has some speakers and she's going

16      to donate those speakers so that you can hear, um, hopefully

17      better.  If you have more problems, you let me know, about

18      those speakers or anything else, okay?  And when you send a

19      note, be sure and sign your name so we know who sent the

20      note, okay?  Just to let you know, but we'll keep that note.

21      We're all set.

22             MR. TAYLOR:  Thank you, Your Honor.

23             MR. SIZEMORE:  Thank you, Your Honor.

24             THE COURT:  Thank you.  You can continue

25      deliberations.

1              THE BAILIFF:  All rise for the jury.

2              (At 2:25 p.m., jury taken out)

3              THE COURT:  Okay.  We will, uh, keep close.

4              MR. SIZEMORE:  Thank you.

5              THE COURT:  Okay, thank you.

6              MR. SIZEMORE:  Absolutely.

7              THE COURT:  We'll call you the next time, Mr.

8    Sizemore.

9              MR. SIZEMORE:  Uh, absolutely.

10             THE COURT:  Felicia has his number, so…

11             COURT CLERK:  I have it.

12             (At 2:26 p.m., Court recessed)

13             (At 4:40 p.m., Court reconvened)

14             THE COURT:  Okay, it's my understanding that the

15   jury has reached a verdict.  And are you ready to receive the

16   verdict?

17             MR. TAYLOR:  We are.

18             MR. SIZEMORE:  Yes, Your Honor.

19             THE COURT:  And can I have your appearances, just

20   for the record.

21             MR. TAYLOR:  Michael Taylor for the People.

22             MR. SIZEMORE:  Rolland Sizemore on behalf of the

23   defendant, Your Honor.

24             THE COURT:  And this is the case of the People of

25   the State of Michigan versus Gary Thomas Fischer.

1                    THE BAILIFF:  All rise for the jury.

2                    (At 4:41 p.m., jury brought in)

3                    THE COURT:  Okay, you may be seated.  The jury is

4        present and it's my understanding that you have reached a

5        verdict.  Is that correct?

6                    JURY:  Yes.

7                    THE COURT:  Would the foreperson please read the

8        verdict?

9                    JURY FOREPERSON:  To the count of, count one of

10       home invasion first degree, we find the guilty.  To count two

11       of interfering with a crime report, committing crime, we find

12       not guilty.  As to count three, police officer, assaulting,

13       resisting, obstructing, we find guilty.  As to count four,

14       assault with an infliction of serious injury, aggravated

15       assault, we find guilty.

16                    THE COURT:  Okay, and you have signed that

17       document?

18                    JURY FOREPERSON:  Yes, I have.

19                    THE COURT:  Could you please collect her verdict

20       form?  And do you want the jury polled?

21                    MR. SIZEMORE:  No, Your Honor.

22                    THE COURT:  Okay, very good.  Then I have, um, home

23       invasion first degree guilty, not guilty of interfering with

24       a crime report, guilty of resisting obstructing a police

25       officer, and guilty of assault and infliction of serious

```
 1          injury, aggravated assault.  And it has been signed and

 2          dated.  Are you, um, may I release this jury?

 3                    MR. SIZEMORE:  Yes, please.

 4                    MR. TAYLOR:  No objection.

 5                    THE COURT:  Okay.  Jury, you are released.

 6                    THE BAILIFF:  All rise.

 7                    THE COURT:  Thank you very much for your service.

 8                    (At 4:43 p.m., jury excused)

 9                    THE COURT:  I need a sentencing date.  When do I do

10          sentencings, on Thursdays?

11                    COURT CLERK:  Yes.

12                    THE COURT:  So one, two, three, it should be, um,

13          March 28th.

14                    MR. SIZEMORE:  Your Honor, can we go one more week

15          on that, please?

16                    THE COURT:  Yes.  Um, April 4th.

17                    MR. SIZEMORE:  Thank you.  And that's morning or

18          afternoon.

19                    THE COURT:  Morning.  Okay?  Thank you very much.

20                    MR. TAYLOR:  Your Honor, um --

21                    THE COURT:  You did a good job.

22                    MR. TAYLOR:  I plan to retrieve the exhibits back

23          from your staff and sign a, uh, acknowledgment of receipt for

24          that.  I would ask that the defendant's bond be cancelled

25          pending sentencing due to the conviction on count one.
```

1              MR. SIZEMORE:  No objection.  I think that's

2     appropriate considering the law.

3              THE COURT:  I will cancel defendant's bond.  Here's

4     the -- we have a verdict form.  Okay?

5              MR. TAYLOR:  I know sometimes it takes them a

6     minute to get you the exhibits back out of the jury room.  Do

7     you have the, the receipt?  Okay.  As soon as, as soon as

8     those are ready, I'll come get it.  I got to get that laptop

9     too.

10             COURT CLERK:  Oh, okay.

11             MR. SIZEMORE:  And send them to me.  Mail or e-mail

12     them to me or I'll get these guys the contact information.

13             (At 4:45 p.m., proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25