# STATE OF MICHIGAN
## IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN,**

        Plaintiff/Appellee,

                        Court of Appeals No. 348539

***v.***

                        Livingston County
                        Circuit Court Case No. 18-025329-FH

**GARY THOMAS FISCHER,**

        Defendant/Appellant.

_____/

| | |
|---|---|
| William J. Vailliencourt, Jr. (P39115) | Katherine L. Marcuz (P76625) |
| Livingston County Prosecutor | Assistant Defender |
| 210 S. Highlander Way | 3300 Penobscot Building |
| Howell, Michigan 48843 | 645 Griswold |
| (517) 546-1850 | Detroit, Michigan 48226 |
| | (313) 256-9833 |

_____/

## PLAINTIFF/APPELLEE'S BRIEF ON APPEAL

Submitted By:

WILLIAM J. VAILLIENCOURT, JR. (P39115)
LIVINGSTON COUNTY PROSECUTOR

**WILLIAM M. WORDEN (P39158)**
Assistant Prosecuting Attorney
210 S. Highlander Way
Howell, Michigan 48843
(517) 546-1850

RECEIVED by MCOA 3/19/2020 3:31:49 PM

## <u>Table of Contents</u>

**Index of Authorities**.................................................................................i-ii

**Counter-Statement of Basis of Jurisdiction**..............................................iii

**Counter-Statement of Questions Presented**.......................................iii-iv

**Introduction** .......................................................................................... 1

**Counter-Statement of Facts**................................................................. 3

Arguments:

     **I. Michigan criminal juries are not required to unanimously agree upon every fact supporting a guilty verdict. Unrefuted testimony showed defendant entered the victim's home without permission, she was lawfully present, and he committed an assault upon her while inside her home, thus meeting the elements of first-degree home invasion. Where this issue is unpreserved, failure to request and give a special unanimity instruction doesn't amount to either "plain" or reversible error based on "manifest injustice."** ......................................... 21

     **II. The amended Information, which included a sentencing enhancement under MCL 769.12, should have been filed within 21 days of the original Information, and that did not occur. Thus, the People concede that Defendant/Appellant is entitled to resentencing as a second habitual offender, MCL 769.10, as charged in the original Information.** ...................................................... 32

     **III. Appellate Courts generally do not address moot questions or declare legal principles that have no effect in a case. Any issue of guidelines scoring is moot because the guidelines will be rescored, and Defendant will have an opportunity to challenge them at Defendant's resentencing. Guidelines scoring issues can best be addressed by the circuit judge at Defendant's resentencing, which the prosecution concedes is necessary.** .................................................................. 33

**Conclusion and Request for Relief**......................................................... 34

RECEIVED by MCOA 3/19/2020 3:31:49 PM

<u>**Index of Authorities**</u>

<u>**Cases**</u>:

*Barrow v Detroit Election Comm*, 305 Mich App 649; 854 NW2d 489 (2014) ........... 33

*Henderson v Kibbe*, 431 US 145; 97 S Ct 1730; 52 L Ed 2d 203 (1976) .................... 21

*People v Adams*, 92 Mich App 619; 285 NW2d 392 (1979) ................................... 30-31

*People v Barbarich*, 291 Mich App 468; 807 NW2d 56 (2011) ................................. 28

*People v Cooks*, 446 Mich 503; 521 NW2d 275 (1994) .................................... 23-27, 34

*People v Gadomski*, 232 Mich App 24; 592 NW2d 75 (1998) .................................... 29

*People v Gonzalez*, 468 Mich 636; 664 NW2d 159 (2003) ......................................... 22

*People v Grant*, 445 Mich 535; 520 NW2d 123 (1994) .............................................. 22

*People v Graves*, 458 Mich 476; 581 NW2d 229 (1998) ............................................ 28

*People v Hornsby*, 251 Mich App 462; 650 NW2d 700 (2002) .................................. 33

*People v Johnson*, 495 Mich 919; 840 NW2d 373 (2013) ........................................... 33

*People v Rigsby*, 92 Mich App 95; 284 NW2d 499 (1979) .......................................... 28

*People v Van Dorsten*, 441 Mich 540; 494 NW2d 737 (1993) ............................... 21, 32

<u>**Court Rules, Statutes and Miscellaneous**</u>:

Const 1963, art 1, § 14 ................................................................................................. 26

MCL 750.81a(1) ............................................................................................................ 1

MCL 750.81d(1) ............................................................................................................ 1

MCL 750.110a(2) ........................................................................................................... 1

MCL 750.483a(2)(b) ...................................................................................................... 1

MCL 768.27c(1) ........................................................................................................... 17

i

RECEIVED by MCOA 3/19/2020 3:31:49 PM

MCL 769.10 ..................................................................................................... 32-33

MCL 769.11 ..................................................................................................... 32

MCL 769.12 ..................................................................................................... 32

MCL 769.13 ..................................................................................................... 32

MCL 769.26 ..................................................................................................... 31

M Crime JI 25.2a .............................................................................................. 23

MCR 2.613(A) ................................................................................................... 31

MCR 7.215(J)(1) ............................................................................................... 28

RECEIVED by MCOA 3/19/2020 3:31:49 PM

ii

**<u>Counter-Statement of Basis of Jurisdiction</u>**

Plaintiff/Appellee accepts Defendant/Appellee's Statement of Basis of Jurisdiction.

**<u>Counter-Statement of Questions Presented</u>**

**<u>I</u>**

**Michigan criminal juries are not required to unanimously agree upon every fact supporting a guilty verdict. Unrefuted testimony showed defendant entered the victim's home without permission, she was lawfully present, and he committed an assault upon her while inside her home, thus meeting the elements of first-degree home invasion. Is it true that where this issue is unpreserved, failure to request and give a special unanimity instruction doesn't amount to either "plain" or reversible error based on "manifest injustice"?**

The Trial Court was not asked this question.

Defendant/Appellant Answers:          "No."

Plaintiff/Appellee Answers:            "Yes."

**<u>II</u>**

**The amended Information, which included a sentencing enhancement under MCL 769.12, should have been filed within 21 days of the original Information, and that did not occur. Is it true that Defendant/Appellant is entitled to resentencing as a second habitual offender, MCL 769.10, as charged in the original Information?**

The Trial Court was not asked this question.

Defendant/Appellant Answers:          "Yes."

Plaintiff/Appellee Answers:            "Yes."

RECEIVED by MCOA 3/19/2020 3:31:49 PM

## III

**Appellate Courts generally do not address moot questions or declare legal principles that have no effect in a case. Any issue of guidelines scoring is moot because the guidelines will be rescored, and Defendant will have an opportunity to challenge them at Defendant's resentencing. Is it true that guidelines scoring issues can best be addressed by the circuit judge at Defendant's resentencing, which the prosecution concedes is necessary?**

The Trial Court was not asked this question.

Defendant/Appellant did not answer this question.

Plaintiff/Appellee Answers:                    "Yes."

RECEIVED by MCOA 3/19/2020 3:31:49 PM

iv

## **Introduction**

A Livingston County Circuit Court jury found defendant Gary Thomas Fischer guilty of first-degree home invasion, contrary to MCL 750.110a(2), resisting and obstructing a police officer, MCL 750.81d(1), and aggravated assault, MCL 750.81a(1). The jury acquitted defendant of interfering with a crime report, MCL 750.483a(2)(b). Jury Trial, Volume II, referred to as JT-II-, at 121.

The defendant's sentencing guidelines minimum range was 99 to 320 months. Sentencing transcript, referred to as ST-, at 6. Observing that defendant had three prior felony convictions, the sentencing judge imposed a sentence of 15 (180 months) to 50 years for first-degree home invasion. Defendant received one-year sentences for resisting and obstructing a police officer, and aggravated assault. ST-14.

This case is about a home invasion involving two people who knew each other intimately. On the evening of September 18, 2018, in Howell, Livingston County, the victim Heather Miner was at home and getting ready for bed. She had known the defendant Gary Fischer for years, and, although they were not in a traditional relationship, they would occasionally "hook up." Prior to September 18, Ms. Miner had an argument with an ex-boyfriend over a dog, and based on that argument, the defendant intervened and created a scene. After quarreling with the defendant, Ms. Miner blocked his number from phone calls and texts. Defendant was still attempting to contact her even though she did not want to have contact with him; her phone indicated when she was receiving texts and blocked calls. Jury Trial, Volume I, referred to as JT-I, at 78-79.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

Ms. Miner got into bed, closed her eyes to go to sleep, and the next thing she knew, Mr. Fischer had entered her home and was climbing into bed. They argued because Ms. Miner thought Fischer had been drinking; she didn't want him drinking and driving to come over to her house. She told him that he had to leave. He started to attack her, delivering several punches to the side of her head, then slamming her head into the floor. She went for her phone to call 911. JT-I-79. They fought over the phone to the point where she retrieved a kitchen knife to defend herself. Defendant got the phone away from her and took it outside the house. He made her promise that she wasn't going to call 911 before he gave it back. Once she got her phone back, Ms. Miner sprinted back into her house and locked the door. Defendant got back inside her house as she was talking to someone from the emergency 911 service. The damage to Ms. Miner's house included a damaged doorframe, smashed drywall, chairs flipped over, and lamps broken. Ms. Miner's 911 call was recorded and played to the jury. JT-I-79-80.

When he arrived, Sergeant Fogo saw a person matching the suspect's description leaving Ms. Miner's home. Believing that this man had just attacked a woman in her home, Sgt. Fogo ordered the defendant to show his hands. Instead, defendant moved to the other side of a vehicle in the driveway, and attempted to flee. Sgt. Fogo gave several more commands; in his flight, defendant ran into a trash can and fell to the ground. Sgt. Fogo tried to subdue him, but the defendant tried to get up and run. Sgt. Fogo identified himself as a police officer, but defendant refused to bend his body to be handcuffed. JT-I-81. Other officers

*Livingston County Prosecutor's Office*

RECEIVED by MCOA 3/19/2020 3:31:49 PM

responded and assisted at the scene, interviewing Ms. Miner, and photographing her injuries. Ms. Miner went to the emergency room to be treated for injuries all over her body, including a broken tooth. After she left the emergency room, Ms. Miner saw a dentist who assessed her broken tooth, and she had several procedures to fix the damage done that night. JT-I-82.

## Counter-Statement of Facts

**HEATHER MINER** was living in the city of Howell, Livingston County, on September 18, 2018. She had known Gary Thomas Fischer since 2015; they met on the Internet. JT-I-90. In the years she had known Fischer, Ms. Miner saw him in person 20 times. He would come over to her house, but he did not have a key. JT-I-91. Fischer came over when Ms. Miner invited him to do so. When they first met, they "were sleeping together." They didn't talk for a long time. Then, Ms. Miner "was in a relationship" with her ex Shawn Cotton, and she thought "Gary went to jail for something" and they met up again February or March of 2018. JT-I-92.

Mr. Cotton moved back into Ms. Miner's Howell address in September of 2016 and he moved out in June of 2018. JT-I-92-93. From the time Mr. Cotton moved out until September 18, 2018, Ms. Miner saw Mr. Fischer at her house about 10 times. JT-I-93. There were times when Gary would come over uninvited and Ms. Miner would have to make him leave; there also were times that she invited Gary to come over. The time she invited Gary, Ms. Miner gave him her garage code to enter through the garage. Gary did work for her, changing and fixing her garage door and changing her locks after Shawn moved out. JT-I-94.

Ms. Miner never told Mr. Fischer that he could come over whenever he wanted. She never gave him a key to her house or told him that he could enter without talking to her. JT-I-94-95. Ms. Miner's home is "a stacked condo in the middle of about eight other condos." All the condos are connected. She shares walls on both sides with her neighbors, and has an attached garage, underneath her condo. JT-I-95-96.

The garage has a doorway going to the interior of Ms. Miner's home. Fischer actually set her garage code because he fixed the garage door. She typically locks the door between her garage and the interior of her home, but on September 17, she did not. JT-I-96. Both entry doors to her home are on the ground level; her living space is above the garage in front of the condo. A neighbor's living space is behind hers, directly above her garage. There are two residences on that floor. JT-I-97.

Ms. Miner did not have any deadbolt or chain locks at that time. JT-I-98. When her ex, Mr. Cotton, moved out, Ms. Miner gave his sons a key to her condo, telling them it was still their home. But, Cotton and his sons had taken her dog. Ms. Miner said she was heartbroken. She shared that information with Mr. Fischer, who agreed to help her try to get her dog back. On September 17, Mr. Fischer went to where he thought Ms. Miner's dog Maggie might be. JT-I-99. The day before, September 16, they had agreed to stop trying to get Maggie back because Ms. Miner's mother warned them they could get in trouble. But, on the 17th, Mr. Fischer texted Ms. Miner, indicating he had not given up the effort to get back Maggie. Fischer called Ms. Miner, saying, "I went to try to get Maggie." Fischer went to

RECEIVED by MCOA 3/19/2020 3:31:49 PM

*Livingston County Prosecutor's Office*

where Shawn lives, saw Shawn and Maggie outside, and walked towards them. Shawn recognized Gary and called him out for being there, trying to get the dog. JT-I-100-102. Ms. Miner was angry with Fischer for potentially getting her in trouble with the cops. JT-I-102. Ms. Miner said of Fischer, "he kind of seemed like he was upset with me for being upset with him." Ms. Miner told Fischer, "I'm not going to talk to you anymore." Gary kept trying to communicate with her, and "the last thing that I communicated to Gary is, okay, you're scaring me, I'm going to block you right now, and I'm not going to answer any more from you." JT-I-103.

Ms. Miner could still see Fischer's blocked messages. She had 23 missed calls. Their last conversation was between 9:00 and 10:30. The next time she saw Mr. Fischer again was when she woke up that same night in her house. She had put her phone, face down, under her pillow and went to sleep. JT-I-104-105, 108-109.

Ms. Miner next attempted to use her phone to call the police, but Mr. Fischer took away her phone. JT-I-109. Ms. Miner later checked her phone after the police arrived, and she had 23 missed calls and 11 blocked text messages. After she blocked Mr. Fischer, Ms. Miner went to sleep. JT-I-109. She was in bed when she sent the last text to Fischer. Then she put the phone under her pillow and went to sleep. She was wearing a striped, multi-colored, sundress, which she wore like a nightgown. JT-I-110. Ms. Miner woke up to hearing her new puppy whimpering like she was in pain. JT-I-110-111. When Ms. Miner opened her eyes, the light was on in her room. It had been off when she fell asleep. When she looked to her left, Gary Fischer was climbing into her bed. She demanded to know why he was there. Ms.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

*Livingston County Prosecutor's Office*

Miner "noticed immediately that he was very intoxicated." Ms. Miner said, "I could definitely smell tequila. I could tell that he wasn't making sense. He was telling me be nice and it wasn't in response to the words that I was saying to him, which was, you know, with cuss words, what are you doing here, get out of my bed, what are you doing here. And he just kept saying you're so mean, stop, stop. And I said, no, you need to, you know, you need to get out, you need to get out." JT-I-112.

Ms. Miner said she screamed at Mr. Fischer, "I don't have to be nice, you're in my house, why are you in my house, what the heck are you doing here." Even though Fischer had been in her house before, it was unusual for Ms. Miner to wake up and see him in her house. And he did not seem surprised by her reaction. Ms. Miner said: "I did ask him to leave and he said no." JT-I-112. Ms. Miner said, "what the hell is wrong with you." And she used her feet in an attempt to push Mr. Fischer off the bed. JT-I-113-114. After Fischer got out of bed and stood up, Ms. Miner also got up, and started to walk him around the bed towards the door, saying: "it's time for you to go." She knew he did not have a driver's license, and she said, "why were you driving? You're obviously drunk or something, what's wrong. And he said that's why I can't leave, I'm, I'm obviously drinking, you can't make me drive." JT-I-114-115. As they approached the bedroom door, and Ms. Miner was saying "you have to leave, he said I'm not leaving." JT-I-115.

Ms. Miner said, "yes you have to leave and he said you can't make me leave. And I said yes, if I can't, then the cops can." She grabbed her cell phone from underneath the pillow, and "that's when he grabbed my phone," after "he grabbed

RECEIVED by MCOA 3/19/2020 3:31:49 PM

my arm somehow and twist it behind me . . . and took the phone from me right there." Ms. Miner said "it hurt a lot" when Fischer twisted her arm. She added: "I still have an injury in my arm." JT-I-116-117.

After Fischer took her phone, Ms. Miner said, "I reacted by fighting violently to get it back." She said she shoved Fischer and struck him. They pushed through her bedroom door and up against a hallway linen closet. JT-I-117. Ms. Miner said she was "trying to punch him" and she connected. Fischer's response was to strike back. He smashed the phone against her head. JT-I-118-119. Ms. Miner said, "I became pretty hysterical." She "started screaming for him to leave and, . . . get out and stop, and he said you're going to regret this." They began fist fighting, exchanging punches. JT-I-119. Fischer pinned her down to the floor as the fight raged from the hallway outside her bedroom almost to the dining room. Fischer had his hand on her face. JT-I-120.

Ms. Miner said that Fischer "grabbed a hold of my face and just smashed my head into the floor like three times in that position." It was the same part of her head that Fischer had hit with the phone so "I had three large goose eggs," Ms. Miner said. JT-I-121-122. Fischer then released her, and went to the refrigerator and got a cherry coke out. Ms. Miner continued saying, "you got to leave, you got to leave." Fischer responded, "this is your fault, . . . why did you act this way, and he slammed the refrigerator door and he said I'm not f-ing leaving." JT-I-122-123.

When Fischer slammed the refrigerator, it rattled everything. Ms. Miner ran towards Fischer and pushed him into the kitchen cabinets, pushing his face, and

RECEIVED by MCOA 3/19/2020 3:31:49 PM

telling him, "you have to leave, you give me my phone, you've got to leave now, give me my phone." When Ms. Miner tried to push Fischer's head into a kitchen cabinet knob, "it really made him mad." She recalled, "that's when he said you're going to get it." Fischer threw Ms. Miner down in the living room, into the table, which flew into the wall and took a chunk out of the wall. She went to the floor and he got on top of her. JT-I-123.

Ms. Miner said that Fischer was "just swinging, but I was protecting my face, so he just kept hitting me in the same spots on my head." Ms. Miner demonstrated how she kept her arms up with her elbows in front of her face. JT-I-124. Then, Ms. Miner said, "I reached up between his legs and, and grabbed and squeezed his private parts as hard as I could to try to get him to release me." Fischer moaned and turned his head close enough for Ms. Miner to bite his face, near his eyebrow. That's when she realized that her tooth was gone. Fischer "yelled bitch and he threw my phone." JT-I-125-126.

Realizing he had tossed away the phone they were fighting over, Fischer released Ms. Miner to go after the phone, and that's when she jumped up and ran down the stairs to leave the house. She was only about ten feet from the stairway. Fischer threw the phone so hard it put a dent in the wall. JT-I-126-127. Fischer had left the door open to Ms. Miner's garage and also the garage door. JT-I-128.

She just kept running to the wide open doors. She ran outside "screaming for help," but it was around midnight she thought, nobody responded, and so she "went around a couple cars and then I cowered down and I was just trying to figure out

RECEIVED by MCOA 3/19/2020 3:31:49 PM

what to do." JT-I-129. There was nobody outside. The next person she saw outside was Gary Fischer. She was afraid he was going to do something to her dog so she ran around the complex to her front door to try to sneak back in. Her door was locked so she pounded on her neighbors' doors. JT-I-130. Ms. Miner said, "I knocked on all my neighbor's and was screaming for them to come out, but nobody heard me." She ran the rest of the way around her condo complex, ending up back behind her garage, and Fischer was standing outside the garage. His demeanor was totally different: "He just looked at me really calmly and said are you ready to deal with this rationally, I'll give you back your phone, if you're rational and don't call the police." Ms. Miner saw her garage door and the door to her house were both still open. She thought Fischer was intoxicated enough that she could grab her phone. JT-I-131. She said, "okay, I promise, I grabbed the phone out of his hand as fast as I could, and I ran in the house." JT-I-131-132. Fischer chased after her. She was unable to close the big garage door, but she managed to make it into the house, and got that door shut and locked. She then ran to the front to make sure that door was locked. JT-I-132-133. She then ran up the stairs to her kitchen, and grabbed a knife from the butcher's block. Then she ran into her bedroom bathroom and called 911. While she was on the phone with 911, Ms. Miner said, "I heard some loudness down in my house, so I, I had a feeling he was coming[.]" JT-I-133.

The phone—a Galaxy S9 plus—was bent and the screen was shattered, but Ms. Miner was still able to dial out. Ms. Miner told 911 that she didn't want Fischer to see her on the phone. JT-I-134. Ms. Miner heard a noise downstairs, Fischer

reappeared, and he saw her still on the phone with 911. She was in the bathroom doorway when she saw him walking back into her bedroom. Fischer said: "you better hope that you land that knife or I will cut you into pieces." JT-I-135. Ms. Miner said: "I can't remember his exact verbatim, but he said you better hope that you kill me with that knife or I will cut you into f-ing pieces." JT-I-135-136.

Ms. Miner said, "I was thankful that I had 911 on the phone and I didn't hang-up. I just stopped talking to them and I kept it in my hand." Ms. Miner held the knife in her right hand and the phone in her left hand. She told defendant to "just stay away" and "just leave, please leave." Defendant did not leave, even after Ms. Miner showed him the knife. Instead, he approached, and she recalled: "He tried to fight me for the knife." JT-I-136. Defendant threw her on the bed. She still held the knife and her phone. They wrestled as "he was trying to get the knife away" from Ms. Miner. "The only person that I know of that got cut was me." Defendant got off her, and Ms. Miner ran out into the living room to try to get away from him. Defendant chased her. JT-I-137.

Defendant chased her around her house and swung on her a couple times. She was balled up on the floor in the dining room. Ms. Miner didn't know if "he saw the police lights from outside, but suddenly he just backed up off me and, and, and yelled fuck." Ms. Miner saw a blue light outside of her slider. JT-I-138. Defendant started "pounding on his head" and "looked out of his mind. And then he started picking up my furniture and just chucking it at me." JT-I-139. Defendant threw at Ms. Miner two bar stools, a chair, and a big bench. The furniture hit and put holes

RECEIVED by MCOA 3/19/2020 3:31:49 PM

in the walls, broke the ceiling fan, and hit near the sliding glass door, which Ms. Miner thought was going to break, but did not. Defendant stopped throwing furniture, turned and walked down the stairs. 911 was still on the phone; they told her to go find the officers. Ms. Miner said, "I have a knife in my hand, please make sure that they're not going to shoot me." JT-I-140.

As she moved through her home, Ms. Miner saw something out of the corner of her eye, and thought it might be the defendant again, but it was actually a female officer who ordered Ms. Miner to drop the knife. The officer, Alicia Vallance, had Ms. Miner go outside to the ambulance. JT-I-141. The jury listened to the entire nine-minute 911 call, which took place inside Ms. Miner's home. JT-I-143.

The paramedics looked at her injuries, which included bruising, a scrape on her leg from the knife, and mostly goose eggs "all over" her head. She had bruising on her jaw, and her tooth was gone. JT-I-143-144. Officer Vallance documented the injuries with pictures. Although the paramedics wanted to take her to the hospital, Ms. Miner refused because she was worried about her dog. She went to the hospital first thing in the morning, six hours after the police left her home that night. JT-I-144-145. Ms. Miner received treatment including a CAT scan. JT-I-145-147. It was either a CAT scan or an MRI. They did her jaw. She had to follow up with the doctor. She needed four oral procedures for her tooth because the location of her bridge was damaged. JT-I-147.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

She has a fake tooth now, replacing the one that defendant damaged. She saw a dentist the same day she went to the hospital. She left the hospital and went directly to her dentist's office. JT-I-148.

Ms. Miner identified the photographic evidence admitted at trial: a picture showing her missing tooth; a knocked-over lamp; gouged wall; overturned furniture that Defendant picked up and threw; a glass fixture on the ceiling fan broken by a bar stool thrown by Defendant; her phone, and the knife she had in her hand, where she dropped them; damage to her door frame; a picture of the Defendant's face showing his right eyebrow where Ms. Miner bit him; her breast showing bruise marks from being grabbed; her right arm, also bruised from being grabbed; small cuts from the knife, which was still in her hand when she got those cuts; and bruises on her shoulder, and the side of her face which were not bruised before Defendant came to her house that night; and bruises on her shoulder. JT-I-151-161. The dentist put a temporary crown on her tooth. JT-I-161-162.

Ms. Miner said: "I believed he was trying to kill me. I wanted to get away from him and I wanted to be safe." Afterwards, she "felt traumatized. . . . I was in shock." JT-I-164. When Ms. Miner gave her statement to the police, she tried to be as accurate and as honest as she could be. JT-I-165.

On cross-examination, Ms. Miner testified that, although she and Defendant told each other that they loved each other, they were never in a relationship: "We would hook-up, for lack of a better term. . . . He was in a relationship with another female." Ms. Miner and Defendant did continue to have a sexual relationship. JT-I-

RECEIVED by MCOA 3/19/2020 3:31:49 PM

167. They met online, through Tinder, a casual dating site for physical, rather than long-term emotional, relationships. That is what Ms. Miner thought she had from 2015 to the end of 2018. Defendant fixed her garage door, and changed the locks on her house after Shawn moved out. JT-I-168. She went with him to pick up a vehicle he purchased, and her two sons, ages 18 and 15, knew the Defendant. Sometimes, Ms. Miner and Defendant would meet for lunch, "and hook up on lunch times, yes." JT-I-169-170.

Ms. Miner admitted that, on the day of the incident, she smoked a bowl of marijuana at about 6:30. She no longer had a medical marijuana card in September of 2018. JT-I-172-173. Ms. Miner denied that the marijuana adversely affected her memory: "I remember everything that I have explained vividly." JT-I-75. Even though Defendant was yelling, "I'm trying to leave," Ms. Miner said, "he was not trying to leave. He was standing in my kitchen." JT-I-176.

**DAVID FOGO**, a sergeant with the Howell Police Department, was dispatched to a domestic violence call on September 18, 2018, in the city of Howell. (JT-I-199-200, 203) It came in as a verbal domestic—people arguing—which was upgraded to a physical domestic. (JT-I-204-206) The scene was a multi-unit condominium with multiple garage doors. Sgt. Fogo noticed that only one of the garage doors was open and the lights were on inside. A radio transmission stated that there was a male exiting the residence. (JT-I-207) The 911 caller was a female, based on dispatch information. Sgt. Fogo was already out of his car and on foot

when he saw the male. When Officer Vallance responded, she had her overhead lights on. (JT-I-208)

Sgt. Fogo identified the defendant as the male he saw outside the condominium that night. (JT-I-208-209) Defendant was exiting the door that leads from the garage into the residence. (JT-I-209) Fogo was wearing a Howell Police uniform with badge, duty belt, firearm, and taser. (JT-I-211) Fogo said he could hear a commotion, i.e., "some banging and that sort of thing." As defendant exited, "he slammed that door that leads from the garage, from the residence to the garage." That door was open before defendant walked through it. Sgt. Fogo thought the defendant was "upset or mad." (JT-I-212)

Sgt. Fogo shined his flashlight at defendant, identified himself as police, and said "let me see your hands." Defendant did not comply. Instead, he took one or two more steps towards Sgt. Fogo: "He is coming at me. . . . He takes another step or two and then he . . . starts to run." There was a vehicle between Fogo and the defendant. Fogo went around the vehicle and started chasing the defendant because of the domestic violence call, defendant appearing visibly upset and aggressive, and he defied Fogo's commands, running instead. (JT-I-213-214) Sgt. Fogo started reaching for his taser when he heard a loud bang; defendant ran into a large plastic trash dumpster and he fell to the ground. Fogo yelled at defendant to stay down. Instead, defendant got up. Fogo managed to grab a hold of defendant's shirt as he started running again, and, using his weight and arm around the defendant's shoulder,

RECEIVED by MCOA 3/19/2020 3:31:49 PM

they went to the ground together. Fogo tried to get defendant to stop squirming so that he could put him in handcuffs. (JT-I-215-216)

At one point, Fogo believed defendant asked him who it was, and Fogo again said "police." At that point, defendant became "passive," laying on the ground with his arms out. (JT-I-217) At first, defendant was not compliant with Fogo trying to physically restrain him: "I basically told dispatch that I'm fighting with one." (JT-I-218) After Fogo made the radio transmission, defendant's response was "no you're not and then he cooperated and I was able to get him into handcuffs." They stayed on the ground—"I'm out of breath, he's out of breath"—until Officer Vallance arrived on scene to assist Sgt. Fogo. (JT-I-219) Defendant did not physically resist Sgt. Fogo any further, and he obeyed all of the sergeant's commands at that point. (JT-I-220)

Sgt. Fogo documented some injuries that defendant had; Fogo wasn't sure if they were from the altercation he had with defendant or if they were from something that happened prior. Fogo took a few pictures of the defendant. Fogo received information from Officer Vallance that there was a physical altercation and police had probable cause to arrest defendant for domestic violence. Sgt. Fogo spoke to the victim: "She stated she could hear Mr. Fischer beating on the doors and the next thing she knew, she was stating, he was standing there." (JT-I-221-222) Fogo recalled discussion of the victim putting her feet on defendant, as she described, and pushing him out of bed. (JT-I-243) Fogo recalled the victim telling him that defendant had hit her head off the floor. (JT-I-246-247)

Sgt. Fogo could tell that defendant had been drinking; he could smell intoxicants as defendant spoke. (JT-I-224) Defendant's speech was slurred; his eyes were very glassy and watery. And he acknowledged that he had some beer. (JT-I-228-229) Fogo did not personally recover the victim's phone, but it was located. Defendant's keys were in the victim's residence. Defendant's wallet was in his vehicle, which was parked down the road. (JT-I-226) Defendant wanted to secure his wallet, which he said contained a large sum of money. (JT-I-227) Fogo did have defendant's phone in his patrol car; after he left defendant at the jail, Fogo noticed he still had defendant's phone. (JT-I-245) Fogo did not find the cell phone on defendant's person: "I would have to speculate it was in his car with his wallet." (JT-I-246)

Paramedics arrived prior to Sgt. Fogo transporting defendant to the jail. Fogo saw the victim walk out towards the ambulance. (JT-I-228) When Fogo secured defendant in his vehicle, transported him to jail, booked and photographed him, defendant "was pretty clear headed." Defendant was "a little verbally defiant at times, but physically he never resisted any further." (JT-I-228-229)

**ALICIA VALLANCE**, an officer with the Howell Police Department, was working on September 18, 2018, and she responded to a verbal domestic, with an open line to 911. (JT-II-4-5) Officer Vallance assisted Sgt. Fogo; she heard him say he was fighting with one. When she arrived, Vallance observed Sgt. Fogo on the ground with a male subject who was in custody. (JT-II-6) Vallance went inside to make contact with the complainant: "when I opened the door, I observed a female

RECEIVED by MCOA 3/19/2020 3:31:49 PM

holding a knife standing in a hallway." Vallance told her to drop the knife, and she immediately dropped the knife. The complainant had a phone in her other hand. She dropped everything she had in her hands. Vallance described the victim's demeanor: "She was visibly upset and crying." (JT-II-7)

Officer Vallance could see that the victim had been crying because she had tears on her face. Vallance also saw blood on her face by her nose and her mouth. Vallance also saw that one of the victim's teeth was broken. Vallance asked the victim what happened, and she said that she was attacked by Gary Fischer. Vallance identified the female victim as Heather Miner. Vallance described the victim "as hysterical. She was distraught, very upset." (JT-II-8)

The prosecutor elicited testimony from the officer under MCL 768.27c.[1] The victim told the officer that defendant had come into her house and attempted to get into her bed. The victim said that when defendant got into her bed, she had told him that he needed to leave several times. And then there was a struggle after that. Vallance asked the victim if she had let defendant into her house: "She said that he did not have permission to be in her house." (JT-II-10)

RECEIVED by MCOA 3/19/2020 3:31:49 PM

---

[1] Under MCL 768.27c(1), "Evidence of a statement by a declarant is admissible if all of the following apply: (a) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. (b) The action in which the evidence is offered under this section is an offense involving domestic violence. (c) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of a statement made more than 5 years before the filing of the current action or proceeding is inadmissible under this section. (d) The statement was made under circumstances that would indicate the statement's trustworthiness. (e) The statement was made to a law enforcement officer."

Page 17

There was a physical fight between the victim and the defendant after she told him to leave, and he refused. She had pushed him to get him out of the bedroom; he pushed back, still refusing to leave. The victim said that she had tried to call for help and defendant had taken her phone during the struggle. Vallance documented the victim's injuries by taking photographs. (JT-II-11-12) The victim said her head was hurting and Vallance requested EMS to evaluate her. Vallance photographed visible injuries. (JT-II-13)

After the victim calmed down, Vallance clarified her statement: "She had originally told me that she was chased with the knife. I clarified that she said she had the knife in her possession and was chased while she had the knife in her possession." That was the knife the victim still had in her hand when Officer Vallance first saw her. (JT-II-15) Officer observed furniture upside down, there was a glass lamp that had been shattered across the entire living room area, a hole in the wall, and the trim had been broken off a door that was no longer on its hinges. (JT-II-17)

Vallance called EMS based on the injuries she observed and the victim's statement that she had been hit in the head repeatedly. Vallance was concerned that the victim could have serious injury to her head. Later, when Vallance re-contacted the victim, the officer noticed a hospital bracelet on the victim's wrist, indicating the victim had been to the hospital. (JT-II-19)

On cross-examination, the officer said that the victim was hysterical but able to answer questions. The victim did make a foggy memory comment during the

RECEIVED by MCOA 3/19/2020 3:31:49 PM

second interview. (JT-II-21, 29) Officer Vallance had no suspicion that the victim

was high on marijuana or drunk on alcohol. Officer Vallance had no reason to

believe by what she observed that the victim was concussed or had amnesia. (JT-II-

21-22) Vallance described the cell phone as "smashed" in her report, but she did not

have the opportunity to see that phone before the victim dropped it on the floor. The

screen was smashed. (JT-II-23) Vallance seized the phone as evidence, but she had

no idea where it was. Vallance testified the victim was still on the phone with

dispatch when she arrived, which would indicate the phone was still working.

Vallance was not able to document the 23 phone calls that the victim said she got

from defendant that night. (JT-II-24) Vallance was unable to verify the calls due to

the screen being shattered, which possibly occurred when the victim dropped it. The

victim told her that defendant was hitting her in the head with the cell phone, but it

was not in the officer's report. (JT-II-25-26) Although the phone was seized, it was

not sent for fingerprints to see if defendant's prints were on the phone. The officer

did not recall what side of her face or head the victim's injuries were on; nor did she

know whether the defendant was right-handed or left-handed. (JT-II-27) The

victim's first statement "was that she was chased with a knife." In her second

statement, "she said she was chased with a knife in her possession." (JT-II-28)

Initially, Vallance thought defendant had the knife. (JT-II-29)

      Vallance did not contact the hospital to find out what the victim's injuries

were and what kind of treatment she was given. After the victim's cell phone was

seized, it was turned over to a detective. Vallance was not sure what steps were

*Livingston County Prosecutor's Office*

RECEIVED by MCOA 3/19/2020 3:31:49 PM

taken regarding phone records from the victim's cell phone to document phone calls or texts between the victim and defendant. (JT-II-30) Vallance had never seen those. The victim was unable to show Vallance anything on her phone. Vallance looked at the door that was off its hinges, but she did not recall seeing any shoe prints or any marks on the door. (JT-II-31) When the victim said she didn't know how defendant got in the second time, the officer suggested to victim that he may have kicked in the front door. The victim said that was possible. The victim told Vallance that there was no damage to the door before the incident. (JT-II-32) Vallance never found the victim's tooth: "I don't remember if we looked for that specifically." (JT-II-33) It appeared that the victim's tooth was broken off: "I can see the top of it that it looks like there is a small piece of it still there." (JT-II-48)

The victim told Vallance that defendant threw her purse, and the officer surmised the purse broke the globe on a ceiling fan light. (JT-II-33-34) The phone was dropped on plastic flooring and not ceramic tile. (JT-II-35)

On re-cross examination, Vallance testified that when she sees a door that's half open and a broken wooden doorframe, it suggests that the door had been kicked in. (JT-II-39) Follow-up with fingerprints on the phone, phone records, and the hospital did not seem relevant to Vallance at the time. She conceded it could be helpful at trial. Vallance took photos of hospital records that the victim gave her the second day. (JT-II-40-41)

RECEIVED by MCOA 3/19/2020 3:31:49 PM

*Livingston County Prosecutor's Office*

## ARGUMENT

### I

**Michigan criminal juries are not required to unanimously agree upon every fact supporting a guilty verdict. Unrefuted testimony showed defendant entered the victim's home without permission, she was lawfully present, and he committed an assault upon her while inside her home, thus meeting the elements of first-degree home invasion. Where this issue is unpreserved, failure to request and give a special unanimity instruction doesn't amount to either "plain" or reversible error based on "manifest injustice."**

**Standard of Review:** Instructional error should not be considered on appeal unless the issue has been preserved by an objection to the instruction in the trial court. *People v Van Dorsten*, 441 Mich 540, 544-545; 494 NW2d 737 (1993). Absent an objection, relief will be granted only in cases of manifest injustice. *Id.*, at 545. The United States Supreme Court has enunciated a similar test. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court. *Id.*, quoting *Henderson v Kibbe*, 431 US 145, 154; 97 S Ct 1730; 52 L Ed 2d 203 (1976). Relief will be given only when necessary to avoid manifest injustice to the defendant. *Id.*

**Preservation of Issue:** Trial defense counsel expressed satisfaction with the reading of the instructions. JT-II-114. In *People v Van Dorsten*, 441 Mich at 542, the defendant did not request a specific unanimity instruction, nor did he object to the instruction given and, therefore, he failed to preserve the issue for appellate review. Likewise, in this case, defendant did not request a specific unanimity instruction. Because defendant failed to object to the omitted instruction, defendant's claim of

RECEIVED by MCOA 3/19/2020 3:31:49 PM

error was forfeited. A forfeited, non-constitutional error may not be considered by an appellate court unless the error was plain and it affected defendant's substantial rights. *People v Grant*, 445 Mich 535, 552-553; 520 NW2d 123 (1994). Thus, review of this issue is limited to plain error affecting defendant's substantial rights. *People v Gonzalez*, 468 Mich 636, 643; 664 NW2d 159 (2003).

**Analysis:** Appellant erroneously claims: (1) the trial court violated Defendant's right to a unanimous verdict by failing to give a special unanimity instruction; and (2) Defendant was deprived of the effective assistance of counsel by his attorney's failure to request a special instruction on unanimity.

Appellant's argues that the prosecution charged Defendant with one count of first-degree home invasion, yet presented evidence of separate and distinct acts to satisfy the offense, particularly with respect to the first element, breaking or entering a home without permission.

The elements of first-degree home invasion are (1) defendant broke into a dwelling. It does not matter whether anything was actually broken; however, some force must have been used. Opening a door, raising a window, and taking off a screen are all examples of enough force to count as a breaking. (2) Defendant entered the dwelling. It does not matter whether the defendant got his entire body inside. If the defendant put any part of his body into the dwelling after the breaking, that is enough to count as an entry. (3) That when the defendant entered, was present in, or was leaving the dwelling, he committed the offense of assault. (4) That when the defendant entered, was present in, or was leaving the dwelling,

RECEIVED by MCOA 3/19/2020 3:31:49 PM

another person was lawfully present in the dwelling. M Crime JI 25.2a. The prosecutor talked about these elements—where more than one act is presented as evidence of the actus reus of a single criminal offense—during his opening statement and his closing argument. JT-I-82-83; JT-II-62-63.

In *People v Cooks*, 446 Mich 503, 512; 521 NW2d 275 (1994), the Supreme Court wrote: "we reach the conclusion that a specific unanimity instruction is not required in *all* cases in which more than one act is presented as evidence of the actus reus of a single criminal offense. The critical inquiry is whether either party has presented evidence that *materially* distinguishes any of the alleged multiple acts from the others. In other words, where materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice."

Where the government has presented evidence of a series of materially indistinguishable acts, each of which would factually satisfy the actus reus element of the alleged criminal offense, numerous federal courts have declined to require a specific unanimity instruction. *Id*., at 517.

In *Cooks*, the Michigan Supreme Court wrote about a "continuing offense" exception to the need for a specific unanimity instruction "when alternative acts are presented as evidence of a single criminal offense. *Id*., at 519-520. The "continuous conduct exception" to the need for a unanimity instruction occurs in two circumstances: when the *two offenses are so closely connected in time that they form part of one transaction*; or when the *offense consists of a continuous course of*

RECEIVED by MCOA 3/19/2020 3:31:49 PM

*Livingston County Prosecutor's Office*

*conduct. Cooks, supra* at 522. This is not a case in which different witnesses testified as to one incident but not the other or where different items of real evidence were introduced to prove one act but not the other, so that the jury might have distinguished between either the credibility of different witnesses or the weight to be given various items of real evidence. *Cooks, supra* at 523. The defense provided the jury with no evidence that focused on one act but not the other. *Id.*

The facts in this case demonstrate a continuous course of conduct on the part of the defendant towards the victim. Additionally, the offenses are so closely connected in time that they form part of one transaction. Thus, in this case, the court sufficiently instructed the jury: "A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict." JT-II-108.

If alternative acts allegedly committed by defendant are presented by the state as evidence of the actus reus element of the charged offense, a general instruction to the jury that its decision must be unanimous will be adequate unless 1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt. *Cooks, supra* at 524.

The *Cooks* Court, *supra* at 530, wrote: "In conclusion, when the state offers evidence of multiple acts by a defendant, each of which would satisfy the actus reus

element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt. When neither of these factors is present, as in the case at bar, a general instruction to the jury that its verdict must be unanimous does not deprive the defendant of his right to a unanimous verdict."

To determine whether one continuing offense may be charged, the facts must be evaluated in a commonsense manner. *Cooks*, *supra* at 533. Although there was evidence of different acts that might have supported a conviction for the charged offense, the failure to give a specific unanimity instruction did not amount to a plain error affecting defendant's substantial rights. The acts were not materially distinct, but rather occurred within the same sequence of events.

Appellant keeps quoting the prosecutor's closing argument that defendant "kind of" committed two home invasions that night. And two assaults if defendant's logic is followed. So, if the prosecutor had charged two counts of home invasion first degree, defendant would now be arguing same transaction double jeopardy. The prosecutor did not charge two counts because this was a continuous action on the part of the defendant. If the prosecution had charged two counts of First Degree Home Invasion, the defendant would have argued that this was all part of the same transaction, and the prosecutor was "piling on." But, the defendant's actions were not separate and distinct, but rather part of the same transaction.

*Livingston County Prosecutor's Office*

RECEIVED by MCOA 3/19/2020 3:31:49 PM

The fallacy of Appellant's argument is demonstrated by the following hypotheticals:

● A burglar breaks into a house through a window, but he can only carry one item (e.g., a television, a stereo, jewelry, furs, etc.) from the house at a time. Does that mean he must be charged with a count of home invasion for each item? No, because these larcenies are all part of the same transaction.

● A bar fight occurs, and a defendant hits the victim multiple times with his fist. Technically, each time the defendant cocks his fist and strikes the victim is an assault and battery. However, the acts are not materially distinct, but rather occurred within the same sequence of events, and, unless there is more than one victim, it will be charged as one count of assault and battery.

## A. The trial court did *not* violate the right to a unanimous verdict by failing to give a special unanimity instruction.

Criminal defendants are guaranteed a unanimous jury verdict under the state constitution. See Const 1963, art 1, § 14; *People v Cooks*, 446 Mich at 510-511. Consequently, trial courts are required to give proper instructions regarding the unanimity requirement. *Id*. at 511. In some circumstances, a general unanimity instruction such as the one given in this case is not adequate to ensure a defendant's right to a unanimous jury verdict. But, this is not one of those cases.

The acts were not materially distinct and there is no reason to believe that the jurors might be confused or disagree about the factual basis of defendant's guilt. Because this issue was not preserved at trial, the test is manifest injustice.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

*Livingston County Prosecutor's Office*

**1. The alternate acts presented as evidence were _not_ conceptually distinct and there were _not_ different proofs regarding each alternative.**

Defense counsel maintained that defendant's entry was with permission. The complainant acknowledged that she had given defendant her garage code and had let him use it to enter the home in lieu of a key. She hired him to change the locks after her ex-boyfriend moved out. They were not "romantically involved" as Appellant claims, but rather the complainant testified that they "hooked up" on Tinder.

Appellant claims a juror could have reasonably found that defendant had implicit permission to enter the home using the garage code as he had in the past. This is a red herring because the complainant testified they had quarreled that night and she had blocked his texts and phone calls. The victim testified that defendant was not welcome to let himself in, and she had not invited him over that night. Defendant had never been given a key to the victim's residence, and the code only opened the garage door, not the door leading from the garage into the residence. Moreover, the victim's testimony was unrefuted.

Appellant claims the acts at issue did not occur so closely in time that they constituted one Home Invasion but this was a continuous transaction. See _Cooks_, _supra_, and corresponding argument above.

Appellant erroneously argues the two alleged home invasions here cannot be continuous because the prosecutor alleged two distinct crimes. That is not true. There was only one charge of Home Invasion with different facts satisfying one of

RECEIVED by MCOA 3/19/2020 3:31:49 PM

the elements. The facts underlying the charge were all part of the same, continuous transaction.

Appellant argues the prosecutor alleged two distinct crimes and this is proved by what he said at sentencing about OV 12 scoring. However, what the prosecutor said at sentencing had no impact on his trial. Additionally, what the prosecutor said at trial was not evidence, and the jury was instructed to decide the case based only on the properly-admitted evidence, which includes only the sworn testimony of witnesses and exhibits. Additionally, the court instructed jurors that the lawyers' statements and arguments are not evidence. JT-II-97-99. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Furthermore, the People concede that Defendant is going to be resentenced and OV 12 can only reflect facts found by the jury, i.e., only one Home Invasion conviction.

**2. There was no juror confusion or disagreement.**

In *People v Rigsby*, 92 Mich App 95, 98; 284 NW2d 499 (1979),[2] the Court wrote, "the power of the appellate court to review jury instructions in the absence of objection of counsel is discretionary and is to be used 'sparingly.'"

At 1:15 p.m., the jury was taken out to begin deliberations. (JT-II-115) The court reconvened at 2:21 p.m. with a note from the jury asking for the transcript of Heather Miner's testimony. (JT-II-117) The jurors were told to rely on their

---

[2] Although published decisions of the Court of Appeals issued before November 1, 1990 are not precedentially binding, MCR 7.215(J)(1), they may be considered as persuasive authority. *People v Barbarich*, 291 Mich App 468, 476 n 2; 807 NW2d 56 (2011).

RECEIVED by MCOA 3/19/2020 3:31:49 PM

collective memories, and continue their deliberations. (JT-II-118-119) At 4:40 p.m., the jury reached a verdict. (JT-II-120-121) Thus, there is no record evidence of juror confusion or disagreement.

## B. Trial counsel's failure to object.

Appellant claims defendant had "implicit permission to enter" but that is a red herring because the complainant quarreled with defendant and blocked his phone calls and texts. Nobody in their right mind would consider a quarrel followed by blocking calls and texts—essentially "ghosting"—as an invitation to come over and crawl into bed. The victim testified that defendant was not welcome to let himself in, and she had not invited him over that night. Defendant had never been given a key to the victim's residence, and the code only opened the garage door, not the door leading from the garage into the residence. Moreover, the victim's testimony was unrefuted by any evidence the jury heard.

Appellant claims that trial counsel's failure to object to the prosecutor's statements (either entry could satisfy the first element of first-degree home invasion), and failure to request a specific instruction on unanimity fell below an objective standard of reasonableness. But, "Michigan criminal juries are not required to unanimously agree upon every fact supporting a guilty verdict." *People v Gadomski*, 232 Mich App 24, 30; 592 NW2d 75 (1998). In *Gadomski*, *supra* at 32, defendant also argued that he was denied the effective assistance of counsel when his trial counsel failed to request a special unanimity instruction: "We disagree.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

Because defendant was not entitled to such an instruction, defense counsel's failure to request the instruction did not constitute ineffective assistance of counsel."

Appellant claims the jury did not blindly credit the complainant's account of the evening because, despite her testimony that defendant forcefully took her phone and tried to prevent her from calling police, the jury acquitted defendant of the interfering with a crime report charge. It is just as likely that the jury found defendant not guilty because the victim was still on the phone with 911 when the police officer arrived.

In our case, there is but one victim, and one continuous transaction, involving an entry without permission. The only reason defendant had the code was because he helped the victim set it up. The victim's testimony was unrefuted: Defendant did not have permission to come and go as he pleased, especially the night of this incident when the victim and defendant quarreled and she blocked him from calling or texting. Under no circumstances can that be considered as an invitation to come over and let yourself in. The complainant testified that defendant did not have permission to enter whenever he felt like it. If defendant had left when the complainant told him to, it is unlikely that she would have even reported it. Instead, the defendant refused to leave, and a physical altercation ensued, which did not end until the police arrived.

Claims of instructional error are considered in the context of all the instructions given. *People v Adams*, 92 Mich App 619, 627; 285 NW2d 392 (1979). Defendant further argues that the trial court's instructions were misleading. None

RECEIVED by MCOA 3/19/2020 3:31:49 PM

of these instructions were objected to by defense counsel. In the absence of manifest injustice or a miscarriage of justice, a conviction should not be set aside on the basis of jury instructions when no objection is raised at trial. 92 Mich App at 627.

If this Court rules for Defendant, it is instructing the prosecutor to charge two counts of Home Invasion based on the facts of this case. Otherwise, on retrial, the prosecution will face the same issue. All twelve jurors could agree that a home invasion occurred, but if they disagree on which underlying facts support an element of the offense, they could acquit, which would create manifest injustice to the People.

The applicable court rule and statute also support affirming the Defendant's conviction. MCR 2.613(A) reads: "An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice." Similarly, MCL 769.26 reads: "No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

RECEIVED by MCOA 3/19/2020 3:31:49 PM

This Court should find no manifest injustice in this case. The home invasion involved a continuing transaction within the same time frame, within the same location, and involving the same victim. The jury did not need to assess and weigh the credibility of multiple witnesses, but rather only the victim. The verdict turned on whether the jury believed the victim, or found reasonable doubt, as urged by defense counsel who pointed out inconsistencies in the testimony and argued that the police investigation was incomplete. (JT-II-74-83) Given that posture of the case, there was no reason for the parties to focus on whether there were two allegations of home invasion. "In this context, the failure to give an instruction requiring unanimity on a particular act in no way impeded the defense or denied the defendant a fair trial." *Van Dorsten*, *supra* at 545.

## II

**The amended Information, which included a sentencing enhancement under MCL 769.12, should have been filed within 21 days of the original Information, and that did not occur. Thus, the People concede that Defendant/Appellant is entitled to resentencing as a second habitual offender, MCL 769.10, as charged in the original Information.**

The original Information included a Habitual Offender, 2nd Offense, Notice, MCL 769.10, and the amended Information included a Habitual Offender, 4th Offense Notice, MCL 769.12. The time limits for filing sentencing enhancements under MCL 769.10, 769.11, and 769.12 is governed by MCL 769.13. The amended Information, which included a sentencing enhancement under MCL 769.12, should have been filed within 21 days of the original Information, and that did not occur. Thus, the People concede that Defendant/Appellant is entitled to resentencing as a

RECEIVED by MCOA 3/19/2020 3:31:49 PM

second habitual offender, MCL 769.10, as charged in the original Information. This concession is supported by the holdings found in *People v Hornsby*, 251 Mich App 462, 471; 650 NW2d 700 (2002) and *People v Johnson*, 495 Mich 919; 840 NW2d 373 (2013).

## III

**Appellate Courts generally do not address moot questions or declare legal principles that have no effect in a case. Any issue of guidelines scoring is moot because the guidelines will be rescored, and Defendant will have an opportunity to challenge them at Defendant's resentencing. Guidelines scoring issues can best be addressed by the circuit judge at Defendant's resentencing, which the prosecution concedes is necessary.**

The trial court scored fifteen points for PRV 5, ten points for OV 10, ten points for OV 12, and fifteen points for OV 19. However, since the People concede that Defendant is entitled to resentencing as a Habitual Offender, 2nd Offense, any issue of guidelines scoring is moot because the guidelines will be rescored prior to Defendant's resentencing. See *Barrow v Detroit Election Comm*, 305 Mich App 649, 659; 854 NW2d 489 (2014) ("We generally do not address moot questions or declare legal principles that have no practical effect in a case.").

The Appellant's argument regarding the number of usable prior misdemeanor convictions can best be addressed by the circuit judge at Defendant's resentencing. Additionally, the Appellant's arguments regarding the scoring of OV 10, OV 12, and OV 19 can best be addressed by the circuit judge at Defendant's resentencing, which the prosecution concedes is necessary.

RECEIVED by MCOA 3/19/2020 3:31:49 PM

**Conclusion and Request for Relief**

This case comes under the "continuing offense" exception to the need for a specific unanimity instruction. *Cooks*, 446 Mich at 519-520. The "continuous conduct exception" to the need for a unanimity instruction occurs in two circumstances: when the two offenses are so closely connected in time that they form part of one transaction; or when the offense consists of a continuous course of conduct. *Cooks*, *supra* at 522. This case involved both prongs of the *Cooks* test: two offenses so closely connected in time that they formed part of one transaction, and, also the first-degree home invasion consisted of a continuous course of conduct.

Based on the foregoing arguments, the People respectfully ask this Court to **affirm** the Defendant/Appellant's Home Invasion, 1st Degree conviction, and remand for resentencing as an Habitual Offender, 2nd Offense.

Respectfully submitted,

WILLIAM J. VAILLIENCOURT, JR. (P39115)
LIVINGSTON COUNTY PROSECUTOR

**Dated:** 03/19/2020

/s/ *William M. Worden*

**William M. Worden (P39158)**
Assistant Prosecuting Attorney
210 S. Highlander Way
Howell, Michigan 48823
(517) 546-1850

RECEIVED by MCOA 3/19/2020 3:31:49 PM