# STATE OF MICHIGAN

# IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

      Plaintiff-Appellee

-vs-

**GARY THOMAS FISCHER**

     Defendant-Appellant.

_____/

**Court of Appeals No.** 348539

**Lower Court No.** 18-25329 FH

**LIVINGSTON COUNTY PROSECUTOR/**
Attorney for Plaintiff-Appellee

_____

**KATHERINE L. MARCUZ (P76625)**
Attorney for Defendant-Appellant

_____

# MOTION TO REMAND

# BRIEF IN SUPPORT OF MOTION TO REMAND

**STATE APPELLATE DEFENDER OFFICE**
**BY:   KATHERINE L. MARCUZ (P76625)**
    **Assistant Defender**
    3300 Penobscot Building
    645 Griswold
    Detroit, Michigan 48226
    (313) 420-2924

# STATE OF MICHIGAN

# IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

                    Plaintiff-Appellee

-vs-

**GARY THOMAS FISCHER**

                    Defendant-Appellant.

_____/

**Court of Appeals No.** 348539

**Lower Court No.** 18-25329 FH

## <u>MOTION TO REMAND</u>

Defendant-Appellant **GARY THOMAS FISCHER**, through his attorneys, the

**STATE APPELLATE DEFENDER OFFICE**, by **KATHERINE L. MARCUZ**,

respectfully asks this Honorable Court to remand the matter to the trial court, pursuant

to MCR 7.211(C)(1)(a), stating:

1.      On March 5, 2019, following a jury trial before the Honorable L. Suzanne

Geddis in the Livingston County Circuit Court, Mr. Fischer was convicted of first degree

home invasion, aggravated assault, and resisting and obstructing a police officer.

2.      On April 4, 2019, Judge Geddis sentenced Mr. Fischer, as a fourth

habitual offender, to serve fifteen to fifty years in prison.

3.      A Claim of Appeal was filed on April 17, 2019.

4.      Mr. Fischer's Brief on Appeal was timely filed on January 22, 2020.

5.      Prior to filing the Brief on Appeal, undersigned counsel conducted an

extensive investigation including obtaining and reviewing records, interviewing

i

potential witnesses, speaking with trial counsel on two occasions, and retaining and consulting with an expert in cell phone forensics. Undersigned counsel obtained Mr. Fischer's Samsung Note 5 from his family and provided it to Larry Dalman of Dalman Investigations to conduct a cell phone forensic examination. Mr. Dalman is a retired Michigan State Police Detective Sergeant and a licensed investigator certified in Cellebrite Advanced Smartphone Analysis.

6.      Mr. Dalman attempted to do a physical extraction using Cellebrite software but got locked out of the phone in the process. He noted that the phone was in "safe mode"[1] when he received it and suspected that may have caused the problem. Mr. Dalman then rebooted the phone to get it out of safe mode so the SMS/MMS/apps could load and be recovered. When it booted up, Dalman had security issues and was prompted to log in. At that time Mr. Dalman was not sure if the data was gone or if he just had to log into the phone as Mr. Fischer. Undersigned counsel provided Mr. Dalman Mr. Fischer's Gmail address and password and communicated with Mr. Fischer's family to obtain his recovery email and password. Approximately two weeks later, Mr. Dalman confirmed that he was able to get into the phone and recover the address book, but that everything else—text messages, photos, phone logs—was gone. Mr. Dalman could not definitively explain what happened but opined that the data was lost when he got locked out of the phone. Mr. Dalman suggested that he return the phone for inspection and

---

1 The Safe Mode function on a Samsung Galaxy Note allows a user to turn on the device with third-party apps disabled so that the user can easily uninstall apps that may be causing a conflict or software problem.

that undersigned counsel work with Mr. Fischer and his family to look for a backup file from the cloud.

7.      Undersigned counsel then continued to investigate and obtain the relevant information through other means. The phone was not fully backed up to a cloud service, but some data—photos, contacts, location history, and web activity--was synced with Gary's Google account and accessible by logging in to Google as Gary. Without a physical extraction and report detailing the contents of the device, undersigned counsel had to review everything potentially relevant, screenshot content to save it, and capture the metadata as well. See Appendices C, D, E, and F. Counsel also obtained the log-in information for Mr. Fischer's Facebook account, downloaded all data, and reviewed the hundreds, if not thousands, of direct messages exchanged between Mr. Fischer and Ms. Miner—a portion of which are attached as Appendix G.

8.      The additional investigation and documenting made necessary after Mr. Dalman inadvertently wiped the phone of useful data required considerably more time. Undersigned counsel is filing this motion to remand, brief in support with offer of proof, and appendix as soon as possible considering the circumstances, counsel's other caseload and teaching obligations, and the delays caused by sheltering-at-home due to COVID-19.

9.      This Court may order remand for an evidentiary hearing at any time. MCR 7.216(A)(5); *see also People v LaPlaunt*, 217 Mich App 733 (1996); *People v Krogol*, 419 Mich 900 (1984); *People v Mayes*, 433 Mich 894 (1989).

10.   A remand is necessary to develop the factual record necessary for appellate review, MCR 7.211(C)(1)(a)(ii), and so that Mr. Fischer can move in the trial court for a new trial, MCR 7.211(C)(1)(a)(i), for the following reasons: (a) Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney unreasonably failed to conduct an investigation, present a defense, and impeach the complainant with information critical to her credibility and the resolution of the case; (b) Mr. Fischer was deprived of his right to effective assistance of counsel as well as his fundamental right to testify in his defense due to counsel's deficient legal advice; (c) Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney received a plea offer but never communicated that offer to Mr. Fischer.

11.   The brief in support of this motion, which Mr. Fischer incorporates herein, more thoroughly discusses the above issues and the need for a remand.

**WHEREFORE**, Defendant-Appellant Gary Fischer respectfully requests that this Honorable Court grant the Motion to Remand.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY:   /s/ Katherine L. Marcuz
**KATHERINE L. MARCUZ (P76625)**
**Assistant Defender**
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 420-2924

Date: May 4, 2020

iv

# STATE OF MICHIGAN

# IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

              Plaintiff-Appellee,

-vs-

**GARY THOMAS FISCHER**

          Defendant-Appellant

_____/

**LIVINGSTON COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee
_____

**KATHERINE L. MARCUZ (P76625)**
Attorney for Defendant-Appellant
_____

**Court of Appeals No.** 348539

**Lower Court No**. 18-25329 FH

# BRIEF IN SUPPORT OF MOTION TO REMAND

**STATE APPELLATE DEFENDER OFFICE**

**BY:**   **KATHERINE L. MARCUZ (P76625)**
       **Assistant Defender**
       3300 Penobscot Building
       645 Griswold
       Detroit, Michigan 48226
       (313) 420-2924

## <u>Table of Contents</u>

Index of Authorities.......................................................................................i

Statement of Facts .......................................................................... 1

I.   Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney unreasonably failed to conduct an investigation, present a defense, and impeach the complainant with information critical to her credibility and the resolution of the case. Moreover, Mr. Fischer was deprived of his right to effective assistance of counsel as well as his fundamental right to testify in his defense due to counsel's deficient legal advice. ......................................................... 16

   A.  Trial counsel performed deficiently where he failed to investigate and failed to impeach Ms. Miner with evidence that she misrepresented the nature of her relationship with Mr. Fischer. Doing so would have diminished the reliability of her trial testimony and supported Mr. Fischer's version of events. ....................................................................... 17

   B.  Trial counsel performed deficiently where he provided belated and inaccurate legal advice that deprived Mr. Fischer of his fundamental right to testify in his defense.................................. 23

   C.  These errors, individually and collectively, undermine the reliability of Mr. Fischer's guilty verdict. ..................................... 25

II.  Mr. Fischer's state and constitutional rights to effective assistance of counsel were violated when trial counsel received a plea offer but never communicated that offer to Mr. Fischer...................................................... 29

Summary and Request for Relief......................................................... 35

KLM*COA Brief in Support of MTR 5-4-20.docx*31731
Gary Thomas Fischer

# Index of Authorities

Cases

*Byrd v Skipper*, 940 F3d 248 (CA 6 2019)............................................................. 32, 33
*Cannon v Mullin*, 383 F3d 1152 (CA 10 2004) ............................................................ 25
*Harrison v Motley*, 478 F3d 750 (CA 6 2007)............................................................. 25
*Hill v Lockhart*, 474 US 52 (1985) .......................................................................... 34
*Kyles v Whitley*, 514 US 419 (1995)......................................................................... 28
*Lafler v Cooper*, 556 US 156 ................................................................................. 33
*Lee v United States*, 137 S Ct 1958 (2017) ................................................................ 33
*Mackey v Russell*, 148 Fed Appx 355 (CA 6, 2005) ...................................................... 28
*Maples v Stegall*, 340 F3d 433 (CA 6 2003) ............................................................... 25
*Missouri v Frye*, 566 US 134 (2012) ........................................................................ 30
*Padilla v Kentucky*, 559 US 356 (2010) .................................................................... 25
*People v Armstrong*, 490 Mich 281 (2011)............................................................ 19, 27
*People v Crews*, 299 Mich App 381 (2013) ................................................................ 32
*People v Douglas*, 496 Mich 557 (2014).................................................................... 30
*People v Ellis*, 224 Mich App 752 (1997)................................................................... 33
*People v Grissom*, 492 Mich 296 (2012).................................................................... 27
*People v LeBlanc*, 465 Mich 575 (2002).................................................................... 28
*People v Pickens*, 446 Mich 298 (1994).................................................................... 17
*People v Pippen*, 500 Mich 937 (2017)..................................................................... 27
*People v Tanner*, 387 Mich 683 (1972) ..................................................................... 31
*People v Trakhtenberg*, 493 Mich 38 (2012)........................................................ 17, 18, 19, 27
*Rayborn v United States*, 489 F Appx 871 (CA 6 2012)................................................... 25
*Rodriguez-Penton v United States*, 905 F3d 481 (CA 6 2018)........................................ 32,33
*Strickland v Washington*, 466 US 668 (1984)......................................................... passim
*Wiggins v Smith*, 539 US 510 (2003) ....................................................................... 18
*Williams v Taylor*, 529 US 362 (2000) ..................................................................... 28

Statutes

Const 1963, art 1, § 20........................................................................................ 17
MCL 750.110(a)(2) ............................................................................................. 31
MCL 750.110(a)(3) ............................................................................................. 31
MCL 750.110a(3) ............................................................................................... 31
MCL 769.10...................................................................................................... 31
MCL 769.12...................................................................................................... 31
MCL 777.64...................................................................................................... 32
MRE 609.......................................................................................................... 24
MRE 609(a) ...................................................................................................... 24

## Statement Of Facts

**Overview**

Throughout the summer of 2018 Gary Fischer and Heather Miner were romantically involved. Heather gave Gary her garage door code so that he could let himself in when they spent time together at her home. On September 17, 2018, Gary and Heather got into an argument over the phone. A short time later, Gary went over to Heather's house and let himself in through the garage door. Heather asked Gary to leave, he refused, and she threatened to call the police. When Gary tried to take the phone from her, she punched him in the face then pushed him into her linen closet. A physical fight ensued with both parties landing blows.

Gary was charged with first-degree home invasion, interfering with a crime report, resisting arrest, and aggravated assault. Prior to trial, trial counsel received a plea offer to reduced charges but never communicated it to Gary. Appendix H ¶¶ 5, 8; Appendix A ¶¶ 22-23. Counsel also failed to object when the prosecutor impermissibly amended the habitual offender enhancement outside of the 21-day statutory period. See ROA, Lower Court Record.

Trial took place over two days in March 2019, before the Honorable L. Suzanne Geddis in the Livingston County Circuit Court.

At trial, Heather downplayed her relationship with Gary, stating, "We were never in a relationship. We would hook up, for lack of a better term." T1, 167.[1] She testified that she had seen him "maybe seven to ten" times between June (when her

---

[1] The trial transcripts are abbreviated as follows: 3/4/19 Trial Tr. ("T1"); 3/5/19 Trial Tr. ("T2"); Sentencing 4/4/19 ("S").

ex moved out) and the incident on September 17th. T1, 93. According to Heather, three of those times were when Gary was "doing work" for her in her house. T1, 94. Heather testified that it was unusual to wake up and see him in her house. T1, 112. And when asked whether Gary had spent time with her two sons, Heather replied, "They've been in the same vicinity as me and Gary . . . but we never did anything together." T1, 169.

Defense counsel waived his opening statement and rested without presenting any evidence. T2, 53. In closing argument, he asserted that Gary and Heather had a relationship and Gary was not guilty of home invasion because he had implicit permission to enter the house as he had in the past. TII, 74, 79.

What the jury did not hear is that over the summer of 2018, Gary and Heather talked nearly every day, saw each other frequently, and Gary sometimes spent the night at Heather's home. Appendix A, ¶ 2; Appendix G. Critically, they also did not learn that Gary stayed at Heather's home with her and her children for the five days and nights leading up to the night of the incident. Appendix A, ¶¶ 2, 7. During this time, Gary slept in Heather's bed, was in the house alone while Heather was at work, and came and went using the garage code. Appendix A ¶ 8; Appendix E. He also helped with projects around the house, helped Heather pick out a new car, and drove from Howell to Detroit to pick up Heather's son from school and bring him home. Appendix A ¶ 9-10; Appendix E; Appendix F. Gary's phone activity and Facebook messages from that time period support and illustrate this story. Appendices D, E, F, G.

The jury did not learn any of this critical information because trial counsel failed to conduct an adequate investigation, failed to develop this evidence, failed to utilize key impeachment evidence, and failed to properly advise Gary about the pros and cons of testifying in his own defense. Appendix A ¶¶ 25-27. Mr. Fischer deserves a new trial and/or the opportunity to avail himself of the plea offer he was never made aware of. Appendix A ¶¶ 22-23; Appendix H ¶¶ 5,8. This Court should remand to further develop the record as to counsel's representation and the prejudice to Mr. Fischer that resulted.

**Pertinent trial evidence**

Gary and Heather met through an online dating service in 2015. T1, 90, 168. While Heather denied being in a "relationship" with Gary, she acknowledged that they had been sexually involved on and off for roughly three years and said "I love you" to each other. T1, 90, 166, 167. Beginning in 2016, Heather did not speak to Gary for a time because she got back together with an ex-boyfriend, Shawn Cotton. When Shawn and Heather broke up in June of 2018, Heather and Gary reunited. T1, 92-93. After the break-up with Shawn, Gary fixed Heather's garage door and changed the code for her. T1, 168. He also changed the locks of her house for her. T1, 168. Heather gave Gary the garage code to use to enter the house when she invited him over. T1, 94. She would also leave the door leading from the garage to the house unlocked for him. T1, 94.

About three months after Heather started seeing Gary again, she told him that Shawn and his sons "kidnapped" her dog, Maggie, from her condo. T1, 98-99,

110. Heather was heartbroken, and Gary agreed to help her try and get her dog back. T1, 99. On September 17, Gary called Heather to let her know that he had driven to Shawn's house and seen him with Maggie, but that he had not been able to get the dog back. T1, 100-101. On that day, Heather had smoked marijuana. T1, 172. Heather became upset at Gary because she was nervous that Shawn was going to call the police on them and thought they had agreed not to go there anymore. T1, 100-102. Gary expressed surprise and told Heather that he thought getting Maggie back was what she wanted. T1, 103. According to Heather, after exchanging several more texts back and forth, she told Gary she was "blocking" him. T1, 103. She then went to sleep between 9:00-10:30pm that evening. T1, 104-105. She left the door between the garage and the home unlocked. T1, 96-97.

Heather testified that she woke up sometime later to find Gary getting into bed next to her, and he was intoxicated. T1, 111-112. Heather stated that she immediately told Gary to leave, and, when he refused, used her feet to push him towards the edge of the bed. T1, 112-113. Gary got out of the bed and Heather began walking him towards the bedroom door while putting his shoes and belongings in his hands. T1, 114. While this was happening, Heather chastised Gary for drinking and driving and he faulted her for trying to make him drive intoxicated again. T1, 114-115. According to Heather, when they got to the bedroom door, Gary said that he was not going to leave and that she could not make him. T1, 115-116. Heather said that if she could not, then the cops could, and then reached for her phone. T1, 116.

4

As per Heather, when she reached for her phone, Gary grabbed her arm and took the phone from her. T1, 116. Heather responded by punching Gary with a closed fist and shoving him until they both ran into the linen closet. T1, 117-118. Then, according to Heather, Gary then hit her in the head with the cellphone. T1, 118. Heather screamed at Gary, and they began fighting. T1, 119. Heather admits there are parts of the fight she does not remember. T1, 120. However, she said at some point, they ended up on the floor near her dining room, and she alleged that Gary hit her head into the floor three times. T1, 120-121. After this, they got back up, and Heather tried to slam him into the cabinets, upon which he pushed her back into the table. T1, 123. Ultimately, Heather and Gary ended up back on the floor and Heather grabbed and squeezed Gary's genitals before biting him in the face. T1, 125. Gary let go of the phone, and when he got up to retrieve it, Heather ran downstairs and out through the garage. T1, 126, 128-129.

A short time later, Heather decided to go back into the house. T1, 130. As she walked back inside, Gary was standing in the doorway connecting the house and garage.

He told her he would give her phone back if she agreed not to call the police. T1, 131. Heather grabbed the phone out of Gary's hand, ran inside, and locked the door. T1, 131-132. She then grabbed a kitchen knife, went into the bathroom, and called 911.[2] T1, 133.

---

[2] The call was entered into evidence as People's Exhibit ("P x") 22. T1, 143.

Sometime later, Heather heard a noise downstairs, then saw Gary in the house. T1, 135. She did not know how he got back in and was still on the phone with 911 at this time. T1, 135. According to Heather, the two started wrestling while she held the knife in one hand and her cellphone in the other. T1, 137. She then claimed that Gary chased her around the house but stopped when he saw police lights outside. T1, 137-138. Eventually, after throwing some furniture which hit the walls and the light fixture, Gary left the house. T1, 140.

Officer Fogo responded to the 911 call. When he saw Gary walking away from the house, he commanded him to put up his hands. Gary began running, ran into a trash can, fell, and was tackled. T1, 213-215. Officer Fogo testified that Gary seemed intoxicated but was mostly "cooperative and cordial" after he allowed himself to be handcuffed. T1, 217, 225.

While Officer Fogo was with Gary, a second officer, Officer Vallance, entered the house. T2, 7. Officer Vallance encountered Heather with a knife in one hand, and the phone in the other. T2, 7. Heather told Officer Vallance she had been attacked by Gary. T2, 8-9. Officer Vallance noted that Heather had some bruising on her chest and arm, blood on her face, and a broken tooth. T2, 8, 12-13; P x 14-21. Heather also complained of bumps on her head, but Officer Valance did not photograph or inspect her. T2, 13.[3]

After talking to Heather, Officer Vallance looked at the front door. T2, 17. She noted that the trim had been broken off and it was no longer on the hinges. T2,

---

[3] The injuries to Gary's face were also documented. T1, 158.

17. She did not recall any shoe marks or pry marks and had no opinion on how it got open. T2, 17.

The police seized Heather's cell phone but did not obtain her phone records or review the calls and text messages between Heather and Gary. T2, 30.

After the People rested, and after the jury had been excused, trial counsel stated, "my reason for asking the Court to send the jury out was to put a record on about my client testifying. My client has indicated to me, he'd like to talk to me for a few minutes before we put that on the record" and asked for a short recess. T2, 49-50. When court reconvened, Gary acknowledged his right to testify in his own defense and stated that it was his choice not to testify. T2, 50-51. Trial counsel noted that Gary originally planned to testify in his own defense but had changed his mind after talking to family members and people in the jail, and that the decision not to testify was based not only on counsel's advice but on the advice of others as well as Gary's "own personal feelings." T2, 51-52. Defense counsel then waived his opening statement and rested without presenting any evidence. T2, 53-54.

Gary was found guilty of Count 1, home invasion first degree, Count III, resisting and obstructing a police officer, and Count IV, aggravated assault. T2, 121. He was found not guilty of Count 2, interfering with a crime report. T2, 121.

On April 4, 2019, Gary was sentenced as a fourth habitual offender. Though he was initially charged as a second habitual offender, the prosecutor amended the Information to increase the habitual enhancement from second to fourth, well after the 21-day statutory period. Felony Information and Amended Information, Lower

Court Record. Defense counsel did not object. Judge Geddis sentenced Gary to 15 years to 50 in prison. S, 14.

**Post-Conviction Offer of Proof**

The following offer of proof draws from appellate counsel's conversations with Gary (Affidavit of Gary Fischer, Appendix A) and Gary's trial lawyer (Statement of Attorney Katherine Marcuz, Appendix H) as well as counsel's examination of Gary's phone and Facebook data from the summer of 2018 (Google Photos of Gary Fischer and Heather Miner, Appendix C; Google Timeline Screenshots, Appendix D; Google Photos with Metatdata 9/13/18 to 9/16/18, Appendix E; Screenshot of Google Activity /Google Maps Search, Appendix F; Facebook Messenger messages between Gary Fischer and Heather Miner, Appendix G). The phone data—photos, Google activity, and location data—was retrieved from Gary's Google account (Gfishee@gmail.com), where it had automatically saved/synced. Undersigned counsel accessed and captured this data for the offer of proof. No data was edited, changed, or deleted. Should this Court grant remand for an evidentiary hearing, counsel could subpoena the records directly from Google.

Gary was represented by Rolland Sizemore III in the trial court. Mr. Sizemore was appointed on October 2, 2018. District Court ROA, Lower Court Record. Mr. Sizemore's communication with Gary was minimal. Sizemore came to visit him once in the Livingston County Jail in October 2018, approximately one month after he was arrested, for about 15 or 20 minutes. Appendix A ¶ 20; see also

Livingston County Jail Visitation Log for Gary Fischer, Appendix B (reflecting one visit from Rolland Sizemore III on 10/24/18).

In between this visit and the trial approximately five months later, Gary only spoke with his lawyer at court dates. Appendix A ¶ 21. Before trial, Mr. Sizemore never talked to Gary about their trial strategy or counseled Gary about the pros and cons of taking the stand. Appendix A ¶¶ 24-25.

While awaiting trial, Gary was interested in a plea offer to reduced charges. Appendix A ¶ 23. Though he maintained and continues to maintain that he had permission to enter Heather's home using the garage door code, he has never denied participating in the physical altercation or trying to run when confronted by Officer Fogo. Appendix A ¶ 23. See also PSIR, Defendant's Description of the Offense. When Gary talked to Mr. Sizemore about the possibility of a plea, Sizemore told him that there was no plea offer and that there would be no plea offer. Appendix A ¶ 22.

After a few attempts, appellate counsel was able to speak to Mr. Sizemore, See Appendix H, ¶¶ 3-5. Undersigned counsel asked whether there had been any offers as none were reflected on the record. Mr. Sizemore said the prosecutor did extend a plea offer, but because Gary had no interest in taking a plea, plea negotiations never went very far. Appendix H ¶ 5. Initially, Mr. Sizemore could not recall the specifics of the plea offer. Appendix H ¶ 5.

A few days later, after reviewing Gary's file, Mr. Sizemore had more information about the specifics of the offer. Appendix H ¶ 8. Sizemore said the state offered to reduce Count 1 from home invasion first to home invasion second and

reduce Count 2 from interference with a crime report to attempt interference with a crime report. Appendix H ¶ 8. Counts 3 and 4 would remain unchanged. Appendix H ¶ 8. And the state agreed to drop the habitual fourth offender enhancement down to a habitual second. Appendix H ¶ 8. According to Sizemore, the plea offer "didn't do a whole lot." Appendix H ¶ 8.

Undersigned counsel also asked Mr. Sizemore why Gary chose not to testify: the record indicated that Mr. Sizemore initially intended to call Gary as a defense witness, but Gary ultimately chose not to take the stand. Appendix H ¶¶ 6, 9. At the second phone call, after Mr. Sizemore had an opportunity to review his file, he stated that Gary did not testify because the prosecution was going to ask him about his prior convictions for aggravated assault and ethnic intimidation. Appendix H ¶¶ 7, 9.

Gary wanted to testify in his own defense at trial. Appendix A ¶ 26. He decided not to in part because he believed that if he testified the prosecutor would be able to question him about his prior convictions for aggravated assault and ethnic intimidation. Appendix A ¶ 27. If he had known that evidence of those prior convictions would not have been admitted, he would have testified. Appendix A ¶ 28.  Had Gary testified he would have told the jury the following:

In the summer of 2018, Gary and Heather spoke almost every day and Gary visited Heather at her home often. Appendix A ¶ 1-2. Sometimes he would spend the night there. Appendix A ¶ 2. They also met at a hotel on a couple occasions. Appendix A ¶ 26. When Gary went to Heather's house, he always entered through

the garage door. Appendix A ¶ 3. Heather gave him the code to the outer door and left the interior door unlocked for him. Appendix A ¶ 3.

From August 24 to September 12, 2018, Gary was in Alpena for a painting job. Appendix A ¶ 5. He is a housepainter by trade. Appendix A ¶ 5. While Gary was in Alpena, he and Heather talked frequently and planned to see each other the moment his job ended. Appendix A ¶ 6.

On September 12, 2018, Gary finished the job, packed up, and drove directly to Heather's house. Appendix A ¶ 7. Until his arrest six days later, he spent every night with Heather. Appendix A ¶ 7. While Heather was at work, Gary came and went from Heather's house, using the garage code each time. Appendix A ¶ 8.

Over the course of that week Gary picked up Heather's son from college and brought him back home for the weekend. Appendix A ¶ 10. He helped Heather negotiate the purchase price of a used car and then did some work on the car for her. Appendix A ¶ 9

And she helped him drive back a used car he purchased in Alpena. Appendix A ¶ 11. Gary also helped Heather try to recover a dog that Heather's ex-boyfriend took when the couple split up. Appendix A ¶¶ 12-13.

The day of the fight (September 17, 2018), Gary had a painting job in White Lake. Appendix A ¶ 14. When he finished, he tried once more to locate the dog, this time driving to the ex-boyfriend's house to see if he could find it. Appendix A ¶ 14. When Gary told Heather about it, Heather grew angry. Appendix A ¶ 15. Gary went

to a nearby restaurant and had some drinks while the couple continued to talk via phone calls and texts. Appendix A ¶ 16.

Around 10:30 pm, Gary returned to Heather's house. Appendix A ¶ 18. As usual, he used the garage code and entered through the unlocked interior door. Appendix A ¶ 18. The pair argued some more, but Heather never asked him to leave, and a short time later the couple had sex. Appendix A ¶ 18.

After the sex, Heather did ask Gary to leave. Appendix A ¶ 18. But Gary told her he did not want to go. Appendix A ¶ 18. Once more the couple started fighting, this time leading to a physical fight. Appendix A ¶ 18.

Trial counsel did not investigate the contents of Gary's phone (much of which was synced to his Google account) or Facebook account which corroborate his account.

One source of data is Gary's **Google Location History**. Appendix D, Google Timeline Screenshots. Google Location History tracks where you go with the reporting device (e.g. phone, iPad), reports that data to Google, and creates a timeline that you can view. Google Timeline (accessed through the Maps application) illustrates where you travelled, when, and the way you travelled from place to place, like walking, biking, driving, or public transportation. Google Location History can be turned on or off. Location History for Gary's Android phone was turned "on" for most of the summer of 2018.[4]

_____

[4] Location History was shut off on September 10, 2018, when Gary inadvertently reset his phone. See Appendix D, Google Maps Timeline screenshot showing first day of no

Accordingly, Gary's (phone's) locations from June to September 10, 2018 were reported to Google and can be viewed through the Timeline application. Timeline reflects that Gary's was at Heather Miner's home—1621 Welland Street Howell, Michigan 48855—on the following dates: June 20, 26, and 27; July 4, 8, 12, 13, 15, 16, 28; August 8, 9, 16, 17, 18. On August 24, 2018, Timeline reflects that Gary drove from Howell to Alpena. Appendix D.

Heather and Gary's **Facebook messages from September 11-17, 2018** are attached as Appendix G.[5] On September 11, 2018, Gary was still in Alpena and Heather was home in Howell. The two direct messaged[6] each other off and on all day discussing: a used car Gary had bought, what sort of car Heather should buy, the house Gary was painting, etc. Appendix G. They sent each other selfies, and called each other "babe," "lovie," and "hun." Appendix G. On September 12, 2018, they again messaged off and on throughout the day. Appendix G. At 6:27 pm, after sending Heather pictures of his painting work, Gary sent Heather a picture of himself in front of his packed-up van, with the message "Annnnnd I'm out!" Appendix G. Heather responded, "Yesssss" "And shaven 😎😎😎. Appendix G. Gary wrote "You [sic]" Twenty minutes later, Heather messaged, "Be safe". Gary replied, "Always. On the freeway to you , . ." Appendix G. About two hours later

---

location data: September 11, 2018 and screenshots showing no Location History data for dates 9/12/18 – 9/17/18.

[5] Undersigned counsel downloaded Gary's Facebook account information using Facebook's "Download your Information" tool.

[6] A direct message (DM) is a message only visible to the sender and the recipient.

Gary sent Heather a video of himself driving and singing along to the song 867-5309/ Jenny. Appendix G.

After viewing the video, Heather wrote, "Did you really text me a selfie video of u car dancing. Ur gonna regret that I promise u". Appendix G. A few minutes later Gary messaged a photo of his dashboard showing his speedometer over 100 mph. Appendix G. Heather replied "Gary . . . Knock that shit off . . . I'll lock ur ass out." Appendix G. Gary responded, "Lol . . . just playin . . . cruise at 80. Speed limit is 75." Appendix G. At 9:20 that evening Gary messaged, "Less than an hour away." Heather responded, "Woohoo!!" Appendix G.

**Gary's photos from September 13 - 16, 2018** (taken with his cell phone and synced to his Google account) show Gary and Heather together every subsequent day until the day of the incident. Google Photos with Metadata, Appendix E. Details about when, where, and how a photo was taken are captured automatically by smartphones and digital cameras and stored as EXIF (Exchangeable Image File Format) data. In Appendix E, appellate counsel has captured the relevant photos along with their corresponding data. On the morning of September 13, Gary took photos of himself in Heather's bed with her dog Kai. Appendix E. The following day, September 14, 2018, Gary took photos at Belle Isle with Heather's son Camden, as well as a picture of Heather standing outside her new car. Appendix E. On September 15, 2018, Gary took photos of Heather and her son driving Gary's new car—the used black Jaguar Gary bought while in Alpena, which Heather helped him drive home. Appendix E. These photos were taken in

Heather's neighborhood. Appendix E. On September 16, 2018, Gary took photos of Heather driving in Howell with Kai in the car. Appendix E.

Remand is necessary to expand the record on appeal with this information.

## Argument

**I.    Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney unreasonably failed to conduct an investigation, present a defense, and impeach the complainant with information critical to her credibility and the resolution of the case. Moreover, Mr. Fischer was deprived of his right to effective assistance of counsel as well as his fundamental right to testify in his defense due to counsel's deficient legal advice.**

At trial, counsel attempted to attack Heather Miner's credibility and show that, despite her assertions to the contrary, she and Gary were more than just acquaintances who would "hook up" from time to time. T1, 167. Establishing the nature of their relationship was critical to his overall defense—that Gary had Heather's implicit permission to use the garage door code like a key and enter her house on the evening of September 17, 2018.

Yet, trial counsel did not think it necessary to be prepared to prove that the relationship was more than transactional. And inexplicably, counsel entirely failed to inform the jury that Gary had spent the five days and nights leading up to the alleged home invasion staying at the home he allegedly broke into. Moreover, as a result of counsel's failure to communicate with his client before trial and his inaccurate legal advice given mid-trial, Gary was deprived of his right to testify in his own defense. The consequence of these many errors was that the jury never heard Gary's side of the story and Heather's account went virtually unchallenged.

There is at least a reasonable probability that but for trial counsel's errors, the outcome of the trial would have been different. Gary therefore asks that this Court remand for an evidentiary hearing so that he may develop the record in support

16

of his claim and move for a new trial.

***Legal Standard***

An accused is entitled to the effective assistance of counsel under both the state and federal constitutions. US Const, Ams VI, XIV; *Strickland v Washington,* 466 US 668 (1984); Const 1963, art 1, § 20; *People v Pickens,* 446 Mich 298, 302-303 (1994). To prevail on an ineffective assistance of counsel claim, the defendant must establish that counsel's performance fell below an objective standard of reasonableness and the deficiency prejudiced the defense. *Strickland*, 466 US at 687-688; *People v Trakhtenberg*, 493 Mich 38, 51 (2012).

To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A defendant need not show that counsel's error more likely than not affected the outcome. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. A reasonable probability is simply a probability sufficient to undermine confidence in the outcome. *Id*. at 694.

**A. Trial counsel performed deficiently where he failed to investigate and failed to impeach Ms. Miner with evidence that she misrepresented the nature of her relationship with Mr. Fischer. Doing so would have diminished the reliability of her trial testimony and supported Mr. Fischer's version of events.**

The proper functioning of the adversarial process demands independent investigation and preparation by counsel. "[T]he Sixth Amendment imposes on

17

counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." *Strickland*, 466 US at 680.

While the defense does not have to put on any case, and defense counsel can make strategic decisions in deciding what evidence to present, in order to be legitimate, the decision must be made after counsel has investigated. *Trakhtenberg*, 493 Mich at 51-52, citing *Strickland*, 466 US at 690-691. As the Supreme Court said in *Strickland,* "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "In any ineffectiveness case," therefore, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances," *id.,* taking into account "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v Smith,* 539 US 510, 527 (2003).

A basic investigation in this case entailed reviewing Gary's phone and social media accounts. The information in the attached offer of proof, discussed in detail *supra*, was readily available to trial counsel as Gary's cell phone was in the property

18

room of the Livingston County Jail and much of the information on it could also be accessed remotely by signing into Gary's Google and Facebook accounts. With this information, counsel could have provided the jury an accurate picture of Heather and Gary's relationship during the summer of 2018.

Furthermore, as a direct result of trial counsel's failure to investigate, he failed to impeach Heather Miner with available and probative evidence that would have severely undermined her credibility and the prosecution's theory of the case.

The failure to impeach a key prosecution witness may amount to reversible error. In *Trakhtenberg*, the Michigan Supreme Court held that defense counsel was ineffective for several reasons including her failure to impeach the complainant with prior inconsistent statements. *Trakhtenberg,* 493 Mich at 54. Likewise, in *People v Armstrong*, 490 Mich 281, 283 (2011), the Michigan Supreme Court held that trial counsel's failure to introduce evidence, which would have undermined the credibility of the complainant, prejudiced the defendant and the Court remanded the case for a new trial based on ineffective assistance of counsel.

At trial, Heather downplayed her relationship with Gary, stating, "We were never in a relationship. We would hook up, for lack of a better term." T1, 167. She testified that she had seen him "maybe seven to ten" times between June (when her ex moved out) and the incident on September 17th. T1, 93. According to Heather, three of those times were when Gary was "doing work" for her in her house. T1, 94.

Heather also suggested that Gary came over uninvited on multiple occasions, stating, "there were times that Gary would come over uninvited and I would have to

19

make him leave, but there were other times that I invited Gary to come over. T1, 94; T1, 170. Significantly, Heather testified that it was unusual to wake up and see Gary in her house. T1, 112.

In sum, Heather represented Gary as someone she hardly knew and with whom she had a purely sexual relationship. And though trial counsel probed on cross-examination, Heather did not waver. When asked whether Gary had spent time with her two sons, Heather replied, "They've been in the same vicinity as me and Gary." T1, 169. And when pressed further, Heather asserted, ". . . we've been in the same house . . . but we never did anything together." T1, 169. Heather even denied that saying "I love you" suggested more of a "boyfriend/girlfriend" type of relationship:

> Q Okay. But you, you said that you guys told each other you
> loved each other.
> A Yeah.
> Q So there was some sort of emotion involved, right?
> A Yeah, but that doesn't necessarily make a relationship.
> Q It doesn't?
> A I love a lot of people. No.
> Q Oh.
> A I love a lot of people. (T1, 167).

Had counsel conducted an adequate investigation he would have been able to confront Heather with specifics and introduce evidence that called into question her portrayal of Gary as nothing more than a "casual hook-up". T1, 170. First, Gary's phone's Location History reflects that he was at Heather Miner's home—1621 Welland Street Howell, Michigan 48855—on fifteen dates between June 20 and August 18, 2018. Appendix D. For several of these dates the location data shows

that Gary stayed the night. Appendix D. Further, contrary to Heather's testimony that Gary repeatedly came over uninvited and was then asked to leave, the location history shows only one visit (13 minutes on July 8, 2018) consistent with this scenario. Appendix C. All other visits to Heather's home were lengthy. Appendix D.

Moreover, Gary's Facebook messages and photos show that Gary and Heather were together on September 12, 13, 14, 15, 16, and 17 during which time Gary stayed at Heather's home. Appendix E. There are photos which show Gary in Heather's bed with her dog Kai. Appendix E. As well as photos of Gary and Heather's son Camden together on Belle Isle after Gary picked him from college to bring him back to his mother's home in Howell for the weekend. Appendix E; see also Appendix F. Other pictures (taken by Gary the following day) show Camden and Heather driving the used car Gary bought while in Alpena. Appendix E.

The location history and photo evidence confirm that Heather and Gary saw each other far more than "seven to ten" times over the course of the summer of 2018.[7] Indeed, Gary spent every day and night with Heather for the five days and nights leading up to the incident. Further, Gary's photographs, taken days before the incident directly belie Heather's testimony that Gary was nothing more than an occasional visitor to her home who did not even know her children.

That trial counsel never elicited this information or presented evidence to

---

[7] Notably, this evidence only captures the times Gary and Heather saw each other at Heather's home. As Heather acknowledged at trial, she and Gary would occasionally meet on their lunchbreaks. T1, 169-170. And as Gary explained, he and Heather also spent time together up at places other than her home and spent the night at a hotel together on a couple occasions. Appendix A ¶ 2.

this effect is objectively unreasonable. Particularly where Heather claimed that it was unusual to wake up and see Gary in her house. T1, 112.

In addition to the photos and location history, Gary and Heather's Facebook direct messages show two people who communicated regularly and were involved in the routine aspects of each other's lives. Appendix G. Heather sought Gary's advice while shopping for a used car, and Gary shared his painting work with Heather. Appendix G. Their messages also show that a part of the relationship was ongoing banter. For example, when Gary sent Heather a photo of his speedometer while driving, Heather chided, "Gary . . knock that shit off . . . I'll lock ur ass out," and Gary responded, "Lol…just playin…cruise at 80. Speed limit is 75". Appendix G. Though Gary does not recall Heather ever telling him not to come over on the evening of September 17, 2018 (Appendix A ¶ 17), given this sort of repartee, it is possible that Heather communicated something to that effect and Gary did not realize it was not part of the banter—especially since he found the garage code unchanged and the inside door unlocked.

When a reviewing court assesses the reasonableness of counsel's actions, it owes deference to counsel's informed strategic choices. In the present case, however, such deference does not come into play. There is no acceptable justification for trial counsel's failure to conduct a basic independent investigation into readily available evidence. Trial counsel's performance was deficient, and his representation of Gary "fell below an objective standard of reasonableness." *Strickland*, 466 US at 688.

**B. Trial counsel performed deficiently where he provided belated and inaccurate legal advice that deprived Mr. Fischer of his fundamental right to testify in his defense.**

At no point prior to the commencement of trial, did trial counsel advise Gary about the pros and cons of taking the stand or discuss with him the contents of his potential testimony. Appendix A ¶ 25. Trial counsel had not been to visit Gary in the County Jail since October 2018, before Gary was even arraigned on the Information in circuit court. Appendix A ¶ 20; Appendix B (Livingston County Jail Log).[8] The only communication Gary had with his attorney between that visit and trial which commenced on March 4, 2019, was at his two pretrial court appearances (12/7/18 and 3/1/19). At no point did trial counsel ever talk to Gary about his trial strategy. Appendix A ¶ 24.

Nevertheless, Gary wanted to testify in his own defense and planned to do so. Appendix A ¶ 26; see also T2, 51. Prior to closing arguments, outside the presence of the jury, trial counsel questioned Gary as to whether he wished to testify in his defense. T2, 51-52. The record reflects that Gary made a last minute decision not to testify after talking to trial counsel on the first day of trial and then consulting with family and friends that evening. T2, 50-52. Included in this colloquy was Gary's understanding that he had an absolute right to testify. T2, 50.

Gary maintains that he elected not to testify largely because he believed that his testimony would open the door to admission of his prior convictions for aggravated assault and ethnic intimidation from 1997. Appendix A ¶¶ 27-28.

---

[8] The prosecution filed the Felony Information on November 1, 2018.

Likewise, when asked why Gary ultimately elected not to testify, trial counsel stated that Gary did not testify because the prosecution was going to ask him about his prior convictions for aggravated assault and ethnic intimidations. Appendix H ¶ 9. However, these prior convictions could not have been used as impeachment.

Under MRE 609, evidence of a witness's prior crimes for the purposes of attacking credibility is generally inadmissible unless the evidence has been elicited from the witness or established by public record during cross-examination, and

(1) the crime contained an element of dishonesty or false statement, or

(2) the crime contained an element of theft, and

(A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and

(B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect. MRE 609(a).

Neither aggravated assault nor ethnic intimidation deal with theft or dishonesty or making a false statement. MRE 609(a). Thus, neither conviction could be used to attack Gary's credibility. MRE 609(a).

Trial counsel has a duty to make sure that his client's decision regarding whether to testify in his own defense was an informed one. *Strickland*, 466 US at 688 (trial counsel has an obligation to discuss potential strategies with his client); see also *Harrison v Motley,* 478 F3d 750, 756 (CA 6 2007). And this duty requires

24

counsel to do more than merely inform the client of his right to testify and his option to waive that right. *Rayborn v United States*, 489 F Appx 871, 880 (CA 6 2012). "Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify." *Id.*, citing *Cannon v Mullin,* 383 F3d 1152, 1171 (CA 10 2004).

If counsel indeed advised Gary that his testimony would open the door to admission of his prior assaultive convictions, then this advice constituted deficient performance that deprived Mr. Fischer of his fundamental right to testify and present a defense. *Padilla v Kentucky*, 559 US 356, 369 (2010); *Maples v Stegall*, 340 F3d 433, 439 (CA 6 2003) (erroneous legal advice amounts to deficient performance).

### C. These errors, individually and collectively, undermine the reliability of Mr. Fischer's guilty verdict.

Trial counsel's failure to investigate, to substantiate Gary's only defense, and to impeach the complainant, as well as his failure properly advise Gary regarding the risks and benefits of testifying in his own defense constitute deficient performance. But for these errors, it is reasonably likely that the result of Gary's trial would have been different.

This case was a he said/she said where, as a result of counsel's deficient performance, the jury never got to hear Gary's side of the story and Heather's account went virtually unchallenged. Heather denied being in a relationship with Gary and told the jury she did not want him around the night of the fight. T1, 103. Heather said when Gary showed up in her bed that night, she immediately told him

25

to leave. T1, 111, 112. Based on Heather's testimony, the state argued that Gary entered Heather's home without permission.

Investigating and presenting evidence of Gary and Heather's relationship was critical for two reasons. Foremost, it was necessary for the jury to appreciate what took place and whether Gary reasonably believed he had permission to enter the home. Heather painted a picture of waking up in bed to find that a "casual hookup" had let himself into her house and tried to crawl into bed with her. That picture changes when you learn that Gary woke up in Heather's bed that very morning, and the morning before that, and the morning before that. And the puppy Heather characterized as whimpering when he saw Gary in her room (T1, 110-111) was the same dog curled up in bed with Gary a few mornings earlier (see 9/13/18 photos Appendix E), and referenced in Gary and Heather's conversations about what car Heather should by ("[A Dart is] very small inside…think of Kai and any kind of road trips …) Appendix G. Had counsel presented evidence of Gary and Heather's relationship and demonstrated that Gary had been staying at Heather's home for several days in a row prior to this incident, the jury would have likely found Gary's belief that he had permission to be understandable, and concluded that it is much more likely that what upset Heather was what happened after Gary got there—not that entered the home in the first place.

Second, trial counsel's failure to investigate prejudiced Gary because, as a consequence, counsel failed to impeach Heather with evidence that she lied about the nature of her relationship with Gary. As the Michigan Supreme Court has

26

recognized repeatedly, impeachment evidence is important. See, e.g*., People v Grissom*, 492 Mich 296 (2012); *People v Trakhtenberg*, 493 Mich 38 (2012); *People* v *Armstrong*, 490 Mich 281 (2011); *People v Pippen*, 500 Mich 937 (2017). And where impeachment evidence would have provided proof that a witness lied to the jury regarding his or her actions with regard to that very case, the fact that the witness' credibility had previously been attacked does not preclude a finding of prejudice. *See Armstrong*, 490 Mich at 292. On the contrary, there is a greater possibility that the additional attack "would have tipped the scales in favor of finding a reasonable doubt about defendant's guilt." *Id.*

Heather's testimony was central to the prosecutor's case for first degree home invasion and the record indicates that the jury did not blindly credit Heather's account of the evening. Despite Heather's testimony that Gary forcefully took her phone and tried to prevent her from calling the police, the jury acquitted Gary of the interfering with a crime report charge. T2, 115, 121. Had the jury learned that Gary spent the entire week before the incident at Heather's house with her and her children it is reasonably likely that they would have concluded that she was wholly incredible.

Here, as in *Armstrong* and *Trakhtenberg*, the impeachment evidence would have tipped the scales. In this credibility contest, had the jury discredited Heather's testimony that Gary did not have permission to come over to the house that evening, it would have affected the outcome of the trial. As such, counsel's failure to investigate and present the evidence discussed above prejudiced Gary.

Likewise, there is a reasonable probability that the outcome would have been different had counsel not misadvised Gary about the risks and benefits of testifying in his own defense. Gary's affidavit establishes what he would have said on the stand. See Appendix A ¶¶ 1-18. Gary would have told the jury about his relationship with Heather. He would have testified that for nearly a week before the fight, he stayed with Heather, coming and going as he pleased, always using the garage code. On the night of the fight, like always, Gary used the garage code to enter the house and the couple briefly reconciled. All told, Gary's testimony undermines confidence in the jury's guilty verdict on home invasion first degree.

These errors, individually and collectively, undermine the reliability of Gary's guilty verdict. See, e.g., *Strickland,* 466 US at 690 (requiring consideration of counsel's actions "in light of all of the circumstances"; *Id*. at 695-96 (noting that the question to be answered in cases such as this is whether, "absent the *errors,* the factfinder would have had a reasonable doubt respecting guilt" (emphasis added)).[9]  Remand is necessary to develop the record and to allow Gary to move for a new trial.

---

[9] *Williams v Taylor,* 529 US 362, 395-96, 398-99 (2000) (considering cumulatively multiple errors of counsel in finding prejudice in light of the "entire ... record, viewed as a whole"); *Kyles v Whitley,* 514 US 419, 434, 436 (1995) (considering cumulative effect of errors in another context in which the *Strickland* standard for prejudice (though not the *Strickland* test for ineffective assistance) had been applied); *Mackey v Russell*, 148 Fed Appx 355, 368–69 (CA 6, 2005); *People v LeBlanc,* 465 Mich 575, 591 (2002) ("[T]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not.").

## II.   Mr. Fischer's state and constitutional rights to effective assistance of counsel were violated when trial counsel received a plea offer but never communicated that offer to Mr. Fischer.

In addition to the failures discussed in Issue I, defense counsel failed to provide effective assistance in this case when he did not communicate a plea offer to Mr. Fischer. No plea offers were placed on the record in this case. And Gary was never made aware of any plea offers extended by the prosecution. Appendix A ¶ 9. On the contrary, it was Gary's understanding that the prosecution had declined to engage in plea bargaining entirely. Appendix A ¶ 9. Nevertheless, trial counsel informed appellate counsel that the prosecution *did* extend a plea offer. Appendix H ¶¶ 5, 8. According to trial counsel, the terms of this offer were as follows:

- Reduce Count 1 from home invasion first degree to home invasion second degree. Appendix H ¶ 8.
- Reduce Count 2 from interference with a crime report to attempt interference with a crime report. Appendix H ¶ 8.
- Counts 3 and 4 would remain unchanged. Appendix H ¶ 8.
- The habitual fourth offender enhancement ("HO4") would be reduced to a habitual second ("HO2"). Appendix H ¶ 8.

This offer greatly reduced Gary's sentencing exposure under the guidelines.[10] Whether the offer "didn't do a whole lot," as trial counsel opined, Appendix H ¶ 8, or not, Gary had a right to hear it. Had he had an opportunity to consider the offer, there is a reasonable probability that he would have accepted it. Appendix A ¶ 23.

---

[10] Especially as Mr. Fischer understood his exposure at the time of sentencing. Trial counsel did not object to the prosecution's untimely amendment of the habitual offender enhancement and Mr. Fischer did not know until recently that he should not have been sentenced as a fourth habitual offender.

*Discussion*

The right to effective assistance of counsel extends to the plea bargaining stage. *Missouri v Frye*, 566 US 134, 143-144 (2012); *People v Douglas*, 496 Mich 557, 591-592 (2014). And claims of ineffective assistance in the plea context are reviewed using the *Strickland* test. *Frye*, 566 US at 140.

### Deficient Performance

Counsel's duty in the plea context includes not only an obligation to promptly communicate any plea officers, but also a duty to explain those offers to the client. *Frye*¸ 566 US at 145. If counsel fails to communicate an offer and it lapses, then "counsel did not render the effective assistance the Constitution requires." *Id.*

Here, trial counsel received a plea offer. In all, the offer meant convictions to lesser offenses and exposed Gary to less prison time. But trial counsel never told Gary about the offer. As a result, trial counsel performed deficiently, thereby satisfying the first *Strickland* prong.

### Prejudice

To show prejudice, Gary must demonstrate a "reasonable probability" that he would have accepted the plea and "the plea would have been entered without the prosecution cancelling it or the trial court refusing to accept it . . ." *Frye*, 566 US at 147. And the plea offer must benefit Gary in the form of a lesser charge or less prison time. *Id.*

There is nothing in the record about this offer, and no information about when it was extended, or when it would have expired.[11] When appellate counsel sought to obtain additional information from trial counsel, trial counsel failed to respond. Appendix H ¶¶ 10-11.

There is also nothing in the record to suggest that there was a material change in the strength of the prosecution's case at any point prior to trial or any reason to believe that the prosecution would have cancelled or refused to accept the offer they extended.

Next, the plea offer would have benefitted Gary in the form of lesser charges and less prison time. The sentencing offense, home invasion first degree, is a Class B offense with a statutory maximum of twenty years in prison. MCL 750.110(a)(2). As a fourth habitual offender the maximum becomes life or any term of years. MCL 769.12. Home invasion second degree is a Class C offense with a statutory maximum of fifteen years in prison. MCL 750.110(a)(3) When sentenced as a second habitual offender, that maximum becomes 22.5 years.[12] MCL 769.10. In addition to applying the guidelines on the "C" grid rather than the "B," the upper limit of recommended range on that grid would have been lower. The second habitual enhancement increases the upper limit of the appropriate cell by 25%, where the fourth habitual enhancement increases the upper limit of the appropriate cell by

---

[11] Presumably, the offer was extended at some point after December 11, 2018, when the state amended the habitual offender notice to increase the enhancement level from second to fourth. See Lower Court Record, Amended Information.

[12] Making 15 years the highest possible minimum sentence pursuant to the *Tanner* two-thirds rule. *People v Tanner,* 387 Mich 683 (1972).

100%. See 2019 Sentencing Guidelines Manual, General Information and Instructions.

At sentencing, the guidelines were calculated at 99 to 320 months. S, 6. Plotting the PRVs and OVs as they were scored at sentencing (PRV Level E; OV Level VI) on the Class C grid as a second habitual offender results in a considerably lower recommended range of 58 to 142 months (approximately 4.8 to 11.8 years). MCL 777.64.

Finally, there is a reasonable probability that Gary would have accepted the plea had he known about it. Gary was interested in a plea to reduced charges and he never disputed his participation in the fight or his attempt to run from the police. Appendix A ¶ 23. True, he maintains he had permission to enter the house through the garage door, and second-degree home invasion requires entry without permission. *People v Crews*, 299 Mich App 381, 393 (2013); see also MCL 750.110a(3). But at this stage, Gary's contention that he entered with permission does not close off a finding of prejudice. See *Byrd v Skipper*, 940 F3d 248, 258-259 (CA 6 2019) (finding a reasonable probability that defendant would have accepted a plea deal even though defendant insisted on his innocence and went to trial hoping to secure an acquittal).

Additionally, Gary asserts that but for counsel's unprofessional errors, the outcome of the plea process would have been different, where there is a reasonable probability that competent counsel would have negotiated a more favorable plea. *See* e.g. *Rodriguez-Penton v United States*, 905 F3d 481, 489-490 (CA 6 2018)

(holding that a defendant could establish *Strickland* prejudice by establishing that he would have negotiated a more favorable plea deal and "with proper advice, the outcome of those negotiations would have been different.").[13]

A proper prejudice analysis must factor in all the ways trial counsel's deficiencies failed his or her client. *Cf. Byrd,* 940 F3d at 258-259. When a plea is offered, counsel needs to grasp all potential ramifications—good and bad. *Lafler v Cooper*, 556 US 156, 166-167; *see also Rodriguez-Penton*, 905 F3d at 489. Ineffective assistance, especially a "wholesale misunderstanding of the law," can short-circuit or even preclude plea negotiations, either one cause for a finding of prejudice. *See Byrd*, 940 F3d at 260. That is because a circumscribed plea negotiation costs the defendant a chance at "benefits he would have received in the ordinary course but for counsel's ineffective assistance." *Byrd,* 940 F3d at 260 (quoting *Lafler*, 556 US at 169).

Here, unbeknownst to trial counsel, a portion of the plea offer was illusory. The offer to reduce the habitual enhancement from fourth to second conferred no benefit because, under the circumstances, Gary should never have been a fourth habitual offender. The amended habitual offender notice, which increased Gary's enhancement level from second to fourth, was filed long after the 21-day statutory period and was thus improper.[14] *People v Ellis*, 224 Mich App 752, 755 (1997).

---

[13] See *Lee v United States*, 137 S Ct 1958, 1966 n 2 (2017) (leaving open the question of whether a defendant can show prejudice by demonstrating that he would have bargained for a plea that did not result in certain deportation).

[14] See Lower Court Record, Information and Amended Information. See also Fischer Brief on Appeal Issue II.

It appears that trial counsel was unfamiliar with the governing law, because he did not object at the time of the amendment or at sentencing.

Trial counsel's failure to grasp the ramifications of the offer left him unable to engage in any meaningful negotiations. Put another way, trial counsel's "wholesale misunderstanding of the law" cost Gary a chance at "benefits he would have received in the ordinary course but for counsel's ineffective assistance." *Byrd*, 940 F3d at 260.

Considering counsel's compete failure to communicate a favorable offer as well as Gary's interest in a plea deal had it been offered, Gary has established deficient performance and a reasonable probability that but for counsel's unprofessional errors, the outcome of the plea process would have been different. *Hill v Lockhart*, 474 US 52, 57 (1985).

This Court should remand for an evidentiary hearing on the issue.

## <u>Summary And Request For Relief</u>

**WHEREFORE**, for the foregoing reasons, Gary Fischer asks that this Honorable Court remand this case for an evidentiary hearing and to allow him to move for a new trial and/or specific performance of the plea offer.

.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Katherine L. Marcuz

BY:_____

**KATHERINE L. MARCUZ (P76625)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 256-9833

Date: May 4, 2020