## STATE OF MICHIGAN

## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN**

                    Plaintiff-Appellee

-vs-

**GARY THOMAS FISCHER**
Defendant-Appellant
_____/

**LIVINGSTON COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee
_____

**KATHERINE L. MARCUZ (P76625)**
Attorney for Defendant-Appellant
_____

**Supreme Court No.** _____

**Court of Appeals No.** 348539

**Lower Court No.** 18-25329 FH

## APPLICATION FOR LEAVE TO APPEAL

**STATE APPELLATE DEFENDER OFFICE**

**BY:**    **KATHERINE L. MARCUZ (P76625)**
        **Managing Attorney**
        3031 West Grand Blvd.
        Suite #450
        Detroit, Michigan 48202
        (313) 256-9833

## <u>Table of Contents</u>

Judgment Appealed From and Relief Sought ................................................................. i

Index of Authorities ....................................................................................................... iv

Statement of Questions Presented.................................................................................. vii

Statement of Facts.......................................................................................................... 1

I.    Where the prosecution offered separate and distinct acts to support a guilty verdict for home invasion first degree, the trial court violated Mr. Fischer's constitutionally guaranteed right to a unanimous verdict by failing to give a special unanimity instruction. Additionally, Mr. Fischer was deprived of his constitutional right to effective assistance of counsel by trial counsel's failure to object to the prosecutor's argument and failure to request a specific jury instruction on unanimity. .............................................................. 8

    A.  The trial court violated Mr. Fischer's constitutionally guaranteed right to a unanimous verdict by failing to give a special unanimity instruction. ................ 11

    B.  Trial counsel's failure to object to the prosecutor's remarks during closing argument and his failure to request a unanimity instruction fell below an objective standard of reasonableness and prejudiced Mr. Fischer. ...................................... 17

    C.  Errors in the Court of Appeals' Analysis............................................................. 19

II.   The Court of Appeals erred by denying Mr. Fischer's remand motions in which he identified meritorious ineffective assistance of counsel claims to be raised on appeal for which factual development was necessary and where Mr. Fischer made the requisite offer of proof................................................................................................................... 21

    A.  Trial counsel performed deficiently where he failed to investigate and failed to impeach Ms. Miner with evidence that she misrepresented the nature of her relationship with Mr. Fischer. Doing so would have diminished the reliability of her trial testimony and supported Mr. Fischer's version of events. .................... 28

    B.  Trial counsel performed deficiently where he provided belated and inaccurate legal advice that deprived Mr. Fischer of his fundamental right to testify in his defense. ................................................................................................................ 32

    C.  These errors, individually and collectively, undermine the reliability of Mr. Fischer's guilty verdict. .................................................................................... 34

    D.  Mr. Fischer's state and constitutional rights to effective assistance of counsel were violated when trial counsel received a plea offer but never communicated that offer to Mr. Fischer. ................................................................................................. 37

    E.  Conclusion and Remedy...................................................................................... 42

Summary and Relief ....................................................................................................... 43

## Judgment Appealed From and Relief Sought

Gary Thomas Fischer appeals from the Court of Appeals' December 17, 2020 unpublished opinion affirming his convictions for first degree home invasion, aggravated assault, and resisting or obstructing a police officer. (Court of Appeals per curiam opinion attached as Appendix K).

The charges arose from an incident at the home of Heather Miner, a woman with whom Gary was involved. On September 17, 2018, Gary and Heather got into an argument over the phone. Heather was mad at Gary for looking for Heather's dog (which Heather believed had been taken by an ex-boyfriend) without her. A short time later, Gary went over to Heather's house and let himself in through the garage door. Heather had previously given Gary her garage door code so that he could let himself in when they spent time together at her home. Heather told Gary to leave, he refused, and she threatened to call the police. When Gary tried to take the phone from her, she punched him in the face then pushed him into her linen closet. A physical fight ensued with both parties landing blows.

At trial, the prosecutor also presented evidence about a separate and subsequent alleged entry into the home with the intent to commit an assault and presented both acts extensively as evidence in favor of the first-degree home invasion charge. The prosecutor never clarified on which alleged instance the charge was based, argued both sets of facts in closing, and stated that Gary "kind of committed two home invasions that night." T2, 64.[1]

The primary issue in this appeal concerns the court's failure to give (and trial counsel's failure to request) a specific unanimity instruction. The Court of Appeals properly concluded that

---

[1] The trial transcripts are abbreviated as follows: 3/4/19 Trial Tr. ("T1"); 3/5/19 Trial Tr. ("T2"); Sentencing 4/4/19 ("S").

prosecution had presented evidence of more than one criminal act in support of a single criminal charge and that the proofs were "materially distinct" thus requiring a specific unanimity instruction. Court of Appeals Opinion at 3, Appendix K, citing *People v Cooks*, 446 Mich 503 (1994). The court, however, erred in concluding that reversal was unnecessary because the error was harmless under plain-error review. Court of Appeals Opinion at 3, Appendix K.

Leave to appeal should be granted, because the Court of Appeals's decision is clearly erroneous and will cause material injustice to Mr. Fischer. MCR 7.302(B)(5). In particular, the Court of Appeals' prejudice inquiry ignored the nature of the error and reads as if the Court was considering a challenge to the sufficiency or strength of the evidence rather than assessing the possibility that the jury's verdict was not unanimous.

Additionally, this case would allow the Court to provide much needed guidance about whether plain-error review of *Cooks*/*Yarger* claims requires demonstrating prejudice beyond that evidenced by the error itself. The *Cooks* line of cases suggests that prejudice is embodied in the error itself; in other words, that where "materially distinct" multiple acts were offered as support a single conviction, the lack of a specific-unanimity instruction (or verdict form) was reason enough to find a violation of the right to unanimous verdict and to grant retrial. See *People v Yarger*, 193 Mich App 532 (1992) (applying such a standard); and *Cooks* (limiting the *Yarger* rule to cases of "materially distinct" facts but otherwise endorsing it). But *Yarger* and *Cooks* preceded *People v Carines*, 460 Mich 750 (1999). After *Carines*, this Court has suggested that plain-error review necessarily entails a prejudice inquiry separate from consideration of the error itself. *People v Young*, 472 Mich 130, 142-43 (2005). Left undecided is whether that conclusion follows in the *Cooks*/*Yarger* context, too.

The Court of Appeals clearly erred in its analysis of the effect this error had on the fairness of Mr. Fischer's trial. MCR 7.302 (B)(5). For the reasons expressed in detail in the attached brief in support, this Court should either grant leave to appeal, or peremptorily reverse the decision of the Court of Appeals and order a new trial for Mr. Fischer.

Furthermore, as outlined in Issue II of the brief in support of this application, the Court of Appeals erred in denying Mr. Fischer's motion to remand and renewed motion to remand where he identified specific ineffective assistance of counsel claims for which the factual record must be developed and where he made the necessary showing and offer of proof required for remand.

The jury did not learn critical information concerning the nature of Gary's relationship with Heather, his access to the home, and his permission to use the garage code as a key because trial counsel failed to conduct an adequate investigation, failed to develop this evidence, failed to utilize key impeachment evidence, and failed to properly advise Gary about the pros and cons of testifying in his own defense. Appendix A ¶¶ 25-27.

The ineffective assistance of counsel claims are fully discussed in the brief in support of this application and provide sufficient and independent grounds for this Court to remand the matter to the trial court for further development of the record as to counsel's representation and the prejudice to Mr. Fischer that resulted.

## <u>Index of Authorities</u>

### <u>Cases</u>

*Byrd v Skipper*, 940 F3d 248 (CA 6 2019) .............................................................. 40, 41

*Cannon v Mullin*, 383 F3d 1152 (CA 10 2004) .............................................................. 34

*Harrison v Motley*, 478 F3d 750 (CA 6 2007) .............................................................. 34

*Hill v Lockhart*, 474 US 52 (1985) .............................................................. 41

*Kyles v Whitley*, 514 US 419 (1995) .............................................................. 37

*Lafler v Cooper*, 556 US 156 (2012) .............................................................. 40

*Lee v United States*, 137 S Ct 1958 (2017) .............................................................. 40

*Mackey v Russell*, 148 Fed Appx 355 (CA 6 2005) .............................................................. 37

*Maples v Stegall*, 340 F3d 433 (CA 6 2003) .............................................................. 34

*Missouri v Frye*, 566 US 134 (2012) .............................................................. 27, 28, 38

*Padilla v Kentucky*, 559 US 356 (2010) .............................................................. 34

*People v Armstrong*, 490 Mich 281 (2011) .............................................................. 29, 36

*People v Cain*, 498 Mich 108 (2015) .............................................................. 11

*People v Carines*, 460 Mich 750 (1999) .............................................................. ii, 8, 11

*People v Carter*, 503 Mich 221 (2019) .............................................................. 14

*People v Cooks*, 446 Mich 503 (1994) .............................................................. passim

*People v Crews*, 299 Mich App 381 (2013) .............................................................. 40

*People v Davis*, 250 Mich App 357 (2002) .............................................................. 8

*People v Douglas*, 496 Mich 557 (2014) .............................................................. 27

*People v Ellis*, 224 Mich App 752 (1997) .............................................................. 41

*People v Givens*, 428 Mich 891 (1987) .............................................................. 42

*People v Grissom*, 492 Mich 296 (2012) .............................................................. 35

*People v Houstina*, 216 Mich App 70 (1996) ................................................................. 8

*People v LeBlanc*, 465 Mich 575 (2002) ....................................................................... 37

*People v Moldenhauer*, 210 Mich App 158 (1995) ...................................................... 8

*People v Pickens*, 446 Mich 298 (1994) ....................................................................... 27

*People v Pippen*, 500 Mich 937 (2017) ........................................................................ 36

*People v Quinn*, 219 Mich App 571 (1996) .............................................................. 9, 10

*People v Shipley*, 256 Mich App 367 (2003) ............................................................... 14

*People v Stevens*, 498 Mich 162 (2015) ....................................................................... 20

*People v Tanner*, 387 Mich 683 (1972) ....................................................................... 39

*People v Trakhtenberg*, 493 Mich 38 (2012) ........................................................ passim

*People v Vaughn*, 491 Mich 642 (2012) ....................................................................... 8

*People v Wilder*, 485 Mich 35 (2010) ........................................................................ 10

*People v Yarger*, 193 Mich App 532 (1992) ......................................................... passim

*People v Young*, 472 Mich 130 (2005) ......................................................................... ii

*Ramos v Louisiana*, 140 S Ct 1390; 206 L Ed 2d 583 (2020) ..................................... 9

*Rayborn v United States*, 489 F Appx 871 (CA 6 2012) ........................................... 34

*Rodriguez-Penton v United States*, 905 F3d 481 (CA 6 2018) ................................... 40

*Strickland v Washington*, 466 US 668 (1984) ...................................................... passim

*United States v Ferris*, 719 F2d 1405 (CA 9 1983) .............................................. 19, 20

*Wiggins v Smith*, 539 US 510 (2003) .......................................................................... 28

*Williams v Taylor*, 529 US 362 (2000) ....................................................................... 37

Constitutions, Statutes and Court Rules

Const 1963, art 1, § 20 ................................................................................................ 28

Const 1963, art 1, §§ 14, 20 ......................................................................................... 9

MCL 750.110 ............................................................................................................. 15

MCL 750.110(a)(2) ..................................................................................................... 40

MCL 750.110(a)(3) ..................................................................................................... 40

MCL 750.110a(2) ....................................................................................................... 10

MCL 750.110a(3) ....................................................................................................... 41

MCL 769.10 ............................................................................................................... 40

MCL 769.12 ............................................................................................................... 40

MCL 777.64 ............................................................................................................... 41

US Const, Am VI ......................................................................................................... 8

MCR 6.410(B) ............................................................................................................. 9

MCR 7.211(C) ........................................................................................................... 43

MCR 7.302 (B)(5) ................................................................................................. ii, 21

MRE 609 ................................................................................................................... 34

MRE 609(a) .......................................................................................................... 34, 35

## <u>Statement of Questions Presented</u>

I.    Where the prosecution offered separate and distinct acts to support a guilty verdict for home invasion first degree, did the trial court violate Mr. Fischer's constitutionally guaranteed right to a unanimous verdict by failing to give a special unanimity instruction? Additionally, was Mr. Fischer deprived of his constitutional right to effective assistance of counsel by trial counsel's failure to object to the prosecutor's argument and failure to request a specific jury instruction on unanimity?

Court of Appeals answers, "No."

Gary Thomas Fischer answers, "Yes."

II.   Did the Court of Appeals err by denying Mr. Fischer's remand motions in which he identified meritorious ineffective assistance of counsel claims to be raised on appeal for which factual development was necessary and where Mr. Fischer made the requisite offer of proof?

Court of Appeals answers, "No."

Gary Thomas Fischer answers, "Yes."

## Statement of Facts

**Overview**

      Gary Fischer and Heather Miner were romantically involved. Over the summer of 2018, Heather gave Gary her garage door code so that he could let himself in when they spent time together at her home. On September 17, 2018, Gary and Heather got into an argument because he tried to retrieve her dog from her ex for her. Gary thought it was what Heather wanted—but Heather became upset. They argued over the phone, then Gary got drunk. A short time later, Gary went over to Heather's house and let himself in through the garage door. Heather asked Gary to leave, he refused, and she threatened to call the police. When Gary tried to take the phone from her, she punched him in the face and pushed him into her linen closet. A physical fight ensued with both parties landing blows. At some point, Heather and Gary exited the home, and then returned inside. Heather ultimately called 911, and Gary was arrested.

      Gary was charged with first-degree home invasion, interfering with a crime report, resisting arrest, and aggravated assault. See Information, Lower Court Record. His trial took place over two days in March of 2019, before the Honorable Suzanne Geddis in the Livingston County Circuit Court.

      Defense counsel waived his opening statement and rested without presenting any evidence. T2, 53. And though Mr. Fischer was only charged with one count of home invasion, the trial prosecutor presented evidence of two alleged unlawful entries and two alleged assaults. No special unanimity instruction was requested or given.

      At sentencing, counsel did not object to an untimely habitual offender enhancement nor did he object to incorrect prior record and offense variables resulting in an inaccurate and inflated guidelines range.

**Pertinent trial evidence**

Gary Fischer and Heather Miner met through an online dating service in 2015. T1, 90, 168.[2] While Heather denied being in a "relationship" with Gary, she acknowledged that they had been sexually involved on and off for roughly three years and said "I love you" to each other. T1, 90, 166, 167. Beginning in 2016, Heather did not speak to Gary for a time because she got back together with an ex-boyfriend, Shawn Cotton. When Shawn and Heather broke up in June of 2018, Heather and Gary reunited. T1, 92-93. After the break-up with Shawn, Gary fixed Heather's garage door and changed the code for her. T1, 168. He also changed the locks of her house for her. T1, 168. Heather gave Gary the garage code to use to enter the house when she invited him over. T1, 94. She would also leave the door leading from the garage to the house unlocked for him. T1, 94.

About three months after Heather started seeing Gary again, she told him that Shawn and his sons "kidnapped" her dog, Maggie, from her condo. T1, 98-99, 110. Heather was heartbroken, and Gary agreed to help her try and get her dog back. T1, 99. On September 17, 2018, Gary called Heather to let her know he had driven to Shawn's house and seen him with Maggie, but had not been able to get the dog back. T1, 100-101. On that day, Heather had smoked marijuana. T1, 172. Heather became upset at Gary because she was nervous that Shawn was going to call the police on them and thought they had agreed not to go there anymore. T1, 100-102. Gary expressed surprise and told Heather that he thought getting Maggie back was what she wanted. T1, 103. According to Heather, after exchanging several more texts back and forth, she told Gary she was "blocking" him. T1, 103. She then went to sleep between 9:00-

---

[2] The trial transcripts are abbreviated as follows: 3/4/19 Trial Tr. ("T1"); 3/5/19 Trial Tr. ("T2"); Sentencing 4/4/19 ("S").

10:30pm that evening. T1, 104-105. The door between the garage and the home was left unlocked. T1, 96-97.

Heather testified that she woke up sometime later to find Gary getting into bed next to her, and he was intoxicated. T1, 111-112. Heather stated that she immediately told Gary to leave, and, when he refused, used her feet to push him towards the edge of the bed. T1, 112-113. Gary got out of the bed and Heather began walking him towards the bedroom door while putting his shoes and belongings in his hands. T1, 114. While this was happening, Heather chastised Gary for drinking and driving and he faulted her for making him drive intoxicated again. T1, 114-115. According to Heather, when they got to the bedroom door, Gary said that he was not going to leave and that she could not make him. T1, 115-116. Heather told Gary that if she could not, the cops could, and reached for her phone. T1, 116.

As per Heather, when she reached for her phone, Gary grabbed her arm, twisted it, and took the phone from her. T1, 116. Heather responded by punching Gary with a closed fist and shoving him until they both ran into the linen closet. T1, 117-118. Then, according to Heather, Gary hit her in the head with her cellphone. T1, 118. Heather screamed at Gary, and they began fighting. T1, 119. Heather admits there are parts of the fight she does not remember. T1, 120. However, she said at some point, they ended up on the floor near her dining room, and she alleged that Gary hit her head into the floor three times. T1, 120-121. After this, they got back up, and Heather tried to slam Gary into the cabinets, upon which he pushed her back into the table. T1, 123. Ultimately, Heather and Gary ended up back on the floor and Heather grabbed and squeezed Gary's genitals before biting him in the face. T1, 125. Gary let go of the phone, and when he got up to retrieve it, Heather ran downstairs and out through the garage. T1, 126, 128-129.

A short time later, Heather decided to go back into the house. T1, 130. As she walked back inside, Gary was standing in the doorway connecting the house and garage. He told her he would give her phone back if she agreed not to call the police. T1, 131. Heather grabbed the phone out of Gary's hand, ran inside, and locked the door. T1, 131-132. She then grabbed a kitchen knife, went into the bathroom, and called 911.[3] T1, 133.

Sometime later, Heather heard a noise downstairs, then saw Gary in the house. T1, 135. She did not know how he got back in and was still on the phone with 911 at this time. T1, 135. According to Heather, the two started wrestling while she held the knife in one hand and her cellphone in the other. T1, 137. She then claimed that Gary chased her around the house but stopped when he saw police lights outside. T1, 137-138. Eventually, after throwing some furniture around, Gary left the house. T1, 140.

Officer Fogo responded to the 911 call. When he saw Gary walking, he commanded him to put up his hands. Gary began running, ran into a trash can, fell, and was tackled. T1, 213-215. Officer Fogo testified that Gary seemed intoxicated but was mostly "cooperative and cordial" after he allowed himself to be handcuffed. T1, 217, 225.

While Officer Fogo was with Gary, a second officer, Officer Vallance, entered the house. T2, 7. Officer Vallance encountered Heather with a knife in one hand, and the phone in the other. T2, 7. Heather told Officer Vallance she had been attacked by Gary. T2, 8-9. Officer Vallance noted that Heather had some bruising on her chest and arm, blood on her face, and a broken tooth. T2, 8, 12-13; P x 14-21. Heather also complained of bumps on her head, but Officer Valance did not photograph or inspect her. T2, 13.[4]

---

[3] The call was entered into evidence as People's Exhibit ("P x") 22. T1, 143.

[4] The injuries to Gary's face were also documented. T1, 158.

After talking to Heather, Officer Vallance looked at the front door. T2, 17. She noted that the trim had been broken off and it was no longer on the hinges. T2, 17. She did not recall any shoe marks or pry marks and had no opinion on how it got open. T2, 17.

The police seized Heather's cell phone but did not obtain her phone records or review the calls and text messages between Heather and Gary. T2, 30.

Gary was found guilty of Count 1, home invasion first degree, Count III, resisting and obstructing a police officer, and Count IV, aggravated assault. T2, 121. He was found not guilty of Count 2, interfering with a crime report. T2, 121.

On April 4, 2019, Gary was sentenced as a fourth habitual offender. Though he was initially charged as a second habitual offender, the prosecutor amended the Information to increase the habitual enhancement from second to fourth, well after the 21-day statutory period. Felony Information and Amended Information, Lower Court Record. Defense counsel did not object.

At sentencing, the prosecutor made several challenges to the offense variables ("OV"s). S, 2-6. He asked that OV 1 be scored at 10 because the phone was a weapon, OV 7 be scored at zero, OV 10 be scored at 10 due to a domestic relationship, and OV 12 be scored at 10 because there had been two break-ins, and the court could find that the charge of interfering with a crime report had happened despite the acquittal. *Id.* S, 4-6. Defense counsel made no objections on the record. S, 7. The sentencing guidelines were calculated at 99 to 320 months. S, 6.

Judge Geddis sentenced Gary to 15 years to 50 in prison. S, 14.

**Court of Appeals**

Gary's Brief on Appeal was timely filed on January 22, 2020.

On May 4, 2020, Gary filed a motion to remand seeking to develop an evidentiary record in support of his claim that his trial lawyer was ineffective for the following reasons: (a) Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney unreasonably failed to conduct an investigation, present a defense, and impeach the complainant with information critical to her credibility and the resolution of the case; (b) Mr. Fischer was deprived of his right to effective assistance of counsel as well as his fundamental right to testify in his defense due to counsel's deficient legal advice; (c) Mr. Fischer was deprived of his right to effective assistance of counsel where his attorney received a plea offer but never communicated that offer to Mr. Fischer.[5]

The brief in support of the motions made included an offer of proof drawing from appellate counsel's conversations with Gary (Affidavit of Gary Fischer, Appendix A) and Gary's trial lawyer (Statement of Attorney Katherine Marcuz, Appendix H) as well as counsel's examination of Gary's phone and Facebook data from the summer of 2018 (Google Photos of Gary Fischer and Heather Miner, Appendix C; Google Timeline Screenshots, Appendix D; Google Photos with Metatdata 9/13/18 to 9/16/18, Appendix E; Screenshot of Google Activity

---

[5] In that pleading, undersigned counsel also outlined why the motion to remand was not filed concurrently with the Brief on Appeal and instead required additional time. Prior to filing the Brief on Appeal, undersigned counsel conducted an extensive investigation which included retaining and consulting with an expert in cell phone forensics, Larry Dalman of Dalman Investigations. Mr. Dalman is a retired Michigan State Police Detective Sergeant and a licensed investigator certified in Cellebrite Advanced Smartphone Analysis. Undersigned counsel provided Mr. Fischer's cell phone to Mr. Dalman to conduct a forensic examination. Mr. Dalman attempted to do a physical extraction using Cellebrite software but wiped the phone of all data by mistake.

As a result, undersigned counsel was required to begin a new investigation to seek the information through other means. Some data—photos, contacts, location history, and web activity--was synced to Mr. Fischer Google account. Undersigned counsel accessed and reviewed the Google account, screenshot content to save it, and captured the metadata. See Appendices C, D, E, and F. Counsel also obtained the log-in information for Mr. Fischer's Facebook account, downloaded all data, and reviewed the hundreds, if not thousands, of direct messages exchanged between Mr. Fischer and Ms. Miner—a portion of which are attached as Appendix G. The additional investigation and documenting made necessary after Mr. Dalman inadvertently wiped the phone of useful data required considerable time and was no fault of Mr. Fischer's.

/Google Maps Search, Appendix F; Facebook Messenger messages between Gary Fischer and Heather Miner, Appendix G).[6]

The Court of Appeals denied Gary's motion to remand on June 9, 2020, for "failure to persuade the Court of the necessity of a remand at this time. Denial of remand is without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." COA Order 6/9/20, attached as Appendix I.

On October 30, 2020, Mr. Fischer was advised that his case would be heard on the Court of Appeals December 2020 session calendar. On November 17, 2020, Mr. Fischer filed a renewed motion to remand so that the issue and need for remand was properly before the case call panel. The case call panel denied the renewed motion to remand less than 24 hours later. COA Order 11/18/20, attached as Appendix J. Undersigned counsel again argued the need for remand at oral argument on December 8, 2020.

On December 17, 2020, the Court of Appeals issued an unpublished opinion affirming Mr. Fischer's convictions but remanding to the trial court for resentencing. Appendix K.

---

[6] The phone data—photos, Google activity, and location data—was retrieved from Gary's Google account (Gfishee@gmail.com), where it had automatically saved/synced. Undersigned counsel accessed and captured this data for the offer of proof. No data was edited, changed, or deleted.

<u>**ARGUMENT**</u>

I. **Where the prosecution offered separate and distinct acts to support a guilty verdict for home invasion first degree, the trial court violated Mr. Fischer's constitutionally guaranteed right to a unanimous verdict by failing to give a special unanimity instruction. Additionally, Mr. Fischer was deprived of his constitutional right to effective assistance of counsel by trial counsel's failure to object to the prosecutor's argument and failure to request a specific jury instruction on unanimity.**

*Issue Preservation and Standard of Review*

Questions of the sufficiency of jury instructions are reviewed de novo. *People v Moldenhauer*, 210 Mich App 158 (1995); *People v Houstina*, 216 Mich App 70 (1996).

Defense counsel did not request a special unanimity instruction. Unpreserved constitutional issues are reviewed for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 764 (1999).

A claim of ineffective assistance of counsel presents "a mixed question of law and fact," with questions of law reviewed de novo and the trial court's findings of fact reviewed for clear error. *People v Trakhtenberg*, 493 Mich 38, 47 (2012). When the issue of ineffective assistance of counsel is not preserved review is limited to the record. *People v Davis*, 250 Mich App 357, 368 (2002).

The Sixth Amendment of the U.S. Constitution guarantees Mr. Fischer "the assistance of counsel for his defense." US Const, Am VI. And the right to counsel is recognized as the right to effective assistance of counsel. *Strickland v Washington*, 466 US 668, 685-686 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, Mr. Fischer must show that (1) counsel's performance "fell below an objective standard of reasonableness" and (2) but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 669 (2012).

*Discussion*

The Sixth Amendment right to a jury trial and the Michigan Constitution entitle the accused to a unanimous jury verdict. *Ramos v Louisiana*, 140 S Ct 1390; 206 L Ed 2d 583 (2020). To protect that right, the trial court must instruct the jury properly on the unanimity requirement. Const 1963, art 1, §§ 14, 20; MCR 6.410(B); *People v Cooks*, 446 Mich 503 (1994). Typically, the general instruction regarding jury unanimity is sufficient to protect the defendant's right. But a specific unanimity instruction, which explains that there must be unanimity as to which one of a number of acts was proven beyond a reasonable doubt, is required in some circumstances. *Cooks*, 446 Mich at 518-519.

A specific unanimity instruction must be given where "1) the alternative acts presented as evidence are conceptually distinct or there are distinct proofs regarding each alternative, or 2) other factors are present that create a genuine possibility of juror confusion or disagreement." *Id*.

In *People v Yarger*, 193 Mich App 532 (1992), the Court of Appeals held that reversible error occurred when "the jury was not instructed that it must unanimously agree on which acts were proven beyond a reasonable doubt." There, the defendant was charged with a single count of criminal sexual conduct and was convicted on the basis of testimony alleging multiple acts. The Court observed, "a possibility exists that, for example, six jurors were convinced that fellatio had occurred, but not intercourse, while the other six jurors held the opposite view." *Id*.

And in *People v Quinn*, 219 Mich App 571, 576 (1996), the Court of Appeals held that two conceptually distinct offenses had been improperly charged in a single count of receiving and concealing stolen property. In that case the defendant had attempted to sell a set of blueprints and a set of "setup sheets" for the manufacture of a machine. The defendant had attempted to sell the materials at the same time but had illegally obtained possession of each document at different

times. The *Quinn* Court held that the defendant had been deprived of his right to a unanimous jury verdict because it was possible that some jurors had voted to convict based upon the blueprints and others based upon the "setup sheets." *Id*. at 576-577.

More recently, in *People v Jordan*, the Court of Appeals found that a special unanimity instruction was appropriate where the defendant was charged with a single count of first-degree home invasion and the three underlying crimes (assault, larceny, and criminal sexual conduct) presented to establish the second element of the charge were based on different acts with different proofs. *People v Jordan*, unpublished per curiam opinion of the Court of Appeals, issued May 25, 2006 (Docket No 259436), attached as Appendix L.[7]

The instant case squarely implicates both prongs of the *Cooks* test. Here, the prosecutor charged Mr. Fischer with one count of home invasion first degree yet presented evidence of separate and distinct acts to satisfy the offense, particularly with respect to the first element of the offense—breaking or entering a home without permission.[8] T1, 78. First, the prosecutor presented evidence that Mr. Fischer entered Ms. Miner's home without permission using the

---

[7] In *Jordan*, the Court of Appeals determined that any error in failing to give a special unanimity instruction did not require reversal because of the jury's verdict on separate offenses. Appendix L. As Mr. Jordan was unanimously convicted of two of the underlying crimes, the Court could "clearly deduce from the jury's verdicts" that they unanimously agreed on the basis for the home invasion conviction. *Id.* at 3.

[8] To establish first-degree home invasion, the prosecution must prove beyond a reasonable doubt:

> (1) that the defendant either broke and entered a dwelling or entered a dwelling without permission,

> (2) that defendant either intended when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling committed a felony, larceny, or assault; and

> (3) while the defendant was entering, present in, or exiting the dwelling either the defendant was armed with a dangerous weapon or another person was lawfully present in the dwelling.

MCL 750.110a(2); *People v Wilder*, 485 Mich 35, 43 (2010).

10

garage door code, an assault occurred, and Ms. Miner was lawfully present. T1, 79. Second, the prosecutor presented evidence that Mr. Fischer broke into Ms. Miner's home through the front door later that same night and engaged in further assaultive behavior. T1, 80. Though the totality of the lower court record reflects that the home invasion charge was premised on the first entry, neither the charging documents nor the prosecution's presentation of the case at trial specified which acts could be considered in deciding whether the elements of first-degree home invasion were met. Indeed, in closing argument the prosecutor conflated the two entries and subsequent alleged assaults when addressing the elements of home invasion, going so far as to say "So, really, [Gary] kind of committed two home invasions that night" T2, 64.

Trial counsel did not object or request a specific unanimity instruction and the trial court instructed the jury only that its verdict must be unanimous, in accordance with CJ2s 3.11(3). T2, 108. It did not instruct the jury that it had to unanimously agree as to which act or acts constituted the charged offenses.

**A. The trial court violated Mr. Fischer's constitutionally guaranteed right to a unanimous verdict by failing to give a special unanimity instruction.**

Here, the two acts were materially distinct *and* there was reason to believe that jurors might be confused or disagree about the factual basis of Mr. Fischer's guilt. Therefore, the trial court was required to issue a specific jury instruction on unanimity to protect Mr. Fischer's constitutional right to a unanimous verdict. The trial court's failure to do was a clear legal error that deprived Mr. Fischer of his constitutional right to a unanimous verdict and thus both seriously affected his substantial rights and the fairness, integrity or public reputation of [the] judicial proceedings. *People v Cain*, 498 Mich 108, 116 (2015) citing *Carines*, 460 Mich at 763 (internal quotations omitted).

1. <u>The alternate acts presented as evidence were conceptually distinct and there were different proofs regarding each alternative.</u>

The critical inquiry for determining whether alternate acts are "materially distinct" is whether either party presented evidence that materially distinguished them. *Cooks*, 446 Mich at 513. In *Cooks*, the defendant was charged with one count of criminal sexual conduct, but testimony on three sexual penetrations was elicited at trial. *Id.* at 505. This Court found that the defendant's multiple acts were not materially distinct in that case because they were substantially similar in kind and were based on identical evidence—the testimony of the complaining witness. The defendant did not present a separate defense for the multiple acts, and the only question for the jury was the credibility of the complaining witness.

As the Court of Appeals recognized, this case is different. The underlying acts alleged to satisfy the first element of first-degree home invasion were not substantially similar in kind, they were supported by different proofs and the defense presented materially distinct defense theories. First, the prosecution's argument that Mr. Fischer entered Ms. Miner's dwelling without permission when he used her garage code was based entirely on Ms. Miner's testimony. T1, 110-112. Ms. Miner said she woke up to find Mr. Fischer climbing into bed with her and testified that he did not have permission to be in her home at that time. *Id.* From this evidence, the prosecutor argued that Mr. Fischer entered without permission and the first element of home invasion was satisfied. T2, 62-63.

Defense counsel maintained that this entry was with permission, T2, 74-75, and elicited information from Ms. Miner to rebut the prosecution's assertion otherwise. Upon cross-examination, Ms. Miner admitted to being romantically involved with Mr. Fischer at the time. T1, 166. She acknowledged that she had given Mr. Fischer her garage code and had let him use it to enter the home in lieu of a key. T1, 169. Further, that night the interior garage door was left

unlocked, which was consistent with how Ms. Miner would leave that door to allow Mr. Fischer

access. *Id.* Based on this evidence, a juror could have reasonably found that Mr. Fischer had

implicit permission to enter the home using the garage code as he had in the past. T1, 186.

The prosecution also presented evidence of a second unlawful entry premised on different

facts. After Ms. Miner and Mr. Fischer both exited the house and the first alleged home invasion

would have been complete, Ms. Miner testified that she ran back into her home and locked the

doors on Mr. Fischer. T1, 187. According to Ms. Miner, Mr. Fischer then broke into her house

by breaking the front door off its hinges. *Id.* At trial, the state presented photo evidence of the

door that showed it had been damaged by the time the police arrived at the scene. T1, 156;

People's Exhibits 9-11. The prosecution also played a 911 call that occurred after both Ms.

Miner and Mr. Fischer had re-entered the house, where Ms. Miner told Mr. Fischer to leave. T1,

143; People's Exhibit 22.

Defense counsel argued that Ms. Miner did not know how Mr. Fischer re-entered the

house and never said that it was through the front door, until Officer Vallance suggested it. T2,

81. He posited that the door could have been broken before the incident or afterward by a police

officer. T2, 82. Defense counsel further asserted that the prosecutor's exhibit does not actually

show that the door was off its hinges as alleged. T2, 82.

In closing argument the prosecutor argued that Mr. Fischer "kind of committed two home

invasions that night," T2, 64. And at sentencing he argued at sentencing that Offense Variable

("OV") 12 (contemporaneous felonious criminal acts) be scored to reflect a second "home

invasion." S, 6.[9]

---

[9] Where certain facts are used as a basis for the conviction of the offense at trial, it is improper to
score them under OV 12 as well. *People v Carter*, 503 Mich 221, 227 (2019).

In sum, because both home invasions relied on different proofs and were subject to different defenses they are materially different acts under the *Cooks* test.

2. <u>Other factors are present that create a genuine possibility of juror confusion or disagreement.</u>

A unanimity instruction was also required because it is likely that the jurors were confused or disagreed, especially given the way the prosecutor presented the evidence at trial and argued it in closing. As discussed above, the prosecution presented both acts extensively as evidence in favor of the first-degree home invasion charge and never clarified on which alleged instance the charge was based. Instead, the prosecutor referenced and relied on facts from both alleged home invasions from start to finish of the trial as evidence for one count in a way that was likely to confuse the jury.

During his opening statement, the prosecutor said:

> The evidence is going to show you that Ms. Miner never told him he could come into her home when she was in bed. And that certainly, by shutting and locking the door after she got her phone back, she made it clear that the defendant was not permitted to come into her home, thus how he had to kick the door in to get back inside.

T1, 81-82.

And in closing argument, the prosecutor openly acknowledged the potential for uncertainty in jurors' minds as to whether Mr. Fischer believed he had permission to enter Ms. Miner's home through the garage. After discussing the first "break-in," the prosecutor turned the jury's attention back to the second act, stating,

> He busted that door in to get back inside. So, if there was any question, any question in his mind of whether or not he was allowed to be in that house, I think her locking him out was probably a very clear signal, no, you are not allowed in here.

T2, 59.

14

The prosecutor's comments blending the evidence were some of the last things the jury heard before going back to deliberate, and they increased the risk that some jurors based their verdict on the first incident, and some based their verdict on the later incident. Given the evidence and the argument, is also possible that some jurors may have based their verdict on a combination of the two incidents.[10]

Moreover, the Felony Information that charged Mr. Fischer with first degree home invasion did not specify the underlying act, and so the jury had no further information from which they could have made their own conclusion about which act they were supposed to be unanimously agreeing on.[11] Felony Information and Amended Information, Lower Court Record.

The possibility of a split is particularly likely in this case because each alleged home invasion had stronger and weaker evidence for individual elements, and the prosecutor's presentation of all the evidence together allowed him to rely on the strongest elements of each. With respect to the first alleged home invasion, the prosecutor presented documentary and testimonial evidence that an assault occurred. In contrast, the evidence of an assault or intent to assault after the second alleged home invasion was weaker. Given Ms. Miner's testimony that she was on the phone with 911 when Mr. Fischer broke in through the front door and remained on the phone with 911 until the police arrived, a reasonable jury could have found that if a threat

---

[10] The chronological nature of first-degree home invasion requires that the unlawful entry occur before, or simultaneously with, the subsequent assault in the dwelling. MCL 750.110.

[11] The Information read: "That on or about September 18, 2018, in Howell, in Livingston County, the defendant did allegedly break and enter or did enter without permission a dwelling located at 1629 Weland Street and while present or exiting did commit an assault. While entering, present in, or exiting the dwelling, Heather Miner was lawfully present there in contrary to state law."

or fight occurred after Mr. Fischer reentered the home, it would have been captured on the 911. Yet, on the call, no threat or fight is audible. P x 22.[12]

Conversely, the evidence offered to prove the first element of home invasion, unlawful entry, was weaker in the first scenario where Mr. Fischer entered with the garage code provided by Ms. Miner, as opposed to the second alleged home invasion where the prosecutor presented evidence of breaking and entering.

Mr. Fischer was constitutionally entitled to a unanimous verdict, and the deprivation of this right affected the basic fairness of his criminal prosecution. For the reasons discussed in detail above, the error was clear and obvious. Finally, this error substantially affected Mr. Fischer's rights and the fairness, integrity or public reputation of [the] judicial proceedings. Because there were several distinct acts and proofs that could support a jury verdict, and a substantial possibility of juror confusion or disagreement as to which acts or proofs made Mr. Fischer guilty of home invasion, it is impossible to discern which acts Mr. Fischer was found guilty of. Where the error in jury instructions denied Mr. Fischer of his right to a unanimous verdict and a fair trial, he is entitled to a new trial. *Yarger*, 193 Mich App at 537.

**B. Trial counsel's failure to object to the prosecutor's remarks during closing argument and his failure to request a unanimity instruction fell below an objective standard of reasonableness and prejudiced Mr. Fischer.**

The prosecution charged Mr. Fischer with first-degree home under a theory that he entered without permission when he let himself in with the garage code. Then, at trial, it presented evidence of two, alleged, first-degree home invasions but never clarified for the jury which acts the charge was to be decided on. Finally, during closing argument, the prosecutor

---

[12] The prosecution said of the time after the alleged break-in, "By the time you hear the 911 call, the fight is pretty much over." T2, 88.

argued both sets of facts as evidence of the crime and stated that Mr. Fischer "kind of committed two home invasions that night." T2, 64.

Trial counsel never objected to this line of argument or countered it in his own closing argument. Nor did he request a special unanimity instruction to inform the jury of its duty to agree unanimously on the requisite underlying acts for the offense.

Trial counsel's failure to object to the prosecutor's repeated statements that either entry could satisfy the first element of first-degree home invasion constituted deficient performance under *Strickland*. Additionally, given the evidence and the prosecutor's argument, trial counsel's failure to request a specific instruction on unanimity also fell below an objective standard of reasonableness. *Id.* There could have been no strategic reason to allow the jury to consider two separate sets of acts in determining whether the elements of one count of home invasion first degree were met, particularly where Mr. Fischer had a persuasive argument that when he entered the home the first time, it was with Ms. Miner's implicit permission.

To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694. The *Strickland* Court explicitly rejected an outcome determinative test, i.e. that counsel's deficient conduct more likely than not altered the outcome in the case. *Id*. at 693. The Court reasoned that the outcome of a case which includes deficient conduct is less entitled to a presumption of accuracy and fairness. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

Whether or not a jury would have decided differently if appropriately instructed is necessarily a difficult question to determine given the black box nature of juries. However, given the fact that there were weaknesses in the prosecution's case for both alleged home invasions—

evidence that Mr. Fischer had implicit permission to enter in the first alleged home invasion, and

uncertainty as to whether an assault, intent to assault, or other qualifying crime occurred after the

second entry—there is a reasonable probability that if the jury had to agree on the underlying

acts, there never would have been a conviction at all. This is especially so where the record

indicates that the jury did not blindly credit Ms. Miner's account of the evening. Despite Ms.

Miner's testimony that Mr. Fischer forcefully took her phone and tried to prevent her from

calling the police, the jury acquitted Mr. Fischer of the interfering with a crime report charge. T2,

115, 121. The proper remedy is a new trial.

### C.  Errors in the Court of Appeals' Analysis

The Court of Appeals reversibly erred by concluding that—although the alternative acts

presented by the prosecution in support of the single charge of first degree home invasion were

materially distinct and the failure to provide a specific unanimity instruction amounted to plain

error—reversal is unnecessary because Mr. Fischer cannot show that the error effected his

substantial rights. Court of Appeals Opinion at 3, Appendix K. The court based its conclusion that

the unanimity error was not prejudicial on a misunderstanding of the general problem raised by

these events and the specific harm at issue. The court stated,

> based on the overall strength of the evidence supporting a conviction
> of first-degree home invasion for either the first entry or the second
> entry, Fischer has failed to show that the trial court's error in failing
> to provide a specific unanimity instruction affected his substantial
> rights. Nor can he show that it resulted in the conviction of an
> actually innocent defendant or that it seriously affected the fairness
> and integrity of the trial.

Court of Appeals Opinion at 4. The right question is not whether there is substantial evidence of

each incident. Rather, where the prosecutor presented alternative acts with materially distinct

proofs in support of a single conviction, Mr. Fischer's substantial rights are affected if there is a

possibility that the jury's verdict was not unanimous. See *United States v Ferris*, 719 F2d 1405, 1407 (CA 9, 1983) ("Unanimity, of course, means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the principal factual elements underlying a specified offense."). This harm analysis respects both the black box nature of jury deliberations and the nature of the error. The Court of Appeals harm analysis did not.

Furthermore, the court did not find overwhelming evidence that Mr. Fischer's initial entry using the garage door code was without permission. Opinion at 3. Instead, it noted the prosecution presented evidence that Mr. Fischer did not have unrestricted access to the home. Opinion at 3.[13] Still, the Court did not recognize the danger of a composite or "patchwork" verdict in this case. A "patchwork" verdict is not a unanimous verdict. *Ferris*, 719 F2d at 1407. Where there is a basis in the record from which a rational juror could have entertained reasonable doubt as to whether one or more of the acts actually occurred, the error cannot be harmless.

Finally, *Cooks* does not provide any guidance with respect to how a reviewing court is supposed to assess prejudice particularly where the error is unpreserved. Indeed, *Cooks* suggests that if a defendant can satisfy the *Cooks* test (i.e., establish that the prosecution presented alternate acts in support of a single charged offense and the acts in question are materially distinct or create a genuine possibility of juror confusion or disagreement), reversal is required. See also *Yarger*, 193 Mich App at 537 (finding reversal was required where it was "impossible to discern of which act of penetration defendant was found guilty."). Cf. *People v Stevens*, 498

---

[13] And while the court concluded that there was "overwhelming evidence that when [Mr. Fischer] entered the second time, he intended to commit an assault in the dwelling," Opinion at 4, trial counsel elicited testimony that Mr. Fischer left his car keys in the house and argued that he entered the second time to get his belongings, not to assault Ms. Miner. T2, 77-78.

Mich 162 (2015) (establishing that the appearance of judicial bias is a structural error where there is a reasonable likelihood that the judge's conduct improperly influenced the jury.").

Concerning the related ineffective assistance of counsel claim, the court correctly concluded that counsel performed deficiently in failing to request a specific unanimity instruction, but erred in finding that even if a specific unanimity instruction had been given, there is no reasonable probability of a different outcome. The court's tortured assessment of prejudice is illuminating. It begins with the second entry—an event it appears the prosecution did not intend to be the basis of the home invasion charge—and then jumps to the assault that occurred during the first entry:

> In this case, there is overwhelming evidence that the second entry was without permission. Again, the entry was preceded by Miner telling Fischer to leave—thereby revoking any implied permission he had to be in her home—and by Fischer physically assaulting Miner. The evidence that an assault occurred was established by Miner's testimony and photographic evidence of her injuries. And, the jury's unanimous decision to convict Fischer of aggravated assault shows that they credited her testimony as to what happened after she woke with Fischer trying to enter her bed. Given that evidence, no reasonable jury would conclude that the second entry was with permission. Further, considering that the jury unanimously determined that the first entry had resulted in Fischer committing an aggravated assault, there is no basis to conclude that the second entry was for a benign purpose.

Opinion at 4. In short, in analyzing *Strickland* prejudice the Court of Appeals did exactly what the jury likely did without a specific unanimity instruction—pick and choose the strongest elements from each alleged act to satisfy the elements of one count of first degree home invasion.

For the reasons discuss above, Mr. Fischer established the requisite prejudice to warrant reversal. To allow the Court of Appeals' decision to stand in this case would be manifestly unjust. MCR 7.302(B)(5).

**II.    The Court of Appeals erred by denying Mr. Fischer's remand motions in which he identified meritorious ineffective assistance of counsel claims to be raised on appeal for which factual development was necessary and where Mr. Fischer made the requisite offer of proof.**

*Introduction*

At trial, counsel attempted to attack Heather Miner's credibility and show that, despite her assertions to the contrary, she and Gary were more than just acquaintances who would "hook up" from time to time. T1, 167. Establishing the nature of their relationship was critical to his overall defense—that Gary had Heather's implicit permission to use the garage door code like a key and enter her house on the evening of September 17, 2018.

Yet, trial counsel was not prepared to prove that the relationship was more than transactional. And inexplicably, counsel entirely failed to inform the jury that Gary had spent the five days and nights leading up to the alleged home invasion staying at the home he allegedly broke into. Moreover, as a result of counsel's failure to communicate with his client before trial and his inaccurate legal advice given mid-trial, Gary was deprived of his right to testify in his own defense. The consequence of these many errors was that the jury never heard Gary's side of the story and Heather's account went virtually unchallenged.

There is at least a reasonable probability that but for trial counsel's errors, the outcome of the trial would have been different. Gary therefore asks that this Court remand for an evidentiary hearing so that he may develop the record in support of his claim and move for a new trial.

Mr. Fischer filed two motions to remand in the Court of Appeals, both of which were denied. See Appendices A and B. The brief in support of these motions made the following offer of proof.

*Offer of Proof in Support of Remand*

Gary was represented by Rolland Sizemore III in the trial court. Mr. Sizemore was appointed on October 2, 2018. District Court ROA, Lower Court Record. Mr. Sizemore's communication with Gary was minimal. Mr. Sizemore came to visit him once in the Livingston County Jail in October 2018, approximately one month after he was arrested, for about 15 or 20 minutes. Appendix A ¶ 20; see also Livingston County Jail Visitation Log for Gary Fischer, Appendix B (reflecting one visit from Rolland Sizemore III on 10/24/18).

In between this visit and the trial approximately five months later, Gary only spoke with his lawyer at court dates. Appendix A ¶ 21. Before trial, Mr. Sizemore never talked to Gary about their trial strategy or counseled Gary about the pros and cons of taking the stand. Appendix A ¶¶ 24-25.

While awaiting trial, Gary was interested in a plea offer to reduced charges. Appendix A ¶ 23. Though he maintained and continues to maintain that he had permission to enter Heather's home using the garage door code, he has never denied participating in the physical altercation or trying to run when confronted by Officer Fogo. Appendix A ¶ 23. See also PSIR, Defendant's Description of the Offense. When Gary talked to Mr. Sizemore about the possibility of a plea, Sizemore told him that there was no plea offer and that there would be no plea offer. Appendix A ¶ 22.

After a few attempts, appellate counsel was able to speak to Mr. Sizemore, See Appendix H, ¶¶ 3-5. Undersigned counsel asked whether there had been any offers as none were reflected on the record. Mr. Sizemore said the prosecutor did extend a plea offer, but because Gary had no interest in taking a plea, plea negotiations never went very far. Appendix H ¶ 5. Initially, Mr. Sizemore could not recall the specifics of the plea offer. Appendix H ¶ 5.

A few days later, after reviewing Gary's file, Mr. Sizemore had more information about the specifics of the offer. Appendix H ¶ 8. Sizemore said the state offered to reduce Count 1 from home invasion first to home invasion second and reduce Count 2 from interference with a crime report to attempt interference with a crime report. Appendix H ¶ 8. Counts 3 and 4 would remain unchanged. Appendix H ¶ 8. And the state agreed to drop the habitual fourth offender enhancement down to a habitual second. Appendix H ¶ 8. According to Sizemore, the plea offer "didn't do a whole lot." Appendix H ¶ 8.

Undersigned counsel also asked Mr. Sizemore why Gary chose not to testify: the record indicated that Mr. Sizemore initially intended to call Gary as a defense witness, but Gary ultimately chose not to take the stand. Appendix H ¶¶ 6, 9. At the second phone call, after Mr. Sizemore had an opportunity to review his file, he stated that Gary did not testify because the prosecution was going to ask him about his prior convictions for aggravated assault and ethnic intimidation. Appendix H ¶¶ 7, 9.

Gary wanted to testify in his own defense at trial. Appendix A ¶ 26. He decided not to in part because he believed that if he testified the prosecutor would be able to question him about his prior convictions for aggravated assault and ethnic intimidation. Appendix A ¶ 27. If he had known that evidence of those prior convictions would not have been admitted, he would have testified. Appendix A ¶ 28.  Had Gary testified he would have told the jury the following:

In the summer of 2018, Gary and Heather spoke almost every day and Gary visited Heather at her home often. Appendix A ¶ 1-2. Sometimes he would spend the night there. Appendix A ¶ 2. They also met at a hotel on a couple occasions. Appendix A ¶ 26. When Gary went to Heather's house, he always entered through the garage door. Appendix A ¶ 3. Heather gave him the code to the outer door and left the interior door unlocked for him. Appendix A ¶ 3.

From August 24 to September 12, 2018, Gary was in Alpena for a painting job. Appendix A ¶ 5. He is a housepainter by trade. Appendix A ¶ 5. While Gary was in Alpena, he and Heather talked frequently and planned to see each other the moment his job ended. Appendix A ¶ 6.

On September 12, 2018, Gary finished the job, packed up, and drove directly to Heather's house. Appendix A ¶ 7. Until his arrest six days later, he spent every night with Heather. Appendix A ¶ 7. While Heather was at work, Gary came and went from Heather's house, using the garage code each time. Appendix A ¶ 8.

Over the course of that week Gary picked up Heather's son from college and brought him back home for the weekend. Appendix A ¶ 10. He helped Heather negotiate the purchase price of a used car and then did some work on the car for her. Appendix A ¶ 9

And she helped him drive back a used car he purchased in Alpena. Appendix A ¶ 11. Gary also helped Heather try to recover a dog that Heather's ex-boyfriend took when the couple split up. Appendix A ¶¶ 12-13.

The day of the fight (September 17, 2018), Gary had a painting job in White Lake. Appendix A ¶ 14. When he finished, he tried once more to locate the dog, this time driving to the ex-boyfriend's house to see if he could find it. Appendix A ¶ 14. When Gary told Heather about it, Heather grew angry. Appendix A ¶ 15. Gary went to a nearby restaurant and had some drinks while the couple continued to talk via phone calls and texts. Appendix A ¶ 16.

Around 10:30 pm, Gary returned to Heather's house. Appendix A ¶ 18. As usual, he used the garage code and entered through the unlocked interior door. Appendix A ¶ 18. The pair argued some more, but Heather never asked him to leave, and a short time later the couple had sex. Appendix A ¶ 18.

24

After the sex, Heather did ask Gary to leave. Appendix A ¶ 18. But Gary told her he did not want to go. Appendix A ¶ 18. Once more the couple started fighting, this time leading to a physical fight. Appendix A ¶ 18.

Trial counsel did not investigate the contents of Gary's phone (much of which was synced to his Google account) or Facebook account which corroborate his account.

One source of data is Gary's **Google Location History**. Appendix D, Google Timeline Screenshots. Google Location History tracks where you go with the reporting device (e.g. phone, iPad), reports that data to Google, and creates a timeline that you can view. Google Timeline (accessed through the Maps application) illustrates where you travelled, when, and the way you travelled from place to place, like walking, biking, driving, or public transportation. Google Location History can be turned on or off. Location History for Gary's Android phone was turned "on" for most of the summer of 2018.[14]

Accordingly, Gary's (phone's) locations from June to September 10, 2018 were reported to Google and can be viewed through the Timeline application. Timeline reflects that Gary's was at Heather Miner's home—1621 Welland Street Howell, Michigan 48855—on the following dates: June 20, 26, and 27; July 4, 8, 12, 13, 15, 16, 28; August 8, 9, 16, 17, 18. On August 24, 2018, Timeline reflects that Gary drove from Howell to Alpena. Appendix D.

Heather and Gary's **Facebook messages from September 11-17, 2018** are attached as Appendix G.[15] On September 11, 2018, Gary was still in Alpena and Heather was home in

---

[14] Location History was shut off on September 10, 2018, when Gary inadvertently reset his phone. See Appendix D, Google Maps Timeline screenshot showing first day of no location data: September 11, 2018 and screenshots showing no Location History data for dates 9/12/18 – 9/17/18.

[15] Undersigned counsel downloaded Gary's Facebook account information using Facebook's "Download your Information" tool.

Howell. The two direct messaged[16] each other off and on all day discussing: a used car Gary had bought, what sort of car Heather should buy, the house Gary was painting, etc. Appendix G. They sent each other selfies, and called each other "babe," "lovie," and "hun." Appendix G.  On September 12, 2018, they again messaged off and on throughout the day. Appendix G. At 6:27 pm, after sending Heather pictures of his painting work, Gary sent Heather a picture of himself in front of his packed-up van, with the message "Annnnnd I'm out!" Appendix G. Heather responded, "Yesssss" "And shaven ☺☺☺. Appendix G.  Gary wrote "You [sic]" Twenty minutes later, Heather messaged, "Be safe". Gary replied, "Always. On the freeway to you , . ." Appendix G. About two hours later Gary sent Heather a video of himself driving and singing along to the song 867-5309/ Jenny. Appendix G.

After viewing the video, Heather wrote, "Did you really text me a selfie video of u car dancing. Ur gonna regret that I promise u". Appendix G. A few minutes later Gary messaged a photo of his dashboard showing his speedometer over 100 mph. Appendix G. Heather replied "Gary . . . Knock that shit off . . . I'll lock ur ass out." Appendix G. Gary responded, "Lol . . . just playin . . . cruise at 80. Speed limit is 75." Appendix G. At 9:20 that evening Gary messaged, "Less than an hour away." Heather responded, "Woohoo!!" Appendix G.

**Gary's photos from September 13 - 16, 2018** (taken with his cell phone and synced to his Google account) show Gary and Heather together every subsequent day until the day of the incident. Google Photos with Metadata, Appendix E. Details about when, where, and how a photo was taken are captured automatically by smartphones and digital cameras and stored as EXIF (Exchangeable Image File Format) data. In Appendix E, appellate counsel has captured the relevant photos along with their corresponding data. On the morning of September 13, Gary took

---

[16] A direct message (DM) is a message only visible to the sender and the recipient.

photos of himself in Heather's bed with her dog Kai. Appendix E. The following day, September 14, 2018, Gary took photos at Belle Isle with Heather's son Camden, as well as a picture of Heather standing outside her new car. Appendix E. On September 15, 2018, Gary took photos of Heather and her son driving Gary's new car—the used black Jaguar Gary bought while in Alpena, which Heather helped him drive home. Appendix E. These photos were taken in Heather's neighborhood. Appendix E. On September 16, 2018, Gary took photos of Heather driving in Howell with Kai in the car. Appendix E.

***Legal Standard***

An accused is entitled to the effective assistance of counsel under both the state and federal constitutions. US Const, Ams VI, XIV; *Strickland v Washington,* 466 US 668 (1984); Const 1963, art 1, § 20; *People v Pickens,* 446 Mich 298, 302-303 (1994). To prevail on an ineffective assistance of counsel claim, the defendant must establish that counsel's performance fell below an objective standard of reasonableness and the deficiency prejudiced the defense. *Strickland*, 466 US at 687-688; *People v Trakhtenberg*, 493 Mich 38, 51 (2012).

To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A defendant need not show that counsel's error more likely than not affected the outcome. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. A reasonable probability is simply a probability sufficient to undermine confidence in the outcome. *Id*. at 694.

The right to effective assistance of counsel extends to the plea bargaining stage. *Missouri v Frye*, 566 US 134, 143-144 (2012); *People v Douglas*, 496 Mich 557, 591-592 (2014). And

claims of ineffective assistance in the plea context are reviewed using the *Strickland* test. *Frye*, 566 US at 140.

**A. Trial counsel performed deficiently where he failed to investigate and failed to impeach Ms. Miner with evidence that she misrepresented the nature of her relationship with Mr. Fischer. Doing so would have diminished the reliability of her trial testimony and supported Mr. Fischer's version of events.**

The proper functioning of the adversarial process demands independent investigation and preparation by counsel. "[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." *Strickland*, 466 US at 680.

While the defense does not have to put on any case, and defense counsel can make strategic decisions in deciding what evidence to present, in order to be legitimate, the decision must be made after counsel has investigated. *Trakhtenberg*, 493 Mich at 51-52, citing *Strickland*, 466 US at 690-691. As the Supreme Court said in *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. "In any ineffectiveness case," therefore, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances," *id*., taking into account "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v Smith*, 539 US 510, 527 (2003).

A basic investigation in this case entailed reviewing Gary's phone and social media accounts. The information in the offer of proof, *supra*, was readily available to trial counsel as

Gary's cell phone was in the property room of the Livingston County Jail and much of the information on it could also be accessed remotely by signing into Gary's Google and Facebook accounts. With this information, counsel could have provided the jury an accurate picture of Heather and Gary's relationship during the summer of 2018.

Furthermore, as a direct result of trial counsel's failure to investigate, he failed to impeach Heather Miner with available and probative evidence that would have severely undermined her credibility and the prosecution's theory of the case.

The failure to impeach a key prosecution witness may amount to reversible error. In *Trakhtenberg*, this Court held that defense counsel was ineffective for several reasons including her failure to impeach the complainant with prior inconsistent statements. *Trakhtenberg*, 493 Mich at 54. Likewise, in *People v Armstrong*, 490 Mich 281, 283 (2011), this Court held that trial counsel's failure to introduce evidence, which would have undermined the credibility of the complainant, prejudiced the defendant and the Court remanded the case for a new trial based on ineffective assistance of counsel.

At trial, Heather downplayed her relationship with Gary, stating, "We were never in a relationship. We would hook up, for lack of a better term." T1, 167. She testified that she had seen him "maybe seven to ten" times between June (when her ex moved out) and the incident on September 17th. T1, 93. According to Heather, three of those times were when Gary was "doing work" for her in her house. T1, 94.

Heather also suggested that Gary came over uninvited on multiple occasions, stating, "there were times that Gary would come over uninvited and I would have to make him leave, but there were other times that I invited Gary to come over. T1, 94; T1, 170. Significantly, Heather testified that it was unusual to wake up and see Gary in her house. T1, 112.

In sum, Heather represented Gary as someone she hardly knew and with whom she had a purely sexual relationship. And though trial counsel probed on cross-examination, Heather did not waver. When asked whether Gary had spent time with her two sons, Heather replied, "They've been in the same vicinity as me and Gary." T1, 169. And when pressed further, Heather asserted, ". . . we've been in the same house . . . but we never did anything together." T1, 169. Heather even denied that saying "I love you" suggested more of a "boyfriend/girlfriend" type of relationship:

> Q Okay. But you, you said that you guys told each other you
> loved each other.
> A Yeah.
> Q So there was some sort of emotion involved, right?
> A Yeah, but that doesn't necessarily make a relationship.
> Q It doesn't?
> A I love a lot of people. No.
> Q Oh.
> A I love a lot of people. (T1, 167).

Had counsel conducted an adequate investigation he would have been able to confront Heather with specifics and introduce evidence that called into question her portrayal of Gary as nothing more than a "casual hook-up". T1, 170. First, Gary's phone's Location History reflects that he was at Heather Miner's home—1621 Welland Street Howell, Michigan 48855—on fifteen dates between June 20 and August 18, 2018. Appendix D. For several of these dates the location data shows that Gary stayed the night. Appendix D. Further, contrary to Heather's testimony that Gary repeatedly came over uninvited and was then asked to leave, the location history shows only one visit (13 minutes on July 8, 2018) consistent with this scenario. Appendix C. All other visits to Heather's home were lengthy. Appendix D.

Moreover, Gary's Facebook messages and photos show that Gary and Heather were together on September 12, 13, 14, 15, 16, and 17 during which time Gary stayed at Heather's

home. Appendix E. There are photos which show Gary in Heather's bed with her dog Kai. Appendix E. As well as photos of Gary and Heather's son Camden together on Belle Isle after Gary picked him from college to bring him back to his mother's home in Howell for the weekend. Appendix E; see also Appendix F. Other pictures (taken by Gary the following day) show Camden and Heather driving the used car Gary bought while in Alpena. Appendix E.

The location history and photo evidence confirm that Heather and Gary saw each other far more than "seven to ten" times over the course of the summer of 2018.[17] Indeed, Gary spent every day and night with Heather for the five days and nights leading up to the incident. Further, Gary's photographs, taken days before the incident directly belie Heather's testimony that Gary was nothing more than an occasional visitor to her home who did not even know her children.

That trial counsel never elicited this information or presented evidence to this effect is objectively unreasonable. Particularly where Heather claimed that it was unusual to wake up and see Gary in her house. T1, 112.

In addition to the photos and location history, Gary and Heather's Facebook direct messages show two people who communicated regularly and were involved in the routine aspects of each other's lives. Appendix G. Heather sought Gary's advice while shopping for a used car, and Gary shared his painting work with Heather. Appendix G. Their messages also show that a part of the relationship was ongoing banter. For example, when Gary sent Heather a photo of his speedometer while driving, Heather chided, "Gary . . knock that shit off . . . I'll lock ur ass out," and Gary responded, "Lol…just playin…cruise at 80. Speed limit is 75". Appendix

---

[17] Notably, this evidence only captures the times Gary and Heather saw each other at Heather's home. As Heather acknowledged at trial, she and Gary would occasionally meet on their lunchbreaks. T1, 169-170. And as Gary explained, he and Heather also spent time together up at places other than her home and spent the night at a hotel together on a couple occasions. Appendix A ¶ 2.

G. Though Gary does not recall Heather ever telling him not to come over on the evening of September 17, 2018 (Appendix A ¶ 17), given this sort of repartee, it is possible that Heather communicated something to that effect and Gary did not realize it was not part of the banter—especially since he found the garage code unchanged and the inside door unlocked.

When a reviewing court assesses the reasonableness of counsel's actions, it owes deference to counsel's informed strategic choices. In the present case, however, such deference does not come into play. There is no acceptable justification for trial counsel's failure to conduct a basic independent investigation into readily available evidence. Trial counsel's performance was deficient, and his representation of Gary "fell below an objective standard of reasonableness." *Strickland*, 466 US at 688.

### B. Trial counsel performed deficiently where he provided belated and inaccurate legal advice that deprived Mr. Fischer of his fundamental right to testify in his defense.

At no point prior to the commencement of trial, did trial counsel advise Gary about the pros and cons of taking the stand or discuss with him the contents of his potential testimony. Appendix A ¶ 25. Trial counsel had not been to visit Gary in the County Jail since October 2018, before Gary was even arraigned on the Information in circuit court. Appendix A ¶ 20; Appendix B (Livingston County Jail Log).[18] The only communication Gary had with his attorney between that visit and trial which commenced on March 4, 2019, was at his two pretrial court appearances (12/7/18 and 3/1/19). At no point did trial counsel ever talk to Gary about his trial strategy. Appendix A ¶ 24.

Nevertheless, Gary wanted to testify in his own defense and planned to do so. Appendix A ¶ 26; see also T2, 51. Prior to closing arguments, outside the presence of the jury, trial counsel

---

[18] The prosecution filed the Felony Information on November 1, 2018.

questioned Gary as to whether he wished to testify in his defense. T2, 51-52. The record reflects

that Gary made a last minute decision not to testify after talking to trial counsel on the first day

of trial and then consulting with family and friends that evening. T2, 50-52. Included in this

colloquy was Gary's understanding that he had an absolute right to testify. T2, 50.

Gary maintains that he elected not to testify largely because he believed that his

testimony would open the door to admission of his prior convictions for aggravated assault and

ethnic intimidation from 1997. Appendix A ¶¶ 27-28. Likewise, when asked why Gary

ultimately elected not to testify, trial counsel stated that Gary did not testify because the

prosecution was going to ask him about his prior convictions for aggravated assault and ethnic

intimidations. Appendix H ¶ 9. However, these prior convictions could not have been used as

impeachment.

Under MRE 609, evidence of a witness's prior crimes for the purposes of attacking

credibility is generally inadmissible unless the evidence has been elicited from the witness or

established by public record during cross-examination, and

(1) the crime contained an element of dishonesty or false statement, or

(2) the crime contained an element of theft, and

(A) the crime was punishable by imprisonment in excess of one year or

death under the law under which the witness was convicted, and

(B) the court determines that the evidence has significant probative

value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court

further determines that the probative value of the evidence outweighs its prejudicial effect. MRE

609(a).

Neither aggravated assault nor ethnic intimidation deal with theft or dishonesty or making a false statement. MRE 609(a). Thus, neither conviction could be used to attack Gary's credibility. MRE 609(a).

Trial counsel has a duty to make sure that his client's decision regarding whether to testify in his own defense was an informed one. *Strickland*, 466 US at 688 (trial counsel has an obligation to discuss potential strategies with his client); see also *Harrison v Motley,* 478 F3d 750, 756 (CA 6 2007). And this duty requires counsel to do more than merely inform the client of his right to testify and his option to waive that right. *Rayborn v United States*, 489 F Appx 871, 880 (CA 6 2012). "Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify." *Id*., citing *Cannon v Mullin,* 383 F3d 1152, 1171 (CA 10 2004).

If counsel indeed advised Gary that his testimony would open the door to admission of his prior assaultive convictions, then this advice constituted deficient performance that deprived Mr. Fischer of his fundamental right to testify and present a defense. *Padilla v Kentucky*, 559 US 356, 369 (2010); *Maples v Stegall*, 340 F3d 433, 439 (CA 6 2003) (erroneous legal advice amounts to deficient performance).

### C. These errors, individually and collectively, undermine the reliability of Mr. Fischer's guilty verdict.

Trial counsel's failure to investigate, to substantiate Gary's only defense, and to impeach the complainant, as well as his failure properly advise Gary regarding the risks and benefits of testifying in his own defense constitute deficient performance. But for these errors, it is reasonably likely that the result of Gary's trial would have been different.

This case was a he said/she said where, as a result of counsel's deficient performance, the jury never got to hear Gary's side of the story and Heather's account went virtually

34

unchallenged. Heather denied being in a relationship with Gary and told the jury she did not want him around the night of the fight. T1, 103. Heather said when Gary showed up in her bed that night, she immediately told him to leave. T1, 111, 112. Based on Heather's testimony, the state argued that Gary entered Heather's home without permission.

Investigating and presenting evidence of Gary and Heather's relationship was critical for two reasons. Foremost, it was necessary for the jury to appreciate what took place and whether Gary reasonably believed he had permission to enter the home. Heather painted a picture of waking up in bed to find that a "casual hookup" had let himself into her house and tried to crawl into bed with her. That picture changes when you learn that Gary woke up in Heather's bed that very morning, and the morning before that, and the morning before that. And the puppy Heather characterized as whimpering when he saw Gary in her room (T1, 110-111) was the same dog curled up in bed with Gary a few mornings earlier (see 9/13/18 photos Appendix E), and referenced in Gary and Heather's conversations about what car Heather should by ("[A Dart is] very small inside…think of Kai and any kind of road trips …) Appendix G. Had counsel presented evidence of Gary and Heather's relationship and demonstrated that Gary had been staying at Heather's home for several days in a row prior to this incident, the jury would have likely found Gary's belief that he had permission to be understandable and concluded that it is much more likely that what upset Heather was what happened after Gary got there—not that entered the home in the first place.

Second, trial counsel's failure to investigate prejudiced Gary because, as a consequence, counsel failed to impeach Heather with evidence that she lied about the nature of her relationship with Gary. As the Michigan Supreme Court has recognized repeatedly, impeachment evidence is important. See, e.g., *People v Grissom*, 492 Mich 296 (2012); *People v Trakhtenberg*, 493 Mich

38 (2012); *People v Armstrong*, 490 Mich 281 (2011); *People v Pippen*, 500 Mich 937 (2017). And where impeachment evidence would have provided proof that a witness lied to the jury regarding his or her actions with regard to that very case, the fact that the witness' credibility had previously been attacked does not preclude a finding of prejudice. See *Armstrong*, 490 Mich at 292. On the contrary, there is a greater possibility that the additional attack "would have tipped the scales in favor of finding a reasonable doubt about defendant's guilt." *Id*.

Heather's testimony was central to the prosecutor's case for first degree home invasion and the record indicates that the jury did not blindly credit Heather's account of the evening. Despite Heather's testimony that Gary forcefully took her phone and tried to prevent her from calling the police, the jury acquitted Gary of the interfering with a crime report charge. T2, 115, 121. Had the jury learned that Gary spent the entire week before the incident at Heather's house with her and her children it is reasonably likely that they would have concluded that she was wholly incredible.

Here, as in *Armstrong* and *Trakhtenberg*, the impeachment evidence would have tipped the scales. In this credibility contest, had the jury discredited Heather's testimony that Gary did not have permission to come over to the house that evening, it would have affected the outcome of the trial. As such, counsel's failure to investigate and present the evidence discussed above prejudiced Gary.

Likewise, there is a reasonable probability that the outcome would have been different had counsel not misadvised Gary about the risks and benefits of testifying in his own defense. Gary's affidavit establishes what he would have said on the stand. See Appendix A ¶¶ 1-18. Gary would have told the jury about his relationship with Heather. He would have testified that for nearly a week before the fight, he stayed with Heather, coming and going as he pleased,

always using the garage code. On the night of the fight, like always, Gary used the garage code to enter the house and the couple briefly reconciled. All told, Gary's testimony undermines confidence in the jury's guilty verdict on home invasion first degree.

These errors, individually and collectively, undermine the reliability of Gary's guilty verdict. *See, e.g., Strickland,* 466 US at 690 (requiring consideration of counsel's actions "in light of all of the circumstances"; *Id*. at 695-96 (noting that the question to be answered in cases such as this is whether, "absent the *errors,* the factfinder would have had a reasonable doubt respecting guilt" (emphasis added)).[19] Remand is necessary to develop the record and to allow Gary to move for a new trial.

### D. Mr. Fischer's state and constitutional rights to effective assistance of counsel were violated when trial counsel received a plea offer but never communicated that offer to Mr. Fischer.

In addition to the failures discussed above, defense counsel failed to provide effective assistance in this case when he did not communicate a plea offer to Mr. Fischer. No plea offers were placed on the record in this case. And Gary was never made aware of any plea offers extended by the prosecution. Appendix A ¶ 9. On the contrary, it was Gary's understanding that the prosecution had declined to engage in plea bargaining entirely. Appendix A ¶ 9. Nevertheless, trial counsel informed appellate counsel that the prosecution *did* extend a plea offer. Appendix H ¶¶ 5, 8. According to trial counsel, the terms of this offer were as follows:

- Reduce Count 1 from home invasion first degree to home invasion second degree. Appendix H ¶ 8.

---

[19] *Williams v Taylor,* 529 US 362, 395-96, 398-99 (2000) (considering cumulatively multiple errors of counsel in finding prejudice in light of the "entire ... record, viewed as a whole"); *Kyles v Whitley,* 514 US 419, 434, 436 (1995) (considering cumulative effect of errors in another context in which the *Strickland* standard for prejudice (though not the *Strickland* test for ineffective assistance) had been applied); *Mackey v Russell*, 148 Fed Appx 355, 368–69 (CA 6, 2005); *People v LeBlanc,*465 Mich 575, 591 (2002) ("[T]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not.").

- Reduce Count 2 from interference with a crime report to attempt interference with a crime report. Appendix H ¶ 8.

- Counts 3 and 4 would remain unchanged. Appendix H ¶ 8.

- The habitual fourth offender enhancement ("HO4") would be reduced to a habitual second ("HO2"). Appendix H ¶ 8.

This offer greatly reduced Gary's sentencing exposure under the guidelines.[20] Whether the offer "didn't do a whole lot," as trial counsel opined, Appendix H ¶ 8, or not, Gary had a right to hear it. Had he had an opportunity to consider the offer, there is a reasonable probability that he would have accepted it. Appendix A ¶ 23.

**Deficient Performance**

Counsel's duty in the plea context includes not only an obligation to promptly communicate any plea officers, but also a duty to explain those offers to the client. *Frye¸* 566 US at 145. If counsel fails to communicate an offer and it lapses, then "counsel did not render the effective assistance the Constitution requires." *Id.*

Here, trial counsel received a plea offer. In all, the offer meant convictions to lesser offenses and exposed Gary to less prison time. But trial counsel never told Gary about the offer. As a result, trial counsel performed deficiently, thereby satisfying the first *Strickland* prong.

**Prejudice**

To show prejudice, Gary must demonstrate a "reasonable probability" that he would have accepted the plea and "the plea would have been entered without the prosecution cancelling it or the trial court refusing to accept it . . ." *Frye*, 566 US at 147. And the plea offer must benefit Gary in the form of a lesser charge or less prison time. *Id.*

---

[20] Especially as Mr. Fischer understood his exposure at the time of sentencing. Trial counsel did not object to the prosecution's untimely amendment of the habitual offender enhancement and Mr. Fischer did not know until recently that he should not have been sentenced as a fourth habitual offender.

There is nothing in the record about this offer, and no information about when it was extended, or when it would have expired.[21] When appellate counsel sought to obtain additional information from trial counsel, trial counsel failed to respond. Appendix H ¶¶ 10-11.

There is also nothing in the record to suggest that there was a material change in the strength of the prosecution's case at any point prior to trial or any reason to believe that the prosecution would have cancelled or refused to accept the offer they extended.

Next, the plea offer would have benefitted Gary in the form of lesser charges and less prison time. The sentencing offense, home invasion first degree, is a Class B offense with a statutory maximum of twenty years in prison. MCL 750.110(a)(2). As a fourth habitual offender the maximum becomes life or any term of years. MCL 769.12. Home invasion second degree is a Class C offense with a statutory maximum of fifteen years in prison. MCL 750.110(a)(3). When sentenced as a second habitual offender, that maximum becomes 22.5 years.[22] MCL 769.10. In addition to applying the guidelines on the "C" grid rather than the "B," the upper limit of recommended range on that grid would have been lower. The second habitual enhancement increases the upper limit of the appropriate cell by 25%, where the fourth habitual enhancement increases the upper limit of the appropriate cell by 100%. See 2019 Sentencing Guidelines Manual, General Information and Instructions.

At sentencing, the guidelines were calculated at 99 to 320 months. S, 6. Plotting the PRVs and OVs as they were scored at sentencing (PRV Level E; OV Level VI) on the Class C

---

[21] Presumably, the offer was extended at some point after December 11, 2018, when the state amended the habitual offender notice to increase the enhancement level from second to fourth. See Lower Court Record, Amended Information.

[22] Making 15 years the highest possible minimum sentence pursuant to the *Tanner* two-thirds rule. *People v Tanner,* 387 Mich 683 (1972).

grid as a second habitual offender results in a considerably lower recommended range of 58 to 142 months (approximately 4.8 to 11.8 years). MCL 777.64.

Finally, there is a reasonable probability that Gary would have accepted the plea had he known about it. Gary was interested in a plea to reduced charges and he never disputed his participation in the fight or his attempt to run from the police. Appendix A ¶ 23. True, he maintains he had permission to enter the house through the garage door, and second-degree home invasion requires entry without permission. *People v Crews*, 299 Mich App 381, 393 (2013); see also MCL 750.110a(3). But at this stage, Gary's contention that he entered with permission does not close off a finding of prejudice. See *Byrd v Skipper*, 940 F3d 248, 258-259 (CA 6 2019) (finding a reasonable probability that defendant would have accepted a plea deal even though defendant insisted on his innocence and went to trial hoping to secure an acquittal).

Additionally, Gary asserts that but for counsel's unprofessional errors, the outcome of the plea process would have been different, where there is a reasonable probability that competent counsel would have negotiated a more favorable plea. *See,* e.g., *Rodriguez-Penton v United States*, 905 F3d 481, 489-490 (CA 6 2018) (holding that a defendant could establish *Strickland* prejudice by establishing that he would have negotiated a more favorable plea deal and "with proper advice, the outcome of those negotiations would have been different.").[23]

A proper prejudice analysis must factor in all the ways trial counsel's deficiencies failed his or her client. *Cf. Byrd,* 940 F3d at 258-259. When a plea is offered, counsel needs to grasp all potential ramifications—good and bad. *Lafler v Cooper*, 556 US 156, 166-167 (2012); *see also Rodriguez-Penton*, 905 F3d at 489. Ineffective assistance, especially a "wholesale

---

[23] See *Lee v United States*, 137 S Ct 1958, 1966 n 2 (2017) (leaving open the question of whether a defendant can show prejudice by demonstrating that he would have bargained for a plea that did not result in certain deportation).

misunderstanding of the law," can short-circuit or even preclude plea negotiations, either one cause for a finding of prejudice. *See Byrd*, 940 F3d at 260. That is because a circumscribed plea negotiation costs the defendant a chance at "benefits he would have received in the ordinary course but for counsel's ineffective assistance." *Byrd,* 940 F3d at 260 (quoting *Lafler*, 556 US at 169).

Here, unbeknownst to trial counsel, a portion of the plea offer was illusory. The offer to reduce the habitual enhancement from fourth to second conferred no benefit because, under the circumstances, Gary should never have been a fourth habitual offender. The amended habitual offender notice, which increased Gary's enhancement level from second to fourth, was filed long after the 21-day statutory period and was thus improper.[24] *People v Ellis*, 224 Mich App 752, 755 (1997).

It appears that trial counsel was unfamiliar with the governing law, because he did not object at the time of the amendment or at sentencing.

Trial counsel's failure to grasp the ramifications of the offer left him unable to engage in any meaningful negotiations. Put another way, trial counsel's "wholesale misunderstanding of the law" cost Gary a chance at "benefits he would have received in the ordinary course but for counsel's ineffective assistance." *Byrd*, 940 F3d at 260.

Considering counsel's compete failure to communicate a favorable offer as well as Gary's interest in a plea deal had it been offered, Gary has established deficient performance and a reasonable probability that but for counsel's unprofessional errors, the outcome of the plea process would have been different. *Hill v Lockhart*, 474 US 52, 57 (1985).

---

[24] See Lower Court Record, Information and Amended Information.

### E.  Conclusion and Remedy

As outlined above, Mr. Fischer's motion to remand and brief in support identified issues sought to be reviewed on appeal which should initially be decided by the trial judge and for which a factual record must be developed. The Court of Appeals erred by denying the remand motions. MCR 7.211(C); see e.g. *People v Givens*, 428 Mich 891 (1987). Mr. Fischer respectfully asks that this Court vacate the judgment of the Court of Appeals and the Court of Appeals orders denying his motion to remand and to remand this case for an evidentiary hearing on his claims regarding ineffective assistance of counsel.

## Summary and Relief

**WHEREFORE**, for the foregoing reasons, Gary Thomas Fischer asks that this

Honorable Court grant leave to appeal or remand for an evidentiary hearing and to allow him to

move for a new trial and/or specific performance of the plea offer.


Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Katherine L. Marcuz
BY:_____

**Katherine L. Marcuz (P76625)**
Managing Attorney
3031 W. Grand Blvd., Ste. 450
Detroit, Michigan  48202
(313) 256-9833


Dated:  February 11, 2021